## IN THE UNITED STATES DISTRICT COURT FOR

## THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ANNE M. ROWAN, | ) | |
| | ) | |
| Plaintiff, | ) | C. A. No.  06-258-GMS |
| | ) | |
| v. | ) | |
| | ) | |
| JAMES T. CHANDLER & SON, INC., | ) | JURY TRIAL DEMANDED |
| FUNERAL SERVICES OF DELAWARE | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' OPENING BRIEF IN SUPPORT OF
## THEIR MOTION FOR SUMMARY JUDGMENT

FERRY, JOSEPH & PEARCE, P.A.

YOUNG, CONAWAY, STARGATT & TAYLOR, LLP

/s/Robert K. Pearce
Robert K. Pearce, Esquire (No. 191)
Thomas R. Riggs, Esquire (No. 4631)
824 North Market Street, Suite 904
P. O. Box 1351
Wilmington, DE 19899
Telephone: (302) 575-1555
Facsimile: (302) 575-1714
rpearce@ferryjoseph.com
Co-counsel for Defendants

/s/Teresa A. Cheek
Teresa A. Cheek, Esquire (No. 2657)
Margaret M. DiBianca, Esquire (No. 4539)
The Brandywine Building, 17th Floor
1000 West Street, P. O. Box 391
Wilmington, DE 19899-0391
Telephone: (302) 571-6676
Facsimile: (302) 576-3286
tcheek@ycst.com
Co-counsel for Defendants

Dated: May 14, 2007

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

NATURE AND STAGE OF THE PROCEEDINGS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

I.      Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

        A.      Summary Judgment Standard . . . . . . . . . . . . . . . . . . . . . . . . . . 16

II.     JTCSI is entitled to judgment in its favor on Counts I and II because
        it was not Plaintiff's employer at the time of the alleged discrimination. . . . . . 16

III.    JTCSI is not covered by Title VII because it had fewer than 15
        employees at the time of the alleged discrimination. . . . . . . . . . . . . . . . . . 17

IV.     Plaintiff has failed to state a claim for discrimination under state law
        because she has elected to pursue here federal law remedy.. . . . . . . . . . . . . . 18

V.      Plaintiff cannot prove her discrimination claim... . . . . . . . . . . . . . . . . . . 20

        A.      Analytical Framework . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

        B.      FSD Terminated Plaintiff's Employment For Legitimate
                Business Reasons. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

        C.      There Is Insufficient Evidence Of Pretext For A Reasonable
                Jury To Reach A Verdict In Plaintiff's Favor.. . . . . . . . . . . . . . . . 24

VI.     Defendants are entitled to summary judgment on Count III because
        they relied upon the advice of their counsel... . . . . . . . . . . . . . . . . . . . 27

VII.    Defendants are entitled to summary judgment on Count IV.... . . . . . . . . . . . . . 29

        A.      Count IV of the Complaint is barred by Delaware's Workers'

Compensation Act. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

    B.    Plaintiff's claim for false imprisonment should be dismissed since her
           alleged detainment was de minimis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

## TABLE OF AUTHORITIES

**Cases**:

*Accord, Texas Dep't of Comm. Affairs v. Burdine*, 450 U.S. 248 (1981)  . . . . . . . . . . . . . . . . . . 20

*ALA, Inc. v. CCAIR, Inc.*, 29 F.3d 855 (3d Cir. 1994)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Bauernfeind v. Village Inn Pancake House*, 21 FEP 1003 (D. Colo. 1979)  . . . . . . . . . . . . . . . 23

*Baxter v. Vigo County School Corp.*, 26 F.3d 728 (7th Cir. 1994)  . . . . . . . . . . . . . . . . . . . . . . 18

*Birkbeck v. Marvel Lighting Corp.*, 30 F.3d 507 (4th Cir. 1994)  . . . . . . . . . . . . . . . . . . . . . . . 22

*Brodsky v. Hercules, Inc.*, 966 F. Supp. 1337 (D. Del. 1977)  . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Brown v. Cluley*, 179 A.2d 93 (Del.Super.1962)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Carson v. Bethlehem Steel Corp.*, 82 F.3d 157 (7th Cir. 1996)  . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Dockham v. Miller*, 1997 WL 817873, *2 (Del.Super.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Doyle v. United States Sec'y of Labor*, 285 F.3d 242 (3d Cir. 2002)  . . . . . . . . . . . . . . . . . . . . . 20

*EEOC v. Metal Serv. Co.*, 892 F.2d 341 (3d Cir. 1990)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509 (3d Cir. 1992)  . . . . . . . . . . . . . . . 22

*Glanzman v. Metro Mgmt. Corp.*, 391 F.3d 506 (3d Cir. 2004)  . . . . . . . . . . . . . . . . . . . . . . . . 21

*Greene v. Associated Air Freight, Inc.*, 23 Fair Empl. Prac. Cas. (BNA)
544 (E.D. Ky. 1980)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Harrison v. Figueroa*, 1985 WL 552279, at *2 (Del.Super.)  . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*James T. Chandler & Son v. Rowan*, Del.Ch., C. A. No. 1056-N, Strine, V.C.
(August 25, 2005)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14-15

*Johns v. Nestucca Rural Fire Protection Dist.*, 2007 WL 429111 (D.Or.)  . . . . . . . . . . . . . . . 34

*Jones v. School Dist. of Philadelphia*, 198 F.3d 403 (3d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . 20

*Joyner v. School District of Philadelphia*, 313 F.Supp.2d 495 (E.D.Pa. 2004 . . . . . . . . . . . . . 33

*Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101 (3d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . 22

*Kelly v. Drexel Univ.*, 94 F.3d 102 (3d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Konstantopoulos v. Westvaco Corp.*, 690 A.2d 936 (Del. 1996) . . . . . . . . . . . . . . . . . . . . . . . . 31

*Kowalski v. L&F Prods.*, 82 F.3d 1283 (3d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Lewis v. Ford Motor Co.*, 17 FEP 933 (E.D. Mich. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Lynch v. Mellon Bank of Delaware*, 1992 WL 51880 (Del.Super.) . . . . . . . . . . . . . . . . . . . . . . 32

*Marzano v. Computer Science Corp. Inc.*, 91 F.3d 497 (3d Cir. 1996) . . . . . . . . . . . . . . . . . . 16

*McDonnell-Douglas Corporation v. Green*, 411 U.S. 792 (1973) . . . . . . . . . . . . . . . . . . . . 20,21

*NLRB v. Deena Artware, Inc.*, 361 U.S. 398 (1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16-17

*Proud v. Stone*, 945 F.2d 796 (4th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 141 (2000) . . . . . . . . . . . . . . . . . . . . . . 21

*Sadler v. New Castle County*, 524 A.2d 18, 25 (Del.Super. 1987) . . . . . . . . . . . . . . . . . . . . . . 34

*Schoch v. First Fidelity Bancorporation*, 912 F.2d 654 (3d Cir. 1990) . . . . . . . . . . . . . . . . . . 16

*Shipley v. B & F Towing Co.*, 2006 WL 1652787 (D.Del.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Shuster v. Derocili*, 775 A.2d 1029 (Del. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Waldron v. SL Indus., Inc.*, 56 F.3d 491 (3d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Williams v. Borough of West Chester*, 891 F.2d 458 (3d Cir. 1989) . . . . . . . . . . . . . . . . . . . . 16

*Williams v. Food Lion, Inc.*, 446 S.E.2d 221, 223 (Ga.App.1994) . . . . . . . . . . . . . . . . . . . . . . 34

**Statutes:**

19 *Del.C.* § 710 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17-18

19 *Del. C.* § 714 ........................................................ 19

19 *Del. C.* § 715 ........................................................ 19

19 *Del.C.* § 2301 *et. seq.* ............................................. 30-31

42 U.S.C. § 2000 ........................................................ 17,20

**Federal Rules:**

Federal Rule of Civil Procedure 12(b)(6) ................................... 18

Federal Rule of Civil Procedure 56(c) ..................................... 16

**Legislative Materials:**

Delaware Bill Summary, 2004 Reg. Sess. S.B. 154 17 ......................... 18

## NATURE AND STAGE OF THE PROCEEDINGS

On January 5, 2005, Plaintiff Ann M. Rowan was terminated from her position with Funeral Services of Delaware, LLC ("FSD"). Shortly thereafter, Plaintiff began working for a major competitor of FSD, McCrery Funeral Homes ("McCrery"). On January 27, 2005, Defendant James T. Chandler & Son, Inc. ("JTCSI") filed a complaint and moved for a temporary restraining order in the Chancery Court of the State of Delaware, New Castle County, to preclude Plaintiff from working for McCrery. After Plaintiff filed an answer to the complaint, the complaint was amended to name FSD as an additional plaintiff. JTCSI and FSD subsequently agreed to dismiss the litigation with prejudice, but before the court entered an order of dismissal, it awarded Rule 11 sanctions against JTCSI and FSD. Plaintiff subsequently brought the instant action, alleging gender discrimination in violation of federal and Delaware state law, malicious prosecution, and false imprisonment. This is the opening brief in support of Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56(c).

1

## SUMMARY OF ARGUMENT

I.    JTCSI is entitled to judgment in its favor on Counts I and II because it was not Plaintiff's employer at the time of the alleged discrimination.

II.   JTCSI is not covered by Title VII because it had fewer than 15 employees at the time of the alleged discrimination.

III.  Plaintiff has failed to state a claim for discrimination under state law because she has elected to pursue her federal law remedy.

IV.   Plaintiff cannot prove her discrimination claim.

V.    Defendants are entitled to summary judgment on Count III because they relied upon the advice of their counsel.

VI.   Defendants are entitled to Summary Judgment on Count IV.

2

## STATEMENT OF FACTS

Plaintiff began working at James T. Chandler & Son, Inc. ("Chandler") in September
1995. Deposition of Ann M. Rowan, p. 24, A-2; JC-31, A-48.[1]  Plaintiff was hired as the
director of pre-need sales, which was a relatively new field at that time.  JC-47, A-50. Although
the principals, Jim and Chad Chandler, held an insurance license which was necessary to make
pre-need sales, each of them were overburdened with their "at need" duties and felt that they
needed a person to specialize and direct the pre-need sales program.  JC-33, A-49; CC-8,11-12,
A-97, 98-99 .

Within a few years of her hiring, Plaintiff grew the pre-need sales, which had been
relatively minimal prior to her arrival, to approximately $1,000,000 annually.  AR-209, A-19;
JC-56, A-51.  Chandler wanted to grow its pre-need sales even more by hiring in-house
salespersons to assist Plaintiff.  CC-19-20, A-100-01..  As director of the pre-need function,
Plaintiff selected and trained most of them.  CC-20, A-101.  None of them were successful as
pre-need salespersons and each of them left because Plaintiff controlled and retained for herself
all viable sales leads that the company generated through advertisements, seminars, and other
marketing techniques.  CC-20-23, A-101-104.  At least one individual, Todd Woodside, whom
FSD tried to hire as an in-house salesperson refused the offer because he felt that allowing
Plaintiff to control all leads would be an unsatisfactory arrangement.  TW-21-22, 28-29, A-235-
38.

---

[1] The depositions, excerpts of which are attached as contained in the Appendix, are hereinafter referred to
as follows: Anne M. Rowan, AR - __; James T. Chandler, IV, JC - __; Chad Chandler, CC - __; Tony Latina, TL-__;
Jason Casper, JAC-__; Diana Pinkerton, DP-__; Rick Harra, RH-__; Victor Battaglia, VB-__; Kelly Burns, KB-__;
Todd Woodside, TW-__..

3

Funeral Services of Delaware, LLC ("FSD") was formed on June 1, 2001 by James T. Chandler & Son, Inc. ("JTCSI"), a Delaware corporation, and Corleto-Latina Funeral Home, Inc. ("Corleto-Latina"). Chandler Dep. Ex. 1 (CFH00171-196), A-261-83.  Before FSD was created, JTCSI was operating two funeral homes, one in Hockessin and one on Concord Pike, and Corleto-Latina was operating one funeral home, on Union Street in Wilmington. JC-15-16, A-33-34. JTCSI owns 82% of FSD and Corleto-Latina owns 18% of FSD.  JC-12-13, A-31. James T. Chandler, IV ("Jim") and Chad Chandler each own 43.5 percent of JTCSI and their late father, James Chandler, III, owned the other 13 percent. JC-14, A-32. Anthony Latina has been the sole owner of Corleto-Latina since 1984. TL-15. When FSD was formed, the employees of JTCSI and Corleto-Latina became FSD employees, but the component businesses continued to market themselves under the trade name of Chandler Funeral Homes and Corleto-Latina Funeral Homes. TL-49-51, A-118-19.  JTCSI is now a real estate holding company only with no employees and no payroll. KB 53-54, A-230-31; JC-20, A-38. Similarly, Corleto-Latina continued to exist as a separate company after the formation of FSD. TL-51-52, A-119-20. Each FSD member company collects rent from FSD. TL-51-52, A-119-20.  Since FSD's formation, Jim Chandler, Chad Chandler and Tony Latina, the three indirect "owners" of FSD, have made decisions by consensus. TL-43-45, A-113-15.

Plaintiff had never favored the alliance with Corleto-Latina and she did not respect Mr. Latina.  AR-40-43, A-3-4 ; TL-109, A-135. Prior to FSD's formation, Plaintiff reported to Jim Chandler. TL-54, A-121; JC-47-48, A-50. For a period of approximately six months following the alliance, Plaintiff reported to Mr. Latina.  JC-148-49, A-82-83; TL-54, A-121. Mr. Latina suggested the possibility of making pre-need sales through another insurance carrier, and Plaintiff

4

opposed his suggestion. TL-58-61, A-125-28. Soon Plaintiff resumed reporting to Jim Chandler. TL-54-61, A-121-28; JC-149, A-83. Plaintiff told Mr. Latina on more than one occasion that he did not have an "f...ing clue" about pre-need sales. TL-118, A-136. At one meeting with the company's owners, Plaintiff stated that Mr. Latina was lazy, and that Chad Chandler was AWOL. JC-125-130, A-68-73.

In June 2002, FSD made another effort to increase the pre-need sales team, hiring Jason Casper, a former teacher. JAC-8-9, A-161-63. He, like the other pre-need salespeople, reported to Plaintiff. AR-99-102, A-8-9. In July 2002, Mr. Casper sold three pre-need contracts for Location 3 (Corleto-Latina). A-252. In September 2003, Mr. Casper and Plaintiff signed an agreement that Mr. Casper would not sell to any Chandler Funeral Homes pre-need customers; his territory would be confined to Location 3. AR-219-221, A-20; JAC-20-21, A-164-65; A-253. Jim Chandler was not aware of the existence of the agreement between Mr. Casper and Plaintiff until he saw the document at Plaintiff's deposition. JC-107-109, A-62-64. By the end of the year, it was clear that Mr. Casper was not succeeding at selling pre-need contracts; FSD's owners liked him, though, so they gave him a position as an at-need counselor or funeral assistant. JC-66-67, A-54-55.

Since the effort to form an in-house sales team had failed again, FSD began to consider hiring an outside contractor to assist with pre-need sales. TL-70-72, A-129-31; JC-82-85, A-56-59. In March 2004, FSD contracted with TDW Funeral Services, a business operated by Todd Woodside, who had substantial experience in pre-need sales, to provide such assistance. JC-93-94, A-60-61. Plaintiff strongly opposed FSD's attempt to create a team consisting of herself and the outside contractor, shouting at one meeting with Jim Chandler and Tony Latina

that the "ship was going down," that it was Mr. Latina's fault, and that the owners of business did not have a clue, before storming out of the meeting. JC-111-113, A-65-67; TL-118, 121,189, A-136-37, 159; AR-68, 70-74, A-5-7; CC-46-47, A-105-06. Plaintiff demanded exclusive control over all leads generated by the company's advertising program, seminars and mailings. AR-70-74, A-6-7. She also demanded exclusive access to all leads generated by the funeral directors at the two Chandler locations. AR-72-73, A-6-7. When she first encountered Mr. Woodside in the office, Plaintiff was openly rude to him, making a scene that required Jim Chandler's intervention. TW-19-20, 31-32, A-233-34, 239-40.

In September 2004, Plaintiff engaged in an "outburst" over FSD's decision to integrate Mr. Woodside into a sales team. AR-166-167, A-10; A-244; TL-153-154, A-138-39. By that time, Plaintiff had been instructed that she was not to sell for Location 3 (the Corleto-Latina Funeral Home) because Mr. Woodside's firm was going to handle all Location 3 business. TL-153-154, A-138-39. Mr. Latina found out that Plaintiff had nevertheless written a policy for Location 3. When Mr. Latina and the Chandlers met with Plaintiff to talk to her about this issue, she raised her voice at them, stormed out and slammed the door, came in 15 seconds later and yelled at them again, and slammed the door shut again. *Id.*

On Monday, September 20, 2004, Plaintiff met with Mr. Latina and acknowledged that an "outburst" was not the best way for her to make him understand that Mr. Woodside should not be given access to "gravy" leads generated by "funeral follow-up" – that is, by calling on recently bereaved families for whom FSD had provided services. AR-167-169, A-10-11; A-244-48. Plaintiff explained to Mr. Latina that she did not think FSD should provide any marketing support for Mr. Woodside – he should be entirely independent. A-246. Plaintiff thought that she

6

had made herself heard and that the "air had been cleared." A-247-48.

On September 30, 2004, FSD decided that Mr. Latina would once again take over from Jim Chandler the responsibility of supervising Plaintiff, she "asked why? & [talked about] How Chandler bros. dropped ball in leadership, mgt." AR-193-194, A-16; A-241; JC-141-143, A-79-81.

Unfortunately, it was not out of the ordinary for Plaintiff to express her low opinion of the owners' capabilities and performance in the funeral business, to engage in noisy confrontations, and to use insults and profanity against her co-workers and managers. KB-36-38, A-225-27. Kelly Burns, for example, described Plaintiff as overly emotional, high-strung and neurotic. KB-13-14, 18-21, 36-40, A-219-229. Diana Pinkerton stated that Plaintiff yelled, screamed, used profanity and ran out of meetings. DP, 24-30, 32, 39-40, A-176-83, 187-88. Every couple of months Plaintiff would get angry and yell at Jim Chandler. DP-29, A-181; KB-37-38, A-185-86. On at least two occasions she got angry and yelled at her co-worker, Helen Johnson, using the "F" word. DP-24-25, 27-28, A-176-180; KB-39-40, A-228-29; JC-131-132, A-74-75. On one occasion she called the company's accountant, Kelly Burns, the "C" word, and said she would have her job, because of a conflict over the accounting for Plaintiff's commissions. KB-17-21, A-218-22. Plaintiff yelled and screamed and slammed out of staff meetings when she got upset. DP-26-27, A-177-79; TL-153-154, A-138-39. On one occasion she accused Mr. Latina of being lazy and said that Chad Chandler was AWOL. JC-125-130, 139-140, A-68-73, 77-78. After she indulged in such behavior, Chad Chandler would talk to her about it and tell her it had to stop. CC-50-51, A-107-08. By September 30, 2004, Jim Chandler had grown weary of dealing with Plaintiff's confrontational manner, and decided to transfer the duty of overseeing Plaintiff and the

7

pre-need sales program back to Mr. Latina.  AR-193-194, A-16; JC-138-139, A-76-77; A-251.

Plaintiff was so possessive about her leads and so determined to maintain exclusive control over FSD sales that even after she broke her ankle on October 1, 2004 and had surgery to repair it on October 2, 2004, she refused Mr. Woodside's offers to assist with her customer meetings. AR-169-170, A-11; A-248. On October 19, 2004, when Mr. Latina tried to hold a meeting with Mr. Woodside and Plaintiff, she, in her own words, "lost it at the sight of Todd W." A-242-43; AR-177-78, A-12.  Plaintiff wrote in her journal: "I confronted both [Todd Woodside and Anthony Latina] with their lack of experience and inability to think things through for themselves."  A-244.

On November 16, 2004, the three owners met with Plaintiff, Mr. Woodside, and representatives from FSD's insurance broker for pre-need sales (at Plaintiff's insistence). A-249-50; AR-184-188, A-13-14. Although Plaintiff was not in the room with the owners at the time, she testified that the three insurance agents advised the owners that if they did not give Plaintiff what she wanted, "her productivity [i.e., Plaintiff] would walk."[2] A-249-50; AR-184-188, A-13-14. The owners stated that they would take the matter under advisement and make a decision on how to proceed with regard to the division of duties and leads between Plaintiff and the outside salesperson. "A-249-50; AR-184-188, A-13-14.

On December 23, 2004, Plaintiff "flipped" because she believed that one of FSD's funeral directors, Jason Casper, had referred a lead from one of the Chandler Funeral Home

---

[2] According to Richard Harra, who is president of McCrery Funeral Home, where Plaintiff now is employed, she met with him at about this time and told him that she was very unhappy with FSD. He had the impression that she was sending out feelers for a new position with McCrery. (At the time of submission of this brief, undersigned counsel did not yet have the transcript of Mr. Harra's testimony. However, once the transcript is received, counsel will supplement this brief with the relevant pages of Mr. Harra's testimony.)

locations to Mr. Woodside. AR-191-192, A-15. Plaintiff believed that this referral violated the unwritten policy that all "Chandler leads" (as opposed to Corleto-Latina leads) belonged to her. *Id.* In her own words, she "confronted" Jim Chandler regarding this supposed "theft" of a commission and he stated that the owners would discuss the matter and get back to her. A-244-50; AR-191-193, A-15-16.

On January 3, 2005, Mr. Latina scheduled a meeting at the Concord Pike location with Plaintiff. TL-169, A-140. The purpose of the meeting was to advise Plaintiff that the three owners had essentially agreed with her proposal regarding the division of leads between her and the outside salesperson. TL-169, A-140. Specifically, all leads from the Chandler location were to be directed to Plaintiff and all leads from the Corleto-Latina location were to be made to TDW. TL-170,173, A-141-143. A further condition, which had not been proposed by Plaintiff, was that Mr. Woodside would share in the duty of presenting seminars on behalf of the three locations. AR-285-86, A-23. Furthermore, the funeral directors would be free to refer leads to whichever salespersons they preferred. AR-288-89, A-23-24; TL-170-73, A-141-144.

Mr. Latina and Plaintiff disagree on the extent to which they discussed the owners' decision on the division of leads when they met on January 3, 2005. Plaintiff stated that they discussed the various aspects of this decision for nearly one hour. AR-283-84, A-22. Mr. Latina maintains, however that before he could even discuss the details of the decision, Plaintiff began complaining about the December 2004 referral of a "Chandler lead" by Jason Casper to Mr. Woodside. TL-173-75, A-144-46. Both Mr. Latina and Plaintiff agree that Plaintiff was upset about this incident, and that she raised her voice during the course of the conversation. AR-293-94, A-25; TL-177-78, A-148-49.

The meeting was held in a conference room behind a closed door.  AR-293-94, A-25. During the course of expressing her dissatisfaction, Plaintiff referred to Todd Woodside as "Dirty Dick" and accused him of running around on his wife.  JAC-74, A-168; AR-294-96, A-25; TL-175-76, A-146-47.  She then accused Jason Casper of running around on his wife.  TL-175-77, A-146-48; AR-294-96, A-25.  Despite the fact that the meeting was held behind a closed door, Jason Casper, who happened to be working in the hallway at the at-need files, overhead Plaintiff's loud voice accusing him of running around on his wife.  JAC-72-74, A-166-68.  Mr. Casper then entered the conference room without invitation.  JAC-74-75, A-168-69.

Although there are some differences in the respective witnesses' recollection of the details, all witnesses agree that an argument ensued between Plaintiff and Mr. Casper.  TL-178-81, A-149-152; AR-299-305, A-26-28; JAC-75-78, A-169-172.  Plaintiff contends that Mr. Casper was within two inches of her face and pointing his finger at her during the course of the argument.  AR-304, A-27.  Mr. Casper maintains that he was standing next to the chair in which Plaintiff was seated, and that he never placed his face next to Plaintiff.  JAC-76-80, A-170-174. All parties agree that Plaintiff held up a pad of paper as a shield between herself and Mr. Casper. TL-178-81, A-149-152; AR-299-305, A-26-28; JAC-75-78, A-169-72.  It is undisputed that Mr. Casper never touched Plaintiff.  AR-308, A-28; JAC-76-80, A-170-174; TL-180-81, A-151-52. Mr. Casper and Ms. Pinkerton (who witnessed the latter part of the confrontation) testified that, during the course of the argument, Plaintiff called Jason Casper a "f...ing prick".  JAC-77-78, A-171-72; DP-36, A-184.  Mr. Casper never cursed at Plaintiff, but demanded that Plaintiff not speak about his relationship with his wife to one of the owners of the business.  JAC-76, A-170.

Plaintiff maintains that she attempted to leave the conference room on three occasions,

10

but that on each occasion, Mr. Casper slammed the door so that she could not leave.  AR-307-08, A-28.  Mr. Casper admits that he closed the door when he entered the room in the hope that their voices would not be heard outside of the conference room. JAC-78-79, A-172-73.  He denies ever closing the door to prevent Plaintiff from leaving the office, however.  JAC-79, A-173.  Diana Pinkerton, an employee who assisted Plaintiff, entered the room after the shouting began between Mr. Casper and Plaintiff, and at that point, stated that Plaintiff was still seated in her chair.  DP-37, A-185.  She stated when Plaintiff got out of her chair, she made the comment about Mr. Casper being a "f...ing prick" and then Plaintiff left the office without any attempt by Mr. Casper to prevent her from leaving.  DP-37-40, A-184-187.  All parties agree that the confrontation between Mr. Casper and Plaintiff was short-lived; Plaintiff estimated that it lasted one to two minutes, while Mr. Casper guessed that it was 15 to 30 seconds.  AR-314, A-29; JAC-80, A-174.  Ms. Pinkerton believed that Mr. Casper was in the conference room for about 15 seconds, and Mr. Latina agreed that within a few seconds of Mr. Casper entering the conference room, Ms. Pinkerton entered and ended the argument.  DP-45, A-189; TL-181-82, A-152-53.

Following the confrontation on January 3, 2005, the three owners met and decided that they could no longer tolerate Plaintiff's outbursts and her resistance to creating a sales team.  CC-64-66, A-109-11; TL-184-88, A-154-58.  Accordingly, despite her success as a salesperson, the owners decided to terminate Plaintiff's employment.  JC-64-66, A-52-54; TL-184-88, A-154-58.  Mr. Casper was counseled about this incident by Chad Chandler and Jimmy Chandler. JAC-84-86, A-174.

On January 5, 2005, Jim Chandler advised Plaintiff that she was terminated.  JC-185, A-84; CC-65-66, A-110-11; Complaint, ¶22, D.I. 1.  Within less than three weeks of her

11

termination, Plaintiff was hired by Chandler's primary competitor, McCrery Funeral Home

(which also has a Concord Pike location) to do pre-need sales. AR-199-201, A-17-18. Indeed,

it appears from Plaintiff's purportedly contemporaneous notes that on January 4, 2005, the day

prior to her termination, she had made contact with Rick Harra, one of the principals of McCrery

about going to work for them. AR-197, A-17. Mr. Harra confirmed that he met with Plaintiff on

January 4, 2005, as evidenced by a notation he had made on in his scheduling book. (Deposition

reference will be added when transcript received).

When the owners of Chandler learned that Plaintiff had or was about to begin working for

McCrery, they decided to consult with an attorney. JC-216-19, A-85-88. At the time of her

hiring in 1995, Plaintiff had signed an employment agreement which included a restrictive

covenant. A-254-60. The covenant precluded Plaintiff from working for another funeral home

in New Castle County in virtually any capacity for three years following her termination of

employment with Chandler. A-254-60.

Jim Chandler acted as the company's liaison in consulting with Victor Battaglia, who was

retained to act as the company's attorney in the matter. TL-193, A-160. Mr. Battaglia reviewed

the employment agreement and hired a private investigator to follow-up on an advertisement that

Plaintiff would be presenting a seminar on behalf of Chandler in late January 2005. VB-13,45,

A-191, 198. The private investigator discovered that Plaintiff had reported to Boscov's, where

the seminar was to be given, that Plaintiff would not be conducting the seminar since she no

longer worked for Chandler, but that she would be returning to perform a seminar for McCrery.

VB-45-50, A-198-203. Mr. Battaglia believed that this information indicated that Plaintiff was

in violation of the restrictive covenant provision in the employment agreement, and advised

Chandler to institute a lawsuit in Chancery Court for breach of contract, requesting an injunction and damages. VB-33-35, 45-51, A-193-95, 198-204.

Once the answer to the complaint was filed in Chancery Court, Mr. Battaglia learned that there were some technical difficulties with the pleading. VB-53-55, A-205-07. First, he discovered that Plaintiff's actual employer was FSD, rather than Chandler. VB-53-54, A-205-06. Mr. Battaglia admitted receiving a fax from Jim Chander at the outset of his representation indicating the existence of FSD, but since the employment agreement was in the name of Chandler and all of the sales agreements that Plaintiff had written were in the name of Chandler, he simply assumed that Chandler remained the employer. VB-14,54, A-192, 206.

Second, Mr. Battaglia learned through the answer that there had never been a written assignment of the employment agreement to FSD. VB-66, A-212. It was his legal judgment, however, that FSD had legally assumed all of the contractual obligations and benefits of Chandler. VB-66, A-212. Accordingly, he not only amended the complaint to add FSD as a plaintiff in the Chancery Court action, but alleged that the contract had been assigned. VB-60-62, A-209-11.

Third, Mr. Battaglia learned through the answer that Plaintiff and her attorney contended that she had not used any trade secrets of Chandler in her new business as alleged in the complaint. VB-54-55, A-206-07. Although Jim Chandler could not give Mr. Battaglia any specific examples of trade secrets that Plaintiff had and/or used, Mr. Battaglia concluded that the definition of trade secrets in the contract was so broad that Chandler should continue alleging unauthorized use of the trade secrets until the issue could be clarified through discovery. VB-49-51,55, A-202-04, 207.

13

Fourth, Mr. Battaglia learned through the answer that the plaintiff contended that the employment agreement lapsed after one year unless the parties formally renewed the contract, which they had never done. VB-53-54, 58, A-205-07, 208. Mr. Battaglia took the position that Plaintiff's continued employment before and after the alliance resulted in the continuation of the contract, including the restrictive covenant. VB-38-39, A-196-97.

In light of the foregoing, Plaintiff's attorney threatened to file for Rule 11 sanctions if the Chancery Court action was not dismissed. VB-70-71, A-213-14. Mr. Battaglia advised Chandler that, despite the foregoing problems, in his judgment, they still had a "60-40" chance of prevailing in the lawsuit and should continue on. JC-301-02, A-94-95. In April, 2005, the owners of Chandler decided that the Chancery Court litigation was becoming too costly and questioned whether the potential benefits of success in the lawsuit justified that cost. JC-283-84, A-89-90. Accordingly, they directed Mr. Battaglia to dismiss the lawsuit. JC-284, A-90; VB-70-73, A-213-16. Mr. Battaglia recommended that Chandler make a settlement demand before dismissing the case outright. VB-72-73, A-215-16. Chandler followed Mr. Battaglia's advice. JC-284-85, A-90-91; VB-73, A-216. According to Mr. Battaglia, the settlement demand was "rejected out of hand" by Plaintiff's attorney and the motion for Rule 11 sanctions was filed. VB-73, A-216; JC-286-87, A-92-93.

At the ensuing hearing, Vice-Chancellor Strine not only dismissed the action in accordance with the request of JTCSI and FSD, but ordered Chandler to pay approximately $8,000 in Plaintiff's attorney's fees. *See* Transcript of Oral Argument, *James T. Chandler & Son v. Rowan*, Del.Ch., C. A. No. 1056-N, Strine, V.C. (August 25, 2005) (attached hereto as Exhibit A.) Vice Chancellor Strine based his decision on his conclusion that the employment contract

14

had, by its own terms, terminated after one year. *Id.* at 30-32. The Court found that Mr. Battaglia's argument that the contract had survived had no merit. *Id.* Furthermore, the Court rejected Mr. Battaglia's legal interpretation that Plaintiff had misappropriated trade secrets as defined by the employment contract. *Id.* at 33. Finally, Vice Chancellor Strine disagreed with Mr. Battaglia's legal conclusion that the contract had been assigned, notwithstanding the lack of a written assignment. *Id.* at 35.

## ARGUMENT

### I.    INTRODUCTION

#### A.    Summary Judgment Standard

Summary judgment is appropriate where there are no genuine issues of material fact that would permit a reasonable jury to find for the non-moving party and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). In performing this analysis, the evidence is to be construed in the light most favorable to the non-moving party. However, if the evidence presented by the non-moving party is nothing more than a reassertion of unsupported allegations, summary judgment is appropriate. *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989). To that end, "[m]ere conclusory allegations or denials are insufficient to withstand a motion for summary judgment once the moving party has presented evidentiary materials." *Schoch v. First Fidelity Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990).

### II.    JTCSI IS ENTITLED TO JUDGMENT IN ITS FAVOR ON COUNTS I AND II BECAUSE IT WAS NOT PLAINTIFF'S EMPLOYER AT THE TIME OF THE ALLEGED DISCRIMINATION.

Plaintiff argued strongly and successfully in the Chancery Court litigation that JTCSI, one of the corporate parents of FSD, was not her employer at the time of her termination from employment. She now takes the opposite position, claiming that she was employed by both JTCSI and FSD when she was discharged.

A corporate parent is presumed not to be the employer of its subsidiary's employees. *Marzano v. Computer Science Corp. Inc.*, 91 F.3d 497, 513-14 (3d Cir. 1996). *See also, NLRB v.*

16

*Deena Artware, Inc.*, 361 U.S. 398, 402-03, 4 L. Ed. 2d 400, 80 S. Ct. 441 (1960) (shareholders are not liable for acts of the corporation). To overcome the presumption, a plaintiff must show either that the parent company controls the employment practices and decisions of the subsidiary, or that the parent company so dominates the subsidiary's operations that they are in effect one entity. *Id.* at 513. There is no evidence of either of these scenarios in the present case.

JTCSI, owned by Jim and Chad Chandler, is not the sole owner of FSD. FSD is also owned by Corleto-Latina, which is owned and controlled by Mr. Latina. Mr. Latina and the Chandlers make FSD's employment as equal partners, by consensus. Accordingly, there is no evidence that JTCSI controls FSD's employment decisions of FSD, nor that JTCSI so dominates FSD's operations that they are in effect one entity. Indeed, as far as FSD is concerned, JTCSI's operations are limited to owning and managing the real estate on which the Chandler Funeral Homes are located, while FSD operates the funeral homes owned by JTCSI and Corleto-Latina.

Consequently, Plaintiff's argument that she was employed by JTCSI at the time of her discharge must be rejected and summary judgment should be granted in favor of JTCSI.

## III.    JTCSI IS NOT COVERED BY TITLE VII BECAUSE IT HAD FEWER THAN 15 EMPLOYEES AT THE TIME OF THE ALLEGED DISCRIMINATION.

In addition to the fact that JTCSI ceased being Plaintiff's employer on June 1, 2001, three and a half years before her termination, the Court should dismiss JTCSI because it does not have enough employees to be a "covered employer" under either Title VII or the Delaware Discrimination in Employment Act. Under Title VII, an employer must have at least fifteen employees to be covered. 42 U.S.C. § 2000e(b). Under the Delaware Discrimination in Employment Act, an employer must have at least four employees to be covered. 19 *Del.C.* §

17

710(6). When FSD was formed, all the employees on JTCSI's payroll were transferred to FSD.

At the time of Plaintiff's termination, JTCSI had no payroll. Accordingly, the Court should

dismiss Plaintiff's claims under Title VII and the Delaware Discrimination in Employment Act.

## IV.    PLAINTIFF HAS FAILED TO STATE A CLAIM FOR DISCRIMINATION UNDER STATE LAW BECAUSE SHE HAS ELECTED TO PURSUE HER FEDERAL LAW REMEDY.

When considering a motion to dismiss for failure to state a claim upon which relief may

be granted pursuant to Federal Rule of Civil Procedure 12(b)(6), a court must accept the

allegations in the complaint as true. *ALA, Inc. v. CCAIR, Inc.*, 29 F.3d 855, 859 (3d Cir. 1994).

However, the court has no obligation to accept as true legal conclusions or unwarranted factual

inferences made by the plaintiff. *Baxter v. Vigo County School Corp.*, 26 F.3d 728, 730 (7th Cir.

1994). Regardless of the substantive merits (or lack of merit) of her state law discrimination

claim, Plaintiff may not pursue it in this Court.

The Delaware General Assembly enacted the current version of the DDEA in 2004, and it

became effective on September 10, 2004. The synopsis to the Senate Bill stated that it created a

right to sue in Superior Court after the exhaustion of administrative remedies. Delaware Bill

Summary, 2004 Reg. Sess. S.B. 154 (attached as Exhibit B). The synopsis explained:

> This bill confirms that Chapter 7 is the exclusive and sole remedy for employment
> discrimination claims, requiring initial processing of all such claims with the
> Department of Labor for review and action. This bill effectively re-establishes the
> exclusive remedy put in question by the decision in *Shuster v. Derocili*, 775 A.2d
> 1029 (Del. 2001). ... Sections 712, 714 and 715 have been repealed in their
> entirety and rewritten to accomplish the goals of initially pursuing informal
> methods of resolution through mediation and conciliation and then permitting
> civil actions in Superior Court."

*Id.*

The DDEA has several provisions that make it clear that the General Assembly intended DDEA claims to be pursued exclusively in Superior Court and, further, that the General Assembly intended to require claimants to make a choice between any available federal remedies and the remedy provided by the DDEA. First, §§19 *Del. C.* § 714(a) states: "(a) A charging party may file a civil action *in Superior Court,* after exhausting the administrative remedies provided herein and receipt of a Delaware Right to Sue Notice acknowledging same." (emphasis added). Second, §§§§19 *Del. C.* § 715(a) states: "*Superior Court shall have jurisdiction over all proceedings brought by the charging party pursuant to § 714 of this title.*" (emphasis added). Third, 19 *Del. C.* § 715(b) states: "*Superior Court shall have the authority* to provide the following relief ...." (emphasis added). Finally, 19 *Del. C.* § 714(c) states:

> (c) *The charging party shall elect a Delaware or federal forum* to prosecute the employment discrimination cause of action so as to avoid unnecessary costs, delays and duplicative litigation. A charging party is barred by *this election of remedies* from filing cases in both Superior Court and the federal forum. If the charging party files in Superior Court and in a federal forum, the respondent may file a motion to dismiss the Superior Court action under this election of remedies provision.

(emphasis added). If the General Assembly had intended to allow DDEA claims to be pursued in federal court simultaneously with similar claims under federal law, it would not have so plainly stated that such claims must be brought in Superior Court, nor would it have explicitly required an election of remedies.

Because Plaintiff is attempting to pursue both state and federal law claims and because the DDEA requires her to choose one or the other, the Court should dismiss Count II of the Complaint.

19

## V.    PLAINTIFF CANNOT PROVE HER DISCRIMINATION CLAIM.

Plaintiff cannot establish pretext, an essential element of her discrimination claim under

the standard established in *McDonnell-Douglas Corporation v. Green*, 411 U.S. 792 (1973)

(detailing the burden-shifting framework to be used in Title VII discrimination claims).  Because

Plaintiff cannot prove pretext, her discrimination claim should be dismissed.

### A.    Analytical Framework

Plaintiff's claims arise in part under Title VII of the Civil Rights Act of 1964, which

states, in relevant part, that "it shall be an unlawful employment practice for an employer . . . to

discriminate against any individual with respect to his compensation, terms, conditions, or

privileges of employment, because of such individual's . . . sex."  42 U.S.C. § 2000e-2(a).

This action is a disparate treatment discrimination case.  Disparate treatment

discrimination cases involve claims of outright discrimination based on a statutorily prohibited

characteristic. *See Doyle v. United States Sec'y of Labor*, 285 F.3d 242, 253 (3d Cir. 2002).  In a

disparate treatment case the plaintiff must establish that she was in fact treated less favorably, or

discriminated against, based on a prohibited characteristic. *See EEOC v. Metal Serv. Co.*, 892

F.2d 341, 347 (3d Cir. 1990) (a disparate treatment violation is made out only when an individual

is shown to have been singled out and treated less favorably than others similarly situated on the

basis of an impermissible criterion). *Accord, Texas Dep't of Comm. Affairs v. Burdine*, 450 U.S.

248, 252-53 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Jones v.

School Dist. of Philadelphia*, 198 F.3d 403, 410-11 (3d Cir. 1999).  In other words, a plaintiff

must prove that the decision makers involved were subjectively motivated by animus against a

protected characteristic when the decision in question was made.  Moreover, the plaintiff must

20

prove that a protected characteristic "actually motivated" and "had a determinative influence" on the decision to take the adverse employment action. *Glanzman v. Metro Mgmt. Corp.*, 391 F.3d 506, 512 (3d Cir. 2004) (citing *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 141 (2000)).  Plaintiff may demonstrate discrimination by a showing of either direct or indirect evidence. *Glanzman*, 2004 U.S. App. LEXIS at *12.  Plaintiff must prove her *prima facie* case by a preponderance of the evidence before the burden of production shifts to the employer to "articulate a legitimate, non-discriminatory reason" for terminating her employment. *McDonnell-Douglas*, 411 U.S. 792.  The employer's burden at this stage is extremely light; it need only state a non-discriminatory explanation for its action, and come forward with some evidence. *Kowalski v. L&F Prods.*, 82 F.3d 1283, 1289 (3d Cir. 1996).

In response to the employer's articulation of the legitimate business reason for its decisions, Plaintiff must prove that "the employer's proffered reason or reasons were pretextual – that is, they are false and that the real reason for the employment decision was discriminatory." *Waldron v. SL Indus., Inc.*, 56 F.3d 491 (3d Cir. 1995). The plaintiff always bears the ultimate burden of persuasion that discriminatory reasons motivated the employment decision. *See Brodsky v. Hercules, Inc.*, 966 F. Supp. 1337 (D. Del. 1977).  The plaintiff must provide additional evidence to demonstrate that discrimination was the real reason why he was not hired or to otherwise "cast doubt on the employer's stated reasons by identifying such weaknesses, inconsistencies, incoherencies, or contradictions" in the proffered reasons that a reasonable fact finder "could rationally find them unworthy of credence. *Brewer*, 72 F.3d at 331.

The court will not substitute its judgment for that of the employer when business decisions are made. *Kelly v. Drexel Univ.*, 94 F.3d 102, 109 (3d Cir. 1996). The employer is

21

entitled to make a business decision without fear of being second guessed by a court. *Birkbeck v. Marvel Lighting Corp.*, 30 F.3d 507, 511 (4th Cir. 1994). The question is not whether the employer made the best, or even a sound, business decision: it is whether the real reason is discrimination. *Carson v. Bethlehem Steel Corp.*, 82 F.3d 157, 159 (7th Cir. 1996). Plaintiff cannot meet her burden of establishing pretext simply by disagreeing with her employer's action. *Fuentes*, 32 F.3d at 765; *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 533 (3d Cir. 1992). The question is not whether FSD made the best, or even a sound, business decision; it is whether its real reason for terminating Plaintiff was discrimination based on sex. *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1009 (3d Cir. 1997).

**B.    FSD Terminated Plaintiff's Employment For Legitimate Business Reasons.**

The evidence that Plaintiff was terminated for legitimate business reasons and not because of her gender is overwhelming. Jim and Chad Chandler hired Plaintiff in 1995 because they wanted to increase JTCSI's pre-need sales. Plaintiff succeeded in increasing sales, but the Chandlers wanted to maximize sales and therefore asked Plaintiff to hire, train and manage additional salespeople. JTCSI was unable to retain the numerous salespeople that Plaintiff helped to hire and train because she monopolized the leads generated by the company's marketing efforts.

In another effort to increase sales, Jim and Chad Chandler agreed with Mr. Latina to form FSD. After FSD's formation, they hired Jason Casper as a new member of the FSD sales team. Six months after he was hired, Plaintiff required Casper to sign an agreement confining his sales "territory" to the Corleto-Latina Funeral Home and leaving the Chandler Funeral Homes as Plaintiff's exclusive domain. When Casper was unable to make a living by selling for Corleto-

22

Latina, he became an at-need counselor and FSD's owners decided to try bringing in an independent contractor to help increase pre-need sales. At that point, in 2003 or 2004, FSD began working with Todd Woodside.

Plaintiff vigorously and vociferously opposed these renewed efforts to continue FSD's growth in pre-need sales. Plaintiff believed herself to be the only person at FSD with any ability to understand and make decisions about sales. She communicated her beliefs to those who worked with her, including the owners of the business, in a loud, confrontational and aggressive manner. Her behavior deteriorated during the fall of 2004 as Mr. Latina continued his efforts to integrate Mr. Woodside and Plaintiff into a team. She had additional confrontations with Mr. Latina and Mr. Jim Chandler in October, November and December 2004, as described above.

It is well-established that insubordinate, disrespectful and unprofessional behavior like that exhibited by Plaintiff is a legitimate reason for termination. See, e.g., *Greene v. Associated Air Freight, Inc.*, 23 Fair Empl. Prac. Cas. (BNA) 544 (E.D. Ky. 1980) (employer was justified in firing female inside salesperson who made unpleasant scene at work); *Bauernfeind v. Village Inn Pancake House*, 21 FEP 1003 (D. Colo. 1979) (employer was justified in firing female assistant manager who repeatedly expressed contempt for her superiors, using "strong and colorful" language); *Lewis v. Ford Motor Co.*, 17 FEP 933 (E.D. Mich. 1978) (employer was justified in firing female employee who verbally attacked her manager, making numerous accusation and using obscene language).

Plaintiff did not mince words when it came to telling her superiors her low opinion of their abilities. She was not intimidated by anyone. Her highly unprofessional confrontation with Mr. Casper on January 3, 2005 was simply the last straw. The owners of the company decided

23

that no matter how good a salesperson Plaintiff was, they could not continue to tolerate her bad behavior, and reluctantly decided to let her go.

### C.    There Is Insufficient Evidence Of Pretext For A Reasonable Jury To Reach A Verdict In Plaintiff's Favor.

Plaintiff's evidence of pretext consists of the following. First, Plaintiff emphasizes that she performed very well as a salesperson. FSD does not dispute that Plaintiff was a good salesperson, but Plaintiff was not let go for poor sales performance; she was let go for unacceptable behavior. Plaintiff next argues that the officers and managers of FSD are all males. FSD does not dispute that the three decision-makers are all males, but this fact is irrelevant, and ignores the fact that Jim Chandler, the person who reluctantly suggested that it was time to terminate her services, was the person who had hired her as well, decreasing the credibility of Plaintiff's claim that he was motivated by gender bias. *See, e.g., Proud v. Stone*, 945 F.2d 796, 798 (4th Cir. 1991) ("employers who knowingly hire workers within a protected group seldom will be credible targets for charges of pretextual firing").

Plaintiff also characterizes her former workplace as having an "all male atmosphere" and characterizes the three business owners as a "boys' club." In point of fact, six of FSD's 10-15 employees were female, so there could not have been an "all-male atmosphere." At her deposition, Plaintiff explained that by "all male atmosphere," she meant that there was a lot of camaraderie among the male employees. AR-59-60. Assuming that the male employees got along well with each other, that is not a violation of Title VII, nor is it evidence of bias against women. According to Plaintiff, the term "boys' club" was a name that the women in the office used to refer to Jim and Chad Chandler, Tony Latina, Jason Casper and Todd Woodside. AR-63-

24

64. Calling adult males "boys" conveys an attitude of disrespect that is consistent with Plaintiff's disrespectful behavior toward the Chandlers, Mr. Latina, Mr. Casper and Mr. Woodside throughout her interactions with them. It is evidence that supports the legitimate reasons for which Plaintiff was terminated. It is not evidence of pretext.

Plaintiff claims that she knew more than Mr. Latina about selling and argues that Mr. Latina admitted this by stating to Plaintiff, "I'm incompetent, but I can learn." The evidence indicates that Plaintiff told Mr. Latina and the Chandlers on more than one occasion that she thought they were incompetent and did not have a clue, but not that they agreed with her assessment. Her repeated assertions in this regard, however, contributed to the decision to terminate her employment.

Plaintiff claims that Mr. Latina told her that she was "overly emotional" and not a "team player." This is not evidence of pretext; it is evidence of FSD's legitimate non-discriminatory reasons for terminating Plaintiff. Several witnesses described Plaintiff's overly emotional behavior at work, including Plaintiff's female co-workers. There is no dispute that Plaintiff was unable to maintain a pre-need sales force; she simply controlled and refused to share any leads that came to the firm, forcing out co-workers, whom she saw as competitors. She also rejected any attempts by the owners to make any alterations in the pre-need program, viewing them as incompetent and clueless, and telling them so.

Plaintiff claims that Latina advised her that the business was not a "popularity contest." Plaintiff was unable at her deposition to provide any details, except to say that it was a reference to competition between herself and Mr. Woodside. This alleged comment may have been in reference to Mr. Latina's and Mr. Woodside's suggestion that funeral directors be given

monetary incentives for providing sales leads. Plaintiff was vehemently opposed to this idea and
to the suggestion that funeral directors be permitted to give leads to Mr. Woodside rather than
exclusively to her. Again, this is not evidence of pretext; it is evidence that supports FSD's
legitimate reasons for terminating Plaintiff's employment.

Plaintiff alleges that on January 3, 2005, Jason Casper (a male) interrupted Plaintiff's
meeting with Mr. Latina, physically threatened her, verbally assaulted her and prevented her from
leaving the room. Again, it is true that a confrontation took place (although there is no evidence
of physical threats), but the confrontation was provoked by Plaintiff herself, and once again, was
one of the legitimate business reasons that led to Plaintiff's termination. It is not evidence of
pretext. Indeed, Plaintiff herself seems to have realized that she had crossed the line, and
immediately, before learning of the decision to terminate her employment, arranged a meeting
with Rick Harra to ask for a job with his company, McCrery Funeral Home.

Plaintiff argues as evidence of pretext that Mr. Casper engaged in violent behavior but was not
reprimanded or otherwise disciplined. However, Plaintiff has no first-hand knowledge on the
point of whether Mr. Casper was disciplined, and, contrary to Plaintiff's assumption, Mr. Casper
was counseled about this incident by Chad Chandler and Jimmy Chandler. It is undisputed that
Mr. Casper did not engage in any violent behavior; he and Plaintiff shouted at each other in a
confrontation provoked by Plaintiff's loud and defamatory comments. She had a pattern of such
behavior and Mr. Casper did not. FSD management's treatment of Mr. Casper in connection with
this episode is no different than its handling of the first several incidents in which Plaintiff
"flipped" and shouted at others at work.

Plaintiff also argues as evidence of pretext that on January 6, 2005, Jim Chandler sent a

26

letter to Plaintiff's fiancé, Jesse Pebley, informing him while FSD had valued Plaintiff's input and

expertise, she was let go because her presence had created a stressful work atmosphere; she notes

that Mr. Chandler did not send anything in writing to Plaintiff herself about her termination.

There is no dispute that Mr. Chandler sent a letter to Mr. Pebley regarding Plaintiff's termination.

Mr. Chandler wanted Mr. Pebley, a fellow business manager, to hear management's side of the

story, not just Plaintiff's side of the story. JC-203-204.

In short, Plaintiff's evidence of pretext is insufficient to justify a verdict in her favor by

any reasonable jury.  Plaintiff was terminated because FSD's management had had enough of her

repeated tantrums, not because of her gender.

## VI    DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON COUNT III BECAUSE THEY RELIED UPON THE ADVICE OF THEIR COUNSEL.

Count III of the Complaint alleges a count of malicious prosecution against the

defendants. In *Shipley v. B & F Towing Co.*, 2006 WL 1652787 (D.Del.), this Court set forth the

elements of a malicious prosecution claim:

(1) prior institution or continuation of some regular judicial proceedings
against plaintiff in this action;
(2) such former proceedings must have been by, or at the insistence, of the
defendant in this action;
(3) the former proceedings must have terminated in favor of the plaintiff
herein;
(4) there must have been malice in instituting the former proceedings;
(5) there must have been a lack of probable cause for the institution of the
former proceedings; and
(6) there must have been injury or damage to plaintiff from the former
proceedings.

Thus, where a party has probable cause to institute an action, a claim for malicious

prosecution may not survive.  Furthermore, Delaware courts have long held that probable cause

27

is conclusively established where a party relies upon the advice of its counsel in pursuing a cause

of action, as long as that person used due care in determining the facts and then presenting the

facts to his attorney. *See Brown v. Cluley*, 179 A.2d 93, 97 (Del.Super.1962)(noting, "If a person

consults a regular attorney about a matter affecting a third person, he ought to use that care in

acquiring the facts and presenting them to counsel, which men of ordinary prudence would

ordinarily use in matters of like importance. *If he does this, and in good faith lays such facts*

*before his counsel, and then acts upon the advice of his counsel, it would constitute probable*

*cause, and a complete defense to an action* [for malicious prosecution.]"(emphasis in original.)

In other words, where a party in good faith  relays all relevant information known to him to his

attorney, and then relies upon the advice of the attorney to determine whether legal action should

be instituted or continued, that party has an absolute defense to a charge of malicious

prosecution.

        In the case at hand, it is clear that the Defendants have an absolute defense to Ms.

Rowan's allegation of malicious prosecution because they had probable cause to bring the prior

action.  When the Defendants discovered that Ms. Rowan had taken a job with a major

competitior less than a mile away, they were understandably worried about what effect that

would have on their business.  They took the reasonable step of consulting with an attorney, Mr.

Battaglia, to see whether they had any legal recourse to protect their business interests.  There is

no dispute that they provided Mr. Battaglia with all of the relevant information that they had

pertaining to this matter.  The Defendants were aware that Ms. Rowan had signed a restrictive

covenant, but did not know whether it was enforceable, so they provided Mr. Battaglia with Ms.

Rowan's employment contract.  They also alerted Mr. Battaglia of the existence of both James T.

Chadler & Sons, Inc. And Funeral Services of Delaware, LLC, and relied on Mr. Battaglia's legal expertise to sort through the facts and determine whether they had a viable legal claim. In other words, there is no question that the Defendants conveyed a full and fair statement of all circumstances to their attorney.

None of the defendants had a legal background, and there is no dispute that they relied completely on the advice provided by Mr. Battaglia. Mr. Battaglia made it unequivocally clear in his testimony that Mr. Chandler had relied on his advice in filing the Chancery Court action, and continuing to pursue the action after the Rule 11 motion was threatened. Mr. Battaglia has made no contention that Chandler failed to answer his questions truthfully or gave him any inaccurate information which he relied upon in giving his advice. In the end, the Court of Chancery rejected Mr. Battaglia's legal interpretation of the employment contract and the restrictive covenant contained therein. There was no allegation by Mr. Battaglia that, had he been provided with more facts by the Defendants, he would have altered his legal advice. In the Court's view, Mr. Battaglia simply was incorrect in his legal reasoning, which had absolutely nothing to do with the Defendants' actions. Again, the Defendants simply relied on Mr. Battaglia's legal interpretation of the contracts at issue, and took his advice when he concluded that they had a meritorious claim. As such, the Defendants clearly had probable cause to bring their action against Ms. Rowan, and have an absolute defense to the malicious prosecution claim brought against them.

## VII. DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON COUNT IV

In Count IV of her Complaint, Plaintiff alleges that she was falsely imprisoned. As will be explained more fully hereafter, Plaintiff's claim should be dismissed because it is barred by Delaware's Workers' Compensation Act, and because the duration of Plaintiff's alleged

29

"imprisonment" was too short to support a claim for false imprisonment.

## A.    Count IV of the Complaint is barred by Delaware's Workers' Compensation Act.

The elements of a false imprisonment claim in Delaware are (a) restraint which is both (b)

unlawful and (c) against one's will. See *Harrison v. Figueroa*, 1985 WL 552279, at *2

(Del.Super.)(attached as Exhibit C). While the facts, read in a light most favorable to Ms.

Rowan, may be interpreted to conclude that Ms. Rowan was "falsely imprisoned" for a very brief

period of time, her claim for false imprisonment is nevertheless barred by Delaware's Workers'

Compensation Act, 19 *Del.C.* § 2301 et.seq. ("the Act"), and specifically the exclusivity

provision of the Act, found at 19 Del.C. § 2304, which provides:

> Every employer and employee, adult and minor,
> except as expressly excluded in this chapter,
> shall be bound by this chapter respectively
> to pay and to accept compensation for personal
> injury or death by accident arising out of and
> in the course of employment, regardless of the
> question of negligence and to the exclusion of
> all other rights and remedies.

Essentially, this section provides that the workers' compensation statute is the exclusive

remedy available to an employee to secure compensation from an employer for injuries "arising

out of and in the course of employment." Furthermore, Section 2301(18)(b) specifies that an

injury arising out of and in the course of employment:

> [S]hall not include any injury caused by the
> willful act of another employee directed
> against the employee by reasons personal to
> such employee and not directed against the
> employee as an employee or because of the
> employee's employment.

30

Thus, where a plaintiff's injuries are caused by the willful act of another employee directed

against the plaintiff for personal reasons, the plaintiff's injuries did not "arise out of and in the

course of employment," and are not compensable by worker' compensation benefits.

*Konstantopoulos v. Westvaco Corp.*, 690 A.2d 936, 939 (Del. 1996).  Under these circumstances,

the plaintiff's injuries may be the subject of an independent lawsuit against the plaintiff's

employer. *Id.*

        While the Act directs that an injured employee's sole remedy against his employer is

workers' compensation, Section 2363(a) does permit an injured employee to assert a claim

against a third-party tortfeasor.  This section provides, in relevant part:

> Where the injury for which compensation is
> payable under this chapter was caused under circumstances
> creating a legal liability *in some person other than a natural
> person in the same employ or the employer* to pay damages in
> respect thereof, the acceptance of compensation benefits or the
> taking of proceedings to enforce compensation payments shall
> not act as an election of remedies, but such injured employee
> or the employee's dependents or their personal representative may
> also proceed to enforce the liability of such third party for damages
> in accordance with this section....

(emphasis added).  Delaware courts have interpreted the phrase, "a natural person in the same

employ" to mean an employee who was acting within the course or scope of his employment.

*Dockham v. Miller*, 1997 WL 817873, *2 (Del.Super.) affirmed by *Miller v. Dockham*, 723 A.2d

397 (Del. 1998)(attached hereto as Exhibit D).  Thus, when read together, these provisions

mandate that where a plaintiff sustains a personal injury caused by a co-employee who was

acting in the course or scope of his employment, the injured employee's sole remedy is workers'

compensation.

31

In the case at hand, Plaintiff has alleged that she suffered personal injuries as a result of Mr. Casper falsely imprisoning her in the conference room. Specifically, Ms. Rowan alleges that she experienced "anxiety, stress and emotional injury." Complaint ¶80, D.I. 1. Moreover, Ms. Rowan acknowledges that Mr. Casper was acting within the course and scope of his employment at the time of the incident. Complaint, ¶¶73,81, D.I. 1. Indeed, Mr. Casper only entered the conference room after Ms. Rowan insinuated that his job performance was somehow adversely affected by the alleged fact that he cheated on his wife. Since Ms. Rowan has expressly alleged that she suffered personal injury as a result of Mr. Casper's actions, and has admitted that Mr. Casper was acting within the course and scope of his employment when she allegedly suffered her injuries, her sole recourse is workers' compensation benefits. As such, her false imprisonment claim must be dismissed.

At first glance, the decision in *Lynch v. Mellon Bank of Delaware*, 1992 WL 51880 (Del.Super.)(attached as Exhibit E) appears to be on point. In *Lynch*, the plaintiff was a bank employee who had been accused of stealing from her employer. The plaintiff's employer asked her to remain behind after the bank had closed for a purported "teller's meeting." *Id.* at *2. In reality, the branch manager used this opportunity to question the plaintiff about her alleged theft, and she was not allowed to leave the bank until the police arrived and searched her belongings. *Id.* No evidence of theft was found, but the plaintiff was terminated. *Id.* She later brought a suit against her employer for, *inter alia*, false imprisonment. The defendants argued that the plaintiff's claim for false imprisonment was barred by the exclusivity provisions in Delaware's workers' compensation statute. *Id.* at *4. The court disagreed, noting that, in order for the workers' compensation statute to serve as a barrier to a civil suit, the complainant must have

32

sustained a physical or mental injury. *Id.* (citation omitted). The *Lynch* plaintiff had not alleged

that she suffered any mental or physical injury as a result of the alleged false imprisonment; her

alleged injury was simply a loss of her freedom of movement. *Id.* Thus, the court held that there

was no personal injury as contemplated by the workers' compensation statute, and the plaintiff's

action was not barred.

In the instant case, as previously mentioned, Ms. Rowan has alleged that she suffered

"anxiety, stress and emotional injury" as a result of her alleged false imprisonment. In other

words, she is alleging that she suffered a "personal injury." As such, the case at bar is similar to

*Joyner v. School District of Philadelphia*, 313 F.Supp.2d 495 (E.D.Pa. 2004). In *Joyner*, the

plaintiff was a teacher who had been involved in an altercation with one of the students in her

class. *Id.* at 498. After the altercation, the plaintiff was detained until the end of the school day,

at which time she was released. The plaintiff subsequently brought an action against her

employer, alleging, among other things, that she had been falsely imprisoned by her employer.

The defendants argued that the false imprisonment claim was precluded by Pennsylvania's

workers' compensation statute, which is similar to Delaware's with regard to the exclusivity

provision. Although the *Joyner* court's opinion does not specify the type of injury the plaintiff

alleged that she suffered, the court held that the plaintiff's action was barred by the workers'

compensation statute since the defendants' actions had not been directed at the plaintiff for

personal reasons. *Id.* at 503. In other words, the defendants' actions had arisen out of the

employment relationship.

Similarly, in the case at hand, as Ms. Rowan has admitted, Mr. Casper's actions were not

directed at her for personal reasons; rather, his actions arose out of and were in the course of his

33

employment. Since Ms. Rowan has alleged that she suffered personal injury as a result of Mr. Casper's actions, Delaware's workers' compensation statute provides her exclusive remedy, and her action for false imprisonment must be dismissed.

**B.    Plaintiff's claim for false imprisonment should be dismissed since her alleged detainment was de minimis.**

The facts, read in a light most favorable to Ms. Rowan, indicate that, at most, she was "falsely imprisoned" for no more than one or two minutes. The remaining witnesses to the event estimate it was no more than 15 or 30 seconds. In other words, Ms. Rowan's alleged false imprisonment was de minimus, and her claim should not be permitted to proceed. Defendants acknowledge that courts in other jurisdictions have permitted false imprisonment claims to go forward where the alleged detainment was brief, based on the rationale that it is for a jury to decide whether a plaintiff's alleged imprisonment is compensable. *See e.g. Johns v. Nestucca Rural Fire Protection Dist.*, 2007 WL 429111, at *6 (D.Or.)(attached hereto as Exhibit F); *Williams v. Food Lion, Inc.*, 446 S.E.2d 221, 223 (Ga.App.1994). However, the law does not require a remedy for every wrong allegedly suffered by a plaintiff. *See Sadler v. New Castle County*, 524 A.2d 18, 25 (Del.Super. 1987)(noting, "[Article I, Section 9 of the Delaware Constitution] does not, however, absolutely guarantee a remedy for every wrong done an individual.") Ms. Rowan, by her own admission, was allegedly detained for no more than a minute or two; such a "wrong" simply does not rise to the level that a legal remedy should be provided. Accordingly, Ms. Rowan's false imprisonment claim should be dismissed.

## CONCLUSION

For the foregoing reasons, Defendants James T. Chandler & Son, Inc. And Funeral

Services of Delaware respectfully request that this Court grant summary judgment in their favor

on all counts of Plaintiff's Complaint.

FERRY, JOSEPH & PEARCE, P.A.

YOUNG, CONAWAY, STARGATT &
TAYLOR, LLP

/s/Robert K. Pearce
Robert K. Pearce, Esquire (No. 191)
Thomas R. Riggs, Esquire (No. 4631)
824 North Market Street, Suite 904
P. O. Box 1351
Wilmington, DE 19899
Telephone: (302) 575-1555
Facsimile: (302) 575-1714
rpearce@ferryjoseph.com
Co-counsel for Defendants

/s/Teresa A. Cheek
Teresa A. Cheek, Esquire (No. 2657)
Margaret M. DiBianca, Esquire (No. 4539)
The Brandywine Building, 17th Floor
1000 West Street, P. O. Box 391
Wilmington, DE 19899-0391
Telephone: (302) 571-6676
Facsimile: (302) 576-3286
tcheek@ycst.com
Co-counsel for Defendants

Dated: May 14, 2007

35

# EXHIBIT
# A

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

JAMES T. CHANDLER & SON,
INC.,

    Plaintiff,

     vs.

ANNE M. ROWAN and MCCRERY
FUNERAL HOMES, INC., a Delware
Corporation,

    Defendants

          : Civil Action
          : No. 1056-N

       — — —

       Chancery Courtroom No. 12a
       New Castle County Courthouse
       Wilmington, Delaware
       Thursday, August 25, 2005
       10:00 a.m.

BEFORE:  HON. LEO E. STRINE, JR., Vice Chancellor.

ORAL ARGUMENT

----------------------------------------------------------------

CHANCERY COURT REPORTERS
500 North King Street - Suite 11400
Wilmington, Delaware 19801-3759
(302) 255-0525

2

1    APPEARANCES:

2

3            VICTOR F. BATTAGLIA, SR., ESQ.
             Biggs and Battaglia
4               For Petitioner

5            NICHOLAS E. SKILES, ESQ.
             Swartz Campbell LLC
6                  -and-
             WILLIAM T. SALZER, ESQ.
7            of the Pennsylvania Bar
             Swartz Campbell
8               For Defendants

9

10

11

12

13                    -  -  -

14

15

16

17

18

19     -

20

21

22

23

24

CFH 00227

3

1               THE COURT:  Good morning, everyone.

2               MR. BATTAGLIA:  Good morning.

3               THE COURT:  You may proceed,

4   Mr. Skiles.

5               MR. SKILES:  Thank you.

6               Your Honor, Nick Skiles on behalf of

7   Anne Rowan.  With me is Mr. Salzer, an attorney with

8   the law firm of Swartz & Campbell, who has been

9   admitted pro hac vice, and he will be presenting the

10  arguments.

11              MR. SALZER:  Good morning, Your Honor.

12              As you know, we are before the Court

13  today on two motions for the defendant Anne Rowan for

14  attorneys' fees under Rule 11, and fees under the

15  Delaware Uniform Trade Secrets statute.  This action

16  was commenced by the plaintiffs on January 26th by

17  complaint in which they allege that my client,

18  Anne Rowan, had breached a restrictive covenant in an

19  employment contract, was using and disclosing trade

20  secrets in violation of that contract.  It was

21  followed five days later by a motion for TRO in which

22  defendant Rowan prepared for and filed her answer in

23  which it was brought to the attention of the

24  plaintiffs the numerous deficiencies which existed

CFH 00228

4

1    with their cause of action.

2                    I would like to list the various facts

3    which would demonstrate the defendants were aware and

4    should have been aware of the patent deficiencies of

5    their legal action.

6                    THE COURT:   What is the trade secret?

7                    MR. SALZER:   This was the question

8    that I had posed continuously, because the pleadings

9    did not identify what the trade secret information

10   was.

11                   Now, my client worked as a seller of

12   pre need funeral services policies.

13                   THE COURT:   Pre need is before you

14   die?

15                   MR. SALZER:   Well, here, though, my

16   client's -- my client's role is pre need sales manager

17   at the time, as opposed to running the funeral home

18   and running the funeral.   So it's really -- there

19   isn't really any ongoing good will associated with her

20   endeavors.   She will tout the benefits of securing a

21   policy, sign up the individual who purchases the

22   insurance contract, and the funeral home is the

23   assignee or the lost payee, and you go on to your next

24   lead and go on to your next lead.   So the ongoing good

CFH 00229

5

1   will doesn't flow through my client in order to the

2   funeral home.

3                  In fact, in their pleadings they don't

4   plead anything associated with loss of good will by

5   the fact that my client is working for a competitor.

6   But here, again, they fired my client so they weren't

7   interested in what her energies and her efforts were

8   because they got rid of her.  She went down the road

9   and found a job elsewhere.

10                 But I wanted to stress here that

11  nowhere in their pleadings do they identify what she

12  took, which was unique, known to them.  And I think in

13  one of their briefs they made some reference to

14  pricing strategies -- some possibility -- but pricing

15  for these policies are public information and they're

16  published.  It's nothing -- there's no -- there are no

17  mysteries here.

18                 THE COURT:  Where are they published?

19          -              MR. SALZER:  Well, they're required to

20  be available.

21                 THE COURT:  The Insurance

22  Commissioner's Office requires those?

23                 MR. SALZER:  I'm informed by federal

24  law they're required.  So she had absolutely nothing

CHANCERY COURT REPORTERS

6

1  that could even remotely be considered to be a trade

2  secret, and it's still a mystery today as to what the

3  plaintiffs were thinking.

4                    THE COURT:  You look like a pre need,

5  but you look like you're getting closer to the need.

6  Is that how you sell this thing?

7                    MR. SALZER:  You know, I don't know

8  how.  But she's been doing it very successfully for --

9  really for the Chandler Funeral Home and thereafter.

10                   THE COURT:  My spouse has been trying

11  to get me to buy one of these.

12                   MR. SALZER:  After the break I guess

13  we can talk.  I have a very willing client to explain

14  all the details.

15                   What I'm trying to stress here is that

16  what she did was really not unique.  It's selling

17  insurance policies.  And her success, or lack of

18  success, depends on her personality and her

19  vitality -- her energy.

20                   THE COURT:  In neither of the

21  complaints or any interrogatory answers was there

22  identified a specific piece of unique -- information

23  unique to Chandler that she was using?

24                   MR. SALZER:  Not one iota.  We served

CFH 00231

7

1   discovery.  It was outstanding, so there was never a

2   response.  We wanted to find out that information.  If

3   you look at the complaint, the amended complaint, the

4   petition for a preliminary injunction, all of the

5   pleadings, it is not identified.  The proof in the

6   pudding is in the answer to our motion.  I'll quote

7   from this because I think it's particularly telling.

8                   They argue the plaintiffs certainly

9   have a reasonable basis to believe that in her new

10  employment, where she is performing the same services

11  for a competitor, there is a reasonable possibility

12  some or all of that proprietary information could be

13  utilized.  Well, once again, it doesn't identify what

14  they're speaking of.  The fact that they're talking

15  about a possibility is evidence they had no clue as to

16  what information she might have been using from her

17  prior job.  And the reality is is that Miss Rowan did

18  not take any client list, did not take any prospective

19  leads, left everything at her place of employment.

20                  THE COURT:  Is this an industry where

21  you use client lists a lot?

22                  MR. SALZER:  Well, if you cold call

23  and you meet somebody -- if you're a good sales

24  person, you'll make a note of it and follow-up with

8

1   that person.

2                   Now, we had given the plaintiffs a
3   number of opportunities to reconsider both at the very
4   beginning when they withdrew the TRO.  We, of course,
5   served -- we complied with the safe harbor provisions
6   by filing a Rule 11 motion.  Our affirmative defense
7   is in the answer and laid out the issues.  We attached
8   documentation to show that, "Gee, for four years she
9   was employed by Funeral Services of Delaware, LLC, not
10  the plaintiff that was the party to the employment
11  contract."  So we just laid it all out there and pled
12  for them to reconsider, because obviously my client,
13  as an individual, could not afford to travel the long
14  and hard path of litigation.  We needed to bring an
15  end to it immediately.

16                  And even up to almost the last day --
17  you know, I think about three or four days before
18  this -- before the plaintiffs agreed that they would
19  dismiss this case with prejudice -- the plaintiffs
20  were still demanding money from my client, as a
21  condition of dropping this lawsuit, which we refused
22  to consider.  So it was only after we showed
23  absolutely no intent to roll over that the plaintiffs
24  agreed that they would dismiss the case with

CHANCERY COURT REPORTERS

9

1   prejudice.

2               We filed this motion prior to entry

3   into that stipulation because of any concern that the

4   Court's jurisdiction would be lost by virtue of

5   entering into the stipulation before this issue was

6   presented before the Court.  We also believe that not

7   only did the plaintiffs breach their obligations of

8   conducting a reasonable investigation into the facts

9   underlying their pleadings, but the law firm did have

10  a duty to conduct some level of inquiry to

11  substantiate the accusations in their pleadings.  And

12  I think the response filed to our motion evidences

13  that just didn't happen.

14              What happened was, there was a series

15  of pleadings -- amended pleadings -- to try to sort of

16  respond to the evidence they were presenting before

17  the plaintiff's law firm, but never a willingness to

18  say, "You know what?  You're right.  We made a

19  mistake."

20              In fact, before the suit was filed, we

21  never received a cease and desist letter.  It was just

22  slapped with the lawsuit.  And you know, my client had

23  to hire a lawyer to defend herself.  So we believe

24  that both under the Uniform Trade Secrets Act,

CFH 00234

10

1  sufficient evidence exists to award fees, and under a

2  Rule 11 as well.

3                    THE COURT:   The Rule 11 letter that

4  you sent, that was sent before you answered the

5  amended complaint?

6                    MR. SALZER:   It was sent before we

7  answered the amended complaint.   We sent a motion --

8                    THE COURT:   A draft rule letter

9  motion?

10                   MR. SALZER:   Yes. -- after we answered

11  the first complaint, before -- I believe before we

12  answered the amended complaint.   That's my

13  recollection.

14                   THE COURT:   I thought it was

15  between -- I thought they originally answered the

16  first complaint, made some of these arguments, then,

17  when your friends filed the amended complaint, you

18  sent over the draft Rule 11 motion and asked them to

19  relent; and when they didn't relent, you had to answer

20  the complaint, and there was some limited discovery

21  before the case went away.

22                   MR. SALZER:   That's my recollection.

23                   I believe on February 25th -- I

24  believe -- we served counsel with a motion.

CFH 00235

11

1   February 25th.  The course, the docket will reflect

2   when the answer to the amended complaint was filed.

3                    THE COURT:  Well, I'll hear from your

4   friend, Mr. Battaglia, to see if he can nail that down

5   for me.

6                    MR. SALZER:  Thank you.

7                    THE COURT:  Mr. Battaglia.

8                    MR. BATTAGLIA:  Good morning, if Your

9   Honor please.

10                   Your Honor, we have remained convinced

11  that there were legal issues that would be resolved in

12  favor of Chandler's had this matter gone the route.

13  We were instructed by our client that because of the

14  cost of litigation and the other side -- when Chandler

15  was confronted with a host of discovery that the other

16  side dropped on us, they decided that they had to make

17  a business decision that they could no longer afford

18  to pursue this.  But this lawsuit was filed based upon

19  Mr. Chandler's complaint that Mrs. Rowan had been

20  employed by Chandler's but was terminated and,

21  contrary to agreements, was competing with Chandler.

22                   THE COURT:  Contrary to what

23  agreement?  An oral -- an expired contract from 1996?

24                   MR. BATTAGLIA:  Well, you have to look

CFH 00236

. 12

1   at the contract.  The basic contract is that contract.

2                   THE COURT:  I have looked at it and it

3   expired by its own terms.

4                   MR. BATTAGLIA:  But --

5                   THE COURT:  And there's nothing in our

6   law -- and you know this very well, Mr. Battaglia --

7   that restrictions against competition are not favored

8   in the law, they're upheld under reasonable duration

9   and specificity.  There isn't any case that says that

10  a three-year limitation on employment in an industry

11  like this would be reasonable, to begin with.  But

12  when it's in an agreement -- the thing about employers

13  is employers in an at-will state have a lot of rights.

14  They can just kind of snap their fingers and terminate

15  people.  So when they write contracts, they're kind of

16  stuck with them.  And this contract expired September

17  11th, 1996.

18                  MR. BATTAGLIA:  We think that there

19  are some aspects of the contract that did not expire.

20  Your Honor, please, if I could just be heard for a

21  second.

22                  If you look at Section 10, the

23  restrictions were not based upon the duration of this

24  particular contract.  It was contemplated, when this

CFH 00237

13

1   contract was entered, that from year to year it would

2   be renewed, that there would be tinkering with the

3   income provisions, there would be tinkering with the

4   duties, but essentially the contract continued.

5                      Your Honor will see that it is agreed

6   that -- it's agreed that the restrictions will

7   continue for a period of at least three years from the

8   date the employer is no longer employed by the

9   employer.  So the question is: when did the employment

10  by the employer stop?  We were prepared to show Your

11  Honor and have submitted the copies of contracts that

12  right up to the date when she was terminated she was

13  operating as an agent of Chandler's.  The contract she

14  executed was executed in the name of Chandler's.

15                     There is never a mention of the FSD.

16  The FSD was simply a service provision.  All of the

17  employees of Chandler received their paychecks from

18  FSD.  But the business enterprise was

19  James T. Chandler, Your Honor, please, and all

20  contracts were in the name of Chandler's.

21                     So we say that that restrictive

22  covenant had a life, even if you were to find that the

23  contract expired and was not renewed, which we think

24  is probably contrary to fact.  But even if you were to

CHANCERY COURT REPORTERS

CFH 00238

14

1    find that, we think that we would have been able to

2    show that the employment with Chandler continued right

3    up to the time she was terminated.

4                    THE COURT:  Her employment might

5    have -- her employment was somewhat continued.  You

6    know, here again, you're before me representing two

7    different entities.  You chose to put her on the

8    payroll of one and to avail your client -- your client

9    to avail itself of the benefits of separate forms of

10   the corporation, and now to say that someone worked

11   for both.  But I have little doubt at all that

12   Chandler wrote this contract.

13                    MR. BATTAGLIA:  I don't think there's

14   any question about that.

15                    THE COURT:  And by it's plain terms,

16   Mr. Battaglia, it expired.

17                    And what you are saying is that an

18   employer that writes a contract that expires so that

19   the employer's obligations -- and so long as it keeps

20   the person on as an at-will employee after that gets a

21   perpetual noncompete?

22                    MR. BATTAGLIA:  No, we're not saying

23   that, Your Honor.  We're saying that when the employer

24   contracts -- when Chandler contracts her to be an

CFH 00239

1   employee, when she contracts herself to be an employee
2   by writing contracts in the name of Chandler, all
3   contracts --

4                       THE COURT:   I'm not focused on the
5   entity dance between your client and the fact that
6   your client is availing -- has attempted to avail
7   himself of the benefits of a separate form of the
8   corporation and now claiming it doesn't matter.  This
9   is another typical instance we hear in America all the
10  time about litigation, and who brings it and who
11  causes courts to have litigation, and it's usually
12  tort plaintiffs who are accused of that; but in our
13  experience around here, it's usually businesses.

14                      And here you have a plain contract.
15  Your client drafted it.  It expired.  It gave
16  Ms. Rowan no rights beyond that year.  And now you're
17  saying, when she didn't get any of the benefits of
18  having a written contract that provided any guarantees
19  by your client to her, that somehow by her staying on
20  at will meant that, whenever she walked out, she
21  couldn't compete for three years in New Castle County
22  because your client's expired contract still bound
23  her?

24                      MR. BATTAGLIA:   Your Honor, please,

CFH 00240

16

1    the term of the contract was so long as she was

2    employed by Chandler.

3                    THE COURT:  Where does it say that,

4    Mr. Battaglia?  I've read Section 3.  The contract

5    does not say that, sir.

6                    MR. BATTAGLIA:  May I suggest, Your

7    Honor, please, Section 10.

8                    THE COURT:  Section 10.

9                    MR. BATTAGLIA:  From the date the

10   employee is no longer employed by the employer.

11                   THE COURT:  So you're saying this

12   term -- even though this contract as a written

13   document went away on September 1996 --

14                   MR. BATTAGLIA:  If you assume that it

15   went away.  We don't agree with that.  We think that

16   the contract was renewed from year to year.  But even

17   if you assume that it went away, we think that that

18   provision would have lasted beyond the termination of

19   the contract, Your Honor.

20                   THE COURT:  You think -- you think

21   that that's a reasonable reading of this and the

22   contract drafted by your client?

23                   MR. BATTAGLIA:  I thought it was, Your

24   Honor.  I advised Mr. Chandler that it was.  If there

CHANCERY COURT REPORTERS

CFH 00241

17

1   is a responsibility here, it is purely mine.

2                    THE COURT:  What is the trade secret,

3   Mr. Battaglia, that Miss Rowan stole?

4                    MR. BATTAGLIA:  In order to tell you

5   what the trade secrets are, you have to look at

6   Section 7 of the contract, which defines trade

7   secrets.

8                    THE COURT:  So again, this one lived.

9                    MR. BATTAGLIA:  Indeed, if that's the

10  contract they were operating under, Your Honor.

11                   THE COURT:  How could it be?  It

12  expired by its own terms.

13                   MR. BATTAGLIA:  Our argument was that

14  it was continued from year to year with minor

15  tinkering with the salary and the duties, but no major

16  changes.  And all the responsibilities continued.

17  That was --

18                   THE COURT:  They orally discussed

19  these sections every year?

20                   MR. BATTAGLIA:  No, sir, they did not

21  orally discuss them.  It was implicit --

22                   THE COURT:  It was an implicit

23  restriction on competition that existed?

24                   MR. BATTAGLIA:  It was implicit that

CHANCERY COURT REPORTERS

18

1   the contract continue, except -- the only thing they

2   talked about were the change in dollars.

3                   THE COURT:  What is the burden of

4   proof that would exist on your client's part to prove

5   up the contract?

6                   MR. BATTAGLIA:  Your Honor, we stopped

7   all discovery because of the expense of my client.

8   But had we had the opportunity --

9                   THE COURT:  What is the evidentiary

10  burden of proof?

11                  MR. BATTAGLIA:  I think we would have

12  had the burden to prove that it continued.

13                  THE COURT:  Isn't it actually not a

14  preponderance?  Isn't it: you would have had to prove

15  an exception to the statute of frauds, and not only

16  would you have to prove that a three-year prohibition

17  on competition was reasonable, given the nature of the

18  services, Mrs. Rowan -- Ms., or Mrs. Rowan, I don't

19  know which she is -- performed -- which I think might

20  be a difficulty -- you would have to prove the

21  existence of this oral contract and its specific terms

22  by clear and convincing evidence?  You're now telling

23  me your client never went over these elements every

24  year with Miss Rowan?

CFH 00243

19

1           MR. BATTAGLIA:  I think that's
2    absolutely clear, Your Honor.
3           THE COURT:  So it's an implicit oral
4    contract that -- and the expired contract that most of
5    the terms have changed materially over the years in
6    different ways, that aspects of it implicitly
7    continued?
8           MR. BATTAGLIA:  Demonstrated
9    irrefutably by the fact that they continued to act as
10   agent and principal and she continued to function in
11   that role.
12          THE COURT:  Why can't an employee say,
13   you know, I signed this thing the first year.  They
14   never -- it's not my duty to go sign up a new
15   noncompete, given that they're not exactly paying me
16   all that lavishly.  I'm doing all right.  It's not
17   like I'm a CEO of a publicly listed corporation or
18   anything.  I got some duty to go ask my employer, you
19   know, please give me a new noncompete to sign?
20          MR. BATTAGLIA:  Your Honor, when the
21   employer continues in the same situation and the
22   employee continues in the same situation, there are
23   cases that support the fact that there's implicit
24   relationship there, and it's governed by the term of

CHANCERY COURT REPORTERS

CFH 00244

20

1    the document.  It's not a statute of frauds problem.

2    There's a document in writing signed by the parties to

3    be charged.  It also is a contract that was --

4                    THE COURT:  Let's get -- let's get to

5    what the trade secret is.

6                    MR. BATTAGLIA:  I'm sorry.

7                    THE COURT:  I would like to know what

8    the specific trade secret is.

9                    MR. BATTAGLIA:  I didn't mean to

10   distract you.

11                   THE COURT:  I was distracting myself,

12   and I apologize.

13                   MR. BATTAGLIA:  Section 7 of the

14   contract, Your Honor, please.

15                   THE COURT:  I want to know -- I don't

16   want to know about Section 7.  I want to know what the

17   trade secret is, what Miss Rowan did that was wrong.

18                   MR. BATTAGLIA:  Section 7 makes

19   anything she does in connection with this business

20   confidential trade information.  It is not subject to

21   any definition, or what they argue today, because they

22   have agreed that anything --

23                   THE COURT:  So what did she do?  You

24   should know -- your client should know.  What did she

CFH 00245

21

1    do?

2                    MR. BATTAGLIA:  She went to work for a

3    competitor selling --

4                    THE COURT:  That's back in the

5    noncompete.

6                    What information was used?

7                    MR. BATTAGLIA:  I'm sorry.

8                    THE COURT:  You're telling me again

9    that the very -- her very act of selling pre funeral

10   plans was a violation of the Trade Secrets Act.

11                   MR. BATTAGLIA:  Yes, sir.

12                   THE COURT:  One, you've got a

13   statutory claim, and the statute I don't think is

14   driven by the contract; right?

15                   MR. BATTAGLIA:  May I say, Your Honor,

16   please, the complaint did not charge a violation of

17   the statute.  If we picked that up, we picked that up

18   as an afterthought and it was wrong.  The trade secret

19   that we're relying upon is the exclusion from the

20   Trade Secret Act, frankly, that says the Trade Secret

21   Act is not exclusive with respect to trade secret

22   information.

23                   THE COURT:  So what were the trade

24   secrets?

22

1                    MR. BATTAGLIA:  Dealing with any pre

2   need thing in this community where trade secrets, as

3   defined by --

4                    THE COURT:  Any -- dealing within the

5   subject at all was a trade secret?

6                    MR. BATTAGLIA:  The agreement says, or

7   any other information concerning the business of

8   employers, matter of operation --

9                    THE COURT:  What information did she

10  use?  You think Miss Rowan had to go to Chandler to

11  learn that people sold pre need funeral policies?

12                   MR. BATTAGLIA:  I think aspects of

13  that are completely involved.

14                   THE COURT:  What aspect did she use?

15                   MR. BATTAGLIA:  Even dealing with --

16  even knowing the insurance companies who sell this

17  kind of product, even developing the approach to

18  people, even --

19                   THE COURT:  So basically it just

20  conflicts with your noncompete argument?

21                   MR. BATTAGLIA:  It is very consistent.

22                   THE COURT:  What was your demand for

23  cash from her?

24                   MR. BATTAGLIA:  I think we offered to

CHANCERY COURT REPORTERS

23

1   settle it for essentially what were the attorneys'

2   fees at the time, about -- I think it was $10,000, but

3   I'm not sure.

4                   THE COURT:  Okay.  Let me hear from

5   your friend on the other side.

6                   MR. BATTAGLIA:  All right, Your Honor.

7                   MR. SALZER:  Well, Your Honor, the

8   Rule 11 motion was sent on February 25th and we

9   received a letter from counsel acknowledging receipt

10  on February 28th saying that he intended to pursue

11  what he believed to be a valid claim.  I unfortunately

12  can't find the dockets.  I believe that the filing --

13                  THE COURT:  We'll pull it up on

14  LexisNexis.

15                  MR. SALZER:  It's very close in time

16  to the filing of their answer to the amended

17  complaint.

18                  MR. BATTAGLIA:  I have it on my docket

19  as the answer of Rowan to the amended complaint filed

20  on February 13th of '05.

21                  MR. SALZER:  Well, then, it's

22  afterwards by 12 days.

23                  I wanted to just very briefly focus on

24  the issues of -- the notion that the one-year contract

CHANCERY COURT REPORTERS

24

1   has a continuing ad infinitum effect, because that's
2   where we did get into the issues of who the employer
3   was and what was the entity that employed Miss Rowan
4   at the time of her termination.

5                   This is a three-year restrictive
6   covenant.  It's a three-year restrictive covenant.  So
7   if you bought the notion that it had some lasting
8   effect after September of 1996, we pled -- and I was
9   not refuted -- that she was employed by
10  Funeral Services of Delaware in 2001, more than three
11  years after she -- more than three years before she
12  took the job with McCrery.  So even under that concept
13  that it had continuing vitality, we would still be in
14  compliance with the restrictive covenant, putting
15  aside reasonableness, duration and all those things.

16                  And in response to this problem of who
17  the corporate entities were, the plaintiffs pled these
18  various, I believe, totally outlandish theories,
19  pleading that Funeral Services of Delaware was the
20  alter ego of Chandler.  I had never seen anything like
21  that before: entity A pleading it is the alter ego of
22  entity B, for purposes of asserting a contract right
23  of entity B.  Alter ego is a plaintiff's theory to
24  pierce a corporate veil to recover a judgment.  It

CFH 00249

25

1  doesn't give the right of corporations to display lose

2  and fancy with their -- the fact of their existence

3  and the force of other contracts.  So this was just

4  nonsense, really.

5          Then they alleged that they were a

6  successor in interest.  Well, these corporations were

7  both in good standing at the time of the filing of the

8  lawsuit.  That was known.

9          THE COURT:  So there's -- they're

10  still operating?

11          MR. SALZER:  They're still operating,

12  according to the corporation bureau, as two entities.

13  It's impossible for --

14          THE COURT:  And the one entity sells

15  the insurance policies?

16          MR. SALZER:  They're two homes.  So I

17  think what happened is that there was an acquisition

18  of an ownership interest in the Corleto-Latina Home,

19  different ownership mix.  So that was why they had a

20  separate LLC created.  But these two companies existed

21  side by side.  One could not be a successor of the

22  other yet, to get over the hurdle of this apparent

23  problem, they pled as if they were the successor.

24  Once again, it's nonsense.

CFH 00250

1          Then, of course, they pled that they

2   were the assignee.  Well, there was never an

3   assignment.  It's undisputed that there was never a

4   document reflecting an assignment of the contract.

5   That doesn't seem to matter.  You can just plead

6   anything you want to attempt to state a cause of

7   action.

8          Now, lastly, this idea that, well, if

9   Funeral Service contracts that Miss Rowan entered into

10  were in the name of Chandler Funeral Home, well that

11  has no bearing on who is her employer and what governs

12  the employment relationship.  She can work for entity

13  A, even as an agent of entity B, for purposes of

14  entering into an insurance policy.  It has no

15  relation -- no probative value to what is the

16  employment relationship or what is the contract.  It's

17  apples and oranges.  It's just more evidence of the

18  frivolity of it.

19          THE COURT:  When the original

20  complaint was filed and the motion for TRO, you had

21  discussions with the other side and attempted to talk

22  them back, and that's what got the TRO going?

23          MR. SALZER:  Contemporaneous with our

24  filing of the answer to the amended complaint, in

27 .

1    which we set forth very detailed affirmative defenses

2    laying it all out, we had conversations.

3                    THE COURT:  When was the TRO motion

4    withdrawn?

5                    MR. SALZER:  It was withdrawn shortly

6    after -- shortly after the filing of our answer.

7                    THE COURT:  To the original complaint?

8                    MR. SALZER:  To the original

9    complaint.  In that time frame I had a conversation

10   with Mr. Battaglia, albeit relatively short because it

11   was apparent to me that it wasn't going anywhere, in

12   which, one, we identified that she was not working for

13   the Chandler Funeral Home; two, I expressed my

14   viewpoint that I didn't see how there was any way that

15   you could enforce a covenant because there was no good

16   will that was being impacted.

17                    I'll be candid with the Court.  I

18   don't recall whether in that first conversation we

19   spoke about the trade secret information.  But it was

20   pretty apparent, of course, in discovery, we were

21   trying to find out what it was.

22                    We made multiple opportunities to

23   avoid coming here today, but it was only after my

24   client had to incur all the expenses and fees to get

CHANCERY COURT REPORTERS

CFH 00252

28

1   this case dropped that we were here.

2               THE COURT:   Thank you.

3               I'm prepared to rule and I'm going to

4   rule.  And I'm going to rule in a way that I believe

5   is excessively charitable, if anything, to the

6   plaintiff.

7               I'm confronted with what is clearly an

8   inequitable situation, and an inequitable situation

9   whereby a business that terminates an employee, then,

10  frankly, files a frivolous lawsuit against the

11  employee.  I'm going to be excessively charitable by

12  allowing -- by not allowing fees for the first

13  complaint.  I'm going to allow -- all Ms. Rowan's fees

14  from the time any work that was done after she

15  answered the original complaint to be paid for by the

16  petitioners and their lawyers, and they can figure out

17  who's responsible.

18              I can see impulsively reacting to

19  competition from an employee and a lawyer having to

20  quickly act on behalf of a client, and that's why I'm

21  giving you credit for that.  But Chandler and his

22  attorney -- distinguished attorney -- and this pains

23  me to do this.  I don't like doing this.  Part of the

24  reason why I'm doing it from the bench is, I don't

CFH 00253

```
 1   want to write an opinion.  You know, bench rulings are
 2   bench rulings.  If I have to write an opinion, then
 3   that's searchable on Westlaw and Lexis forever and
 4   it's out there in the community.  I don't want to do
 5   that.  And I don't want to make this into the private
 6   century, but it is a grotesque inequity.  The idea --
 7   as I understand the law -- and I think I understand
 8   covenants of not to compete very well, because it's
 9   what I have to do around here frequently -- covenants
10   not to compete are not a favorite.  We are an
11   economy -- we have a fixed economy.  It's based on a
12   regulated capitalist system, and where there's a heavy
13   dose of competition.  So we don't favor restrictions
14   on competition.
15                   We're also worried that we're an
16   at-will state and the policies of our state are about
17   how employees will be treated in a situation where
18   they don't have all that many strong statutory or
19   common law rights to begin with.  If you want to
20   restrict someone from competing, you know, we kind
21   of -- we kind of think that's a little unAmerican.
22   There's a little push back.  That means it has to be
23   reasonable as to scope and duration, geographically
24   and how long.  Frankly, I think it's -- it would be
```

CHANCERY COURT REPORTERS

CFH 00254

30

1   very difficult, if almost impossible, for Chandler,

2   had this contract been in place, to prove that a

3   three-year restriction on participating in this market

4   would be reasonable.  I mean, I've heard nothing.  And

5   I've read all the papers.  And I heard nothing that

6   suggested that would be reasonable, especially -- and

7   there's a proportionality component of the

8   reasonableness inquiry, which is how unique and

9   distinct is what the employee does, and what does the

10  employee get.

11              You know, it may be one thing if you

12  invent some new thing and you got -- you're the first

13  in the territory and then you train somebody and they

14  go out and exploit it.  Right?  You know, we might

15  give you -- the law tends to give more leeway to that.

16  There's nothing about this that suggests that

17  something as onerous as three years would be

18  reasonable.  But that's a trifle, compared to the

19  astonishing notion that an employer, who crafts an

20  agreement with a clear termination provision -- a

21  termination provision, which by the way, divests the

22  employee of any of the rights of the agreement at the

23  end of its plain terms -- would then say, well, you

24  know, but implicitly we kept the employee on the

31

1   payroll.  The employee never came and said, "Put a

2   piece of paper saying, yeah, you know, the contract

3   you drafted for me that says expired, well you signed

4   a piece of paper every day saying it's still expired."

5   That's not the duty of an employee.

6                  If an employer wants a noncompetition

7   provision from an employee, it's the employer's duty

8   to secure it.  And when an employer drafts an

9   agreement that terminates the rights of the employee

10  and the provisions of the contract on a date certain,

11  the employer has to live with that, not just the

12  employee.  This is absurd.  And the notion that it

13  lives on -- nothing lives on beyond September 11th,

14  1996, except some preexisting obligation to pay maybe

15  Miss Rowan's last bit of salary for that year.  But

16  the idea that she would implicitly, by not quiting her

17  job, re-upped, Mr. Battaglia, there was no paragraph

18  by paragraph recontracting orally every year.  This

19  would be within the statute of frauds, in my view, to

20  prove up an oral agreement.

21                 That document, by it's plain terms,

22  it's expired.  If you want to revive it, you'll have

23  to prove an oral agreement to revive it by clear and

24  convincing evidence.  Then you're going to have to

CFH 00256

32

1    prove that the restriction was reasonable in scope and

2    duration.  I don't think you can even do that as to

3    the duration, even if it was actually enforced.  I

4    think there's no nonfrivolous argument for it to be

5    enforced, particularly given the contractual

6    interpretation of presumption against Chandler.

7    Chandler would have to prove that its reading of the

8    contract was the only reading of the contract.  There

9    is no way it can do it.  I don't even think the

10   reading of the contract is reasonable.  Its trade

11   secret claim is even more of a farce.  Again, the idea

12   that this provision of the trade secret that

13   continues -- that doesn't even have the hook of "so

14   long as you're employed."  It's just sitting out there

15   nakedly.

16              What is the trade secret?  The idea

17   that people die, there's a trade secret apparently,

18   because it relates to this.  Sometimes people die and

19   they'd like to have things taken care of financially

20   in advance so that those they love don't have to do

21   it.  There's a trade secret.  The idea that you could

22   procure insurance is apparently a trade secret.  I

23   read in papers that pets -- that people sometimes do

24   this for their pets.  That's a trade secret.  I was in

CFH 00257

1   on that because I remember watching -- channel surfing

2   one day, trying to get to the news or something, and I

3   went through Entertainment Tonight or something.  They

4   were talking about all these people in Hollywood

5   buying -- having funeral vaults for Fi Fi the dog.

6   These are the kinds of trade secrets that Miss Rowan

7   took?  Our law doesn't recognize anything like that as

8   a trade secret.

9                   Even acknowledging Mr. Battaglia's

10  argument that that could be a deviation between .

11  contractually defined trade secrets in the statute,

12  you still have to reasonably define them.  You have to

13  plead the what.  What was pled here is that Miss Rowan

14  was somehow stealing trade secrets totally

15  unidentified.  Mr. Battaglia can't -- the only trade

16  secret she was stealing was the very fact of her

17  participating in this rather mundane industry was in

18  itself a stealing of a trade secret.  That doesn't cut

19  it.  It doesn't come close to cutting it.

20                  The balancing of the equities.  I've

21  got to say, I thought a lot about this.  I don't like

22  to do this.  I really was tempted, frankly, to award

23  all the fees to Ms. Rowan, particularly when I

24  heard -- I asked Mr. Battaglia for a reason what the

CFH 00258

34

1    request was, and he answered about what I assumed it

2    would be, which is that Chandler wished to essentially

3    be able to make Ms. Rowan pay Mr. Battaglia.  That

4    almost got me the whole way to awarding everything.

5    It didn't.

6                 You know, I'm going to be restrained

7    here.  I'll give you credit.  But I mean, it says

8    something that ought to be reflected upon, the idea

9    that Chandler, these two entities -- I'm going to

10   finish with the entity point -- but these two entities

11   were very happy to have Miss Rowan individually

12   subsidize their frivolous lawsuit -- dismay is about

13   the best word.  Again, I'll finish again with the idea

14   we have an entity, an employer essentially preserves

15   the right to terminate an employee at any time,

16   decides that it will employ the person for a

17   particular corporation.  That's convenient -- can be

18   convenient for tax reasons, for all kinds of reasons.

19   If the employee believed that it's actual employer,

20   the entity that was actually paying her checks,

21   shorted her when she sued the other entity, I have no

22   doubt that the Chandler, you know, parent company

23   comes in and says, Ms. Rowan was working for them, she

24   can only sue this entity.  Just like if a customer had

CFH 00259

35

1  a problem with one of the entities.  No, we're

2  protected by the corporate -- you know, the corporate

3  forum.  This was a capitalized corporation.  There's

4  no need to look to anything else.  Yet an employee

5  apparently works for both, and not only works to her

6  but works under an expired contract that is implicitly

7  renewed every year, even though there's not a

8  discussion of its actual terms.  And even though

9  various terms change every time, including apparently

10  the entity the employee is working for changed, but

11  this is assigned -- this implicitly reaffirmed

12  contract is assigned pursuant to apparently an

13  implicit assignability provision of the contract.  It

14  would be cutting edge stuff, I think, for the law to

15  embrace these theories.

16           So, you know, I take no joy in this,

17  but I feel the duty to speak plainly.  Frankly, if

18  anything, I've couched my ruling in order to be as

19  diplomatic but as clear as possible.  But I want --

20  what I want Mr. Skiles and his colleagues to do is put

21  in an affidavit as to your time from the period --

22  from any work you did from when the answer -- after

23  the answer was filed to the first complaint, and to

24  work with Mr. Battaglia and to submit an agreed-upon

CFH 00260

36

1    form of order that implements this ruling.

2                    MR. SKILES:   Certainly, Your Honor.

3                    THE COURT:   Thank you all.

4                    (Court adjourned at 10:55 a.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

CHANCERY COURT REPORTERS

CFH 00261

37

```
1                        CERTIFICATE
2                   I, DIANE G. McGRELLIS, Official Court
3   Reporter of the Chancery Court, State of Delaware, do
4   hereby certify that the foregoing pages numbered 3
5   through 36 contain a true and correct transcription of
6   the proceedings as stenographically reported by me at
7   the hearing in the above cause before the Vice
8   Chancellor of the State of Delaware, on the date
9   therein indicated.
10                  IN WITNESS WHEREOF I have hereunto set
11  my hand at Wilmington, this 8th day of November, 2005.
12
13                       Diane S. Mc Grellis
14              ------------------------------
                       Official Court Reporter
15                        of the Chancery Court
                           State of Delaware
16
17
       Certification Number: 187-PS
18     Expiration:   Permanent
19       -
20
21
22
23
24
```

CHANCERY COURT REPORTERS

CFH 00262

# EXHIBIT
# B

## *Senate Bill # 154*

| | | | | |
|---|---|---|---|---|
| **Primary Sponsor:** | Marshall | | **Additional Sponsor:** | Lofink |

**Introduced on :**   06/12/2003

**Long Title:**   AN ACT TO AMEND TITLE 19 OF THE DELAWARE CODE RELATING TO DISCRIMINATION IN EMPLOYMENT.

**Synopsis:**   This bill eliminates the Equal Employment Review Board, and creates a corresponding Delaware Right to Sue in Superior Court after exhausting Administrative remedies. This bill confirms that Chapter 7 is the exclusive and sole remedy for employment discrimination claims, requiring initial processing of all such claims with the Department of Labor for review and action. This bill effectively re-establishes the exclusive remedy put in question by the decision in Schuster v. Derocili, 775 A. 2d 1029 (2001). Some definitions have been added to section 710, specifically new terms such as "No Cause Determination"; "Reasonable Cause Determination"; "Charging Party"; "Respondent"; "Delaware Right to Sue Notice"; "Mediation"; and "Conciliation". Sections 712, 714 and 715 have been repealed in their entirety and rewritten to accomplish the goals of initially pursuing informal methods of resolution through mediation and conciliation and then permitting civil actions in Superior Court.
☐

**CoSponsors:**   { NONE...}

**Current Status:**   Signed  **On**  07/12/2004

**Volume Chapter**   74:356                    **Fiscal Note:** Not Required

**Date Governor acted:**   07/12/2004

**Full text of Legislation:**
**(in HTML format)**   **Legis.html**

**Full text of Legislation:**
**(in MS Word format)**   **Legis.Doc**   (You need Microsoft Word to see this document.)


**Committee Reports:**   Senate Committee report 05/12/04 03:59 pm F=0 M=3 U=0----->
                        House Committee Report 06/22/04 F=0 M=5 U=0---->

**Voting Reports:**   Senate vote: () Passed 6/10/2004 4:58:12 PM------->
                     House vote: () Passed 6/24/2004 7:24:29 PM------->

## Actions History:

Jun 24, 2004 - Passed by House of Representatives
Jun 22, 2004 - Reported Out of Committee (LABOR) with 5 On Its Merits
Jun 16, 2004 - Introduced and Assigned to Labor Committee in House
Jun 10, 2004 - Passed by Senate
May 12, 2004 - Reported Out of Committee (SMALL BUSINESS) with 3 On Its Merits
Jun 12, 2003 - Assigned to Small Business committee in Senate

# EXHIBIT
# C



Not Reported in A.2d                                                                                          Page 1

Not Reported in A.2d, 1985 WL 552279 (Del.Super.)
(Cite as: Not Reported in A.2d)

Harrison v. Figueroa
Del.Super.,1985.
Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Superior Court of Delaware.
C.L. Scott HARRISON
v.
Nivea R. Castro FIGUEROA
No. Civ.A. 83C-MY-14.

Submitted Jan. 11, 1985.
Decided March 6, 1985.
Gentlemen:
BIFFERATO, J.
*1 This is an action for damages brought by C.L.
Harrison (hereinafter "Harrison") against Nivea
Castro Figueroa (hereinafter "Defendant") for
malicious prosecution, abuse of process, and false
arrest.

Harrison owns a rental property at 617 North
Tatnall Street in Wilmington. In December, 1980,
Harrison rented the property without a lease to one
Willie Brown, presently age 50, and Miss Viola
Grandville, presently age 68, charging $120 per
month. At some point, DP & L turned off the gas
for the heat and hot water due to lack of payment.
Tenant Brown arranged with DP & L to restore
service; however, when the serviceman arrived to
restore the service, he refused because holes in the
chimney created a dangerous situation. The tenants
persevered without heat or hot water for over a
year, including the 1981-82 winter.

In September, 1982, Mr. Brown went to court to
fight eviction and to get the premises repaired, at
which time the judge told him to get a lawyer.
Brown approached the defendant, at the time a staff
attorney with Community Legal Aid Society, Inc.,
(CLASI) who agreed to represent Brown and
Grandville. On October 27, 1982, defendant, on
behalf of her clients, filed a complaint and request

for forthwith summons to compel Harrison to repair
the rental property, and to secure for her client rent
abatement due to the denial of essential services
necessary to the safe habitation of the rental unit.

The constables served Harrison on October 28,
1982 at approximately 7:00 a.m. The constables,
pursuant to the judge's instruction regarding the
forthwith summons, brought Harrison down to
Justice of the Peace Court # 13 (hereinafter "J.P.
Court"). He remained at J.P. Court until defendant
arrived at approximately 9:30 a.m. A hearing was
begun, but after an "expression of outrage" by
Harrison's counsel, it was rescheduled. After being
rescheduled several times, the case was heard by a
six-person jury on February 23, 1983. The jury
awarded defendant's clients (defendant was no
longer with CLASI so another CLASI staff attorney
represented Brown and Grandville at trial) Brown
and Grandville $889.50 in rent abatement. Harrison
prevailed on a counterclaim. It is interesting to note
that the hot water heater was replaced by Harrison
several days after the Brown/Grandville suit was
filed, and that Brown patched up the chimney,
himself.

Now before the Court is defendant's motion for
summary judgment.

In order to prevail on her motion for summary
judgment, defendant must demonstrate that, taking
the evidence in the light most favorable to plaintiff,
she is entitled to judgment as a matter of law. *Oliver
B. Cannon & Sons, Inc. v. Dorr-Oliver, Inc.*,
Del.Super., 312 A.2d 322 (1973).

Each cause of action will be addressed separately:

*Malicious Prosecution*

The elements of malicious prosecution are that:
(1) There must have been a prior institution or
continuation of some regular judicial proceedings

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                              Page 2

Not Reported in A.2d, 1985 WL 552279 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

against the plaintiff in this action for malicious prosecution.
\*2 (2) Such former proceedings must have been by, or at the instance of the defendant in this action for malicious prosecution.
(3) The former proceedings must have terminated in favor of the defendant therein, the plaintiff in the action for malicious prosecution.
(4) There must have been malice in instituting the former proceedings.
(5) There must have been want of probable cause for the institution of the former proceedings.
(6) There must have been injury or damage resulting to the plaintiff from the former proceedings.

*Stidham v. Diamond State Brewery,* Super.Ct., 21 A.2d 283 at 284 (1941).

Harrison has not, and cannot, demonstrate that the former proceeding was terminated in his favor. The February 25, 1983 order of the J.P. Court is irrefutable evidence that Harrison lost in the prior proceedings. Harrison attempts to distinguish the forthwith summons from the proceeding on the merits. This is inappropriate. Harrison's argument, if anything, goes to the abuse of process claim and not the malicious prosecution claim.[FN1]

> FN1. The Court has read the memoranda written by Chief Magistrate Norman Barron and submitted by Harrison but is not considering it in the resolution of the motion presently before the Court. The memo was written over a year after the incident, and is immaterial and irrelevant to this proceeding. Delaware Rule of Evidence 402, 407.

### False Imprisonment

False imprisonment is defined as the unlawful restraint by one person of the physical liberty of another. 32 Am.Jur.2d False Imprisonment § 1. In other words, the elements of the tort are (a) restraint which is both (b) unlawful and (c) against one's will. *Id.* False Imprisonment § 5.

Harrison has not submitted, nor could the Court find, any authority or facts to support his position that his detention was unlawful. Instead, he relies on the aforementioned Barron directive from which he infers that Barron concluded that detention pursuant to a forthwith summons is illegal. The Barron directive does not conclude that such an arrest is unlawful; rather, it merely changes the procedure utilized when a forthwith summons is issued.

This Court finds no evidence that the arrest, pursuant to a forthwith summons, is unlawful. Defendant has met her burden with respect to the claim of false imprisonment.

### Abuse of Process

The elements of the tort of abuse of process are: (a) an ulterior purpose and (b) a willful act in the use of process not proper in the regular conduct of the proceedings. *Nix v. Sawyer,* Del.Super ., 466 A.2d 407, 412 (1983), quoting *Unit, Inc. v. Kentucky Fried Chicken Corporation,* Del.Super., 304 A.2d 320 (1973). *See* Prosser and Keeton on Torts § 121 (5th ed., 1984).

Harrison's evidence of ulterior motive is insufficient to create a question of fact. The record is barren of facts to show that the use of a forthwith summons was for any purpose other than compelling Harrison's attendance at the hearing. Harrison concedes in his brief that had he been served with a mere summons, he would not have been compelled to come to court to defend his case. In such a situation, the litigation would have been dragged out, thereby denying Brown and Grandville essential services. This was precisely what defendant sought to avoid by use of the forthwith summons.

\*3 The record is clear that defendant's motive in requesting a forthwith summons was to secure Harrison's attendance in order to promptly restore essential services to his tenants. There is not a single shred of evidence that defendant had another improper motive for requesting such service.

Defendant's motion for summary judgment is

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                              Page 3

Not Reported in A.2d, 1985 WL 552279 (Del.Super.)
**(Cite as: Not Reported in A.2d)**


GRANTED. IT IS SO ORDERED.

Del.Super.,1985.
Harrison v. Figueroa
Not Reported in A.2d, 1985 WL 552279
(Del.Super.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT
# D

Westlaw.

Not Reported in A.2d                                                    Page 1

Not Reported in A.2d, 1997 WL 817873 (Del.Super.)
(Cite as: Not Reported in A.2d)

**H**
Dockham v. Miller
Del.Super.,1997.
Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Superior Court of Delaware.
Leticia DOCKHAM and Stephen A. Ingrahm
v.
Linwood R. MILLER
No. 95C-02-091-WTQ.

May 21, 1997.

Letter Opinion and Order on Defendant's Motion
for Summary Judgment-Motion Denied.

Jeffrey S. Welch, Esquire, Mary Anne McLane,
Esquire, Murphy Welch & Spadaro, Wilmington,
DE.
Stephen P. Casarino, Esquire, Casarino Christman
& Shalk, Wilmington, DE.
QUILLEN, J.
*1 Dear Ms. McLane and Messrs. Casarino and
Welch:

This is the Court's decision on defendant's Motion
for Summary Judgment pursuant to Superior Court
Civil Rule 56. Defendant seeks a decision from
this Court that plaintiffs' claims are barred by the
exclusivity provisions of Delaware's worker's
compensation statute, 19 *Del. C.* ch. 23. For the
reasons that follow, the Motion is DENIED.

FACTS

On June 25, 1994, plaintiff Leticia Dockham
(hereinafter "Dockham") was employed as a
waitress at Captain John's Restaurant in Dover.
Defendant Linwood R. Miller (hereinafter "Miller")
at the time was a co-owner of the restaurant and
Dockham's direct supervisor. On that day,

Dockham was the waitress for "Section 2" of the
restaurant. According to Miller, the restaurant's
custom was that the hostess and the waitress in
Section 2 were responsible for maintaining the
buffet line, keeping it clean and making sure the
kitchen kept it well-stocked. According to
Dockham, she had no duties with respect to the
buffet. During his deposition, Miller testified that
during Dockham's shift he noticed that the buffet
was nearly empty and that the biscuits were hard.
Allegedly upset by this, Miller took one of the
biscuits, went to the hostess, put the biscuit in her
face, and asked her if she would eat it. Miller then
approached Dockham. According to Dockham,
Miller grabbed her by the shoulders and shoved the
biscuit into her mouth, cutting Dockham's mouth.
He also bent her over backwards, which allegedly
caused injury to Dockham as she struggled to
extricate herself. Dockham collected worker's
compensation benefits from the restaurant's worker's
compensation carrier.

Miller testified at deposition that his sole reason for
his actions was his anger over the condition of the
buffet. Dockham, however, also asserts that Miller
was angry with her because she knew of the affair
he was having with another employee.[FN1] She also
asserts that Miller had been "picking on" her for
sometime in a variety of ways: (1) assigning to her
tasks properly belonging to other waitresses; (2)
belittling her intelligence and difficulty with
speaking English; (3) making unwelcome physical
contact; and (4) making inappropriate and
unwelcome remarks concerning her nationality
(Filipino) and gender.

FN1. Dockham has not, however, actually
come forth with any evidence tending to
indicate that such an affair did take place.
Her only deposition testimony as to the
affair was a basic "well, everybody knew
about it" response to a question concerning
her evidence of the affair.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Page 2

Not Reported in A.2d, 1997 WL 817873 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

Dockham and her husband, plaintiff Stephen A. Ingrahm, filed this action in Superior Court on February 10, 1995 against Miller and the restaurant. A motion to dismiss as to both defendants was subsequently granted in part when the Court ruled that the action was barred against the restaurant. The Court denied the motion as to Miller. Following discovery, Miller now moves for summary judgment.

### DISCUSSION

When considering a motion for summary judgment under Superior Court Civil Rule 56, the Court's function is to examine the record to determine whether genuine issues of material fact exist. *Oliver B. Cannon & Sons, Inc. v. Dorr-Oliver, Inc.,* Del.Super., 312 A.2d 322, 325 (1973). If, after viewing the record in a light most favorable to the non-moving party, the Court finds there are no genuine issues of material fact, summary judgment is appropriate. *Id.* The Court's decision must be based only on the record presented, including all pleadings, affidavits, depositions, admissions, and answers to interrogatories, not on what evidence is " potentially possible." *Rochester v. Katalan,* Del.Supr., 320 A.2d 704, 708 (1974). All reasonable inferences must be drawn in favor of the non-moving party. *Sweetman v. Strescon Indus.,* Del.Super., 389 A.2d 1319, 1324 (1978). Summary judgment will not be granted if the record indicates that a material fact is in dispute or if it seems desirable to inquire more thoroughly into the facts in order to clarify the application of law to the circumstances. *Ebersole v. Lowengrub,* Del.Supr., 180 A.2d 467, 470 (1962).

*2 The issue for the Court's resolution is whether Dockham is permitted to maintain a civil tort suit for her injuries or whether the worker's compensation statute is her exclusive remedy. As Miller argues it, the injury clearly arose out of Dockham's employment situation and that the two of them had no relationship outside of the employment sphere. Consequently, he argues, Dockham should be estopped from asserting her tort claim under the exclusivity provision of 19 *Del. C.* § 2363(a) because she has already received worker's

compensation benefits. Dockham, on the other hand, argues that worker's compensation is not her exclusive remedy because Miller's conduct was willful and directed against her for personal reasons. She also appears to suggest that the exclusivity doctrine applies only in negligence suits between co-employees.

The worker's compensation statute is the exclusive remedy available to an employee to secure compensation from an employer for work-related injuries:
Every employer and employee, adult and minor, except as expressly excluded in this chapter, shall be bound by this chapter respectively to pay and to accept compensation for personal injury or death by accident arising out of and in the course of employment, regardless of the question of negligence and to the exclusion of all other rights and remedies.

19 *Del. C.* § 2304. *See also SW (Delaware), Inc. v. American Consumers Indus., Inc.,* Del.Supr., 450 A.2d 887, 888 (1982); *Mergenthaler v. Asbestos Corp. of America,* Del.Super., 534 A.2d 281, 282-84 (1987). This precludes all employee actions against the employer to recover for personal injuries, irrespective of the liability character of the tort. *Kofron v. Amoco Chem. Corp.,* Del.Supr., 441 A.2d 226, 231 (1982). *See also Langhorne v. Walters,* Del.Super., C.A. No. 92C-10-184, Alford, J. (June 30, 1994); *Ward v. General Motors Corp.,* Del.Super., 431 A.2d 1277 (1981).

Although the statute bars common law claims against the employer, employees are not thereby barred from asserting a claim against a third party tortfeasor:
Where the injury for which compensation is payable under this chapter was caused under circumstances creating a legal liability in some person *other than a natural person in the same employ* or the employer to pay damages in respect thereof, the acceptance of compensation benefits or the taking of proceedings to enforce compensation payments shall not act as election of remedies, but such injured employee or his dependents or their personal representative may also proceed to enforce the liability of such third party for damages in accordance with this section....

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 1997 WL 817873 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

19 *Del. C.* § 2363(a) (emphasis added). As the emphasized language indicates, co-employees of the injured person are excluded from the category of third persons who may be sued. *Groves v. Marvel,* Del.Supr., 213 A.2d 853, 855 (1965).

The basis for the co-employee's inclusion appears to arise from the agency principles and the general nature of the employer/employee relationship. Where the employee stands in the place of the employer, the employer's exclusion is extended to include the co-employee. Consequently, and consistent with the general common law liability of an employer for the torts of its employees, the employer's exclusion is extended to include the co-employee only if he was acting within the course or scope of his employment:

*3 There is uniformity of opinion that a "person in the same employ" means a person employed by the same employer *and acting in the course of his employment at the time of the injury to the co-employee.* It is agreed that the statutory language requires more than an employer in common without regard for the time, place, or circumstances of the accident; and that it encompasses more than acts within the scope of the offending employee's regular duties.

*Groves,* 213 A.2d at 855.[FN2]

> FN2. Consistent with this language from *Groves,* the Court specifically rejects Miller's contention that Dockham is precluded from recovery against him as a co-employee because she had already elected to received worker's compensation benefits. As Miller would have it, the only way Dockham would be able to recover against Miller is if she chose to forego worker's compensation benefits. However, as this Court has already pointed out, the case law of this jurisdiction makes it abundantly clear that the worker's compensation statute does *not* contain an opt-out provision. If the injury is covered, worker's compensation applies. Miller's argument is legally impossible. The argument is also factually contrary to prior

decision of our courts. In *Groves,* the plaintiff had already received worker's compensation from the employer before he attempted to recover damages from the co-employee. The Supreme Court found that the suit was barred, not because the plaintiff had already claimed worker's compensation benefits, but because the co-employee was within the scope of his employment at the time of the accident. *Groves,* 213 A.2d at 856.

In analyzing whether Miller was engaged in an activity within the course of his employment when the altercation with Dockham occurred, our courts generally look to the time, place, and circumstances of the injury, with a focus on three factors: (1) the employee's act causing the injury was willful; (2) the injury must not have been directed against plaintiff as an employee or because of plaintiff's employment; and (3) the assault was directed against the plaintiff because of personal reasons. *Ward,* 431 A.2d at 1280. *See also Staker v. Willard,* Del.Super., C.A. No. 80C-SE-15, Stiftel, P.J. (Aug. 9, 1984). The first factor is relatively straightforward; the second and third, which appear to overlap to some degree, examine the alleged tortfeasor's motivations and involve a consideration of four different elements: (1) whether the employee's actions were necessary or related to the duties of the job; (2) whether the duties of either party required them to work together or to be in close proximity or to communicate with each other; (3) whether the incident was generated or stimulated by duties, assignments, or conditions of work; and (4) whether the incident resulted from the fact that plaintiff was an employee of this particular employer. *Ward,* 431 A.2d at 1280; *Staker,* letter op. at 3-5.

Applying these considerations to the present case, the Court is unable to conclude that Miller is entitled to summary judgment at this time. The Court finds that issues of material fact remain unresolved at this time. There is no dispute that the first factor, willfulness, is met, but the other two factors are clearly in dispute. Miller has testified that he had no personal animosity toward Dockham and that the sole reason for his actions with the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                        Page 4

Not Reported in A.2d, 1997 WL 817873 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

biscuit was to confront Dockham, who Miller said was responsible for the buffet. A trier of fact, if it chose to believe this testimony, could conclude that Miller's actions were motivated solely out of his anger over what he perceived to be the deplorable condition of the buffet line, rather than any personal animosity toward Dockham. Dockham, on the other hand, has testified that Miller treated her in a derogatory and offensive manner on numerous occasions and that she was not in fact responsible for the buffet that night. This could permit a trier of fact to conclude that Miller's conduct toward Dockham was motivated for personal reasons wholly unrelated to the condition of the buffet line.

*4 The Court rejects Miller's contention that it is clear that the injury arose out of Dockham's employment situation. The fact that the parties had no relationship outside of their work at the restaurant does not mandate a finding that the injury was a consequence of the employment. The case law simply is not that restrictive. *See, e.g., Ward,* 431 A.2d at 1280-81 (and cases cited therein). In *Ward,* this Court specifically rejected the idea that " the mere fact that the setting for injury was the time and place of employment renders the employment as a cause of the injury." *Id.* at 1280. Contrary to Miller's suggestion, it is *not* a "fact" that Miller pushed the biscuit into Dockham's mouth because it was hard and he was displeased that a hard biscuit was at the buffet table. On the contrary, the evidence presently in the record indicates that Miller's intent and motivation in his actions are hotly contested. This is not to say that Dockham's evidence is strong; the Court simply finds that her evidence is enough to escape summary judgment at this time.

CONCLUSION

On this Motion for Summary Judgment, all reasonable inferences concerning intent or other subjective reactions of the defendant must be resolved in favor of the plaintiff as the non-moving party. The Court finds that genuine issues of material fact exist and that summary judgment may therefore not be granted as a matter of law at this time. For these and all of the foregoing reasons,

defendant Linwood R. Miller's Motion for Summary Judgment is DENIED. IT IS SO ORDERED.

Del.Super.,1997.
Dockham v. Miller
Not Reported in A.2d, 1997 WL 817873 (Del.Super.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT
# E

Westlaw.

Not Reported in A.2d                                                                                   Page 1

Not Reported in A.2d, 1992 WL 51880 (Del.Super.)
(Cite as: Not Reported in A.2d)

▷
Lynch v. Mellon Bank of Delaware
Del.Super.,1992.
Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Superior Court of Delaware.
Bryan LYNCH & Victoria F. Lynch
v.
MELLON BANK OF DELAWARE
Civ. A. No. 90C-JA-125.

Submitted: Nov. 1, 1991.
Decided: March 12, 1992.

Darryl K. Fountain, Wilmington.
Sheldon N. Sandler, Young, Conaway, Stargatt &
Taylor, Wilmington.
DEL PESCO, Judge.
*1 This action is brought by Brian Lynch and
Victoria F. Lynch against Mrs. Lynch's former
employer, Mellon Bank of Delaware (the bank), for
damages arising out of Mrs. Lynch's dismissal from
the bank and the circumstances surrounding her
dismissal. In their amended complaint of July 26,
1990, Mrs. Lynch charges the defendant with prima
facie tort [FN1], negligence, breach of the implied
covenant of good faith and fair dealing, malicious
prosecution, defamation, and false imprisonment.
Mr. Lynch charges the defendant with loss of
consortium for the loss of his wife's social services.
The bank has moved for summary judgment on all
charges.

> FN1. "Prima facie tort" was recognized as
> a cause of action in *Kaye v. Pantone,*
> Del.Ch., 395 A.2d 369 (1978). The
> following definition of prima facie tort was
> set forth in *Nix v. Sawyer,* Del.Super., 466
> A.2d 407, 412 (1983): "[prima facie tort]
> has been defined as the intentional
> infliction of harm, absent excuse or

justification, resulting in damage by an act
or series of acts which would otherwise be
lawful and which do not fall within the
categories of traditional tort."

To survive a motion for summary judgment, the
plaintiff must show that a genuine issue of material
fact exists. *Moore v. Sizemore,* Del.Supr., 405 A.2d
679 (1979). In examining the record, the Court
must view the facts in a light most favorable to the
non-moving party; however, uncontroverted
evidence offered in support of a motion for
summary judgment must be accepted as true.
*Battista v. Chrysler Corp.,* Del.Super., 454 A.2d
286, 490 (1982). If the facts are undisputed,
summary judgment may only be granted if the
moving party establishes that it is so entitled as a
matter of law. *Vanaman v. Milford Memorial
Hospital, Inc.,* Del.Supr., 272 A.2d 718, 720 (1970).

FACTS

The facts, as seen in a light most favorable to the
plaintiff, are as follows. Mrs. Lynch was hired as a
teller in August, 1988, in the bank's Brandywine
branch. In November, 1988, Airbase Carpet Mart,
also known as Lomax, complained that it had not
received credit for some $6,600 [FN2] in night
deposits beginning in September, 1988.
Investigation revealed that of the seven deposits,
Mrs. Lynch had processed all but one. In
December, 1988, after interviewing Mrs. Lynch and
the other tellers, the bank's Audit Department
conducted a test of Mrs. Lynch's integrity. An
envelope was placed in the Automated Teller
Machine (ATM) which contained more cash than
was stated on the enclosed deposit slip. Tellers are
expected to report such discrepancies to their
supervisors. When the December test was
conducted, Mrs. Lynch reported the discrepancy.

> FN2. The defendant's brief suggests that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                    Page 2

Not Reported in A.2d, 1992 WL 51880 (Del.Super.)
(Cite as: Not Reported in A.2d)

there were over $60,000 involved, but on the cited page in the arbitration transcript, Martin Hodovanich, a Mellon Bank investigator, stated that the transactions involved $6,600.

Mrs. Lynch testified at the July 5, 1990, arbitration hearing that she met with Dick Burke, a Mellon Vice-President, on January 16, 1989, and requested that she be moved to another branch to work part-time after her vacation. Mrs. Lynch testified that she had complained previously to bank officials about the Assistant Branch Manager, Robert Carlson, alleging that he had refused to allow her to leave when she had pregnancy-related sickness and had called and left harassing messages on her telephone answering machine about her absence from work for a cancer biopsy. (Barber at 106, Lynch at 32) [FN3] Mrs. Lynch also stated that Mr. Burke agreed to allow her to work part-time for full-time wages with a doctor's note about the hours she could work beginning after her vacation with the condition that she stay in the Brandywine branch (Lynch at 32-33). George Barber, the Employment Manager for Mellon Bank, Delaware testified in the arbitration hearing that Mr. Burke's offer was pursuant to the bank's short term disability program which applies to all employees. (Barber at 108-109) Mrs. Lynch asked for two days to decide and was to inform Mr. Burke of her decision on January 18, 1989.

> FN3. Citations in parentheses shall be to the arbitration transcript unless otherwise noted.

*2 On January 17, 1989, another integrity test was conducted. This time Karen Genello, a member of the bank's Audit Department, and Mr. Carlson deposited an envelope containing $200 in cash and a deposit slip for $140 in the ATM. Later that afternoon, Mr. Carlson entered the ATM alone, retrieved the deposits from the ATM and brought the sealed envelopes to Mrs. Lynch for processing. It must be noted at this point that it is against the bank's policy for any employee to enter the ATM alone, and Mr. Carlson was later reprimanded for his breach of that procedure. All of the envelopes

had been marked by the ATM and did not appear to have been tampered with when Mrs. Lynch received them. After processing the deposits, Mrs. Lynch failed to report the $60 discrepancy. According to the deposition testimony of Ms. Genello and Mr. Burke, it was bank policy to terminate employees who fail procedural or integrity tests.

After the bank closed, Mrs. Lynch was told to stay after work for a tellers' meeting. There was no tellers' meeting. The branch manager spoke with Mrs. Lynch about the bank's leave policy to keep her in the bank until Martin Hodovanich of the Audit Department and George Barber of the Human Resources Department could arrive to discuss the unreported discrepancy with her. When they arrived, she denied taking the money, and asked if she could leave for an appointment. During the time that the interview lasted, she made four phone calls, two to the salon where she had the appointment, one to her husband and one to her father. Mrs. Lynch refused permission for Hodovanich and Barber to search her purse. Her work area and trash can were searched for the money. Without admitting to taking the money, Mrs. Lynch offered to pay the bank $60 from her bank account.

After consultation with the bank's legal department, the police were called, and two officers were dispatched to investigate. The officers searched Mrs. Lynch, her personal belongings including her car, and her work area. The $60 was not found. Mrs. Lynch was terminated for falsifying a balance and the police filed a report naming her and Robert Carlson, who was also in the chain of custody of the money, as suspects.

## WORKMEN'S COMPENSATION ACT EXCLUSIVITY

The defendant asserts that Mrs. Lynch's claims are barred by the exclusivity provision of the Workmen's Compensation Law:

Every employer and employee, adult and minor, except as expressly excluded in this chapter, shall be bound by this chapter respectively to pay and to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 1992 WL 51880 (Del.Super.)
(Cite as: Not Reported in A.2d)

accept compensation for personal injury or death by accident arising out of and in the course of employment regardless of the question of negligence and to the exclusion of all other rights and remedies.

19 Del.C. § 2304.

"[T]he twin purposes of the Delaware Workmen's Compensation Law are to provide a scheme for assured compensation for work-related injuries without regard to fault and to relieve employers and employees of the expenses and uncertainties of civil litigation." *Kofron v. Amoco Chemicals Corp.,* Del.Supr., 441 A.2d 226, 231 (1982). For this reason, most claims arising out of and in the course of employment are held to fall under the exclusivity of the Workmen's Compensation statute. *See Weaver v. E.I. DuPont de Nemours & Co.,* Del.Supr., No. 152, 1987, Horsey, J. (Oct. 8, 1987) (ORDER) (negligence falls within exclusivity of Workmen's Compensation Law); *Nutt v. A.C. & S., Inc.,* Del.Super., 466 A.2d 18 (1983) (claim for fraud which happened before injury occurred and contributed to injury is merged into injury and is only compensable under the provisions of the Workmen's Compensation Law); *Kofron,* 441 A.2d 226 (workers' claims for gross negligence and intentional tort fall under exclusive province of the Workmen's Compensation Law); *Battista v. Chrysler Corp.,* Del.Super., 454 A.2d 286 (1982) (claim of intentional infliction of emotional distress arising from allegedly wrongful demotion precluded by Workmen's Compensation Law). The exclusive remedy provision of the Workmen's Compensation Law also bars the claim of a spouse whose entitlement is solely derivative of the employee's claim. *Farall v. Armstrong Cork Co.,* Del.Super., 457 A.2d 763 (1983).

**\*3** Mrs. Lynch's claims for prima facie tort, negligence, and breach of the implied covenant of good faith and fair dealing and Mr. Lynch's claim for loss of consortium deriving from those claims are barred by the exclusivity provision of the Workmen's Compensation Law, 19 Del.C. § 2304. The defendant's motion for summary judgment is GRANTED with respect to those claims. This Court need not reach the question of whether the

alleged breach of the implied covenant of good faith and fair dealing is a recognized tort in Delaware.

## DEFAMATION

The Superior Court adopted an exception to the exclusivity of the Workmen's Compensation Law in *Battista,* 454 A.2d 286. In that case, the Court held that whether an action is precluded by the Workmen's Compensation Law depends upon the nature of the injury for which the plaintiff makes the claim. *Id.* at 288-289, *citing Foley v. Polaroid Corp.,* Mass., 413 N.E.2d 711 (1980). In its analysis of a defamation claim, the *Battista* Court stated:

Turning to the defamation claim, the harm flowing therefrom is not a "personal injury" within the purview of the Workmen's Compensation law. In fact, an injury to reputation affects a proprietary interest and as such is not a personal injury at all, any concommitant physical or mental injury notwithstanding.

Other jurisdictions have recognized that not all harms occasioned by the employment relationship qualify as compensable injuries under the Act. Such harm includes: injuries to reputation resulting from libel, malicious prosecution and false imprisonment, invasion of privacy, and false arrest.

*Battista,* 454 A.2d at 289.

In order to succeed in a defamation action, the plaintiff must show: "1) the defamatory character of the communication; 2) publication; 3) that the communication refers to the plaintiff; 4) the third party's understanding of the communication's defamatory character; and 5) injury." *Los v. Davis,* Del.Super., C.A. No. 89C-OC-122, Goldstein, J. (Apr. 9, 1991) at 3. Since the bank's dismissal of Mrs. Lynch for falsifying a balance imputes a crime and maligns Mrs. Lynch's professional qualifications, the defamatory matter is actionable *per se.* As such, she is not required to prove special damages. *Battista,* 454 A.2d at 290.

Mrs. Lynch acknowledges that the bank has not

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                          Page 4

Not Reported in A.2d, 1992 WL 51880 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

published the facts surrounding her dismissal. She alleges that although no one, including the other tellers at the Brandywine branch, has been told about the reason for her dismissal, she will be required to explain her reason for leaving the bank to prospective employers, thereby self-publishing the defamation. This concept is supported by *Lewis v. Equitable Life Ins. Society,* Minn., 389 NW2d 876 (1986), and by cases in a number of other states. *See Elmore v. Shell Oil Co.,* E.D.N.Y., 733 F.Supp. 544, 546 (1988); *Burger v. Health Ins. Plan of Greater New York,* S.D.N.Y., 684 F.Supp. 46, 52 (1988). Although the concept of self-publication has been accepted in a minority of other jurisdictions, it is not the law in Delaware. Without publication, Mrs. Lynch does not have a claim for defamation in Delaware. *Los v. Davis* at 3. Therefore, the defendant's motion for summary judgment is GRANTED with regard to defamation.

## MALICIOUS PROSECUTION AND FALSE IMPRISONMENT

*\*4* There has not yet been a Delaware ruling explicitly following the *Battista* dicta to hold that m alicious prosecution and false imprisonment claims do not fall under the exclusivity provision of the Workmen's Compensation law, but there have been Delaware cases where employees' malicious prosecution and false imprisonment claims against their employers were heard and decided by the Superior Court. *See O'Neill v. White,* Del.Super., No. 82C-AP-31, Martin, J. (Sept. 28, 1987); *Wilson v. Draper-King Cole,* Del.Super., C.A. No. 83C-AU-10, Bush, J. (Mar. 7, 1986); *Alexander v. Sanford School,* Del.Super., C.A. No. 81C-AU-21, Poppiti, J. (May 23, 1984).

## MALICIOUS PROSECUTION

The elements of malicious prosecution are set forth in *Stidham v. Diamond State Brewery,* Del.Super., 21 A.2d 283, 284 (1941).[FN4] This Court's analysis ends at the first element: "There must have been a prior institution or continuation of some regular judicial proceedings against the plaintiff in this action for malicious prosecution." *Id.* There have

been no judicial proceedings instituted against Mrs. Lynch. Even if criminal charges had been brought, the fact that the bank informed the police of the incident would not make the bank liable for malicious prosecution without proof of malice and a lack of probable cause. *Id.* at 285. Since Mrs. Lynch's malicious prosecution claim is wholly without merit, there is no need to determine whether that claim falls within the exclusivity provision of the Workmen's Compensation law. The defendant's motion for summary judgment is GRANTED with regard the malicious prosecution claim.

> FN4. The elements of malicious prosecution set forth in *Stidham,* 21 A.2d at 284 are as follows:
> (1) There must have been a prior institution or continuation of some regular judicial proceedings against the plaintiff in this action for malicious prosecution.
> (2) Such former proceedings must have been by, or at the instance of the defendant in this action for malicious prosecution.
> (3) The former proceedings must have terminated in favor of the defendant therein, the plaintiff in the action for malicious prosecution.
> (4) There must have been malice in instituting the former proceedings.
> (5) There must have been want of probable cause for the institution of the former proceedings.
> (6) There must have been injury or damage resulting to the plaintiff from the former proceedings.

## FALSE IMPRISONMENT

Actions for false imprisonment have been held by several courts not to be barred by the exclusivity provision of the Workmen's Compensation law. *Larson's Workmen's Compensation Law,* 2A, § 68.31. In *Le v. Federated Department Stores,* Md.App., 560 A.2d 42 (1989), the Maryland Court of Special Appeals held that an employee's action for false arrest, defamation and intentional infliction of emotional distress was not barred by the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 1992 WL 51880 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

exclusivity provision of the workmen's compensation statute where a department store employee was detained and terminated after a stolen calculator was recovered by the security director from the employee's attache case. The Court stated: "[w]e think it clear that before the Workers' Compensation Act may serve as a barrier to an employee's civil suit for the intentional torts of a supervisory employee, the complainant must have sustained a physical or mental injury." *Le* at 43. *Battista* takes this concept even further when discussing the plaintiff's defamation claim: "the harm flowing therefrom is not a 'personal injury' within the purview of the Workmen's Compensation law. In fact, an injury to reputation affects a proprietary interest and as such is not a personal injury at all, any concommitant physical or mental injury notwithstanding." [emphasis supplied] *Battista* at 289. Mrs. Lynch has not claimed that she suffered any physical injury as a result of the alleged false imprisonment. The injury caused by Mrs. Lynch's alleged false imprisonment was the loss of her freedom of movement, not a physical or mental injury as contemplated by the Workmen's Compensation law. Therefore, Mrs. Lynch's false imprisonment claim is not barred by the exclusivity provision of the Workmen's Compensation law.

*5 Assuming arguendo that the bank had a right to detain Mrs. Lynch to investigate the suspected theft of the $60 ATM overage, that detention would have to be reasonable. In her arbitration testimony, Mrs. Lynch stated that she was held from the time that bank closed at 3:00 until around 7:00 that evening. (Lynch at 39, 49) Martin Hodovanich, a bank auditor, testified in the arbitration that they had left the branch at about 5:45. (Hodovanich at 82) The length and reasonableness of the detention are a factual question which should be considered by a jury. The defendant's motion for summary judgment regarding Mrs. Lynch's false imprisonment claim is DENIED.

### LOSS OF CONSORTIUM

According to the Restatement (Second) of Torts § 693(1), "[o]ne who by reason of his tortious conduct is liable to one spouse for illness or other bodily harm is subject to liability to the other spouse for the resulting loss of the society and services of the first spouse...." Mrs. Lynch's only remaining claim in this case is for false imprisonment. Mrs. Lynch has not alleged any physical or mental illness or injury caused by the alleged false imprisonment for which Mr. Lynch could claim a loss of her consortium. The defendant's motion for summary judgment for Mr. Lynch's loss of consortium claim is GRANTED.

### CONCLUSION

The defendant's motion for summary judgment is DENIED for the plaintiff's false imprisonment claim and GRANTED for all remaining claims.

IT IS SO ORDERED.

Del.Super.,1992.
Lynch v. Mellon Bank of Delaware
Not Reported in A.2d, 1992 WL 51880 (Del.Super.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT
# F

Westlaw.

Slip Copy                                                                 Page 1

Slip Copy, 2007 WL 429111 (D.Or.)
(Cite as: Slip Copy)

Johns v. Nestucca Rural Fire Protection Dist.
D.Or.,2007.
Only the Westlaw citation is currently available.
United States District Court,D. Oregon.
Kimberly A. JOHNS and USIA Corporation,
Plaintiffs,
v.
NESTUCCA RURAL FIRE PROTECTION
DISTRICT, Royce Fletcher, an individual; John
Kiefel, an individual, Defendants.
No. CV05-1744-HU.

Feb. 2, 2007.

Daniel Dickerson, Matthew Arbaugh, Daniel W.
Dickerson, P.C., Portland, OR, for plaintiff.
Peter Mersereau, Barrett Mersereau, Mersereau &
Shannon LLP, Portland, OR, for defendants.

OPINION AND ORDER
HUBEL, Magistrate Judge.
*1 Kimberly Johns brought this action against
defendants Nestucca Rural Fire Protection District
(District), John Kiefel, and Royce Fletcher,
asserting claims for relief under 42 U.S.C. § 1983,
42 U.S .C. § 1985 29 U.S.C. § 660, and for assault,
slander, intentional interference with economic
relations, intentional infliction of emotional distress,
and violation of Or.Rev.Stat. § 659A.230 (the
whistleblower statute).

Plaintiff has voluntarily dismissed all claims except
one for violation of Or.Rev.Stat. § 659A.230
against the District, claims for false imprisonment
and assault against Kiefel and Fletcher, and a claim
for intentional infliction of emotional distress
against the District and Fletcher. Defendants move
for summary judgment.

**Factual Background**

Plaintiff Kimberly Johns was at all times a
volunteer with the District. District volunteers are
not paid money for their services, but they do
receive life insurance providing benefits if they are
killed on or off the job, and worker's compensation
coverage. The Worker's Compensation coverage
applies only when volunteers are serving the
District.

The District pays for volunteers to attend training
sessions, to ensure that they interact with other
emergency personnel and to allow them to enhance
their certifications. Volunteers occasionally also
receive certain articles of clothing from the District,
such as T-shirts, hats, and sweatshirts. Occasionally,
the District provides them with meals. Volunteers
receive no other benefits from the District.

Johns alleges that he was formerly captain of the
District's water rescue team, a position he held until
September 2, 2005, when he received a letter from
defendant Royce Fletcher, Fire Chief of the District,
terminating his services.

In his capacity as captain of the water rescue team,
Johns arranged funding for some additional
equipment for the team. Because new written safety
policies were required after the equipment was
obtained, Johns was asked to draft the policies. The
District did not use the policies Johns drafted, but
continued to use the new equipment. Johns warned
the District of the need for proper guidelines and
training on the new equipment.

Johns alleges that Fletcher repeatedly blocked his
efforts to implement new policies for the
equipment, prompting Johns to tell Fletcher he
intended to file a complaint with Oregon OSHA,
which Johns did in July 2004. Johns alleges that the
day after he told Fletcher he was going to complain
to OSHA, Fletcher, on a pretext, rescinded Johns's
authorization to respond to fire emergency calls.

In July 2004, Johns notified Fletcher of his intention

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                     Page 2

Slip Copy, 2007 WL 429111 (D.Or.)
(Cite as: Slip Copy)

to file an unlawful discrimination claim with the
Oregon Bureau of Labor and Industries (BOLI) for
Fletcher's rescission of Johns's authorization. In
December 2004, Johns filed an action against the
defendants in state court for violation of his
whistleblower rights under Or.Rev.Stat. § 659A.230.

Johns alleges that between July 2004 and
September 2005, Fletcher repeatedly singled him
out for conflict and usurped his authority. On
August 31, 2005, Johns issued a notice of training
for the water rescue team, to be conducted on
September 4, 2005. The next day, Fletcher and
Kiefel, head of training for the District, rescinded
the notice, stating that attendance at any training
would be considered insubordination and result in
disciplinary action. Fletcher and Kiefel ordered the
team to go "off line" and cease all operations over
the Labor Day weekend. Despite this order, the
water rescue team held its training session, on
September 4, 2005. Fletcher and Kiefel came to the
meeting, and Fletcher ordered all members of the
team to leave so that he and Kiefel could talk to
Johns in private.

*2 Johns alleges that as soon as he, Fletcher and
Kiefel were alone in the room, Fletcher shut the
door and Kiefel pulled out a tape recorder and
began recording. Johns allegedly told Fletcher and
Kiefel that he was uncomfortable with the situation
and attempted to leave the room. Fletcher said, in a
raised voice, "You're not going anywhere!" and
blocked the only exit from the room. Johns alleges
that he attempted to leave the room a second time
by reaching for the door handle, but that Fletcher
repositioned himself to block Johns's access to the
door handle.

Johns alleges that he attempted to leave a third time
and Fletcher stepped in front of him and physically
blocked his path. Fletcher then attempted to force
Johns to accept a letter of termination, which Johns
refused. Johns instructed Fletcher to send the letter
to his attorney.

Johns alleges that after refusing to accept the letter,
he again moved for the door and forced his way out
of the room. Johns was followed by Kiefel, who
took pictures of him.

Johns was subsequently terminated from his
position.

### Standards

Summary judgment is appropriate "if the pleadings,
depositions, answers to interrogatories, and
admissions on file, together with the affidavits, if
any, show that there is no genuine issue as to any
material fact and that the moving party is entitled to
a judgment as a matter of law." Fed.R.Civ.P. 56(c).
Summary judgment is not proper if material factual
issues exist for trial. *Warren v. City of Carlsbad*,
58 F.3d 439, 441 (9th Cir.1995), *cert. denied*, 116
S.Ct. 1261 (1996). On a motion for summary
judgment, the court must view the evidence in the
light most favorable to the non-movant and must
draw all reasonable inferences in the non-movant's
favor. *Clicks Billiards Inc. v. Sixshooters Inc.*, 251
F.3d 1252, 1257 (9th Cir.2001).

### Discussion

#### 1. The claim under Or.Rev.Stat. § 659A.230

Oregon's whistleblower statute provides as follows:
It is an unlawful employment practice for an
employer to discharge, demote, suspend or in any
manner discriminate or retaliate against an
employee with regard to promotion, compensation
or other terms, conditions or privileges of
employment for the reason that the employee has in
good faith reported criminal activity by any person,
has in good faith caused a complainant's
information or complaint to be filed against any
person, has in good faith cooperated with any law
enforcement agency conducting a criminal
investigation, has in good faith brought a civil
proceeding against an employer or has testified in
good faith at a civil proceeding or criminal trial.

Defendants assert that Johns does not have standing
to bring an action pursuant to § 659A.230 because
he is not an employee. Johns concedes that he was a
volunteer, and does not dispute that he received

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 3

Slip Copy, 2007 WL 429111 (D.Or.)
**(Cite as: Slip Copy)**

only non-pecuniary benefits for his services. He asserts that he hoped to obtain an enhanced reputation in the community that he could parlay into increased sales for his business and, possibly, political gain.

*3 Defendants point to the definition contained in Oregon's wage and hour laws, Or.Rev.Stat. § 653.010, which defines "employ" to exclude " voluntary or donated services performed for no compensation or without expectation or contemplation of compensation as the adequate consideration for the services performed ..." Defendants argue that Johns's "inchoate and highly speculative 'compensation,' " i.e., enhanced reputation leading to increased sales and possible political gain, cannot be characterized as "adequate consideration." Defendants argue further that the benefits received by the District's volunteer firefighters-a few articles of clothing, training in firefighting and emergency medical care, the occasional meal, and worker's compensation and life insurance benefits-do not constitute monetary compensation.

Moreover, Oregon's wage and hour statutes make a distinction between "volunteer firefighters," and " firefighters." Section 652.050, which provides definitions for Or.Rev.Stat. § 652.050 to 652.080, provides as follows:
(1) "Firefighter" means a person whose principal duties consist of preventing or combating fire or preventing loss of life or property from fire.
(2) "Regularly organized fire department" means any organization maintained for the purpose of preventing or combating fire and employing one or more persons on a full-time basis as firefighters.
(3) "Volunteer firefighter" means a person who performs services as a firefighter for a regularly organized fire department and whose work hours and work shifts *are voluntary and whose volunteer service is not a condition of employment.*

(Emphasis added). The wage and hour statutes apply to "firefighters," or to persons "employed on a full-time basis as a firefighter by any regularly organized fire department," but not to volunteer firefighters.

Defendants contend that under relevant case law, Johns is not an employee, citing *Jylha v. Chamberlain,* 168 Or. 171, 175-76 (1942)(the term "employee" in the Oregon Employers' Liability Act is to be construed as referring to "one who renders service for another for wages or salary.") and *Hyland v. Wonder,* 972 F.2d 1129, 1140-41 (9th Cir.1992)(volunteer in San Francisco Juvenile Probation Department, who was terminated as a volunteer, did not have a property interest in continuation of his volunteer status and therefore could not state a claim under § 1983 based on denial of due process).

Johns counters that the applicable definition is found at Or.Rev.Stat. 659A.001, which defines " employee" merely by excluding "any individual employed by the individual's parents, spouse or child or in the domestic service of any person." Or.Rev.Stat. § 659A.001(3). The term "employer" is there defined as
any person who in this state directly or through an agent, engages or uses the personal service of one or more employees, reserving the right to control the means by which such service is or will be performed.

*4 Or.Rev.Stat. § 659A.001(4).

t is an axiom of statutory construction that statutes are to be interpreted, if possible, to give each word some operative effect. See, e.g., *United States v. Menasche,* 348 U.S. 528, 538-39 (1955); *Walters v. Metropolitan Ed. Enterprises,* 519 U.S. 202, 117 S.Ct. 660 (1997). Individual words of a statute are not to be viewed in isolation, but rather to be interpreted by reading the relevant statutory provisions as a whole. *Leisnoi, Inc. v. Stratman,* 154 F.3d 1062, 1066 (9th Cir.1998); see also *Carpenters Health & Welfare Trust Funds v. Robertson,* 53 F.3d 1064, 1067 (9th Cir.1995) (interpretation of statutory language requires more than viewing words or subsections in isolation; meaning is derived from context).

Section 659A.001(4) does not address the difference between an employee and a volunteer. Construing § 659A.001(4) in a manner that would make it contradict the provisions of Or.Rev.Stat. §

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2007 WL 429111 (D.Or.)
**(Cite as: Slip Copy)**

653.010 is neither necessary to its meaning, nor obedient to the rules of statutory construction. I agree with defendants that Johns's status as a volunteer places him outside the provisions of Or.Rev.Stat. § 659A.230.

Johns also contends that a later decision in *Hyland v. Wonder,* 117 F.3d 405, 412 (9th Cir.1997) *(Hyland II)* indicates that in some circumstances, a volunteer is entitled to protections generally provided only to employees. Johns argues that he is not asserting a claim for violation of due process, but rather a claim for unlawful retaliation, based on his First Amendment right not to be retaliated against for his protected speech.

In *Hyland II,* the court acknowledged that while in *Hyland* I, plaintiff failed to state a due process claim because he lacked a property or liberty interest in his position as a volunteer, that analysis did not apply to plaintiff's First Amendment.
As we held above, dismissal from a volunteer position can constitute unconstitutional retaliation. There is ample authority that retaliatory acts other than actual discharge can serve as the basis for a First Amendment claim. See, e.g., *Sanchez v. City of Santa Ana,* 936 F.2d 1027, 1039 (9th Cir.1990) (ostracism, silent treatment, selective enforcement of the rules, and poor reviews can all be acts of retaliation); *Allen v. Scribner,* 812 F.2d 426, 429 (9th Cir.1987)(retaliation included transfer, defamatory statements to the media, intimidation, and harassment), *amended,* 828 F.2d 1445 (9th Cir.1987).

The flaw in Johns's reliance on *Hyland II* is that he has not alleged a First Amendment claim. He has asserted a nonconstitutional claim under a state statute which expressly applies to employees and employers. *Hyland II* does not save this state statutory claim.

Defendants are entitled to summary judgment on the whistleblower claim under Or.Rev.Stat. § 659A.230.

*2. The assault claim*

Johns has asserted a common law claim for assault against Fletcher and Kiefel, based on their having physically prevented him from leaving the room during the conference by blocking his path to the door. Defendants assert that Johns has not made out a claim for assault because he has not alleged that the defendants made a threat against him.

*5 Assault is "an intentional attempt to do violence to the person of another coupled with present ability to carry the intention into effect." *Bollaert v. Witter,* 101 Or.App. 654, 658 (1990). Words alone do not amount to an assault. *Id.*

In his deposition, Johns described the incident as follows:
And I says, well, look it, you need to let me out of this room. And Chief Fletcher stood in front of me and puffed up his chest and said, you're not going until this meeting is over. I said, am I under arrest? He said no. I said, you need to let me out of this room. He said no. Then he proceeded to tell me about some letter that he was giving me of a notice of termination ... He hit me in the chest with the letter. I then took the letter or-I didn't touch the-I don't remember what happened to the letter, but I didn't take the letter. I told him to mail it to my attorney. I asked them again to let me out of the room. He refused. I asked him again to let me out of the room. He refused. I believe I asked him a third time to let me out of the room. He refused. I was feeling highly uncomfortable, highly agitated, highly threatened. And so I reached around him to get out of the room, unlocked the door, and went out of the room. And there was some discussion, and I told them, you can talk to my attorney. See you later.

* * *

Q: When you pushed around [Fletcher] to get out, was that difficult? Did Chief Fletcher resist you getting out of the room when you did actually leave?
A: I made contact. I don't know.
Q: Well, what I'm asking is, do you remember him moving so as to be more in your way or moving so as to get out of your way, or none of the above.
A: I made contact, so I don't know what his intentions were. I was going out the door, whether

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 429111 (D.Or.)
(Cite as: Slip Copy)

he was going to try to stop me or not, and that
ensued some physical contact. I don't know if he
was resisting, I don't know if he was moving, I don't
know what his intentions were. My intentions were
to leave the room.
Q: And you did?
A: And I did.

Mersereau Affidavit, Exhibit 2 (Johns deposition)
134:16-135:20; 136:20-137:12. Johns testified that
he felt threatened by Fletcher when he told Johns he
wasn't going anywhere until the meeting was
finished. Mersereau Affidavit, Exhibit 3 (Johns
deposition) 138:22-139:6. Johns has alleged that he
anticipated acts of violence; when asked at the
deposition what those acts of violence were, he
responded:A: Physical contact, you know, invasion
of my personal space.
Q: Well, were you-was there ever a point in which
you were afraid that someone would do violence to
you-
A: Yes.
Q: -by invading your personal space?
A: Yes.
Q: You call that violence?
A: I believe that invasion of personal space
escalates, and somehow violence can occur when
you're within a certain distance of someone.
Q: Okay. Did Mr. Kiefel or Chief Fletcher ever do
anything that made you think they were about to
strike you?
*6 A: When I attempted to leave the room and
Chief Fletcher stepped a few-I don't even know how
far it was. But just say that Chief Fletcher
repositioned himself. And I remember we were in a
small room with filing cabinets. There's not much
room to go. But when that happened and he made
the statement, you're not going anywhere until this
meeting is over, at that point I believed that it could
escalate into a violent situation.
Q: Did either Mr. Kiefel or Chief Fletcher raise
their hands in a threatening manner?
A: Just with the letter.
Q: Did that injure you when you were struck with
the letter?
A: No.

*Id.* at 142:14-143:19.

I conclude that Johns has not made out a claim for
assault because he has not pleaded or proven an
intentional attempt by the defendants to do violence
to Johns. Johns argues that being forced into a
closed room and blocked from leaving, having his
personal space invaded by others, and being "hit" in
the chest with a letter, constitute assault. I disagree.
Being forced into a closed room and blocked from
leaving is an allegation that goes to a claim of false
imprisonment, not assault. The words, "you're not
going anywhere until this meeting is over," coupled
with an invasion of another's "personal space," and
throwing a letter, without more, do not constitute an
intentional attempt to do violence.

Defendants are entitled to summary judgment on the
assault claim.

### 3. *The false imprisonment claim*

False imprisonment consists of 1) the detention or
restraint on the freedom of movement of the person
and 2) the unlawfulness of the detention or restraint.
*Lukas v. J.C. Penney* Co., 233 Or. 345 (1963). The
confinement "may be accomplished by actual or
apparent physical barriers, compulsive physical
force, a threat to apply physical force or assertion of
legal authority." *Walker v. City of Portland,* 71
Or.App. 693, 697 (1985). There need not be a
battery or actual physical contact with the person of
the plaintiff. See Restatement (Second) of Torts §
38 (1965).

Words, acts or gestures that result in a reasonable
fear of personal difficulty or injury to person,
property or reputation will support a claim of false
imprisonment. *Lukas,* 233 Or. at 353.

Johns argues that being told he could not leave the
room until the meeting was over and having the exit
blocked by Fletcher's body, which ultimately
required Johns to move around Fletcher in order to
leave, is sufficient to constitute a claim for false
imprisonment. Fletcher's body constituted an "
apparent barrier," especially in conjunction with the
statement that Johns was not going to be allowed to
leave the room.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                    Page 6

Slip Copy, 2007 WL 429111 (D.Or.)
(Cite as: Slip Copy)

The defendants argue that the "confinement," if any, was too *de minimis* in nature and duration to support a claim for false imprisonment, because Johns was never physically confined, and the moment Johns chose to leave the room, he was able to do so without resistance. What damages, if any, flow from the confinement is for the trier of fact. I conclude that Johns's false imprisonment claim survives summary judgment.

#### 4. The claim for intentional infliction of emotional distress

*7 The elements of intentional infliction of emotional distress are 1) that the defendant intended to inflict severe emotional distress on the plaintiff; 2) that the defendant's acts caused the plaintiff severe emotional distress; and 3) that the defendant's acts constituted an extraordinary transgression of the bounds of socially tolerable conduct or exceeded any reasonable limit of social toleration. *Patton v. J.C. Penney Co.*, 301 Or. 117, 122 (1986); *Sheets v. Knight*, 308 Or. 220, 236 (1989). Insults, harsh or intimidating words, or rude behavior ordinarily do not result in liability under this cause of action, even when intended to cause distress. *Hall v. The May Department Stores*, 292 Or. 121, 135 (1981).

Johns testified at his deposition that this claim was based on Fletcher's having locked him in a room and told him he was not going to be allowed to leave. Mersereau Affidavit, Exhibit 6 (Johns deposition) 159:10-24. Defendants contend that this conduct does not amount to "an extraordinary transgression of the bounds of socially tolerable conduct." I agree.

Defendants are entitled to summary judgment on this claim.

#### Conclusion

Defendants' motion for summary judgment (doc. # 20) is granted in part and denied in part: granted with respect to the whistleblower, assault, and intentional infliction of emotional distress claims,

and denied with respect to the false imprisonment claim.

IT IS SO ORDERED.

D.Or.,2007.
Johns v. Nestucca Rural Fire Protection Dist.
Slip Copy, 2007 WL 429111 (D.Or.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.