IN THE UNITED STATES DISTRICT COURT FOR

THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ANNE M. ROWAN, | ) | |
| | ) | |
| Plaintiff, | ) | C. A. No. 06-258-GMS |
| | ) | |
| v. | ) | |
| | ) | |
| JAMES T. CHANDLER & SON, INC., | ) | JURY TRIAL DEMANDED |
| FUNERAL SERVICES OF DELAWARE | ) | |
| | ) | |
| Defendants. | ) | |

**APPENDIX TO DEFENDANTS' OPENING BRIEF IN SUPPORT
OF THEIR MOTION FOR SUMMARY JUDGMENT**

FERRY, JOSEPH & PEARCE, P.A.

YOUNG, CONAWAY, STARGATT &
TAYLOR, LLP

/s/Robert K. Pearce
Robert K. Pearce, Esquire (No. 191)
Thomas R. Riggs, Esquire (No. 4631)
824 North Market Street, Suite 904
P. O. Box 1351
Wilmington, DE 19899
Telephone: (302) 575-1555
Facsimile: (302) 575-1714
rpearce@ferryjoseph.com
Co-counsel for Defendants

/s/Teresa A. Cheek
Teresa A. Cheek, Esquire (No. 2657)
Margaret M. DiBianca, Esquire (No. 4539)
The Brandywine Building, 17th Floor
1000 West Street, P. O. Box 391
Wilmington, DE 19899-0391
Telephone: (302) 571-6676
Facsimile: (302) 576-3286
tcheek@ycst.com
Co-counsel for Defendants

Dated: May 14, 2007

# TABLE OF CONTENTS

Excerpts from Deposition of Ann M. Rowan,
dated August 31, 2006 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1-29

Excerpts from Deposition of James T, Chandler, IV
dated August 31, 2006 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-30-95

Excerpts from Deposition of Chad Chandler
dated August 31, 2006 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-96-111

Excerpts from Deposition of Tony Latina
dated August 31, 2006 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-112-160

Excerpts from Deposition of Jason Casper
dated August 31, 2006 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-161-174

Excerpts from Deposition of Diana Pinkerton
dated August 31, 2006 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-175-189

Excerpts from Deposition of Victor Battaglia
dated August 31, 2006 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-190-216

Excerpts from Deposition of Kelly Burns
dated August 31, 2006 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-217-231

Excerpts from Deposition of Todd Woodside
dated August 31, 2006 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-232-240

Excerpts from Journal of Ann M. Rowan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-241-250

Memo dated September 30, 2004 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-251

July 2002 Pre-Need Sales Report for Jason Casper . . . . . . . . . . . . . . . . . . . . . . . . . . . A-252

Agreement between Ann M. Rowan and Jason Casper
dated September 17, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-253

Employment Agreement between Anne M. Rowan and
James T. Chandler & Son, Inc. dated September 11, 1995 . . . . . . . . . . . . . . . . . . . . . . A-254-260

Limited Liability Company Agreement of Funeral
Services of Delaware , LLC . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-261-283



IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

- - -

|                                   |   |                          |
|-----------------------------------|---|--------------------------|
| ANNE M. ROWAN,                    | : |                          |
|                                   | : |                          |
| Plaintiff,                        | : | C.A. No. 06-258 GMS      |
|                                   | : |                          |
| v.                                | : | NON-ARBITRATION CASE     |
|                                   | : |                          |
| JAMES T. CHANDLER & SONS,         | : | JURY TRIAL BY TWELVE     |
| INC., and FUNERAL SERVICES        | : |                          |
| OF DELAWARE,                      | : |                          |
|                                   | : |                          |
| Defendants.                       | : | VOLUME I                 |

- - -

          Oral deposition of **ANNE M. ROWAN**, taken
pursuant to notice, before NANCY BLOOM, Registered
Professional Reporter-Notary Public, duly authorized
to administer oaths, on **THURSDAY, DECEMBER 21, 2006,
at 10:00 a.m.**, held at the offices of FERRY, JOSEPH &
PEARCE, 824 Market Street, Suite 904, Wilmington,
Delaware.  There being present:


          APPEARANCES:

                    KORI A. CONNELLY, ESQ.
                    SWARTZ CAMPBELL
                    Two Liberty Place, 28th Floor
                    50 S outh 16th Street
                    Philadelphia, PA  19102
                    Attorney for Plaintiff



               BLOOM REPORTING SERVICE
          REGISTERED PROFESSIONAL REPORTERS
     17 WOOD ROAD - WILMINGTON, DELAWARE  19806
                    (302) 654-5541

A-1

Page 21

1      MS. CHEEK: No. She's fine. Saves me a
2 lot of talking.
3 BY MS. CHEEK:
4      Q. So how long were you a receptionist at
5 Oliver Bair?
6      A. I started at Oliver Bair in October of
7 1983.
8      Q. Okay. And you were a receptionist for
9 how long?
10      A. Maybe two months, because my then boss,
11 now husband, saw that I had the people skills. I had
12 no prior sales experience, other than working in
13 retail at the mall during Christmas breaks and what
14 not, during school. But he taught me everything I
15 know about pre-need sales.
16      Q. So that the Oliver H. Bair Funeral Home
17 already had a pre-need sales program?
18      A. No, they did not.
19      Q. Did anybody have a pre-need sales
20 program at that point? Was there already an industry?
21      A. Yes. Now, death care, which encompasses
22 funeral and cemetery, started back in the 1920s in
23 Southern California. Some people may say it began in

Page 22

1 Pittsburgh, but actually, it began in Southern
2 California with a fellow by the name of Dr. Eaton who
3 started Forest Lawn Cemeteries.
4      Dr. Eaton saw the value that this
5 particular product had and the necessity of it, and
6 had not one funeral home, a cemetery and actually, in
7 California, you can have, unlike other states, not to
8 get too complicated about this, California is a unique
9 state in that you can have a funeral home on a
10 cemetery. Delaware, for instance, you cannot.
11      Anyway, make a very long story short,
12 pre-need has been around since the '20s industry-wide.
13      Q. So how did you transition from
14 receptionist? You said your boss was Jesse Pebley?
15      A. Yes. He taught me. He wanted to put in
16 a pre-need program. And the Oliver Bair Company also
17 had other divisions. He had cemeteries. There were
18 flower shops. There were deliveries. There were all
19 different entities to draw upon.
20      Q. Draw upon in what way?
21      A. Experience. Meaning, if you have a
22 sales program going in cemeteries, it is very easy to
23 run some parallel things, never identical-identical.

Page 23

1      But, for instance, how to go about
2 getting leads. How to do follow-up work. How to hire
3 people. How to train people.
4      Q. So did you work in some of these other
5 divisions?
6      A. I was never employed by the other
7 divisions. But oftentimes, we would have inner
8 divisional meetings, swap ideas.
9      Q. How many people worked for that company,
10 the Oliver Bair Company; do you know?
11      A. I think very late in its history, in its
12 heyday, they had over 2,200 burials out of Center City
13 Philadelphia and West Philadelphia.
14      By the time I got there, the
15 demographics had changed. West Philadelphia had
16 turned. The socioeconomics had changed dramatically
17 that many of the people that Oliver Bair once upon a
18 time had served had moved out to the Suburbs.
19      And can you repeat the question? I lost
20 my train of thought.
21      (Wherein, the requested portion of the
22 record was read by the Reporter as follows:
23      "Question: How many people worked for

Page 24

1 that company, the Oliver Bair Company; do you know?")
2      THE WITNESS: When I was there, I'll
3 just speak for that, there were 10.
4 BY MS. CHEEK:
5      Q. How long were you there?
6      A. From 1983 until July of 1995.
7      Q. So that was your last employer before
8 you came to your job with defendant?
9      A. Correct.
10      Q. And why did you leave Oliver Bair?
11      A. The corporation was sold to Service
12 Corporation International, which was a huge
13 conglomerate.
14      In 1995, it was a very sticky issue
15 regarding licensing. Also being a large conglomerate,
16 they did not want to put themselves in a vulnerable
17 position of hiring me because, although I have an
18 insurance license and degrees from university, years
19 of experience, I am not a licensed funeral director.
20      So they did not want to risk, they being
21 SCI, Service Corporation International, did not want
22 to risk hiring a non-funeral director, licensed person
23 such as me. So I then began my quest for new

Page 37

1 hired specifically for pre-need sales. So I was
2 in-house. His organization that has funeral home
3 accounts in the whole Northeast Corridor does not have
4 inside sales and outside sales.
5         If you speak with any of the vendors,
6 insurance carriers, casket manufacturers, vault
7 companies, any of the suppliers, ern manufacturers,
8 monument dealers, anything that parallels, you will
9 find the very same thing.
10        So I'll just use the word common
11 knowledge, common standard industry that you do not
12 have inside and outside sales in the same
13 organization.
14   Q.  Okay.
15        So in other words, you're not referring
16 to any particular article, research, survey, anything
17 in writing, any kind of publication?
18   A.  I could find something, only because the
19 articles are out there. But it's a very general
20 question, that there is not one particular survey.
21        I'm sure if I did a little homework, I
22 would come up with several surveys, several
23 publications. If you speak with the people in the

Page 38

1 marketing firms, they are going to find the very same
2 thing.
3   Q.  Okay.
4        But as we are sitting here right now,
5 you're not aware of any survey or any publication.
6 I'm just asking, you're not at this point aware of any
7 publication of any survey or research that supports
8 what you say, this industry standard?
9   A.  I am aware that the surveys exist and
10 that there are articles written. I cannot put my
11 finger on it this very moment.
12   Q.  Where would you find them if you were
13 going to go look?
14   A.  I would go back to some of the industry
15 journals, The Director, Funeral Service, Insider. I
16 would make calls to the marketing firms. I would call
17 vendors, suppliers, et cetera.
18   Q.  Okay. But I'm talking about articles.
19   A.  Articles, yes, that's what I would do.
20 I would also call, in a broader sense, I mean, any of
21 the books that you read at Border's, whatever, on
22 sales in general, how to operate a team. And that's
23 something else.

Page 39

1         I authored a book, never got published,
2 on training people on pre-need sales. The reason it
3 didn't get published, there's not that big of a
4 market.
5         So Simon Schuster did not see the point
6 of putting out the effort to make it happen if there
7 weren't going to be enough book sales to justify the
8 cost of making it. And I just bring that to mind
9 because it is something that I am very proud of.
10   Q.  Is that something that you produced in
11 discovery, that book?
12   A.  I don't believe I did.
13   Q.  Okay.
14        Anything else, any other reasons why or
15 any other things that prompted you to file the
16 discrimination charge?
17   A.  (Pause) ... I was excluded from
18 activities that they had done. The All Boys' Club.
19 My responsibilities were shifted, taken away from me.
20   Q.  What responsibilities were shifted and
21 taken away?
22   A.  I was hired to put in a pre-need program
23 there. All of a sudden, Mr. Latina sends out a memo

Page 40

1 saying he's the newly-pointed person in charge of the
2 pre-need program. And any questions, see him.
3         Also what I find very interesting, from
4 the period when I was hired till the year 2001, things
5 were very happy there, very happy. It was a very
6 wonderful period in my career, very wonderful. We
7 grew the business. We were somebody on the map. We
8 were at the cutting edge.
9         And it was never really defined to the
10 employees whether this acquisition/merger or the
11 Corleto-Latina Funeral Home with Chandler Funeral
12 Home, they didn't know this entity of Funeral Homes of
13 Delaware was formed.
14        The owners even admitted they did not
15 know how they were going to go. But let's just wing
16 it, fly by the seat of our pants and we're going to
17 make it happen. And that's when the difficulty began.
18   Q.  Then you began to have difficulty at
19 work?
20   A.  It wasn't just me. It was the entire
21 organization.
22   Q.  The entire organization became less
23 happy, you're saying?

Rowan v. Chandler, et al.                  Multi-Page™                  Anne M. Rowan - 12/21/06

Case 1:06-cv-00258-GMS   Document 63   Filed 05/14/2007   Page 6 of 20

Page 41

1   A.  Yes.
2   Q.  And how do you know that?
3   A.  From speaking to my fellow employees at
4   the time. Lots of suspicion. A lot of unknowing and
5   very short on the explanation. And here's an example
6   of that.
7       I specifically posed the question, When
8   writing an insurance contract, it will have the name
9   of the insured, the owner of the policy, if they are
10  not one in the same, will have the amount of sale, how
11  it is to be paid, the general health questions, the
12  replacement question. But also where should this
13  insurance company direct the proceeds at the time of
14  the person's death?
15      I specifically said, What do I write in
16  that line? The marketing firm had advised us that we
17  market the funeral home separately.
18      In other words, you do not even mention
19  the word Funeral Services of Delaware. That was a
20  legal something. But Chandler/Corleto-Latina stayed
21  the same.
22      So my question is, What should I be
23  putting on these contracts? There were several of

Page 42

1   them that had Chandler/Corleto-Latina Funeral Home
2   with the Concord Pike address because it's the main
3   headquarters for the operation where all the billing
4   and everything takes place there.
5       So there was confusion on my part about
6   that. And I never received a satisfactory answer. I
7   was tossed around: Yes, you're going to go sell for
8   Corleto-Latina. Work several affairs at the Hispanic,
9   what would you call it, Hispanic Days where they had
10  music and food and exhibitor tables.
11      I took what I knew from Chandler's and
12  had great success with direct mail, programs inserts,
13  even had some seminars.
14      And it's a very difficult community.
15  And it is predominately Hispanic; some Italian, but
16  predominately Hispanic, and met with very little
17  success there.
18      Someone struggling to pay their phone
19  bill, they are not going to be able to put out a
20  monthly premium to pay for a funeral.
21      Chandler's side of the fence was a
22  higher socioeconomic group. It had its difficulties
23  as well in that a sale is a sale.

Page 43

1       To get people to part with money
2   requires great skill and talent. For value that they
3   perceive they are going to be receiving, it takes a
4   special person to be able to do that and do it
5   gracefully and do it sincerely, do it with integrity,
6   do it professionally in a kind and caring manner.
7   Q.  Any other factors that prompted your
8   decision to file the discrimination charge?
9   A.  They were all men ganging up.
10  Q.  They meaning who?
11  A.  The principals.
12  Q.  You're talking about Chad Chandler,
13  Jimmy Chandler and Tony Latina?
14  A.  Correct, who also was best buddies, so
15  it appears, with Mr. Woodside and Mr. Casper.
16  Q.  And who was best buddies?
17  A.  Todd Woodside, Mr. Casper. There were
18  other employees that had outbursts who were not
19  reprimanded, not corrected.
20      One incident in particular was at a
21  staff meeting right after the Iraq War had started.
22  And funeral directors in the area were asked to go
23  down to Dover Air Force Base to retrieve bodies and

Page 44

1   bring them up here or get them on planes.
2       Jimmy Chandler wanted to charge for
3   that. Said, How much are we charging? The entire
4   room, but one director in particular, Mr. Dwayne
5   Casini, stood up and said, Are you nuts? As did Chad
6   Chandler. Horrified. Behavior was tolerated by the
7   males and not a female.
8   Q.  Can you be more specific than that?
9   A.  Dwayne was not reprimanded. Jason
10  wasn't reprimanded.
11  Q.  How do you know that Dwayne wasn't
12  reprimanded?
13  A.  He said so.
14  Q.  He told you so?
15  A.  Yes.
16  Q.  And you are saying that Jason was not
17  reprimanded in connection with the January 3rd
18  incident?
19  A.  He's still working there. He was not
20  fired. I was fired.
21  Q.  We'll come back to that.
22      Any other incidents in which you think
23  that men were engaged in similar outbursts or engaged

Page 65

1  were available to everyone to go to conventions,
2  motivational seminars.
3      Q.  Are you saying that you went with other
4  women in the office to conventions or seminars?
5      A.  Correct.  Continuing educational-type
6  things.
7      Q.  Did you ever go to lunch with any of the
8  men in the office?
9      A.  I'm trying to recall, and nothing comes
10 right off the top of my hat.
11     Q.  Did you ever go to dinner with any of
12 the women in the office?
13     A.  We took Debbie out for her birthday one
14 time.
15     Q.  Did you invite any of the men in the
16 office to go to that?
17     A.  Yes.
18     Q.  Did any of them go?
19     A.  No.
20     Q.  Which men did you invite?
21     A.  Dwayne, Larry and Joe.
22     Q.  Anyone else?
23     A.  I want to say probably everyone.  And

Page 66

1  the reason it was an evening was because lunchtime was
2  not available because of the work schedule.
3      Q.  Okay.  Did you and the women in the
4  office call yourselves the Girls' Club?
5      A.  No.
6      Q.  Were you calling the men the Boys' Club
7  in a derogatory sense?
8      A.  It was descriptive.
9      Q.  So you viewed it as descriptive, not as
10 derogatory?
11     A.  I would use the word descriptive.
12     Q.  Well, were they boys?
13     A.  They were boys.
14     Q.  They were all over the age of 18,
15 weren't they?
16     A.  Correct.
17     Q.  Is this a term that you used to make
18 fun of them?
19     A.  It was a term used to describe.
20     Q.  Did you make fun of them amongst
21 yourselves?
22     A.  The girls?
23     Q.  Yes.

Page 67

1      A.  (Pause) ...
2          MS. CONNELLY:  Can you just clarify the
3  "them" that you're speaking of?  Are you talking about
4  all the men in the office or specifically the men that
5  she identified as the Boys' Club?
6  BY MS. CHEEK:
7      Q.  The Boys' Club
8      A.  Did I make fun of the Boys' Club; is
9  that what you're asking?
10     Q.  Yes, or the people in what you call the
11 Boys' Club.
12     A.  (Pause) ... I'm not sure how to answer
13 that.
14     Q.  Why is that?
15     A.  Because I'm not sure how to answer that.
16     Q.  Okay.
17         You say in Paragraph 14 on page 774, In
18 October 2004, I complained that I felt as though I was
19 being treated differently because I was a woman and
20 that I felt as though the males were forcing me out of
21 my employment.
22         Who did you complain to?
23     A.  (Pause) ... I don't recall.

Page 68

1      Q.  Do you recall anything about this
2  complaint that you are describing?
3      A.  October the 1st of 2004, I fell and
4  broke my right ankle.  It was a Friday night.  I was
5  hospitalized.
6          Monday morning in my hospital bed, I
7  receive a call from Mr. Woodside wanting to know if he
8  can take my appointments.
9      Q.  And was there something wrong with that?
10     A.  Yes.
11     Q.  What was wrong with that?
12     A.  It was taking income away from me,
13 potential income.
14     Q.  So you didn't see that as a helpful
15 gesture?
16     A.  No.
17     Q.  Did you see Mr. Woodside as a competitor
18 of yours, as competing with you?
19     A.  Yes.
20     Q.  You did not see yourself as working
21 toward the same goals?
22     A.  Absolutely not.
23     Q.  Well, wasn't it your goal to sell as

Page 69

1 many pre-need contracts as you could for your
2 employer?
3    A.  That was one of my goals.
4    Q.  Okay.  And wasn't Mr. Woodside's goal
5 also to sell pre-need contracts for the company?
6    A.  I don't know what his goals are.  I had
7 no access to what he was thinking or doing.
8    Q.  So you're saying you don't know whether
9 it was his job to try to sell pre-need contracts for
10 Funeral Services of Delaware?
11    A.  I assume.  I was never told.
12    Q.  So how does this relate to the complaint
13 that you are describing in this Paragraph 14?
14    A.  The complaint is that Tony was now in
15 charge of the program and very clearly wanted me out
16 and to be replaced by Mr. Woodside.
17    Q.  Did he say, I want you out and I want to
18 replace you with Mr. Woodside?
19    A.  That was the direct behavior toward me.
20 The words were not spoken.
21    Q.  So he did not say that; correct?
22    A.  The words were not spoken.
23    Q.  That's how you interpreted what was

Page 70

1 happening; is that right?
2    A.  Yes.
3    Q.  And so I'm still trying to figure out
4 whether you actually did make a complaint to anyone in
5 October 2004.
6    A.  How could I complain to any of the
7 principals?  They were in cahoots with one another.  I
8 had no one to go to.
9    Q.  So when you say you complained, it was
10 not to any of the three owners of the company.
11    A.  The only one that it could have possibly
12 been would have been Mr. Chandler, James.
13    Q.  Well, do you have any recollection of
14 making a complaint to James Chandler?
15    A.  I don't recall.
16    Q.  You say in the next paragraph, When I
17 complained to management about the process of
18 referrals for our pre-need planning insurance
19 policies, I was told that I was not a team player.
20       Can you tell me, when you say
21 management, who do you mean?
22    A.  Jimmy and Anthony.
23    Q.  So you're saying you had a conversation

Page 71

1 where you complained to Jimmy and Anthony or Tony
2 about the referral process?
3    A.  Yes.
4    Q.  And when was that conversation?
5    A.  I don't recall.
6    Q.  What was your complaint exactly?
7    A.  Lead distribution was not defined and
8 was not being done in a manner that was fair.
9    Q.  Lead distribution was not defined.  What
10 does that mean?
11    A.  Who gets what leads.
12    Q.  As between you and TDW?
13    A.  Yes.
14    Q.  Did you have some proposal in mind or
15 some method?
16    A.  Yes, I did.
17    Q.  Did you communicate that proposal?
18    A.  Yes, I did.
19    Q.  What was the proposal?
20    A.  That an outside contractor should be
21 responsible for his own marketing and generating his
22 own leads, and inside salesperson, company employed,
23 should be able to have access to all leads generated

Page 72

1 by the company and creating new business on my own.
2    Q.  And when you say should have access to
3 all leads, does that mean the leads that the outside
4 contractor generated?
5    A.  No.
6    Q.  So your concept was the company would
7 pay for marketing conducted or directed by you, and
8 then you would get all those leads.
9       And then Mr. Woodside's company would
10 be responsible for spending whatever money they want
11 to spend on marketing and then would have their leads.
12    A.  Correct.
13    Q.  And the twain would not meet.
14    A.  Correct.
15    Q.  And you say it was not being done in a
16 fair manner.  What do you mean by that?
17    A.  By that I mean, the decision that
18 Mr. Woodside was going to be there and have access to
19 funeral follow-up leads, these are families that had
20 been served in the past.  And for my then, what nearly
21 was going on 10 years employment, I was not permitted
22 access to them whatsoever.
23    Q.  Okay.  And they were going to change the

Rowan v. Chandler, et al.                                        Anne M. Rowan - 12/21/06

Multi-Page™

**Page 73**

1  policy regarding funeral follow-up leads and he was
2  going to have access to them, but you were not going
3  to have access to them.
4      A.  Correct.  And the other thing was, any
5  funeral director could make a referral to the outside
6  contractor.
7      Q.  And you thought that they should only
8  make referrals to you?
9      A.  Correct.
10     Q.  And did you think that the funeral
11 directors would be more inclined to make referrals to
12 TDW than to you?
13     A.  Jason and Tony.
14     Q.  You thought they would be more inclined
15 to make referrals to Mr. Woodside?
16     A.  They had.
17     Q.  Okay.
18         Did you have problems getting along with
19 Mr. Casper, Jason Casper?
20     A.  Not until the January 3rd incident.
21     Q.  And you say, I was told that I was not a
22 team player.  Who told you that you were not a team
23 player?

**Page 74**

1      A.  Mr. Latina.
2      Q.  And was that because you did not want to
3  share leads with Mr. Woodside?
4      A.  Correct.
5      Q.  And you think that was an unfair
6  characterization?
7      A.  Yes.
8      Q.  Well, it's a fact, isn't it, that you
9  did not want to work with Mr. Woodside as a member of
10 your team?  Isn't that true?
11     A.  He was an outside contractor.
12     Q.  So you didn't view him as part of your
13 team.
14     A.  Correct.
15     Q.  Then the next paragraph you say, On at
16 least, I think that should be "one" and it says "on".
17         On at least one occasion, Tony Latina
18 accused me of being "overly emotional" and advised me
19 that the business was not a "popularity contest."
20         Can you give me some context for that?
21     A.  I was very definite in my opinions about
22 how a pre-needs program should be run and felt that it
23 was falling on deaf ears.

**Page 75**

1      Q.  And when you say very definite, does
2  that mean that you perhaps raised your voice to
3  emphasize your point?
4      A.  I would raise my voice.  I have a very
5  loud voice.
6      Q.  And did you get upset over this issue?
7      A.  I was invested in the outcome.  By
8  upset, I don't understand what you're asking.
9      Q.  You don't understand what it means to be
10 upset?
11     A.  It can be interpreted several different
12 ways.  This upset was that I felt threatened that the
13 leads were going to be given away and I was going to
14 take a hit in income.
15     Q.  And would you say that you were
16 emotional about this issue?
17     A.  I was very passionate about what I did
18 and how it could benefit the company I was employed by
19 and the families we served.
20     Q.  Okay.  And what about this comment about
21 the business not being a popularity contest?  How did
22 that come up?  Any idea what that's referring to?
23     A.  Yes.

**Page 76**

1      Q.  Okay.
2      A.  Anthony wanted Woodside in, come hell or
3  high water, and that was going to go down.
4      Q.  So in what respect would a popularity
5  contest have been implicated?
6      A.  Meaning, make room.
7      Q.  Well, who would be in the popularity
8  contest?
9      A.  Woodside and myself.
10     Q.  So he's trying to make the point that
11 that was not a competition between the two of you?
12     A.  I don't know.
13     Q.  Was there a particular meeting or
14 conversation with Mr. Latina that you are referring to
15 here in this paragraph?
16     A.  I'm not sure.
17     Q.  Was there ever a meeting at which
18 Mr. Pebley was present?
19     A.  No.  I was on crutches.  He was my mode
20 of transportation.  He came into the room where
21 Mr. Woodside and Mr. Latina were, simply to take me
22 home.  There was no meeting where he was an active
23 participant.

Page 97

1 had already started looking for another job?
2    A.    No.
3    Q.    You hadn't already met with someone from
4 McCrery to talk about working there?
5    A.    Absolutely not.
6    Q.    Okay.
7         (Discipline Questionnaire was
8    marked for identification as Rowan
9    Exhibit 5.)
10 BY MS. CHEEK:
11    Q.    Ms. Rowan, you have in front of you
12 Exhibit 5, which begins on Page CFH758 and runs
13 through 763.
14    A.    (Witness reviews document.)
15    Q.    Have you seen this document before?
16    A.    Yes.
17    Q.    Is that your signature and date on the
18 last page?
19    A.    Yes, it is.
20    Q.    And is this your handwriting?
21    A.    Yes, it is.
22    Q.    And this is entitled the Discipline
23 Questionnaire, (Demotion, Suspension, Discharge,

Page 98

1 et cetera.)
2         Is this a form that you filled out for
3 your discrimination charge?
4    A.    Yes.
5    Q.    And at the top, it's asking about your
6 employment history.  It's asking about the respondent
7 employer.  And you say that your position title at
8 time of hire was sales manager; correct?
9    A.    Yes.
10    Q.    And then you say, position title at
11 time of most recent discipline was sales associate.
12 And then there's a D and maybe what was going to be an
13 "i" but it's scribbled out.  And that's your
14 handwriting; correct?
15    A.    Right.
16    Q.    What were you going to write there that
17 you scribbled out?
18    A.    My titled on my business card.
19    Q.    Which is?
20    A.    Director of Advanced Planning.
21    Q.    And why did you scribble that out?
22    A.    I don't know.  I don't know why I
23 scribbled it out.

Page 99

1    Q.    And had anyone told you that your title
2 was sales associate?  Is that what was on your
3 business card?
4    A.    No.  It had Director of Advanced
5 Planning.  But we had the memo that said Mr. Latina
6 was head of the pre-need department.  So I'm only
7 guessing that I went to put my business card title,
8 but then it says Position Title, I was an associate.
9 I was not anything other.
10    Q.    According to who?
11    A.    To me.  According to me.
12    Q.    Were there other members of the pre-need
13 department at the time of your departure from Funeral
14 Services of Delaware?
15    A.    That were not employees.  Mr. Woodside
16 was hired as the out contractor.
17    Q.    And you were the only employee that
18 worked in the pre-need department?
19    A.    Correct.
20    Q.    In the past, had there been other
21 members of the pre-need department that were
22 employees?
23    A.    Yes.

Page 100

1    Q.    Was Steve Acret one of them?
2    A.    I don't remember.
3    Q.    How about Gerald Bogos?
4    A.    Yes.
5    Q.    Was Jason Casper a member of the
6 pre-need department at one time?
7    A.    For a very short while after he was
8 hired.
9    Q.    And did he report to you?
10    A.    Yes.
11    Q.    Did Mr. Bogos report to you?
12    A.    Yes.
13    Q.    And you don't remember Mr. Acret?
14    A.    I don't.
15    Q.    How about Gladys Krespal?
16    A.    Yes, I remember Gladys.
17    Q.    Was she in the pre-need department?
18    A.    Yes.
19    Q.    And did she report to you?
20    A.    Yes.
21    Q.    How about Maria Cruz?
22    A.    Yes.
23    Q.    Same thing?

A-8

Page 101

1    A. Yes.
2    Q. And Robert Eppes?
3    A. Yes.
4    Q. Was also in the pre-need department
5 reporting to you?
6    A. Yes?
7    Q. How about Sandy Kaminski?
8    A. Yes. She was a secretary.
9    Q. She was a secretary in pre-need?
10   A. Yes.
11   Q. And what about Dominick Lupacchino?
12   A. I don't remember him.
13   Q. How about Maureen Lyons?
14   A. Yes.
15   Q. Also in pre-need?
16   A. Correct.
17   Q. As a salesperson reporting to you?
18   A. Correct.
19   Q. What about Susan Beachell, was she a
20 pre-need salesperson in your department?
21   A. Correct.
22   Q. Susan Peden?
23   A. Yes.

Page 102

1    Q. Also pre-need salesperson reporting to
2 you?
3    A. Right.
4    Q. Richard Sanford?
5    A. Yes.
6    Q. Was also a pre-need salesperson?
7    A. Yes.
8    Q. And Carmen Silva?
9    A. She was a translator for the Hispanic
10 Community.
11   Q. But not a salesperson?
12   A. Correct.
13   Q. Richard Stanton?
14   A. I'm trying to remember. I don't recall
15 him.
16   Q. Do you remember anyone named Art Carey?
17   A. Yes. But he was nothing to do with
18 pre-need sales.
19   Q. Okay. Do you remember what he was?
20   A. I think he was a part-timer working at
21 night, viewings and that sort of thing.          A-9
22   Q. Like a funeral assistant kind of person?
23   A. Yes.

Page 103

1    Q. How about Eric Lefridge?
2    A. I don't remember that name.
3    Q. Was Diana Pinkerton in the pre-need
4 department?
5    A. She was the administrative assistant
6 that would do all the processing.
7    Q. Did you consider her to be part of the
8 pre-need department?
9    A. She was my assistant.
10   Q. When Tony Latina told you that you
11 should be more of a team player or that you were not a
12 team player, did you consider that to be a criticism
13 of your performance?
14   A. Yes.
15       (Witness Questionnaire was marked
16    for identification as Rowan Exhibit 6.)
17 BY MS. CHEEK:
18   Q. Ms. Rowan, I have just handed you
19 Exhibit 6, which is CFH755 through 757. And this is
20 yet another questionnaire. Is this something that you
21 recognize?
22   A. Yes.
23   Q. Is that your name and date at the top?

Page 104

1    A. Yes.
2    Q. And this form is filled out by you?
3    A. Correct.
4    Q. And this is titled the Witness
5 Questionnaire. The Department of Labor was asking you
6 to give them names of people that you thought had
7 information pertinent to your charge; correct?
8    A. Yes.
9    Q. Okay.
10       And you wrote on here that you thought
11 that Kelly Burns had experience firsthand of being
12 treated negatively because of being female.
13   A. Correct.
14   Q. So he wanted you to explain what you
15 meant by that.
16   A. She went to Chad Chandler because she
17 had been harassed by Mr. Woodside. This was after my
18 departure. And Kelly was a very frustrated, at-times
19 bookkeeper. And I feel it was not taken seriously by
20 the management.
21   Q. Okay. This is the same person as you
22 referred to earlier as accountant or comptroller;
23 correct?

Page 165

1    A.   Well, I would have paged and then he
2 phoned in, responded back to the page.
3    Q.   And when you say that Corleto-Latina
4 sales rep, that's referring to whom; to Todd?
5    A.   Woodside.
6    Q.   Okay.  And what was the bad decision?
7 It says bad decision.
8    A.   In sales, you never postpone an
9 appointment for two days.  You are on it, especially
10 if the client is in the office.  So he blew it off and
11 it just made everybody look bad.
12    Q.   You're saying that you think that Todd
13 Woodside didn't follow-up?
14    A.   No, I'm sure he did.  It was a bad call
15 to reschedule the appointment when a woman was already
16 in the office wanting to contract business.
17    Q.   Okay.
18         (Journal notes were marked for
19      identification as Rowan Exhibit 22.)
20 BY MS. CHEEK:
21    Q.   You have in front of you Exhibit 22,
22 which begins on P1056 and runs through P1062.  Have
23 you seen this before?

Page 166

1    A.   Yes.
2    Q.   These are more pages from your journal;
3 is that correct?
4    A.   Yes.
5    Q.   Now, we're going to ignore the top part
6 of this first page for the time being because I think
7 that's a continuation for something that happened
8 later.
9         So looking at 9/20/04, 8:35 a.m.  This
10 is a note you made.  Did you make it on this date at
11 this time, approximately?
12    A.   I may not have written it at that time,
13 but that's what time that took place.
14    Q.   So you may have written this later?
15    A.   Right.
16    Q.   All right.
17         And it says, AMR calls Tony and
18 apologizes for outburst and requests meeting with Tony
19 alone.  He calls at 9:10 to say he's five minutes
20 away.  Is that correct?
21    A.   Correct.                              A-10
22    Q.   Do you know what you're referring to
23 when you say "and apologizes for outburst?

Page 167

1    A.   That particular one was in response to,
2 I would think, probably something to do with Todd
3 coming in and having access to leads.
4    Q.   So you would have had an outburst to
5 Tony.  You yelled at Tony or something like that?
6    A.   Correct.
7    Q.   Okay.
8         9/24/04, 9:05 a.m. Tony arrives to meet
9 with AMR with coffee in hand.  AMR restates that
10 outburst is not best way to accomplish desired goal of
11 getting non-sales experienced person to understand why
12 it is detrimental to allow outside contractor access
13 to "gravy" leads.
14         Did I read that correctly?
15    A.   Yes.
16    Q.   Tony is listening.  AMR explains
17 outburst is due to extreme frustration of not being
18 heard, random poor judgment decisions being made about
19 the program she gave birth to without consulting her.
20 Is that all right?
21    A.   Right.
22    Q.   "I feel like the child (the program)
23 I've given birth to, raised, nourished and supported

Page 168

1 has been molested, raped and left to die."
2         This is a quote.  So you're quoting what
3 you said to Tony?
4    A.   No, to myself.
5    Q.   To yourself.  You did not actually say
6 this to Tony?
7    A.   Actually, you know what?  I think I did.
8    Q.   Okay.  AMR further explained and defined
9 what the role of an outside contractor should be.  He
10 is responsible for generating his own leads and
11 delivering closed sales, nothing else.
12         He receives no marketing support from
13 the company and is responsible for paying for any
14 marketing that he would do.  Tony disagreed with that.
15         So you are relating the conversation
16 that you had with Tony; is that correct?
17    A.   Correct.
18    Q.   Tony also tried to assure that outside
19 contractor was not out for AMR's job.  AMR does not
20 believe this.  AMR stated her extreme displeasure with
21 the "ganging up" factor.  Meeting with management have
22 been three men to one female.
23         So I think that's the end of your

Page 169

1 recounting of this meeting. Do you recall anything
2 else about the meeting that is not described here?
3    A.   No.
4    Q.   Okay. We've already talked about the
5 24th, I think, which is on a different document.
6        If you look at Page 1060 of the same
7 exhibit, you have some notes. This was just 9/20 that
8 we were talking about. And I think we already talked
9 about 9/24, which was in Exhibit 21. So now we are on
10 Exhibit 22. 10/1/04, do you see that?
11    A.   Yes.
12    Q.   Now, I'm assuming this is something that
13 you wrote later?
14    A.   Right.
15    Q.   Kind of making yourself a timeline or a
16 chronology of what had happened?
17    A.   Yes.
18    Q.   So October 1st, 2004, you broke your
19 ankle?
20    A.   Right.
21    Q.   And then October 2nd, you had surgery
22 for fractures of your foot; is that right?
23    A.   Right.

Page 170

1    Q.   10/3, AMR contacts owners. Does that
2 mean Chad, Jimmy and Tony?
3    A.   Right.
4    Q.   Okay. This was what you were telling us
5 about earlier 10/4/04. Talks about outside contractor
6 could he take my appointments? AMR said no. Called
7 IV to take only one that Monday morning. What does
8 that say next?
9    A.   Otley was the family name.
10    Q.   Otley imminent. All others rescheduled.
11 And then you have your rescheduling dates; is that
12 correct?
13    A.   Correct.
14    Q.   And then it says 8 sales closed by 10/9
15 with broken ankle.
16        Next page, AMR feared for job loss. Is
17 that what that says at the top?
18    A.   Yes.
19    Q.   For month of October, AMR continued to
20 book appointments from home and go to office for
21 appointments. Closed 22 for October; meaning 22
22 contracts?
23    A.   Yes.

Page 171

1    Q.   No driving, compromised physical
2 condition.
3        So there's the period when Jesse was
4 driving you to work?
5    A.   Yes.
6    Q.   And on 10/25/04, AMR wrote
7 business/marketing plan for 2005. Locations 1 and 2;
8 is that right?
9    A.   Right.
10    Q.   Now, I want to go back to the beginning.
11        Let's mark this one.
12        (Journal notes were marked for
13        identification as Rowan Exhibit 23.)
14 BY MS. CHEEK:
15    Q.   This is 23; correct?
16    A.   Right.
17    Q.   Exhibit 23, and it is Bates numbered
18 P1054 and 1055. These, too, are pages from your
19 journal; is that correct?
20    A.   Right.
21    Q.   And did you write this first one
22 10/12/04, on or about?
23    A.   Yes. When it's dated, yes.

Page 172

1    Q.   Tony met with AMR. Requested '04 budget
2 and proposal for '05 budget. Was told outside
3 contractor would be selling for 1. That means
4 Location 1; is that correct?
5    A.   Right.
6    Q.   And that's what?
7    A.   Concord Pike.
8    Q.   Concord Pike. And you considered that
9 to be your territory?
10    A.   Exactly.
11    Q.   And be doing funeral follow-up. And
12 what is funeral follow-up?
13    A.   They are in-house leads.
14    Q.   Okay. So in-house meaning what, someone
15 who had already had a funeral?
16    A.   Correct. Following up with survivors.
17    Q.   AMR not to sell for 3. That was a
18 different location, Corleto.
19    A.   Correct.
20    Q.   AMR currently doing all follow-up. And
21 so you're stating that you were doing all the
22 follow-up at that time?
23    A.   What I was allowed to do. That was a

Page 177

1    Q.  Okay.  So that you wouldn't have to talk
2  to them at all?
3    A.  Correct.
4    Q.  10/19/04, 2:50 p.m.  Tony called at 2:30
5  to ask if he could meet with me for 30 minutes, or is
6  that 20 minutes?
7    A.  20 minutes.
8    Q.  He shows up with Todd W to discuss other
9  employees sending referrals and how they should be
10  compensated.  I lost it at the sight of Todd W -- and
11  I think that we're going to go to another page.
12       Did I read that part correctly?
13    A.  Yes.
14    Q.  And then going back to Exhibit 22, back
15  to Bates No. P1056, Todd W having anything to do with
16  the established PN program.
17    A.  Correct.
18    Q.  So the top of this page is a
19  continuation from 1019; is that right?
20    A.  I'm not sure of that.
21    Q.  Right.  I'm not either.  That's why I'm
22  asking you.
23    A.  I don't know.

Page 178

1    Q.  I confronted both with their lack of
2  experience and inability to think things through for
3  themselves.
4       Also questioned Todd why he needed to
5  invade Chandler's pre-need if he was so successful
6  with his other accounts.  He replied that this is a
7  democracy and he answers to management only.
8       So do you think that's a continuation?
9    A.  I'm not sure.  I don't think it is.
10    Q.  Okay.
11       And you say with regard to Bates
12  numbered P1055, which is Exhibit 23, I lost it at the
13  sight of Todd W.  Can you explain what you mean when
14  you say you lost it?
15    A.  I would get very angry, or I got very
16  angry and simply did not want to communicate with
17  them.
18       And the reason for that is, Tony did not
19  announce to me prior that, that he was bringing in
20  with Mr. Woodside to meet.  It was a surprise.
21    Q.  So you thought you were going to just
22  meet with Tony, not Tony and Todd?
23    A.  Exactly.  And Tony knew how hot the

Page 179

1  whole issue was and continued to pour gas on the fire
2  by doing that.
3    Q.  So when you say, going back to
4  Page 1056 or Rowan 22, I confronted both with their
5  lack of experience and inability to think things
6  through for themselves, also questioned Todd why he
7  needed to invade Chandler's, are you describing a
8  meeting that you had with Todd and somebody else here
9  at the top of 1056?
10    A.  Might have been.  I don't know.
11    Q.  Okay.
12       Could you take a look at 1058 in that
13  same exhibit.  Firstly, this meeting with Tony and
14  Todd was 10/19/04, correct, in the afternoon?
15    A.  Okay.
16    Q.  According to Exhibit 23 --
17    A.  Are you referring --
18    Q.  -- Page 1055, which is Exhibit 23.
19    A.  Okay.
20    Q.  Then we went to 1056 and it's got
21  something that we are not quite sure about at the top,
22  and then going back to describe some things in
23  September.  But then on Page 1058, do you see where I

Page 180

1  am?
2    A.  Yes.
3    Q.  In the middle, it says on 10/19/04, Tony
4  and outside contractor, two males, met with AMR.  Do
5  you have any idea when you wrote this?
6    A.  It would have been shortly after.  I
7  can't tell you exactly.
8    Q.  Tony asked AMR if outside contractor is
9  not given funeral follow-up "gravy leads".  So you
10  were calling them gravy leads; right?
11    A.  Yes.
12    Q.  Because they were easy sales?
13    A.  Yes.  It's a lot easier than going out
14  and creating brand new business.
15    Q.  What should he been doing?  So, AMR
16  responded with her own direct mail, inserts,
17  et cetera.  Have I got that right?
18    A.  Correct.
19    Q.  Tony speaking for management team stated
20  he thought my plate was full and AMR didn't have time
21  to do funeral follow-up.  Is that right so far?
22    A.  Correct.
23    Q.  AMR responded by saying she can manage

Page 181

1 it if given the opportunity. Historically, CFH has
2 discouraged any funeral follow-up as it was in direct
3 conflict with after-care program. Is that correct?
4     A.  Correct.
5     Q.  How was it in direct conflict with the
6 after-care program?
7     A.  The after-care coordinator felt that the
8 solicitation of doing a funeral plan was in direct
9 conflict with somebody bereaving or grieving their
10 lost loved one. So for most of my career there, none
11 of that was permitted.
12         We finally got to an agreement where I
13 was allowed after one year after the death. And then
14 that got chiseled away to eight months, and then six
15 months, and then finally three months after the death
16 occurred, I was magically allowed to call.
17         But it was never the strongest lead
18 source. I had to go create business from other lead
19 sources.
20     Q.  It would have been a lot closer in time
21 probably to the actual provision of the service?
22     A.  It is freshest in their memory, yes.
23     Q.  It is easier to sell. So the after-care

Page 182

1 coordinator was Helen?
2     A.  Johnson.
3     Q.  Was that a source of conflict between
4 the two of you, between you and Helen?
5     A.  We never fought over it. We had
6 differences of opinions. I backed off. Chad Chandler
7 very clearly supported her and her efforts. Jimmy
8 supported me in mine, and we were trying to just get
9 to a reasonable timeframe.
10     Q.  Okay. AMR negotiated to -- and I'm
11 stuck on that word.
12     A.  Prior.
13     Q.  -- prior pre-needs manager?
14     A.  Yes.
15     Q.  JTC, IV to reduce one-year waiting
16 period. That's what you were just telling me about?
17     A.  Yes. Yes, that's what I was just
18 saying.
19     Q.  It was working. Outside contractor is
20 mailing info prior to funeral bill going out from
21 first death. Bad taste, poor judgment to do this.
22         Meeting concluded with Tony resolving to
23 convey ideas to two other owners at next partner's

Page 183

1 meeting and that he would research --
2     A.  Firm with other sales organizations.
3     Q.  Okay. The role of an outside
4 contractor. Is that all correct?
5     A.  Yes.
6     Q.  AMR also encouraged him to seek referral
7 info regarding current outside contractor past
8 performance with prior employees. Meeting concluded
9 with air being cleared.
10         So was Todd Woodside still present for
11 this whole discussion?
12     A.  I don't believe so.
13     Q.  What did you think that Tony Latina
14 would be told about Todd Woodside? If I'm
15 understanding this correctly, you're saying to Tony,
16 you should check Todd's references, check into his
17 past performance; is that right?
18     A.  Correct.
19     Q.  And why did you want him to do that?
20     A.  When he was employed at another place,
21 with Laurel Hill, and I think Brinhurst Funeral Home,
22 he came and observed me doing the seminar to learn how
23 to do that. He did not stay on there. I don't know

Page 184

1 the circumstances of him leaving.
2         But from accounts that he has had and
3 his methods of doing sales, very little follow-up. He
4 talks a good game but does not deliver.
5     Q.  Okay. So you didn't think he was a good
6 salesperson?
7     A.  Absolutely not.
8     Q.  And when you say meeting concluded with
9 air being cleared, what do you mean by that?
10     A.  By that, I meant I felt the air had been
11 cleared with Tony and me in that particular occasion.
12     Q.  Okay. So now I want to go to Page 1061,
13 which is Exhibit 22. We are almost finished with this
14 one.
15         Now, the thing I want to look at is a
16 note that starts Plan was presented 11/16/04, 3 p.m.
17 to three owners, outside contractor, three insurance
18 carrier reps.
19         So it sounds like this is the meeting
20 that you were proposing, Let's have a meeting with the
21 insurance carrier reps and all of us to talk about the
22 plan going forward.
23     A.  Correct.

**Page 185**

1    Q.    Okay.  And the people that were the
2  insurance carrier reps are the ones that you named
3  earlier?
4    A.    Right.
5    Q.    Bobby Rae and Chad Adams and Chris
6  someone?
7    A.    Yes.
8    Q.    Were they all with the same firm?
9    A.    Yes.
10    Q.    What was their firm?
11    A.    Golden Considerations is the name of the
12  company.
13    Q.    So going back to your note, outside
14  contractor, outburst of --
15    A.    Anger.
16    Q.    Outburst of anger directed at AMR who
17  clarified the role of an outside contractor.  No
18  access to funeral follow-up leads (Part of AMR's lead
19  source).
20          So can you explain that outburst of
21  anger?
22    A.    Todd Woodside stood up in the middle of
23  room pointing his finger at me, and very angrily so,

**Page 186**

1  because I clarified what his role as an outside
2  contractor should be.
3    Q.    So this was the first that he had heard
4  that your position was that he should not have access
5  to funeral follow-up leads?
6    A.    I don't know if it was the first, but it
7  was an attack directly at me.
8    Q.    Do you recall what he said?
9    A.    Not specifically.
10    Q.    But it was clear that in that meeting,
11  that you did not want to share the funeral follow-up
12  leads.
13    A.    Correct.
14    Q.    And he thought you should share the
15  funeral follow-up leads.
16    A.    I don't know what he thought.
17    Q.    But he was angry that you did not want
18  to?
19    A.    He was angry that I corrected what his
20  role should be.
21    Q.    He didn't like your description of his
22  role?    A-14
23    A.    Correct.

**Page 187**

1    Q.    Outside contractor had no marketing plan
2  or sales goals with the numbers attached.
3          So did I read that correctly?
4    A.    Yes.
5    Q.    And so you're saying that at this
6  meeting, he had not presented a sales plan or a
7  marketing plan?
8    A.    Correct.  What he was going to bring to
9  the table, nobody knew.
10    Q.    And you were presenting your plan --
11    A.    Correct.
12    Q.    -- at this meeting.
13    A.    Correct.
14    Q.    Owners asked for AMR and outside
15  contractor to be excused.  Is that correct?
16    A.    Yes.
17    Q.    Insurance carrier reps told owners to
18  give AMR what she wanted or her production would walk.
19          Owners see AMR as territorial, not team
20  player, and said they would meet themselves and see if
21  AMR's plan was acceptable.  Is that correct?
22    A.    That's correct.
23    Q.    Okay.  So you had left the meeting; am I

**Page 188**

1  right?
2    A.    Correct.
3    Q.    So what is your source for saying what
4  the insurance carrier reps told the owners?
5    A.    I called them and asked them.
6    Q.    Was there any one in particular that you
7  called?
8    A.    Bob Rae.
9    Q.    And that's what he said?
10    A.    Yes.
11    Q.    And did he tell you that the owners saw
12  you as territorial and not a team player?
13    A.    No.  That was my own take on it.
14    Q.    So you were thinking then, you are
15  writing down your thoughts of this segment, owners see
16  you as territorial and not a team player, and said
17  they would meet themselves and see if your plan was
18  acceptable?
19    A.    Correct.
20    Q.    So, said to whom?
21    A.    The people that were at that meeting.
22    Q.    Okay.  You didn't know of this
23  information on account of listening outside the door?

Rowan v. Chandler, et al.
Case 1:06-cv-00258-GMS    Document 63    Filed 05/14/2007    Page 17 of 20
Multi-Page
Anne M. Rowan - 12/21/06

Page 189

1   A.  No.
2   Q.  Did you ever listen outside the door?
3   A.  I did not.
4   Q.  Okay.
5       12/22/04, 2 p.m.  AMR tipped off.  And
6 then above that it says Diana, appointment book.
7   A.  Appointment in book for office.
8   Q.  Okay.  So Diana told you?
9   A.  Correct.
10  Q.  At-need director Jason, that's Jason
11 Casper?
12  A.  Right.
13  Q.  Was making a prearrangement with outside
14 contractor for Location 1 after policy had been
15 established.  AMR to do all of 1 and 2.
16      Did I read that correctly?
17  A.  Yes.
18  Q.  When had that policy been established?
19  A.  There was no written document on it.  I
20 can't tell you when.
21  Q.  Well, who had established it?
22  A.  I assume the owners.
23  Q.  How did you find out about it?

Page 190

1   A.  I don't recall.
2   Q.  Location 1 is Concord Pike?
3   A.  Right.
4   Q.  And Location 2 is Hockessin?
5   A.  Correct.
6   Q.  All right.  I'm reading again.  Jason
7 asked Tony if okay to do.  Tony agreed.  You have that
8 underlined, Tony agreed.  Policy was written under
9 Location 3, underlined twice.
10      So how did you find out about this
11 agreement that you are writing about between Jason and
12 Tony and the policy being written under Location 3?
13  A.  Diana told me that the appointment was
14 booked.  And it was clearly a Location 1 call.  And
15 Jason was funneling it to 3 to pass the lead to
16 Mr. Woodside.  The policy, I can't answer that.  There
17 was nothing written.
18  Q.  But you say Jason asked Tony if okay to
19 do.  How do you know Jason asked Tony if okay to do?
20  A.  Because when I found out it happened, I
21 confronted him about it.
22  Q.  Who?
23  A.  Jason.  I asked him.

Page 191

1   Q.  And he said Tony said it was okay?
2   A.  Yes.
3   Q.  And then policy was written under
4 Location 3.  How did you find out that?
5   A.  It was written through Forethought.  I
6 was not writing Forethought policies at the time.
7   Q.  And how did you know how it was written
8 at all?
9   A.  Because there was a folder in the
10 pre-need file for Diana to process, which I reviewed
11 regularly.
12  Q.  So you saw it in the pre-need Diana's
13 in-box at work?
14  A.  Right.
15  Q.  12/23/04, reading again from your note,
16 10 a.m.  AMR flipped with this news and confronted
17 Jimmy about it who said he would look into it.
18      And then in parentheses it says,
19 (Commission stolen from AMR.  Direct violation from
20 Cofrancesco.)
21      AMR also confronted IV for okay on plan.
22 He had no answer.  AMR sees "All Boys' Club," Tony,
23 Jason, outside contractor in cahoots.

Page 192

1       Did I read that correctly?
2   A.  Yes, you did.
3   Q.  Okay.  When you say you flipped with
4 this news, what does that mean?
5   A.  That means I was upset.  I was angry
6 about it.  I needed to talk to someone about it.
7       So at this point, Tony, who is supposed
8 to be my immediate supervisor, gave the okay to steel
9 commission and lead from me.
10      So who was I going to go to for some
11 advice, Chad?  The pickins were slim.  I went to
12 Jimmy.
13  Q.  When you say confronted Jimmy about it,
14 can you describe what --
15  A.  Wanted him to do something about it.
16  Q.  When you say confronted, did you yell at
17 him about it?
18  A.  No, no, no.  I brought it to his
19 attention.
20  Q.  And so you were seeing Jimmy as your
21 best ally or your ally against Tony?
22  A.  That went back and forth.  I needed to
23 report the incident to somebody in management.  Chad

A-15

Rowan v. Chandler, et al.
Case 1:06-cv-00258-GMS    Document 63    Filed 05/14/2007    Page 18 of 20
Multi-Page
Anne M. Rowan - 12/21/06

Page 193

1 basically didn't want any parts of anything. And at
2 that point, Jimmy was my better bet.
3       Jimmy and I had a wonderful relationship
4 the first several years there and it slowly started
5 going awry.
6    Q.  Okay.  And when you say IV okay on plan,
7 are you talking about the marketing plan?
8    A.  Yes.
9    Q.  And that was the one that was discussed
10 or that you presented on November 16, 2004?
11   A.  Correct.
12       (Journal note was marked for
13   identification as Rowan Exhibit 24.)
14 BY MS. CHEEK:
15   Q.  So much for chronological order.  This
16 is Exhibit 24.  It is Bates numbered P1053.  And is
17 this from your journal?
18   A.  Yes.
19   Q.  And was it written on September 30,
20 2004?
21   A.  Yes, or shortly thereafter.
22   Q.  And this is when you were told that Tony
23 would be what?  You say in charge of the pre-need

Page 194

1 program; correct?
2    A.  Correct.
3    Q.  After nine years of me doing it, you
4 say; is that right?
5    A.  Correct.
6    Q.  But it's true that you were reporting to
7 Jimmy Chandler during this time?
8    A.  Up until that point, and there was a
9 period when I was reporting to Chad.  I couldn't tell
10 you when, but there was a period there.
11   Q.  And you say bring in two competitors for
12 two locations.  Who were the two competitors?
13   A.  Myself and the outside contractor.
14   Q.  Okay.  For two locations.  And what was
15 that?
16   A.  Chandler's and Corleto-Latina.
17   Q.  Okay.  And you say AMR asked why and how
18 Chandler brothers dropped the ball in leadership,
19 management.  Is that correct?
20   A.  Correct.  That was a thought.  That was
21 not a statement.                                    A-16
22   Q.  Okay.  So you're saying you did not tell
23 them that "You dropped the ball in leadership and

Page 195

1 management"?
2    A.  No.
3    Q.  So you certainly felt that you were more
4 knowledgeable about sales than Tony?
5    A.  Yes.
6    Q.  And you probably, tell me if I'm wrong,
7 but you felt you were more knowledgeable about sales
8 than anybody at Funeral Services of Delaware.
9    A.  Correct.
10       (Journal notes were marked for
11   identification as Rowan Exhibit 25.)
12 BY MS. CHEEK:
13   Q.  Ms. Rowan, Exhibit 25 begins on P704 and
14 goes on until P710.  Are these notes that you wrote?
15   A.  Yes.
16   Q.  Okay.  And this is a fairly lengthy
17 list.  I think you will be relieved to know that we
18 are not going to read it.
19   A.  Oh, good.
20   Q.  But can you just give me an idea of when
21 you wrote it?
22   A.  This was after the suit had been filed
23 and I was asked to bring materials to my attorney.

Page 196

1    Q.  And when you say suit had been filed, do
2 you mean this lawsuit or do you mean your
3 discrimination charge?
4    A.  This one.
5    Q.  So this is a list of things that you
6 were bringing to your attorney?
7    A.  Correct.
8    Q.  So this is a list of what, everything
9 that you had to do with everything that you had in
10 your possession that had to do with Funeral Services
11 of Delaware?
12   A.  Yes.  How I got to be where I am.
13   Q.  Okay.
14   A.  And one thing I wrote that you must have
15 in your possession is the pre-need sales training
16 manual.
17   Q.  It's an outline, basically?
18   A.  Yes.
19       (Journal notes were marked for
20   identification as Rowan Exhibit 26.)
21 BY MS. CHEEK:
22   Q.  This is Exhibit 26, Bates numbered P1063
23 to 1064.  Are these notes from your journal?

Page 197

1    A. Yes.
2    Q. Okay.
3         Now, on Page 1064, there's a note
4  1/5/05, 9:15. Jimmy comes into my office. "We need
5  to part ways." AMR asked when. IV says now. Is that
6  correct?
7    A. Correct.
8    Q. So this is the description of your
9  recollection of how you were let go?
10   A. Yes.
11   Q. And there was no discussion between you
12 at that point about the rationale?
13   A. None.
14   Q. Okay.
15        And then the note below that says,
16 1/4/05, 8:15 a.m. AMR interviews with Rick Herra at
17 Dunkin' Donuts. Rick to call me back by Friday. Who
18 is Rick Herra?
19   A. Rick Herra is the president of McCrery
20 Funeral Homes.
21   Q. So on the morning after the incident
22 that you contend consists of false imprisonment, the
23 morning after, you have an interview with the

Page 198

1  president of McCrery Funeral Homes; is that correct?
2    A. No, I didn't have an interview that day.
3  I was fired, then interviewed, and then hired a week
4  later starting on the 24th of January.
5    Q. But this note says 1/3/05, 4 p.m. and
6  then there's a description of the meeting.
7         And then 1/4/05, it says on the next
8  page, you interviewed with Rick Herra. And 1/5/05, it
9  says Jimmy comes into my office. We need to part
10 ways; correct?
11   A. Correct.
12   Q. So are you saying that although your
13 note here says 1/4/05, you interviewed with Rick
14 Herra, you did not?
15   A. I interviewed with him but not on that
16 date. There was nothing determined to meet with him
17 until after I was fired.
18   Q. You interviewed with him, but not on
19 this date?
20   A. No. What I think happened is, and this
21 happened frequently, I would see him at Dunkin' Donuts
22 and he would say, How's it going? And I would say,
23 Not so wonderfully.

Page 199

1         But I was not in Wilmington on that
2  date. I was in New Jersey the entire day. Jimmy had
3  called me at home to ask me if I was coming in, to
4  which I replied, No, I was not.
5         So I think what I did was enter the
6  wrong date on that, which should have been 1/6.
7    Q. So you're saying that you stayed home in
8  New Jersey all day --
9    A. Correct.
10   Q. -- on the 4th?
11   A. Correct. That was a Tuesday.
12   Q. And was that a planned day off?
13   A. No, it was not planned.
14   Q. I think Mr. Pearce is going to ask you
15 more questions about that actual meeting.
16        Okay. So let's see.
17        (Journal note was marked for
18        identification as Rowan Exhibit 27.)
19 BY MS. CHEEK:
20   Q. You're looking at Exhibit 27 which is
21 Bates numbered P1065. Is this also from your journal?
22   A. Yes.
23   Q. And was this first note written on

Page 200

1  January 6, 2005?
2    A. Yes, it was.
3    Q. And the second note written on
4  January 11, 2005?
5    A. Yes.
6    Q. Okay. And it's describing, Rick calls
7  back and invites me to lunch at University Whist Club
8  with Carol and Jay, Tuesday 1/11 at noon. Who are
9  Carol and Jay?
10   A. McCrerys. Both McCrerys.
11   Q. Both McCrerys. Okay. And then 1/11 you
12 described the lunch and they are interested in hiring
13 you and so on; is that correct?
14   A. Correct.
15   Q. So that was an interview lunch?
16   A. Correct.
17        (Journal note was marked for
18        identification as Rowan Exhibit 28.)
19 BY MS. CHEEK:
20   Q. This is Exhibit 28, P1066. Is this also
21 a page from your journal?
22   A. Yes.
23   Q. And written on the dates indicated?

Page 201

1    A.   Yes.
2    Q.   And describing your interview and hiring
3 process when McCrery hired you?
4    A.   Correct.
5    Q.   And you started on January 24, 2005?
6    A.   Right.
7    Q.   And I think I asked you earlier whether
8 you had anything in writing about your terms of
9 compensation, but you said no.
10    A.   No.
11    Q.   And do you have any written benefits
12 descriptions?
13    A.   We would have the 401(k) plan and the
14 health coverage and also they provide a life insurance
15 policy.
16    Q.   Did you have a life insurance policy at
17 Funeral Services of Delaware?
18    A.   No.
19    Q.   What is the face amount?
20    A.   I believe $52,000.  No, 56.  It's twice
21 your base salary.
22    Q.   And your health coverage, is that
23 comparable to what you had at Funeral Services of

Page 202

1 Delaware?
2    A.   It's a better plan.
3    Q.   It is better?
4    A.   Yes, it's a better plan.
5    Q.   And how does the 401(k) plan compare?
6 Your employer makes a contribution?
7    A.   Correct.
8    Q.   McCrery; correct?
9    A.   Correct.
10    Q.   The did the employer make a contribution
11 when you were at Funeral Services?
12    A.   Yes.  But I think there was a waiting
13 period.  And I had, at McCrery as well, a one-year
14 waiting period until I could qualify for the vested
15 part of it.
16    Q.   McCrery contributes some percentage of
17 your salary or income?
18    A.   To be honest, I don't recall exactly
19 what it is, but yes, they do.
20    Q.   But you think you have that in writing?
21    A.   I'm sure somewhere it is spelled out.
22    MS. CHEEK:  I'm going to ask you to
23 produce that, if you don't mind; even if you do mind.

Page 203

1    MS. CONNELLY:  Okay.
2    MS. CHEEK:  I'm just being nice.  I
3 don't really mean it.
4        (Journal note was marked for
5        identification as Rowan Exhibit 29.)
6 BY MS. CHEEK:
7    Q.   This is Exhibit 29 you have in front of
8 you, which is Bates numbered P1067.  Do you recognize
9 it?
10    A.   Yes.
11    Q.   Can you tell me what it is?
12    A.   These were requests from my attorney to
13 bring.
14    Q.   Okay.  And did you have a job
15 description, a written job description?
16    A.   No.
17    Q.   Business plan.  Did you have a business
18 plan that you produced?
19    A.   Now, I'm not sure if this is what I was
20 asked to bring.  This could have been something else.
21    Q.   What do you think it might have been?
22    A.   I'm trying to remember, but it's not
23 coming to me.

Page 204

1    Q.   Since we are on it, it says,
2 organizational charts.  Can you explain that?
3    A.   Whoever was requesting this wanted to
4 know the order of the organization.
5    Q.   Did you have an organizational chart?
6    A.   Not in my possession, no.
7    Q.   Did you ever receive an organizational
8 chart for Funeral Services of Delaware?
9    A.   No.
10    Q.   And then the next item says, regulation
11 on kickbacks from carriers; is that correct?
12    A.   That's what that says, yes.
13    Q.   And crossed out, it looks like.
14    A.   Right.
15    Q.   Can you tell me anything about that?
16    A.   No.  No, I can't.  I can't.
17    Q.   I'm going to switch gears and stop
18 looking at notes.
19        (Pre-Need Sales Report for 1995
20        was marked for identification as Rowan
21        Exhibit 30.)
22 BY MS. CHEEK:
23    Q.   Exhibit 30 is Bates numbered P658 and it

A-18