Page 209

BY MS. CHEEK:

2 Q. You have Exhibit 32, Bates numbered
3 P668; correct?

4 A. Right.

5 Q. And this is showing sales for the month
6 of December 1997 and also for the year-to-date; is
7 that correct?

8 A. Correct.

9 Q. So it's showing an increase in sales
10 from 172, that's referring to number of contracts; is
11 that right?

12 A. Right.

13 Q. Under 172 in '96 to 249 in '97. Am I
14 right?

15 A. Right.

16 Q. And an increase in sales from $718,000
17 to over a million. And down at the bottom, it's got a
18 list of people. Do you see that?

19 A. Right.

20 Q. Anne, that's you?

21 A. Right.

22 Q. You sold 159; is that right?

23 A. Yes.

Page 210

1 Q. And Jerry, that was Jerry Bogos?

2 A. Correct.

3 Q. Sold 73. And Rob --

4 A. Right. Rob Eppes.

5 Q. Sold 14. And Richard sold 3?

6 A. 3.

7 Q. Was that Richard Stanton?

8 A. (No response.)

9 Q. You don't remember?

10 A. No.

11 Q. And this was the year where you are
12 trying to build up the sales force for Hockessin; is
13 that right?

14 A. No, for Chandler's.

15 Q. For Chandler's. Okay.

16      (Pre-Need Sales Report for 1998
17      was marked for identification as Rowan
18      Exhibit 33.)

19 BY MS. CHEEK:

20 Q. You're looking at Exhibit 33, P5587,
21 Pre-Need Sales Report for December 1998 which also
22 shows sales this year-to-date and last year-to-date,
23 and shows your sales at the bottom and Jerry's sales

Page 211

1 as well as IV's sales; correct?

2 A. Correct.

3 Q. And so the number of sales altogether
4 had gone up; is that right?

5 A. Correct.

6 Q. And your sales had increased as well,
7 your individual sales; is that right?

8 A. Correct.

9      (Pre-Need Sales Report for 1999
10      was marked for identification as Rowan
11      Exhibit 34.)

12 BY MS. CHEEK:

13 Q. Exhibit 34 is P575. Do you recognize
14 this?

15 A. Yes.

16 Q. It's a Pre-Need Sales Report for
17 December 1999?

18 A. Correct.

19 Q. And it is showing monthly sales as well
20 as year-to-date and last year-to-date; correct?

21 A. Correct.

22 Q. And as far as you know, these figures
23 are accurate?

Page 212

1 A. Yes.

2 Q. Now, this year, evidently, you were the
3 only salesperson; is that correct?

4 A. Correct.

5 Q. Sales decreased, correct, compared to
6 the prior year?

7 A. Correct.

8 Q. What had happened to Jerry and the other
9 sales people?

10 A. Jerry, in particular, had difficulty
11 making phone calls. He had asked me numerous times if
12 we could hire a telemarketer to book his appointments.

13      And in this particular game, it's very,
14 very, very important to establish a bond right off the
15 bat immediately with the family, rather than having a
16 third-party start the ball rolling so the connection
17 is made there with the family from Day 1.

18      Jerry also had difficulty in just seeing
19 things a little bit more proactively, shall we say.
20 He was acquainted with sales and direct sales through
21 training.

22      But his prior history to coming to
23 Chandler's was, he sold cars. He was a car salesman.

Page 217

1 P507, Pre-Need Sales Report for December 2004;
2 correct?
3     A.  Correct.
4     Q.  And this is showing your sales going
5 from 207 in 2003 to 221 in 2004; correct?
6     A.  Correct.
7         (Pre-Need Sales Report for 2005
8     was marked for identification as Rowan
9     Exhibit 40.)
10 BY MS. CHEEK:
11     Q.  Finally, to come to the end of the
12 sales reports that we're going to look at, this is
13 Exhibit 40.  It's P761.  It says at the top, Anne
14 Rowan Pre-Need Sales Report for December 2005.  Do you
15 recognize this document?
16     A.  Yes.
17     Q.  And this is showing your sales from
18 McCrery?
19     A.  No.
20     Q.  No?
21     A.  December of 2005?  Oh, McCrery, yes,
22 that would be right.
23     Q.  Okay.  So your year-to-date sales in

Page 218

1 2005 were 142 compared to 221 in 2004.  This was not a
2 full year; correct?
3     A.  Correct.
4     Q.  11 months.  Were you using basically the
5 same sales methods as you did as when you were at
6 Funeral Services of Delaware?
7     A.  Yes.
8     Q.  Okay.
9         And how are your sales were in December
10 now of 2006?  How are your sales going so far this
11 year?
12     A.  I don't have a report to show you, so I
13 couldn't tell you exactly.
14     Q.  But you have been tracking it on a
15 monthly basis, I'm thinking.
16     A.  Yes, I have been.  I'm on a trend going
17 upward slightly from where I was last year.
18     Q.  Okay.  Do you know by how many,
19 approximately, at this point, or are you already above
20 142 for the year?
21     A.  Yes.                                    A-20
22     Q.  Do you know by how many?
23     A.  No.  I could go back and count, but I

Page 219

1 don't know right now.  December is not done.
2     Q.  That's right.  You've still got a few
3 days.
4         (Short recess was taken.)
5             - - -
6         (Agreement was marked for
7     identification as Rowan Exhibit 41.)
8
9 BY MS. CHEEK:
10     Q.  You're looking at Exhibit 41, which is
11 P703.  Do you recognize this?
12     A.  Yes.
13     Q.  Can you tell us what it is?
14     A.  It was an agreement between me and Jason
15 for how the operations were going to run in sales.
16     Q.  Who wrote it?
17     A.  I did with Jason.
18     Q.  And why did you and Jason write it?
19     A.  I was asked to write it so that we would
20 have a clear understanding about how the leads were
21 going to be managed for the locations.
22     Q.  Who asked you to write it?
23     A.  I believe Jimmy, IV.

Page 220

1     Q.  Did you ever give a copy to Jimmy or
2 Chad or Tony?
3     A.  I believe I did.
4     Q.  And could you explain the intent of the
5 agreement?
6     A.  So it was clarified who was to manage or
7 who was responsible for what leads for which
8 locations.
9     Q.  When you say in support of management's
10 decision to run two separate sales operations under
11 Funeral Services of Delaware, could you explain what
12 you mean by that?
13     A.  The marketing firm had advised us that
14 we should be marketing these two separately.
15         When Jason came to work at Chandler's,
16 he was hired to do pre-need sales.  And at the time,
17 this was after this whatever you call it,
18 merger/acquisition occurred, and he was asked to get
19 Corleto-Latina up and going.
20         I, having been there for many, many
21 years at that point was asked to help him, train him,
22 share what I knew, and come up with something that
23 spelled things out.

273

1  A.   Yeah.

2  Q.   During that hour, you discussed your

3  forecast and your marketing plan; is that correct?

4  A.   Correct.

5  Q.   And that was, essentially, the written

6  report that you had produced; is that correct?

7  A.   Yes.

8  Q.   The written forecast?

9  A.   Correct.

10  Q.   Tell me at what point did you confront

11  Tony about the Otley sale.

12  A.   That must have been in the beginning,

13  because my notes indicate that we started with that and

14  then went onto the forecasting thing.

15  Q.   Okay.  Tell me about the Otley sale, and

16  what you mean by, confronted Tony about it, what was

17  said?

18  A.   If you see the note on the 22nd of

19  December, '04, it's PO1062, on the 22nd of December,

20  two o'clock, Diana told me that in the appointment

21  book -- there was an appointment book or a scheduling

22  book for the conference room, that Jason was making

23  arrangements with the outside contractor for Location

24  One.

25  Q.   That would be Jason Casper making

BLOOM REPORTING SERVICE

274

1  arrangements with Todd Woodside for the Concord Pike

2  location; is that correct?

3  A.   Correct.  And Jason had been asked by

4  Tony if it was okay to do.  Tony agreed and the

5  contract, just to kind of cover their butts, was

6  written under Location Three, when it was the Location

7  One.

8  Q.   You skipped a part there.  It says,

9  after policy had been established, what policy had been

10  established?

11  A.   There was discussion, it was never

12  written, about who should be handling leads for which

13  location.  The policy seemed to change every single

14  week or every other week.

15  In the beginning, I was writing for all

16  three locations.  Then, Mr. Latina deemed it necessary

17  to get someone other to do it.  Jason was hired for

18  that purpose.  He failed.

19  And his little funeral home, all of a

20  sudden, was not getting the activity or the attention

21  that the Chandler funeral homes were getting so, sure,

22  he wanted to get somebody in there, then hires Todd   A-21

23  Woodside to take care of that.

24  Q.   To take care of --

25  A.   Corleto-Latina.

BLOOM REPORTING SERVICE

275

1  Q.   When did that happen?

2  A.   I don't know, whenever he was hired and

3  the contract signed.  I don't know, in the notes

4  somewhere --

5  Q.   We went through it yesterday?

6  A.   Yesterday, yes.

7  Q.   It was, at least --

8  A.   '02 or '03, somewhere around there.

9  Q.   Let me stop you there, okay, because I

10  want to make sure if you agree with that, because it

11  wasn't entirely clear yesterday to me, anyway.

12  As I recall it, the agreement, the written

13  agreement with Todd Woodside was March of 2004, but as

14  I understood it, there was some type of verbal

15  agreement and he was doing work at least for

16  Corleto-Latina before March 2004.  First of all, is

17  that your understanding?

18  A.   Yes.

19  Q.   Okay.  So, we can agree that he, being

20  Todd Woodside, started before March 2004?

21  A.   Correct.

22  Q.   And that is what I am trying to get is

23  your best understanding of when Mr. Woodside started to

24  do pre-need work for Corleto-Latina.

25  A.   It would have had to have been at least

BLOOM REPORTING SERVICE

276

1  a year prior to that.  I don't know when he left his

2  former employment and when he started this company and

3  came knocking at the door trying to get the account.

4  It was '03, don't know exactly when.

5  I was not included in any of the discussion

6  about this.  This was just something the owners thought

7  they needed to do.

8  Q.   Okay.  So, in the beginning, say

9  sometime in 2003, Todd Woodside was only doing pre-need

10  work for Corleto-Latina; is that correct?

11  A.   That is my understanding, yes.

12  Q.   Did that situation change at all any

13  time between 2003, when it started, and January, 2005?

14  A.   Yes.

15  Q.   Okay.  When and tell me how it changed?

16  A.   He also was then, and I don't know when,

17  that is what I don't remember exactly and why the

18  emotional level started heating up.

19  He was given permission to go sell for

20  Location Two, which is Chandler-Hockessin, and then the

21  next thing I know, he is now given permission to do

22  followup work and get referrals from Chandler One,

23  which in my opinion, was something that I was just

24  forced to have to deal with.

25  This was after nine plus years of building

BLOOM REPORTING SERVICE

281

1    role of the outside contractor and my role as an inside
2    salesperson.
3        Q.    I thought there wasn't any real
4    understanding, that was the problem?
5        A.    Well, it is a problem. It was a
6    problem. The policy kept changing, who was doing what
7    and how and --
8        Q.    And that was your problem, correct, I
9    mean, you wanted --
10       A.    It was everyone's problem.
11       Q.    And you wanted it more clearly defined;
12   is that fair to say?
13       A.    Yes.
14       Q.    So, again, my question is, what was
15   discussed regarding the Otley sale at this meeting?
16       A.    Who should get the commission was the
17   topic of discussion on that.
18       Q.    Okay. And then I guess you're going to
19   have to give me a little bit of background. I think I
20   understand from looking at the notes, but give me a
21   little bit of background to make sure I understand it
22   correctly as to what the problem was with the Otley
23   sale.
24       A.    Jason -- Otley was a Chandler lead.
25   Tony gave permission --

282

1        Q.    And what do you define a Chandler lead,
2    why do you say it was a Chandler lead?
3        A.    A Chandler lead could have been
4    generated any number of ways, either through a direct
5    mail piece, perhaps a family that we might have buried
6    in the past, a call comes in on the Chandler funeral
7    home line, that would define a Chandler lead.
8            I do not know the reason that Jason was
9    chosen to make the funeral arrangement and why Mr.
10   Woodside was brought in on it. Jason had an insurance
11   license, opted not really to use it.
12           Mr. Woodside was ready, willing, and able
13   to sit there, write the contract, take the commission
14   with Tony's blessing on it.
15       Q.    How do you know all of that? I mean,
16   where did you get this information from?
17       A.    It came out in this conversation and
18   back on the notes here. I asked Jason --
19       Q.    Back on the notes on December 22nd?
20       A.    Correct.
21       Q.    Tell me the sources of your information.
22       A.    I asked Jason who, why, what happened
23   here. He said Tony gave him permission.
24       Q.    Did he acknowledge that it was a, quote,
25   Chandler lead?

283

1        A.    I don't recall that but I am fairly
2    certain I wouldn't be that upset about it if it hadn't
3    been. If it had been a Corleto lead, take it.
4        Q.    Okay. Go ahead.
5        A.    So, I asked Jason about this and Jason
6    said, no, Tony gave me permission, and the policy was
7    written under Corleto-Latina. It was not written as a
8    Chandler case trying to cover it up.
9        Q.    Okay. That gives me some of the
10   background. Now, I am trying to figure out what was
11   said at the January 3 meeting about the Otley sale.
12       A.    Who gets the commission.
13       Q.    Okay. What was said about that?
14       A.    I asked them who gets the commission and
15   he very sheepishly said, you do.
16       Q.    And was there any more discussion about
17   Otley?
18       A.    No.
19       Q.    So, there wasn't any argument or heated
20   discussion regarding the Otley sale on January 3, 2005?
21       A.    No.
22       Q.    And then you go onto the forecast, the
23   marketing plan; is that correct?
24       A.    That's correct.
25       Q.    And that takes the better part of an

284

1    hour or so?
2        A.    Yes.
3        Q.    Okay. Before I go forward with anything
4    more on January 3, going to that note, it says, AMR
5    confronts Tony about Otley sales going against policy.
6            That is what I don't, see, I am having a
7    little bit of difficulty with that because it's my
8    understanding that there was no policy.
9        A.    That's correct.
10       Q.    Okay.
11       A.    The policy, I guess you could say, did a
12   policy exist, yes, a policy existed but it was changed
13   every other week, who was to sell for what location.
14   On this particular go round, it was pretty clear that
15   this was against what the flavor of the month was.
16       Q.    Well, it's fair to say that it was
17   against your proposal as how this was to be handled; is
18   that fair to say?
19       A.    Correct.
20       Q.    And it's also fair to say that a policy,
21   a consistent policy had not been established on this
22   issue to your satisfaction as of January 3, 2005; is
23   that fair to say?
24       A.    Yes.
25       Q.    And then it says on this note, on page

285

1  1063, also AMR's plan is accepted with two exceptions,
2  okay, and I am not sure exactly what you mean there
3  about the plan.
4        Are you talking about the written forecast,
5  budget and forecast that you had given?
6        A.    Yes, correct.
7        Q.    And then you talk about the two
8  exceptions. Why don't you read what that says?
9        A.    Outside contractor to do seminars and
10  funeral directors to be able to make referrals to
11  whatever salesperson they want.
12        Outside contractor paying a kickback never
13  before allowed. AMR flips at unprofessional, unethical
14  manner Tony, Jason, and outside contractor have
15  demonstrated. Jason accosted me and Diana breaks up
16  argument. Tony, no leadership, control of meeting, I
17  leave.
18        Q.    Okay. The first exception then is
19  outside contractor to do seminars and funeral directors
20  to be able to make referral, okay. Outside contractor
21  to do seminars, that is one exception?
22        A.    Correct, because up until this point for
23  the previous nine and nearly ten years, I was doing the
24  seminars.
25        Q.    And was that a problem for you that the

286

1  outside contractor would also be doing seminars?
2        A.    It would be, yes.
3        Q.    And did you tell that to Tony Latina
4  that day that that was a problem?
5        A.    Yes.
6        Q.    And why did you tell him it was a
7  problem for you?
8        A.    It would be a conflict of interest.
9        Q.    How so? I don't understand.
10        A.    Too many fingers in the pie for the
11  small geographic area of Wilmington, so if Mr. Woodside
12  would like to do them for Corleto-Latina, that is just
13  fine, but don't come over to Chandler's and be doing
14  the same thing.
15        He was proposing that Woodside be allowed
16  to do whatever seminars he wanted, as he wanted, when
17  he wanted.
18        Q.    How is that set up a conflict of
19  interest between you and Mr. Woodside or Mr. Woodside
20  and the company?
21        A.    It would be a conflict of interest to me
22  for lead generation and it would also be a conflict of
23  interest to the company.
24        Q.    How so?
25        A.    How so?

A-23

287

1        Q.    Yes.
2        A.    Because let's just say that he did not
3  have the experience at doing seminars that I did and he
4  was an unknown and I feared for the company that they
5  were going to get a less quality and a less something
6  because of the lack of experience.
7        Q.    Okay. So, you were concerned about the
8  quality of the seminar that Mr. Woodside would put on;
9  is that fair to say?
10        A.    Correct.
11        Q.    Do you agree that that is not a conflict
12  of interest, it's just, you know, it's not as good as
13  it could be with somebody who was more skilled in doing
14  seminars?
15        A.    Do I think it was a conflict of
16  interest?
17        Q.    Yeah. I am trying to understand the
18  conflict of interest point, how you considered it to be
19  a conflict of interest.
20        A.    Well, because there would be leads
21  generated. Whoever gave the seminar got to keep the
22  leads.
23        Q.    Well, the leads would ultimately go to
24  the company; is that correct?
25        A.    The company who paid for the advertising

288

1  to run the seminar should have been the one to get the
2  leads and then going back to the definition of an
3  outside contractor, if he is not paying for the
4  advertisement, he shouldn't have the benefit of the
5  leads.
6        Q.    Aren't you saying that it's a conflict
7  of interest between you and Mr. Woodside as to who is
8  going to get the commission on that sale?
9        A.    It's a conflict of management because
10  they gave no direction.
11        Q.    Okay. Was there any further discussion
12  on that? Was there any further discussion on that
13  first exception regarding seminars?
14        A.    No.
15        Q.    Was there any resolution of that or was
16  it just, this is ownership's position, and he is going
17  to be allowed to do seminars?
18        A.    That's correct.
19        Q.    And you agree that that is the
20  prerogative of ownership to make that decision, do you
21  not?
22        A.    Correct.
23        Q.    And then the second exception is that
24  funeral directors to be able to make referrals to
25  whatever salesperson they want?

289

1   A.   Correct.

2   Q.   So, that was discussed as part of your

3   marketing plan?

4   A.   No.

5   Q.   It was not?

6   A.   No.  This was what I was very upset

7   about.  Never, ever before in the history of the

8   pre-need department was it allowed for a funeral

9   director to make a referral to whatever salesperson

10   they wanted.

11   Q.   Well, that wasn't my question.  My

12   question really is, if I understand what you're saying

13   here correctly, your plan is accepted with two

14   exceptions, and one of those exceptions is this thing

15   about funeral directors being able to make referrals,

16   so I assume that that one part of your plan --

17   A.   It was not part of my plan.

18   Q.   Okay.  Then --

19   A.   It's not an exception.

20   Q.   Okay.  But that was discussed that day,

21   whether it's an exception or not, it was discussed that

22   day that funeral directors were going to be able to

23   make referrals to whomever they wanted?

24   A.   That is correct.

25   Q.   And tell me what was discussed about

290

1   that on January 3rd?

2   A.   That was told to me.  I had knowledge

3   that the outside contractor was paying a kickback so,

4   naturally --

5   Q.   What was the basis of that knowledge?

6   A.   Jason told me.

7   Q.   Anybody else?

8   A.   I asked Dwayne Casini and he didn't want

9   to tell me and he just said, I would rather not discuss

10   it, so I didn't push him, but it was obvious to me that

11   there had been a discussion among the other directors,

12   excluding me, and also to have Mr. Woodside saying, hey

13   guys, send me and I'll give you a little kickback here.

14   Q.   There was a meeting of the directors

15   when?

16   A.   I don't know when or how but, obviously,

17   there was a communication.  I don't know if it was with

18   a group or individually where Mr. Woodside said, send

19   me leads, I will pay you.

20   Q.   And you're saying that Mr. Woodside got

21   the approval from the owners to pay kickbacks to

22   funeral directors?

23   A.   I do not know if he had approval or not.

24   All I know is this is what was going down.

25   Q.   And I understand that.  And you got that

A-24

291

1   from Jason; you told us that?

2   A.   That's correct.

3   Q.   Okay.  My question is whether or not you

4   know or have any knowledge of the owners being aware of

5   that and giving their approval of that?

6   A.   I think Mr. Latina knew about it.  I

7   don't know whether he approved it or not but I

8   certainly know he knew about it.

9   Q.   Do you have any factual basis for saying

10   that other than you think that is what happened?

11   A.   I cannot recall.

12   Q.   And, by your earlier statement, you said

13   that you were told by Mr. Latina that this was the way

14   it was going to be, that funeral directors were going

15   to be able to make a referral to whomever they wanted

16   regardless of the location; is that correct?

17   A.   That's correct.

18   Q.   He didn't say anything about kickbacks

19   that day, did he?

20   A.   No.

21   Q.   Okay.  And do you agree that that is

22   also the prerogative of the ownership to determine

23   whether or not funeral directors can make referrals to

24   whomever they want?

25   A.   Yes.

292

1   Q.   And did you express to Mr. Latina your

2   displeasure with that decision?

3   A.   I did.

4   Q.   Okay.  And tell me what you said?

5   A.   Mr. Latina asked me what was it I didn't

6   like about Jason and Mr. Woodside, to which I

7   responded, they are unethical, they run on their wives,

8   and I don't think they belong doing this kind of

9   business.

10   Q.   Okay.  My question initially was what

11   you said in response to Mr. Latina's directive to you

12   that funeral directors were going to be permitted to

13   make referrals to whomever they wanted.

14   A.   Why, I would have asked why.

15   Q.   I didn't ask what you would have asked.

16   I am asking what was said that day.

17   A.   I don't recall exactly.  All I remember

18   is things started heating up at that point.  I was very

19   upset that this was going to be changing and there was

20   no recourse, it was already decided.  I felt that my

21   professionalism had been compromised.

22   Q.   How was your professionalism being

23   compromised?

24   A.   Because I would not be able to continue

25   in the manner that I had been.  I would always have to

293

1  be watching over my shoulder who was stealing what from
2  whom and how was I going to make a living and survive
3  in this environment, didn't know.
4       Q.    You were concerned about the
5  commissions, weren't you?
6       A.    Well, of course, it was my livelihood.
7       Q.    You said you were upset. Did you raise
8  your voice?
9       A.    Yes.
10      Q.    And is it fair to say that you were
11 shouting at Mr. Latina?
12      A.    No, I wouldn't say I was shouting.
13      Q.    How would describe it?
14      A.    I would say I was very firm and direct
15 in my voice and was demanding of an answer, why, why
16 the change in policy.
17      Q.    And I was really going for the volume of
18 your voice. Were you speaking in a loud voice, louder
19 than normal?
20      A.    I would say louder than normal.
21      Q.    But somewhat less than shouting?
22      A.    Yes.
23      Q.    Loud enough to be heard outside of the
24 conference room?
25      A.    Correct.

294

1       Q.    And the door was closed?
2       A.    Correct.
3       Q.    What did you mean in your written
4  statement when you said, AMR flips, what do you mean by
5  that?
6       A.    I meant that I was upset for the very
7  same reasons we just said, change in policy from the
8  nine plus years previously that I had been there doing
9  this.
10      I was scared for my livelihood and I simply
11 wanted to know why and as very often happened, nobody
12 had an answer.
13      Q.    Okay. So, you asked why. What did Tony
14 Latina say in response to your question?
15      A.    Didn't. He just looked like he often
16 did, blank face, no nothing.
17      Q.    Well, then how did we get to the
18 discussion of Mr. Woodside and Jason Casper running
19 around on their wives?
20      A.    He asked me what it was that I didn't
21 like about them.
22      Q.    I thought he didn't respond at all when
23 you told him why?
24      A.    He did not respond to my question why.
25 He retaliated with the question, what was it I didn't

295

1  like about them.
2       Q.    So, he did respond, he responded with a
3  question?
4       A.    After a pause. He never directly
5  answered my question why.
6       Q.    I am just having trouble following the
7  sequence of the conversation here. As I understand it,
8  he gives the directive that the funeral directors are
9  going to be able to make referrals to whomever they
10 want and you basically say, why, and he doesn't have
11 any response.
12      How do we get from there to Jason and Todd
13 are running around on their wives?
14      A.    I think he wanted to have an
15 understanding of why it was difficult for me to work
16 with them.
17      Q.    Well, they weren't even in the
18 discussion at that point, were they? Didn't you bring
19 that up?
20      A.    No. He told me about the outside
21 contractors that now are going to be able or funeral
22 directors could make a referral to anybody he wanted,
23 so the only outside contractor was Mr. Woodside.
24      I am upset. I asked the question why.
25 Pause, no response to that. What is it about them you

296

1  don't like was asked of me. And to which I said, they
2  run on their wives and I don't think it's ethical.
3       Q.    That they run around on their wives?
4       A.    No. That in this kind of business that
5  we're serving families at a very fragile time, that it
6  just to me would not be the kind of personnel you would
7  want to have on the front line.
8       Q.    How does Jason and Mr. Woodside running
9  around on their wives, how does that have anything to
10 do with the funeral home?
11      A.    I can't answer that question.
12      Q.    Why did you say it then?
13      A.    To me, it's a business that requires
14 people to be of utmost professionalism, to be sincere,
15 to be genuine, to be honest, all of the right values.
16      In my opinion, to run on somebody's wife is
17 not a good value, probably doesn't have anything to do
18 with the funeral home.
19      Q.    Is it fair to say that you were upset
20 when you made that statement that they were running
21 around on their wives?
22      A.    Yes.
23      Q.    It is it fair to say that you said that
24 in a voice loud enough that it could be heard outside?
25      A.    Yes.

A-25

1    Q.    And is it correct that Jason Casper
2  entered the office after you said that, not before?
3    A.    Correct.
4    Q.    And Jason Casper, as I understand, was
5  not supposed to be a part of this meeting; is that
6  correct?
7    A.    That is correct. You should also know
8  that another employee was out in the parking lot with
9  Jason Casper. Jason Casper was walking back and forth,
10  pacing, saying, I've got to calm down, I've got to calm
11  down.
12    This was told to me by Bob Simpson who was
13  the other party out in the parking lot.
14    Q.    When was this?
15    A.    Prior to him bursting into the room.
16    Q.    He was with Bob Simpson?
17    A.    Correct.
18    Q.    And who is Bob Simpson?
19    A.    Part-time employee.
20    Q.    What was his job?
21    A.    Assisting on funerals, running errands.
22    Q.    And he is your source for this
23  information that Jason was upset?
24    A.    Yes.
25    Q.    And what did he tell you why Jason was

1  upset that day before he even came into the office?
2    A.    What Bob told me was that Jason was in
3  the parking lot. Bob was also out in the parking lot,
4  I am assuming getting ready to get in their cars and
5  go, and Jason is pacing saying, I've got to calm down,
6  I've got to calm down.
7    Q.    Calm down about what?
8    A.    I guess what the conversation was in the
9  office. I don't know what else might have been
10  upsetting him that day.
11    Q.    When you say the conversation in the
12  office, you mean the conversation between you and Tony
13  Latina?
14    A.    Correct.
15    Q.    What was your understanding of what time
16  it was that in relation to that that Bob Simpson and
17  Jason were in the parking lot?
18    A.    I don't know where Jason was when I was
19  in the meeting with Tony. He could have very well been
20  outside the door listening or even walking by because
21  my voice is very loud, and even the name of Otley and
22  how that whole thing was handled and the commission
23  could have been very upsetting to him.
24    I don't know that because I was on the
25  inside with the door closed. I don't know what would

1  have gotten him that upset with the timing of all of
2  this.
3    Q.    And the discussion of Otley, if I
4  understood it, that was done at a normal voice, the
5  voices weren't raised; as far as you know, your voices
6  couldn't have even been heard outside of the conference
7  room?
8    A.    Exactly.
9    Q.    And how long did this discussion with --
10  was there more than one statement by you that day about
11  Jason running around on his wife?
12    A.    No. It was Jason and Todd. It wasn't
13  Jason exclusively. It was Jason and Todd.
14    Q.    Okay. Wasn't it right after that that
15  you mentioned that Jason came into the room?
16    A.    He didn't come in. He burst into the
17  room.
18    Q.    Okay. Well, when was this meeting with
19  Mr. Simpson where Jason was pacing around in the
20  parking lot in relation to when Jason --
21    A.    I don't know. I was on the inside. I
22  couldn't answer that. You would have to ask Mr.
23  Simpson.
24    Q.    So, immediately after you say Mr.
25  Woodside and Jason are running around on their wives is

1  when Jason bursts into the conference room; is that
2  correct?
3    A.    Yes.
4    Q.    And that was about an hour after the
5  meeting had begun, so it was around five o'clock; is
6  that correct?
7    A.    Right.
8    Q.    So, the door was closed when Jason
9  entered; is that correct?
10    A.    Yes.
11    Q.    And when he entered the room, did he
12  immediately close the door?
13    A.    I'm trying to recall. Yes, I believe he
14  did.
15    Q.    I assume that the door he entered was
16  this little semi-circle that you have drawn on exhibit
17  55; is that correct?
18    A.    Yes.
19    Q.    Okay. As I understand it, and correct
20  me if I am wrong, that you and Tony Latina were sitting
21  at this conference table?
22    Q.    Okay. Were you still sitting when Jason
23  entered the room?
24    A.    Yes.

A-26

301

1    Q.    Could you put your initials and Tony
2  Latina's initials at the table here on this diagram to
3  show me where the two of you were?
4    A.    This was Tony, over here.
5    Q.    Okay. You have written Tony, okay.
6    A.    Right. I would always make it a point
7  to sit closest to the door and I was sitting here.
8    Q.    And you have put AMR there where you
9  were sitting?
10   A.    Yes.
11   Q.    So, you were sitting across from each
12 other?
13   A.    Correct.
14   Q.    And, again, I know you didn't have a
15 measuring stick or anything like that but how far was
16 the chair when you were sitting in it, the back of your
17 chair from that door?
18   A.    It's a smaller room, smaller than this
19 one, so I am going to say maybe two feet.
20   Q.    Was there enough room for the door to
21 even swing out? First of all, maybe I am not even sure
22 that the door did swing into the room.
23   A.    As I recall, the door would come in,
24 because when he tried to, well, prevented me from going
25 out, he slammed it with his fist and it closed, pushing

BLOOM REPORTING SERVICE

302

1  it in. He was on the inside.
2    Q.    So, my question right now is, the door
3  opened to the inside?
4    A.    Correct.
5    Q.    And my next question was, when the door
6  swung to the inside, was there enough clearance to get
7  by your chair?
8    A.    Yes.
9    Q.    But not much?
10   A.    Not much.
11   Q.    Is that fair, just a couple of inches
12 beyond that, okay?
13   A.    (Witness shakes head.)
14   Q.    And what did Jason say when he entered
15 the room?
16   A.    As I recall, I was seated and his finger
17 was in my face.
18   Q.    So, he is standing?
19   A.    Yes.
20   Q.    Okay. And is he standing in front,
21 facing you?
22   A.    Yes. He comes in. If this were the
23 door here, he comes in, and I am sorry, I can't --
24   Q.    Why don't you put where Jason was
25 standing on the diagram?

BLOOM REPORTING SERVICE

303

1    A.    Okay. He was right in front of me.
2    Q.    Not with an X because there is too many
3  X's. You have to put Jason.
4    A.    There.
5    Q.    Okay. So, he is standing right next to
6  your chair, I assume on your right side, from looking
7  at the diagram; is that correct?
8    A.    Yes.
9    Q.    Okay. And are you turned facing toward
10 him or are you still facing toward Tony, who is across
11 the table from you, as he is talking?
12   A.    I am facing him and I stood up.
13   Q.    You're facing --
14   A.    Jason.
15   Q.    Jason.
16   A.    And then I stood up.
17   Q.    So, both of you are standing?
18   A.    Correct.
19   Q.    And how far are you from each other?
20 Are you in each other's face?
21   A.    Each other's face, approximately
22 (indicating).
23   Q.    You're going towards your attorney, and
24 she is cowering away from you, but you were only inches
25 from her face; is that correct?

BLOOM REPORTING SERVICE

304

1    A.    That's right.
2    Q.    And that is what you were saying, your
3  face and Jason's face were just inches apart?
4    A.    Except he is, I don't know how tall,
5  six, four, six five, so it was more he looking down
6  than nose to nose.
7    Q.    Okay. I've got you, but you are only
8  inches apart?
9    A.    Correct.
10   Q.    And before we get into what was said, is
11 it fair to say that whatever was being said by both of
12 you was being said in a loud voice?
13   A.    Correct.
14   Q.    And a voice that could be heard outside
15 of that conference room?
16   A.    That is correct.
17   Q.    Now, as best you can, tell me what was
18 said by anybody?
19   A.    Jason said, don't say anything about my
20 wife, and still with the finger in my face, I took a
21 yellow legal pad, put it to block him.
22         He tried to smack it out of my hand. At
23 the same time, I tried to make an exit, he slams the
24 door.
25   Q.    Okay. I am going to get into the

BLOOM REPORTING SERVICE

A-27

305

1  actions in a moment. At this point I was trying to
2  focus on what was said, okay. Can you tell me what was
3  said, other than, don't say anything about my wife?
4      A.    I then said, your mother would be
5  ashamed of your behavior.
6      Q.    Okay.
7      A.    At which point, the finger back in my
8  face, don't say anything bad about my wife. I make a
9  second attempt to leave.
10     Q.    Okay. So, you tried to leave in the
11 middle of this?
12     A.    Yes.
13     Q.    Okay.
14     A.    Diana then enters the room.
15     Q.    Okay. What did you do to attempt to
16 leave?
17     A.    I stood up with the yellow pad, blocking
18 his face from me, and tried to get out. That was
19 twice.
20     Q.    What did you do to try to get out?
21     A.    Stood up, pulled the door that was now
22 shut. He being taller than I, reached up at the top of
23 the door, and slammed it shut again. It was at that
24 time --
25     Q.    Were you still yelling at each other at

306

1  that point?
2      A.    I don't recall. I just wanted to get
3  out of there.
4      Q.    Would it be fair to say that Jason was
5  trying to keep the door closed so that other people
6  wouldn't hear?
7      A.    No.
8      Q.    That is not fair to say?
9      A.    No, I don't believe that for a minute.
10     Q.    Okay.
11     A.    I think he wanted to scare me and
12 intimidate me.
13     Q.    What did he do other than slam the door
14 to make you think that he was trying to intimidate you?
15     A.    Well, if someone is that much physically
16 taller, bigger than you, and they are screaming in your
17 face with a finger, and prevent you from leaving, I
18 would think someone would be more than just a little
19 upset.
20         I think you would be frightened of how the
21 heck are you going to be able to get out of here.
22     Q.    You were screaming at Jason, too, were
23 you not?
24     A.    I was.
25     Q.    Did you have your finger in his face?

307

1      A.    No, I did not.
2      Q.    So, you tried to open the door. Did you
3  open the door?
4      A.    I opened and he slammed it shut, opened
5  about two inches, slammed it shut.
6      Q.    Okay. Then, did you continue to argue?
7  Apparently, you did because you said you told him, your
8  mother would be ashamed of your behavior?
9      A.    That was my response, yes.
10     Q.    That was after he slammed the door?
11     A.    The first time.
12     Q.    Okay. So, you say, your mother would be
13 ashamed of your behavior, then what happens?
14     A.    I try to leave the second time. He
15 slams it shut.
16     Q.    And, again, you're talking about opening
17 the door?
18     A.    Correct.
19     Q.    And this time did you get it open a
20 couple of inches again?
21     A.    I don't believe I did, because it was
22 still closed when Diana came in.
23     Q.    You didn't open it at all then?
24     A.    I tried to get the handle. He kept
25 pushing it shut from above.

308

1      Q.    Pushing the door shut?
2      A.    (Witness shakes head.)
3      Q.    During any of this confrontation, did
4  Jason ever touch you?
5      A.    No.
6      Q.    Okay. So, there is two occasions then
7  when you tried to open the door and Jason prevents you
8  from doing so?
9      A.    Correct.
10     Q.    And then did Jason leave his hand on the
11 door or not to prevent you from getting out?
12     A.    I don't recall. I think he did.
13     Q.    But didn't Diana enter from the other
14 side of the door?
15     A.    Yes, so then he must not have had his
16 hand on the door then.
17     Q.    What happened next?
18     A.    Diana tried to be a voice of reason and
19 said Jason, leave. Jason would not leave. Diana said
20 to me, Anne, will you leave, which, at that point,
21 Jason still did not want me to leave, so he had the
22 door shut again and Diana said, Anne, please leave, and
23 I said, yes, and then she said, thank you. I left.
24     Q.    Are you saying that after Diana told
25 Jason to leave and he refused, then asked you to leave,

315

1 not an employee who was present at the time of the
2 meeting at all?
3       A.      I don't know. I don't believe there
4 was.
5       Q.      Fair to say, there may or may not have
6 been, you just don't know?
7       A.      I don't know. They could have been on
8 the other side of the building somehow. I wouldn't
9 have known that.
10      Q.      Other than yourself, Mr. Latina, Diana,
11 and possibly Debbie Guyer, anyone else whom you're
12 aware of who has any knowledge of what was said or what
13 happened in that conference room?
14      A.      The only other one that might have, and
15 I don't know if she was there or not, would have been
16 Kelly.
17      Q.      Kelly Burns?
18      A.      Correct. I don't know. I don't know.
19      Q.      When Diana entered the room, where were
20 you and Jason in relation to each other and in relation
21 to the room?
22      A.      We were at that point, right, I was
23 slightly shy of where the door actually would open.
24 Jason was right in the middle of the door and when
25 Diana came in, she got in between both of us and she

314

1 faced Jason, so she and I were both facing Jason. She
2 was in front of me.
3       Q.      Literally right in front of the door?
4       A.      Correct.
5       Q.      Can you give me an idea time-wise how
6 much time we're talking about between the time Jason
7 entered the room and you left the room?
8             And I know you didn't have a stop watch or
9 anything like that, so I am asking for your best
10 estimate.
11      A.      I want to say five to six minutes,
12 something like that. It happened -- maybe that is even
13 too long. It happened very quickly, I'll say that.
14 Five minutes might be too long, more like, say, three
15 to four minutes.
16      Q.      You think the conversation really took
17 that long between the two of you?
18      A.      That might be too long, too. Yeah, it
19 was very brief. Let's say one to two minutes.
20      Q.      And during that period of time from the
21 time Jason entered to the time that you left, did Mr.
22 Latina continue sitting in the chair?
23      A.      Yes.
24      Q.      Did he say anything at all --
25      A.      No.

315

1       Q.      Let me just finish the question. Did he
2 say anything at all during that period of time?
3       A.      No.
4       Q.      Other than your attorneys, have you
5 spoken to anyone else about the events of that January
6 3rd meeting, what was said and what happened?
7       A.      Not to my recollection, no.
8       Q.      I assume from what you have described to
9 me as to what happened -- strike that. Is there
10 anything else about the events on January 3rd, about
11 this meeting that you want to tell me that you believe
12 to be important regarding that incident?
13      A.      I saw my whole career going down the
14 tubes at Chandler's is what I felt and I felt that I
15 also was being backed into a corner where there was
16 little hope of moving forward.
17      Q.      That is what you were thinking when you
18 were in this confrontation?
19      A.      Well, prior to the confrontation,
20 remember, the marketing plan now had these additional
21 things that were going to be happening that I was not
22 very pleased about.
23             That is when that started, this
24 hopelessness in me, shall we say, of, what are they
25 doing, more importantly, how am I have going to survive

316

1 in this. I saw this ganging up effect of the partners,
2 Woodside and Jason, and it came true.
3       Q.      Anything else about what occurred at
4 this meeting and this confrontation that you think is
5 significant to your false imprisonment claim?
6       A.      No.
7       Q.      Okay. I take it from what you have
8 described that you didn't sustain any physical injuries
9 as a result of that incident; is that fair to say?
10      A.      Correct.
11      Q.      But you do claim emotional injuries?
12      A.      Yes.
13      Q.      Are there any emotional injuries which
14 you can separate out, somehow parcel out the emotional
15 injuries from this incident as opposed to the emotional
16 injuries that you had from being terminated by the
17 company?
18      A.      Can you say the question again, please?
19      Q.      Yeah. In your mind, are there any
20 emotional injuries that you sustained as a result of
21 this January 3 confrontation with Jason Casper, that
22 you would separate somehow from the emotional injuries
23 which you contend that you sustained as a result of the
24 termination of your employment?
25      A.      I will never ever be in the presence of

A-29

JAMES T. CHANDLER, IV

Page 1

IN THE SUPERIOR COURT OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

- - -

ANNE M. ROWAN,                        :
                                      :
        Plaintiff,                    : No. 06-258-GMS
                                      : Civil Action
        Vs.                           :
                                      :
JAMES T. CHANDLER & SON,              :
INC., and FUNERAL SERVICES            :
OF DELAWARE,                          :
                                      :
        Defendants.                   :

- - -

WEDNESDAY, JANUARY 10, 2007

- - -

        Oral deposition of JAMES T. CHANDLER, IV, taken
pursuant to Notice, before Shari Bowen, Certified
Shorthand Reporter and Notary Public, at SWARTZ
CAMPBELL, LLC, 300 Delaware Avenue, Suite 1130,
Wilmington, Delaware, commencing at 10:00 a.m.



KARASCH & ASSOCIATES

REGISTERED PROFESSIONAL REPORTERS

PENNSYLVANIA and DELAWARE

(800) 621-5689
A-30

JAMES T. CHANDLER, IV

Page 13

1      A.    I honestly don't know.  I'd have to look at

2  the document itself.

3      Q.    So you don't know whether that's a

4  corporation?

5      A.    I honestly don't know.

6      Q.    Don't know.

7             Do you hold any ownership interest in

8  Corleto-Latina?

9      A.    No.

10     Q.    Who holds ownership interest in that entity?

11     A.    I believe -- I honestly don't know.  I

12  believe Tony has -- Anthony Latina owns 100 percent of

13  the interest in Corleto-Latina.  Tony owns a hundred

14  percent of the interest in Corleto-Latina.

15     Q.    The three partners, therefore, are the LLC as

16  you personally --

17             MR. PEARCE:  You have to say yes or no.

18             THE WITNESS:  Yes.  Yes.

19  BY MR. SALZER:

20     Q.    I'll summarize for you.

21             You personally, the Corleto-Latina entity

22  and then James T. Chandler & Son, Inc.?

23     A.    No.

24     Q.    Incorrect?

25     A.    James T. Chandler & Son, Inc. owns 82 percent

A-31

JAMES T. CHANDLER, IV

Page 14

1   of Funeral Services of Delaware, LLC.  The other 18

2   percent is Corleto-Latina, I believe it's Funeral Home,

3   but I'm not a hundred percent sure as part of this.

4       Q.   All right.  With James T. Chandler & Son,

5   Inc., who are the shareholders of that entity?

6       A.    James T. Chandler, III I believe is 13.5.

7   There's a document here that has that.  Let's see,

8   Chad -- well, let's do it this way:  James T. Chandler,

9   IV is -- okay, because James T. Chandler, IV is 43.5;

10  Chad H. Chandler is 43.5; James T. Chandler, III is 13;

11  does that add up to a hundred?

12      Q.   I didn't take the math down.

13              MR. PEARCE:  Yes, it does.

14              THE WITNESS:  Okay.  That's it.

15              MR. SALZER:  All right.  Let's mark this

16  as Exhibit 1.

17              (Whereupon, a document was marked for

18  identification as Chandler Exhibit Number 1.)

19  BY MR. SALZER:

20      Q.   I'm going to hand you what's been marked as

21  Chandler 1 and ask you if you recognize that document?

22      A.    I believe it's the LLC agreement.  Let's see,

23  it seems awful long.  This has on the back of it a

24  certificate Schedule C.  Schedule C, it's the LLC with

25  the schedules and also the LLC agreement with the

A-32

JAMES T. CHANDLER, IV

Page 15

1   schedules.

2       Q.    So this is a true and correct copy of the LLC

3   agreement which applies to Funeral Services of Delaware

4   LLC; is that correct?

5       A.    Yes.

6       Q.    When was the LLC created?

7       A.    June 1, '01.  Do you mean the agreement

8   signed?

9       Q.    Well, as far as -- well, was the LLC created

10  on a date other than the date of which the agreement

11  was signed?

12      A.    It was signed on -- I'll answer the question

13  it was signed June the 1st of 2001.

14      Q.    What was the purpose of the creation of the

15  LLC?

16      A.    Chandler was trying to grow.  How does one

17  grow in the funeral service?  You either gain

18  relationships with other funeral homes, you build or

19  build a new location, or you do both.  So we elected to

20  gain a relationship with Corleto-Latina.

21      Q.    In deciding to gain a relationship with

22  Corleto-Latina, I take it that they were operating a

23  funeral home?

24      A.    Correct.

25      Q.    And at the time Chandler operated two funeral

A-33

JAMES T. CHANDLER, IV

Page 16

1    homes?

2         A.    We had two locations.

3         Q.    And those locations were where?

4         A.    Concord Pike and Lancaster Pike in Hockessin.

5    Concord Pike in Wilmington and Lancaster Pike in

6    Hockessin.

7         Q.    Now, we're going to talk later about location

8    numbers, but are the Chandler locations 1 and 2?

9         A.    We usually call Concord Pike 1, Hockessin 2.

10        Q.    Where was the Corleto-Latina home located?

11        A.    808 North Union Street.  Still is.

12        Q.    In Wilmington?

13        A.    Uh-uh.

14        Q.    Tell me, if you will, if you know

15    specifically, though, why there was an LLC created as

16    part of the decision to affiliate with Corleto-Latina?

17        A.    Well, we had advisors.  Eddie Lugan, we had

18    an advisor, Norris Wright, an attorney, and this is

19    what our advisors and also Jeff Langdon, our

20    accountant.  So our three advisors advised us that we

21    should probable create an LLC.  We arrived at Funeral

22    Services of Delaware.  We created a new entity.

23        Q.    All right.  Now, from the time of the

24    creation of the new entity in June of '01 to the

25    present, can you tell me how that affected the

A-34

JAMES T. CHANDLER, IV

Page 17

1  operations of the business?  So first tell me prior to

2  the creation of the LLC, Chandler owned and operated,

3  two funeral home locations; correct?

4        A.    Correct.

5        Q.    And is it correct to state that the assets

6  that the corporation held included its property,

7  tangible property, its accounts receivable, its good

8  will; correct?

9        A.    (Witness nods head yes.)

10       Q.    And it operated by and through Chandler

11 employees; is that correct?

12       A.    Say that last part again.

13       Q.    It operated by and through Chandler

14 employees, that's prior to June of '01?

15       A.    Correct.

16       Q.    All right.  And prior to June of '01, how

17 many employees did Chandler have approximately?

18       A.    I'll say 10 full-time; five part-time.

19       Q.    Does that include the officers?

20       A.    Yes.

21       Q.    Subsequent to the creation of the LLC, can

22 you tell me whether there were changes in how -- tell

23 me what the changes in the operation were?  So, for

24 example, is it correct to state that the physical

25 assets that were owned by James T. Chandler & Son, Inc.

A-35

JAMES T. CHANDLER, IV

Page 18

1  remained with that entity?

2      A.   I'm not sure of the, I'll say furniture and

3  related items within the building itself.  The

4  building, the real estate, yes.  I'm not a hundred

5  percent sure on other than that.

6      Q.   Okay.  So you know that the land and the

7  building of these funeral homes remained owned by the

8  Chandler, Inc. entity?

9      A.   There's two buildings, that's correct.

10      Q.   What about the contracts that James T.

11  Chandler held?  For example, contracts either with

12  insurance companies or contracts with customers?

13      A.   You're talking about preneed contracts?

14      Q.   Could be preneed contracts or other contracts

15  that James T. Chandler had that were to be performed in

16  the future, or were they continuing in the performance,

17  what happened to those contracts?

18      A.   Again, are you talking about preneed funeral

19  contracts?  When you say insurance we have insurance

20  with --

21      Q.   Any contract.  I'm not limiting it to preneed

22  right now.

23          MR. PEARCE:  I'm going to object to the

24  question to the extent it calls for a legal conclusion,

25  but he can certainly give his understanding.

A-36

JAMES T. CHANDLER, IV

Page 19

1  BY MR. SALZER:

2      Q.    Your lay understanding.

3      A.    We -- from the insurance coverage not

4  counting preneed, basically we listed Funeral Services

5  of Delaware and James T. Chandler & Son, Inc. on autos,

6  or buildings or what have you.  So that was one event

7  that took place.  We probably had to -- what else did

8  we do?  What was re-titled.  At that moment we were I

9  guess -- well, that's all that comes to mind.  At that

10  moment that's what we did.  Now, there may have been

11  other permits or things that we over time combined both

12  names or kept one name versus the other.

13      Q.    For example, with the pre-need contracts,

14  were there contracts in existence in which Chandler &

15  Son, Inc. was a signatory prior to the formation of the

16  LLC?

17      A.    Yes.

18      Q.    Subsequent to the formation of the LLC, were

19  there any steps taken to transfer those contracts from

20  Chandler, Inc. a shorthand to the LLC?

21      A.    No.

22      Q.    So they remained in the name of Chandler,

23  Inc. as far as you know?

24      A.    Yes.  We do business as Chandler Funeral

25  Homes and Crematory, so not all our legal documents

A-37

JAMES T. CHANDLER, IV

Page 20

1  state other than that --

2      Q.    I see.

3      A.    -- to include preneed funeral contracts.

4      Q.    So is it your best recollection that those

5  contracts with that name remain the same --

6      A.    Correct.

7      Q.    -- they weren't any steps taken --

8      A.    No.

9      Q.    -- as a result of the LLC?

10         MR. PEARCE:  Let him finish the question.

11  Don't interrupt his line of questions.

12  BY MR. SALZER:

13     Q.    Is that correct?

14     A.    Correct.

15     Q.    So as best you can recall, then, the only

16  changes to contracts that you can remember subsequent

17  to June of '01 was that your insurance policies now

18  listed both the LLC as well as Chandler, Inc.?

19     A.    One comes to mind.  I'm sure with payroll it

20  changed.  It probably changed with anything related to

21  employee benefits.  What else would have changed?

22  Again, that's all that comes to mind.

23     Q.    So subsequent to June of '01 employees who

24  were on the payroll of Chandler, Inc. -- you wanted to

25  say something further.

A-38

JAMES T. CHANDLER, IV

Page 21

1     A.    I believe we got a new checking account.  I

2  know we got a new checking account.

3     Q.    By the way, in the course of the deposition,

4  if at any time you want to add something that you said

5  before, or you want to change something, please feel

6  free to do so.

7           After June of '01, the employees who had

8  been employed by Chandler, Inc. were now transferred to

9  the payroll of LLC?

10     A.    Correct.

11     Q.    So whatever steps were necessary for purposes

12  of paying their payroll taxes, insurance, employee

13  benefits, all those steps were taken so that those

14  employees were now employed by LLC and not Chandler,

15  Inc.?

16     A.    That's correct.

17     Q.    And who were the lawyers that -- were there

18  lawyers that assisted the company in effecting those

19  changes?

20     A.    Principally one.  Norris Wright.

21     Q.    Norris Wright?

22     A.    Norris Wright.  W-R-I-G-H-T.

23     Q.    Who is Norris Wright affiliated with?

24     A.    Right now he's with U.S. Trust.  He was

25  affiliated with Morris James.

A-39

JAMES T. CHANDLER, IV

Page 22

1     Q.   Was there a separate employee benefit plan

2  created for the employees of LLC?

3     A.   Separate plan, the plan did not change.  It

4  was probably re-titled.

5     Q.   So the existing trust -- were you aware of

6  whether there was a trust agreement?

7     A.   Trust agreement?

8     Q.   For employee benefits.  Why don't we stop

9  here.

10           As of June of '01, prior to the formation

11  of the LLC, what employee benefit plans existed for

12  Chandler employees?

13     A.   There was a Cafeteria Plan 125.  There -- I

14  believe there was a health insurance supplement of

15  approximately $300 monthly.  Possibly medical

16  reimbursement.  That may have not been after the 125

17  plan, I think we dropped the medical reimbursement.

18  I'm not a hundred percent sure.  125 consists of

19  healthcare.  What else?  The 401K, employer match six

20  percent up to -- I forget what the number is and it's

21  .50 on the dollar.

22     Q.   For each of those employee benefit plans, is

23  it your understanding that subsequent to June of '01

24  simply the name was changed from Chandler, Inc. as the

25  plan sponsor to the LLC?

A-40

JAMES T. CHANDLER, IV

Page 23

1        A.    Correct.

2        Q.    So you don't recall separate documents and

3    being created for purposes of now providing the

4    employee benefits under --

5        A.    If there were separate documents there were

6    no changes in what we provided.

7        Q.    Were you the person that was responsible for

8    overseeing that process?

9        A.    I think I delegated some to Kelly Cook,

10   probably to Diana Pinkerton, everybody, all the staff

11   sort of assisted on that.  I say all the staff, but if

12   something came up that had to be re-titled they would

13   bring it to our attention.

14       Q.    But you were certainly aware of the changes

15   that were occurring?

16       A.    Oh, yeah.  Well, the only changes was the

17   re-titling of documents.

18       Q.    June of '01, who were the officers of James

19   T. Chandler, Inc.?

20       A.    June of '01, I believe I was chairman of the

21   board; Chad was president; Maryjo Chandler, secretary;

22   and I believe Chad and I were co-treasurers.

23       Q.    Did that remain the same until January of

24   '05?

25       A.    Correct.

                         A-41

JAMES T. CHANDLER, IV

Page 24

1     Q.    As of January of '05, did Chandler, Inc. have

2     any ongoing operations at all?

3     A.    Any ongoing operations at all?  I need --

4     specifically what does it do?

5     Q.    Yeah, what does it do?

6     A.    It's basically a real estate holding company.

7     Q.    Does it lease property to the LLC?

8     A.    Both locations.

9     Q.    Both locations?

10    A.    They're lease agreements.

11    Q.    Through lease agreements between the LLC and

12    Chandler, Inc.?

13    A.    Correct.

14    Q.    Okay.  How much does LLC pay Chandler, Inc.

15    for those leases?

16    A.    It's about $17,000 a month.

17    Q.    Are there any other agreements between LLC

18    and Chandler, Inc. other than the lease agreements and

19    the limited liability company agreement that you have

20    before you as Exhibit 1?

21    A.    They're the only two, not aware of any other.

22    Q.    Can you explain to me how money flows through

23    these businesses?  So, for example, LLC is operating

24    the three funeral homes and how are profits --

25    A.    The James C. Chandler & Son, Inc. does

A-42

JAMES T. CHANDLER, IV

Page 25

1    have -- I don't know if we have official contracts with

2    grounds maintenance maintaining property.  We -- Inc.

3    may have a separate agreement with a grounds

4    maintenance company.  I'm not a hundred percent sure of

5    that.

6         Q.    That maintains which property?

7         A.    The grounds.

8         Q.    Of the funeral home?

9         A.    Yeah.

10        Q.    And does it charge money to the LLC for that?

11        A.    No.

12        Q.    That's part of the lease payments?

13        A.    Right.

14        Q.    All right.  So is it fair to say that LLC's

15   operating revenue flows into the LLC and then the net

16   profits are distributed to the shareholders, those

17   shareholders being Chandler, Inc. and the

18   Corleto-Latina entity; correct?

19        A.    (Witness nods head yes.)

20        Q.    And then those two entities distribute

21   profits in accordance with their own ownership

22   interest, Corleto you're not aware of, Chandler, Inc.

23   in accordance with the shareholder interest of the

24   individuals who own that company; is that right?

25        A.    We make a decision, correct.  We make a

A-43

JAMES T. CHANDLER, IV

Page 26

1    decision whether or not to have a quarterly

2    distribution. FSOD does.  If we elect to have a

3    quarterly distribution we then distribute profits to

4    the shareholders.  So it's not automatic.

5        Q.   The individuals who are responsible for

6    setting policy for Chandler, Inc. and Funeral Services

7    of Delaware, LLC are they one and the same?

8        A.   Yes.

9        Q.   And would that include any issues as to

10   personnel matters?

11       A.   Inc. doesn't have any personnel.  So for

12   FSOD, yes.

13       Q.   If you would turn to Exhibit 1 you will see

14   that on Bate Stamp 190, Schedule B.

15       A.   The three locations?

16       Q.   There are three leases for those locations;

17   is that correct?

18       A.   Correct.

19       Q.   And then the page before 189, there's a

20   schedule which purports to show capital contributions

21   two of the members to the LLC.

22            Is the information contained in that

23   document true and correct to the best of your

24   knowledge?

25       A.   Yes.

A-44

JAMES T. CHANDLER, IV

Page 27

1    Q.   And then if you would turn to Bate Stamp 193,

2    Schedule C purports to show the total value of the

3    company as it existed on June 1, 2001.

4              Is that information to the best of your

5    knowledge true and correct?

6    A.   Correct.  Yes, it is.

7    Q.   If you could turn to Schedule D and this

8    pertains to distributions from the LLC, and it states

9    that discretion will be based on available cash and

10   operating income of the entity and will be at the

11   discretion of the members.  And then it goes on to read

12   that any distribution will be distributed 75 percent on

13   ownership percentages and 25 percent on the basis of

14   profitability by location.

15   A.   That's correct.

16   Q.   Is that how it works?

17   A.   That's how it works.

18   Q.   So is there a tracking of profitability for

19   each funeral home Locations 1, 2 and 3?

20   A.   Right.

21   Q.   And is that documented somewhere?

22   A.   We get monthly income statements and balance

23   sheets.

24   Q.   For each --

25   A.   Internal.

A-45

JAMES T. CHANDLER, IV

Page 28

1    Q.    Internal, for each home?

2    A.    Correct.

3    Q.    So if I wanted to see how profitable the

4  Corleto Funeral Home was in any given month or year

5  there would be a document that would show me that?

6    A.    Yes, there would be.

7    Q.    Show me net income?

8    A.    Show you net income, show you gross income.

9  Again, it would be an income statement and a balance

10  sheet.

11    Q.    So can you explain to me, then, how in

12  practice this distribution method works?

13    A.    A, you first have to have cash.  You have to

14  make a profit.  You also have to have the cash.

15  Second, we determine how much we made in the quarter,

16  how much cash is available for distribution, and then

17  we do the calculations, we being the three partners.

18    Q.    The three partners make a determination, but

19  you've got dollar figures by home and then you have

20  overall dollar figures for the enterprise?

21    A.    That's correct.

22    Q.    That's correct?  And so tell me in your own

23  words how you combine that information to make a

24  decision on how to distribute?

25    A.    A, I'm going to repeat myself.

A-46

JAMES T. CHANDLER, IV

Page 29

1    Q.    Yeah.    Other than you need to have cash and

2    there needs to be income, but in terms of splitting it

3    up.

4    A.    You need to make a profit.    You need to have

5    cash.    You then do the numbers on what branch was

6    profitable what month, if they weren't profitable, if

7    they were profitable.    The term and the average and

8    then distribute the dollars.

9    Q.    Who are the persons that make that decision?

10   A.    The three partners.

11   Q.    Well, and the three partners are you, Chad,

12   and Tony?

13   A.    Correct.

14   Q.    Okay.    Do you know whether Chandler, Inc.

15   transferred any obligations to the LLC?    For example,

16   any loans, notes, including car loans.

17   A.    If it was the proper business practice, I'll

18   say we did or we co-titled it.    I don't

19   honestly know the answer.

20   Q.    You don't recall.    It's fair to say you don't

21   know.

22   A.    I don't know.

23   Q.    All right.    Is it your understanding that the

24   LLC has been elected to be treated as a partnership for

25   income tax purposes or do you not know?

A-47

JAMES T. CHANDLER, IV

Page 31

1      A.    Cover & Rossiter.

2      Q.    And they're in Wilmington?

3      A.    And they're in Wilmington.  Geoff, G-E-O-F-F,

4  Langdon is the person we deal with there.

5      Q.    Do you recall when Ms. Rowan was hired by

6  Chandler, Inc.?

7      A.    September of '95.

8      Q.    How did it come to be that she was hired?

9      A.    Well, we were looking to have a preneed

10  program that we had an individual that knew the

11  business of preneed and Anne -- I don't actually know

12  how we initially communicated, but Anne was looking for

13  a position.  She evidently left her former employer

14  Oliver Bear, so we're looking for a person and Anne is

15  looking for a job.

16      Q.    You didn't know her --

17      A.    I didn't know her at all.

18      Q.    -- prior to her applying?

19      A.    Correct.

20      Q.    And you said there was a person at Chandler

21  that was working in the area of preneed?

22      A.    Prior to Anne?

23      Q.    Yeah.

24      A.    Nobody had the assignment of if someone would

25  walk in and I say I want to make a prearrangement, we

A-48