JAMES T. CHANDLER, IV

Page 33

1          I am a member of the National Funeral

2   Directors Association, was involved in the state

3   association in my youth, attend seminars nationally on

4   a regular basis, national conventions, funeral service

5   conventions.

6          Q.    How long have you been in the funeral

7   services business?

8          A.    I'll say 35 years.

9          Q.    And have you worked in any other capacity for

10  a significant period of time?

11         A.    No.

12         Q.    Do you hold any licenses?

13         A.    I am licensed to practice funeral service in

14  Delaware, Pennsylvania, and I have a -- I'll call it

15  restricted license in Maryland.  It's called a courtesy

16  card.  It gives us limited abilities or tasks to

17  perform in Maryland.

18         Q.    But you personally hold that license?

19         A.    Yeah.

20         Q.    Is that as a funeral director or is it --

21         A.    Yes.  Licensed funeral director.  I think I

22  also have an insurance license, I'm not sure if I have

23  one or not in Delaware.

24         Q.    When you -- did you interview Anne Rowan?

25         A.    Yeah.          A-49

Page 47

1    agreement, did you realize that absent such an

2    agreement the company could terminate an employee at

3    will, at its pleasure?

4        A.    Yeah, it can terminate an employee at will.

5        Q.    Right.  And Anne wanted some guarantees, so

6    she entered into the employment agreement at least as

7    communicated to you?

8        A.    Yes.

9        Q.    Did you make a decision not to broach the

10   issue of an employment contract after September 11,

11   1996?  I mean, do you remember thinking, okay, well,

12   let's not revisit this issue?

13       A.    I don't remember revisiting the subject.

14       Q.    And you don't remember why?

15       A.    I don't remember if I did or I didn't.

16       Q.    Fine.  Now, when she initially started

17   working for Chandler, what was her job title?

18       A.    I don't know.  Anne preferred the title of

19   Director of Advanced Planning, I believe.  She had

20   business cards, whatever was on the business card.

21       Q.    Subject to your discretion?

22       A.    I probably okayed it but, you know, Anne

23   selected the title.

24       Q.    Did she report to you?

25       A.    Anne and I -- yes.

A-50

JAMES T. CHANDLER, IV

Page 56

1    A.    I believe they started out -- well, we
2  started at zero.  So then we go up, then we sort of go
3  down a little bit, flatten out and then go up again.
4    Q.    And so it would be fair to say that there was
5  an up trend in the year prior to termination in terms
6  of production?
7    A.    Correct.
8    Q.    So, for example, this report that you have
9  before you, Exhibit 3, would reflect that for the year
10  to date of December of '04, $965,000 in gross sales of
11  preneed policies were made by Anne; correct?
12    A.    Say the number again.
13    Q.    Well, it's $965,851, do you see that on the
14  first line?
15    A.    That was 2003.
16    Q.    Correct.  Thank you.
17        And for the year end of 2004, gross sales
18  were $1,265,202?
19    A.    Correct.
20        (Whereupon, a break was taken.)
21  BY MR. SALZER:
22    Q.    Tell me what you understand the gross sales
23  figure to represent?
24    A.    Would be the funeral amount of all the
25  preneed contracts whether they be funded through -- the

A-51

JAMES T. CHANDLER, IV

Page 64

1       Q.   And then he was relieved of the instructions

2  to sell preneed policies?

3       A.   That's correct.

4       Q.   And do you know why he failed?

5       A.   Poor follow-up.

6       Q.   What does that mean?

7       A.   I don't know the specifics of why he failed.

8  He didn't have the ability to follow-up with a, here's

9  a lead, you need to follow-up with a lead.  You need to

10  continue to follow-up with a lead and make the sale.

11  He could not perform that act.

12      Q.   Is that what you concluded or did someone

13  tell you that or a combination?

14      A.   I believe Tony Latina told me that.

15      Q.   Do you remember when Tony told you that?

16      A.   No.

17      Q.   Did Tony tell you why he thought that was

18  happening?  For example, did he say that it was because

19  of a lack of initiative, or was it because of

20  personality, or because it was disorganization or did

21  he give you any idea as to why that was?

22      A.   Jason felt that his skills related to at

23  need, performing at need services versus preneed

24  services.

25      Q.   Well, that's what Jason said to you?

A-52

JAMES T. CHANDLER, IV

Page 65

1       A.    That was either told to me by Tony or Jason.

2       Q.    Was there any other information given to you

3    as to why Jason wasn't successful with preneed sales?

4       A.    If there was I've forgotten.

5       Q.    Are you saying then that after a period of

6    three months there was a decision --

7       A.    Approximately three months.

8       Q.    Approximately, okay.

9            Approximately three months until the

10   partners made a decision to task Jason with the

11   responsibility of handling at need funeral business and

12   not preneed?

13      A.    That's correct.  That would be his principal

14   responsibility.

15      Q.    When you say "principal," what would be the

16   secondary?

17      A.    If somebody walked in and wanted to make a

18   prearrangement, he may see them.

19      Q.    But you --

20      A.    I may see them.

21      Q.    Right.  Now, was Jason the subject of any

22   performance discipline or criticism by the partners

23   because of his failure to satisfactorily execute those

24   responsibilities with regard to preneed?

25      A.    Discipline meaning loss of pay?

A-33

JAMES T. CHANDLER, IV

Page 66

1    Q.    Could be anything.

2    A.    I would say no.

3    Q.    Why?

4    A.    There was a task that we wanted to perform,

5    he couldn't perform it.  As -- we like Jason.  We

6    thought he would do well in at need so we hired him for

7    at need, transferred him to at need.

8    Q.    When you say "we like Jason," who's the we?

9    A.    Partners.

10    Q.    I'm sorry?

11    A.    The partners.

12    Q.    Was there something about Jason that you guys

13    liked?

14    A.    Personable, outgoing, grew up in the area,

15    knew people, active in the community.  Thought he could

16    bring us business.

17    Q.    So then tell me what at need is.  We've been

18    talking about preneed, what is at need?

19    A.    At need is fulfilling -- well, when someone

20    dies, that would be at need.  Performing the services,

21    providing the merchandise after death.

22    Q.    Was Jason a funeral director?

23    A.    Jason is not a licensed funeral director.

24    Q.    So --

25    A.    He would be a counselor.

A-54

JAMES T. CHANDLER, IV

Page 67

1    Q.   A counselor.

2         But is he viewed by the company as a

3    salesperson?

4    A.   No.

5    Q.   He's viewed as a counselor?

6    A.   At need counselor.

7    Q.   Does he have a job description?

8    A.   I would say no.

9    Q.   What are his duties?

10   A.   Jason will see families, he'll run funerals,

11   he's on evening call and weekend call.  His skills rely

12   in people skills.  He would not do a lot of work in the

13   preparation room in preparing bodies for burial or at

14   the crematory.

15   Q.   Does the company measure in any manner how

16   Jason's performance is as an at need counselor?

17   A.   We don't have a standards sheet.  My brother

18   deals with the staff and has the annual meetings with

19   the staff.

20   Q.   Chad?

21   A.   Chad does.  So he's our human resources

22   person.  He probably can answer these questions better

23   than I, but I'm not aware of any grading sheet or

24   anything like that on Jason's performance.

25   Q.   So the company for all its employees has not

A-55

JAMES T. CHANDLER, IV

Page 82

1  grow from '03?  Maybe you can give me a sense of the

2  trending in unit sales.

3      A.   We've been flat for a few years.  The whole

4  industry has been flat.

5      Q.   What about '05 and '06?

6      A.   '05 we worked for 511 families; '06 we worked

7  for 508 families.

8      Q.   That's still sort of flat in your mind?

9      A.   Correct.

10      Q.   Same thing for Location 3, has it been flat?

11      A.   Location 3 had a poor 2006.

12      Q.   Why is that?

13      A.   Pardon me?

14      Q.   Why is that?

15      A.   I wish I knew.  It's --

16      Q.   And when you say poor, what do you mean?

17      A.   His sales were off about 20 percent.

18      Q.   What about '05?

19      A.   I believe they were, unit sales were flat

20  with '04.

21      Q.   So we've been talking about your discussions

22  with Anne regarding creating a team and then these

23  teams were created, do you know for any of these

24  individuals what caused the separation of their

25  employment?  For example, do you know whether they

A-56

JAMES T. CHANDLER, IV

Page 83

1  quit, or were terminated, or do you not know?

2      A.    I don't actually know.

3      Q.    Did you ever sit down with Anne and discuss

4  with her what was going on with these teams that were

5  created?

6      A.    Definitely.

7      Q.    Tell me what you talked about.

8      A.    Why they were going to be successful.  Why

9  they failed.  How we can do a better job making them

10 successful.

11     Q.    Tell me what you talked about.  These are

12 generalities, can you give me anymore substance to it?

13     A.    Lead generation.  It was years ago.  That's

14 all I can remember.

15     Q.    Take some time, sir, because this is an

16 important topic.  What I'm trying to find out is the

17 substance of your discussions with Anne about the

18 teams, the pros and cons, why they were either

19 performing okay, why they were not performing okay,

20 anything that you can remember about that program?

21     A.    I remember they failed.

22     Q.    Is that all you remember?

23     A.    I remember -- I know the subject of lead

24 generation would always come up.

25     Q.    What does that?

A-57

JAMES T. CHANDLER, IV

Page 84

1    A.    Who was giving what specific leads with what

2    individuals have.  That's all I can remember about

3    that.

4        Q.    Are you aware of any documents which exist

5    which discuss the failure of that -- I'll call it --

6    program?

7        A.    You mean a summary from Anne as to why it

8    failed?

9        Q.    Anything.  It could be memos from you, from

10   her.

11       A.    No.

12       Q.    E-mails, anything.

13       A.    We had -- we had verbal discussions on it.

14       Q.    What did Anne say about this?

15       A.    Weren't qualified, weren't diligent.  I don't

16   know.  I'd be guessing.  It was what --

17       Q.    Did you at any time tell Anne that you viewed

18   the failure of the program as reflecting negatively on

19   her job performance?

20       A.    No.

21       Q.    Why?

22       A.    I just knew it failed.

23       Q.    Did she ever say anything to you which

24   suggested that she agreed with you?

25       A.    That it failed?

A-58

JAMES T. CHANDLER, IV

Page 85

1     Q.    No.    Did she ever talk to you and say I agree

2  with you, I think this has failed?

3     A.    I'll say yes.

4     Q.    What is that based on?

5     A.    My memory.    Specific place and time I can't

6  recall.    It was clear that it failed.

7     Q.    So, then, your recollection is that after

8  June of '01 there was a decision not to grow

9  internally?

10    A.    Correct.

11    Q.    Who made that decision?

12    A.    I did and Anne knew of that decision.

13    Q.    What did you tell her?

14    A.    We weren't going to go down the path of

15  training staff which took Anne's time, took our time,

16  or people in our organization's time because it's

17  failed.    We need to have another direction on how we're

18  going to grow the preneed team.

19    Q.    What do you recall saying to her regarding

20  that?

21    A.    We need to have seasoned salespeople that

22  know preneed, can sell preneed.

23    Q.    What did she say?

24    A.    She didn't object.

25              MR. SALZER:  Let's take a moment break if

A-59

JAMES T. CHANDLER, IV

Page 93

1     Q.     -- aims of the company?

2     A.     Correct.

3     Q.     And that included media, print media?

4     A.     Uh-uh.

5     Q.     Anything else?

6     A.     TV.  Those -- we did some radio but I'm not

7   sure if that was MJK related.

8     Q.     Was Anne the principal person responsible for

9   those activities?

10    A.     Yes.

11    Q.     And how would you characterize her

12   performance?

13    A.     Good.

14    Q.     Was there a decision to continue in that

15   vein, the outside marketing efforts, notwithstanding

16   the decision to retain Todd Woodside's company?

17    A.     We limited our outside marketing after Anne

18   left.

19    Q.     Oh, no, I'm not asking after she left.

20           I'm saying before she was terminated at

21   the time that we've been talking about, which was '02

22   or '03, you weren't quite sure when the company engaged

23   the Woodside company; right?

24    A.     Well, we have the agreement is March of '04.

25    Q.     The agreement with the Woodside company?

A-60

JAMES T. CHANDLER, IV

Page 94

1    A.    Yes, is March of '04.  We actually started
2    discussing, talking to, we eventually formalized an
3    agreement.
4    Q.    Well, prior to March of '04, was the Woodside
5    company brokering policies where your company was --
6    I'll call it -- a beneficiary?
7    A.    I'll say no.
8    Q.    You're certain of that?
9    A.    No, I'm not.
10   Q.    Who would best know the answer to that?
11   A.    Probably Anne Rowan.
12   Q.    So is it your recollection that in '02 and
13   '03 there were discussions with Todd Woodside?
14   A.    Yes.  There was discussion with many people
15   that were going to make an effort to grow our sales
16   team.
17   Q.    All right.  But your best recollection was
18   that the first time that it was formalized that
19   Woodside would be selling preneed policies for the
20   benefit of your company was in the March of '04?
21   A.    Correct.
22   Q.    Did Mr. Woodside in your conversations with
23   regard to the services that he would provide say to you
24   that he would incur the expenses of the marketing
25   activities?

A-61

JAMES T. CHANDLER, IV

Page 107

1   understandings.

2       Q.   Prior to March of '04, Mr. Woodside was

3   servicing Location 3?

4       A.   Correct.

5       Q.   Did that change as a result of the March '04

6   agreement?

7       A.   No.

8       Q.   So that continued?

9       A.   Yes.  The oral understanding between Anne and

10  Todd was that Todd would take care of Location 3; Anne

11  would take care of 1 and 2.

12      Q.   Anne would take care of 1 and 2?

13      A.   That's correct.

14           (Whereupon, a document was marked for

15  identification as Chandler Exhibit Number 5.)

16  BY MR. SALZER:

17      Q.   I'm going to show you a document which has

18  been marked as Chandler 5 and ask if you recognize

19  this?

20      A.   Yes.  This I saw at Anne's deposition.

21      Q.   Well, other than seeing it at Anne's

22  deposition, do you recognize this document?

23      A.   Frankly, I don't until I saw it at Anne's

24  deposition.

25      Q.   So were you aware of any agreement between

A-62

JAMES T. CHANDLER, IV

Page 108

1   Anne Rowan and Jason Casper or an agreement -- strike

2   that.

3                   Were you aware of any agreement which

4   delineated responsibilities of Anne Rowan and Jason

5   Casper?

6        A.    Written agreement, no.

7        Q.    Verbal?

8        A.    Possibly.

9        Q.    And that was what?

10       A.    I don't know.

11       Q.    So you'll see then that in the agreement with

12   TDW it makes reference to Funeral Home as the LLC; is

13   that correct?

14       A.    I'll have to read it.

15       Q.    I just want to be clear that even though the

16   agreement doesn't make reference to this delineation

17   between Locations 3 and Locations 1 and 2, that was

18   what took place even after this agreement was entered

19   into?

20       A.    That's correct.

21       Q.    And Anne was okay with that as far as you

22   know?

23       A.    Again, Anne coveted 1 and 2.

24       Q.    Meaning that there was nothing in this

25   arrangement that Anne objected to?

A-63

JAMES T. CHANDLER, IV

Page 109

1      A.    Correct.

2      Q.    Before this arrangement was entered into, how

3   would you characterize your working relationship with

4   Anne?

5      A.    We had a good working relationship.  We were

6   usually frank with one another.  We bounced ideas of

7   off of one another, whether they'd be preneed or at

8   need or after care.  We had a good working

9   relationship.

10      Q.    How would you characterize her as an

11   employee?

12      A.    Anne would tell you, be very frank about

13   matters whether it might be detrimental to you.  She

14   spoke her mind.

15      Q.    Anything else?

16      A.    No.

17      Q.    We're going to talk about the events

18   immediately preceding her termination of employment,

19   but did you ever express displeasure to her with regard

20   to her performance in any capacity?  When I say

21   performance I mean in any respects whatsoever?

22      A.    Are you talking about her sales performance

23   or her conduct?

24      Q.    I'm not drawing any distinctions, sir.

25      A.    Her conduct.    A-64

JAMES T. CHANDLER, IV

Page 111

1   commissioned, their principal wages were commission.

2   So do I -- do you give a year-end Christmas gift to

3   these commissioned individuals?  I didn't think they

4   should warrant one.  So they didn't get one.  Anne

5   wasn't happy.  She was vocal about it.  I don't know

6   what she actually said.  I probably shouted some things

7   back to her and she, again, I was -- in hindsight I

8   should have given them something for year end.  So we

9   had a shouting match.

10          Q.    A real shouting match?

11          A.    I shouldn't say that.  We raised our voices.

12          Q.    What about Jerry?

13          A.    I don't remember Jerry saying anything.

14          Q.    So then the next thing is in April of '04?

15          A.    For me personally?

16          Q.    Yeah.  Tell me what you remember about that.

17          A.    Well, there was -- the partners were meeting,

18   Anne, or we had a preneed meeting or the partners were

19   meeting, and Anne was invited into the meeting.  Anne

20   is not happy with the way things are going on as we

21   proceed down the path of creating a seasoned sales

22   team.  She at some point leaves the meeting and in so

23   many words says, the ship's going down.  The ship's

24   going down.  When she was talking about the ship, she

25   was referring to Funeral Services of Delaware.  When

A-65

JAMES T. CHANDLER, IV

Page 112

1   you attack the ship you attack me.  So I personally

2   took it and wanted to address it with her.

3           So shortly thereafter --

4       Q.   All right.  Go ahead.

5       A.   Shortly thereafter Anne and I met.  I wanted

6   an apology.  I believe she apologized.  I told her her

7   conduct was unacceptable; that I had supported her in

8   the past, had given her every benefit of the doubt and

9   that her conduct was unacceptable and had to change.

10          Anne and I threw out our business

11  relationship, apologized to one another.  I don't know

12  how many times it was, but there were times that we

13  apologized to one another.

14      Q.   So this is a preneed meeting?

15      A.   Well, it could have been -- Anne was -- it

16  was a preneed meeting or it was a partners meeting that

17  Anne was invited into.  The subject matter was preneed

18  at one time.

19      Q.   And who was there?

20      A.   I believe Chad, Tony, Anne and I.

21      Q.   What was the subject before she made this

22  comment, what was the subject of conversation?

23      A.   I honestly don't know, but the subject was

24  preneed so it had something to do with preneed.

25      Q.   Other than that you don't remember?

A-66

JAMES T. CHANDLER, IV

Page 113

1  A.   Don't remember.

2  Q.   How long was that part of the meeting in

3  which Anne was in attendance?

4  A.   I have no idea.

5  Q.   Do you know what was being said immediately

6  prior to her comment about the ship is going down?

7  A.   I don't know other than on the subject of

8  preneed.

9  Q.   And when that comment was made, did you or

10  anyone else present say anything directly in response

11  to that comment at the time of the meeting?

12  A.   I don't remember anybody saying anything.   We

13  were all witnessing Anne's displeasure, shouting,

14  stomping out of the meeting.

15  Q.   I'm sorry?

16  A.   We were witnessing Anne's displeasure,

17  getting up, stomping out of the meeting.

18  Q.   You said stomping?

19  A.   Rushing out of the meeting.

20  Q.   Now, is there anything else that she said

21  other than the words "the ship is going down," which

22  you took offense to at that meeting?

23  A.   That's correct.

24  Q.   Was there anything else?

25  A.   At that meeting?

A-67

JAMES T. CHANDLER, IV

Page 125

1   are the -- what are their titles?

2       A.    Funeral counselors, funeral directors

3   assistants.  Paul principally is in charge of the

4   preparation, Paul Mullin.  Joe Kelly is principally in

5   charge of the crematory.  That's not all our staff but

6   that's the at need team.

7       Q.    Okay.  Other than the October '04 incident

8   and the incident that immediately preceded --

9       A.    October '04 incident?

10      Q.    The ship going down comment.

11      A.    That's April.

12      Q.    April.  Thank you.

13            Other than that incident and then the

14  incident immediately preceding her termination from

15  employment, is it fair to state that you personally are

16  unaware of any incident involving any individual at the

17  business in which my client acted inappropriately?

18      A.    I know of at least two comments.  One was to

19  Mr. Latina about him being lazy, challenged his

20  credentials as a funeral director.  I was at that

21  meeting.

22            Second, she called my brother Chad AWOL.

23  AWOL being absent without leave, and not at the funeral

24  home, not to his face, but I think it was at the same

25  meeting that Tony was at when she made the reference to

A-68

KARASCH & ASSOCIATES
800-621-5689

JAMES T. CHANDLER, IV

Page 126

1    Tony being lazy.

2        Q.    When was this meeting?

3        A.    It was prior to the April '04.  That's all I

4    can tell you.  I mean, it wasn't -- I'll say it was the

5    latter part of -- I don't know.  I believe it was --

6    I'm sure it was prior to that meeting.

7        Q.    Where was the meeting?

8        A.    It was at our funeral home, Location 1, one

9    of the conference rooms.

10       Q.    Who was there?

11       A.    Tony, Anne and I.

12       Q.    And Anne?

13       A.    Tony, Anne and I.

14       Q.    And what was the subject of the conversation

15   at the time that you say Anne referred to Tony as lazy?

16       A.    I do not know specifically.

17       Q.    Even generally?

18       A.    I would guess it was preneed.  Again, the

19   subject of expanding the preneed sales team.

20       Q.    Other than that you can't provide any

21   further --

22       A.    Don't know.

23       Q.    -- amplification; right?

24       A.    Correct.

25       Q.    And I just want to make certain I understand,

                          A-69

JAMES T. CHANDLER, IV

Page 127

1   you're saying that Anne said you're lazy?

2        A.   Correct.

3        Q.   Just those words?

4        A.   Correct, to his face.

5        Q.   Right.  And what did Tony say?

6        A.   She said, I think more than that.  It got to

7   the point where Tony had to defend himself.

8        Q.   What did Tony say?

9        A.   I've been in funeral service for X years,

10  I've been licensed for X years, something to that

11  effect.

12       Q.   Anything else you can recall?

13       A.   No.

14       Q.   Did you make any notes of this?

15       A.   Mental note.

16       Q.   Well, not written notes?

17       A.   Not written notes.

18       Q.   Now, when you say challenged credentials as a

19  funeral director, what do you mean by that?

20       A.   Well, Tony responded in how long he had been

21  in funeral service, what he had done in funeral

22  service, how long he had been licensed to whatever she

23  said beyond being lazy.

24       Q.   So you're not saying that you remember Anne

25  challenging Tony's licensure as a funeral director?

JAMES T. CHANDLER, IV

Page 128

1      A.    I remember lazy.  I know that happened.

2  Beyond that, I'm not sure what happened.  There was

3  more than just lazy.

4              Tony's response was talking about how long

5  he had been in funeral service, how long he had been

6  licensed.  What prompted that response beyond being

7  lazy I don't know or can't remember.

8      Q.    Did you say anything directly in response to

9  that comment?

10     A.    To?

11     Q.    When Anne made this comment about Tony being

12  lazy, did you say anything?

13     A.    I believe I was silent.

14     Q.    At any time did you say something to Anne

15  about that comment?

16     A.    I don't believe I said anything.

17     Q.    Was this conversation documented in any shape

18  or form by the company?

19     A.    The company?

20     Q.    Yeah, the company.

21     A.    No.  Tony may have.

22     Q.    You're not aware of it?

23     A.    I'm not aware of any.

24     Q.    You told me that Tony defended himself, I

25  think were your words?    A-71

JAMES T. CHANDLER, IV

Page 129

1    A.    That's correct.

2    Q.    Did he say anything else as to her use of the

3    word lazy?

4    A.    Can you repeat the question again?

5    Q.    Did Tony say anything directly challenging

6    her accusing him as lazy other than defending himself

7    with his experience and his credentials and so forth?

8    A.    He only defended himself.

9    Q.    Would you consider Anne to have been part of

10   the management team?

11   A.    Of?

12   Q.    Of Funeral Services.

13   A.    I don't know if I'd say management team.  We

14   talked about other than preneed subjects, Anne and I

15   did.  I would say she was -- well, I would say as head

16   of preneeds she was part of the overall management

17   team.

18   Q.    And would you say that it would be your

19   expectation that a member of the management team would

20   be frank in their communications with the other members

21   of the management team?

22   A.    Well, there's frank and there's just

23   respectful.

24   Q.    Granted.

25   A.    I would say Anne was disrespectful.

A-72

JAMES T. CHANDLER, IV

Page 130

1      Q.    On this occasion?

2      A.    Yes.

3      Q.    But you would agree with me that you would

4    expect Anne as a member of the management team to be

5    frank?

6      A.    Yes.

7      Q.    And if a member of the management team felt

8    that another member of the management team was not

9    holding up their end, would you expect that viewpoint

10   to be expressed civilly, but to be expressed?

11     A.    Yes.

12     Q.    Did you ever express any sentiment to Tony

13   that he was not pulling the oar, so to speak?

14     A.    Never lazy.  There was a subject that we

15   reviewed that he could do a better job on, whether it

16   be accounts receivable, or other matters.  They were

17   specific business tasks or areas of work as opposed to

18   you're lazy.

19     Q.    Did you express to Tony a viewpoint that he

20   needed to work harder, show more initiative, things

21   along those lines?

22     A.    We would talk about increase volume.  We

23   would talk about appearance of the building.  We would

24   talk about things like that as opposed to how you

25   would -- you're not -- you're lazy or you're -- we

JAMES T. CHANDLER, IV

Page 131

1  wouldn't talk about things like that.

2       Q.   Was Anne reprimanded for this incident?

3       A.   Not to my knowledge.

4       Q.   Why?

5       A.   Why was Anne not reprimanded?

6       Q.   If you remember.  If you don't remember --

7       A.   I don't remember.

8       Q.   Any time you don't remember just tell me.

9            We started along this path and I was

10  asking you about whether you were aware of any

11  incidents involving anybody at the company in which

12  Anne acted inappropriate or said something

13  inappropriate.

14           What other incidents do you remember?

15      A.   That I've heard of, witnessed?

16      Q.   Well, let's first speak of witnessing.

17      A.   I've told you all the ones I've witnessed.

18      Q.   Now, let's speak about what you've heard?

19      A.   I know Helen Johnson, our after care

20  coordinator, would be -- if there was an organization

21  chart would be on the same level as Anne on the

22  organization chart.

23           There was an incident in the parking lot

24  that I wasn't a party to, but evidently there was a

25  certified shouting match reprimand.  Anne was

A-74

JAMES T. CHANDLER, IV

Page 132

1  reprimanding Helen.  Helen is a person that's probably

2  60-years-old.  She's not -- she's a mature woman.  We

3  had -- that's all I remember of that incident.  There

4  may have been other incidents with Helen, that's the

5  only one that I remember.

6           Susan Beechel, I'm not sure how to spell

7  Beechel.  Beechel was -- Susan worked for our company,

8  I don't know when she actually worked there, but she

9  and Anne did not get along.  I don't know what the

10  specific incident was.  I know that they weren't

11  friends.

12      Q.    Anything else?

13      A.    That's all I can remember.

14      Q.    Well, let's talk about Helen Johnson.

15           When did you learn of that incident?

16      A.    Shortly thereafter.  This incident occurred

17  probably five to seven years ago.

18      Q.    Had did you find out about it?

19      A.    I believe Helen told me.  I either heard

20  about it and then Helen told me.  They both were giving

21  a seminar at some location and the argument occurred

22  about -- I don't know what the argument was about.

23      Q.    All right.  Did Helen tell you about this?

24      A.    She has told me about it.

25      Q.    When did she tell you about it?

A-75

1    Q.    Okay.  But not as much experience as Anne

2  had?

3    A.    Correct.

4    Q.    What precipitated this decision in September

5  30th of '04?

6    A.    The situation with Anne trying to develop the

7  season preneed team had deteriorated.  I just felt that

8  as the management rep for preneed that we needed to

9  have a change.  It just -- the relationship with Anne

10  had deteriorated because of her conduct, new to the

11  company, decided a change was in order.

12    Q.    Well, you said the relationship with Anne had

13  deteriorated  because of her conduct, what you've told

14  me about is the comment prior to April of '04, the lazy

15  comment, and you've told me about the comment about

16  AWOL involving your brother Chad, and those are the

17  only two incidents that you recall in and around '04;

18  correct?

19             Is that what you're referring to?

20    A.    You mean verbal abuse or verbal --

21    Q.    No, I wasn't saying abuse, sir.

22    A.    Abuse isn't the right word.

23    Q.    I had asked you about incidents in which

24  Anne's conduct was unacceptable.  Those were the

25  incidents that you told me about.

A-76

JAMES T. CHANDLER, IV

Page 139

1    A.    Okay.   There was also the -- the incident

2    with Co-Francisco where Anne had to give back her

3    commission.  I forget her actual conduct.  It was a

4    tense meeting.  There was a lot of tension.  I don't

5    remember any verbal abuse.

6    Q.    Let's talk about this AWOL comment, I forgot

7    to ask you about that.

8    A.    My brother Chad.

9    Q.    Now, were you a witness to this?

10   A.    No.  Oh, yes, yes, I was.

11   Q.    You were?

12   A.    I was, my brother Chad wasn't.

13   Q.    And when was it?

14   A.    It was the same time she called Tony lazy.

15   Q.    And who was there besides yourself?

16   A.    It was Tony, Anne and I.

17   Q.    What was said?

18   A.    You mean about Chad AWOL?

19   Q.    Yeah.

20   A.    She said that Chad was AWOL.  What she said

21   in addition to that I don't remember.  AWOL meaning not

22   at the funeral home.

23   Q.    Well, you don't know whether she was saying

24   that as a criticism of him, it could have been simply

25   that he wasn't around, he was doing something else?

A-77

JAMES T. CHANDLER, IV

Page 140

1     A.   It was a criticism.

2     Q.   Why do you say that?

3     A.   The tone of her voice, the mood of the

4 meeting, it was a criticism.

5     Q.   Was Chad -- should Chad have been there?

6     A.   At the meeting?

7     Q.   Yeah.

8     A.   I don't remember.

9     Q.   Do you know where Chad was?

10    A.   Don't remember.

11    Q.   What was the meeting about?

12    A.   I assume -- I don't really know.  I assume it

13 was --

14    Q.   Sir, I don't want you to guess.

15    A.   I don't know.

16    Q.   You don't know.  That's a fair enough answer.

17         Do you know where Chad was?

18    A.   I already said I don't know.

19    Q.   Did you say anything to her?

20    A.   No.

21    Q.   Did Tony?

22    A.   No.

23    Q.   So nothing was said to her about this

24 comment, the AWOL comment?

25    A.   About Chad being AWOL; correct.

A-78