JAMES T. CHANDLER, IV

Page 141

1    Q.    Did you tell Chad about it?

2    A.    I believe I told Chad about it.

3    Q.    Do you recollect telling Chad about it, sir?

4    A.    I don't remember specifically saying it to

5    him.

6    Q.    Do you recollect Chad coming to you and

7    talking to you about it?

8    A.    I don't remember Chad, no.  There was an

9    incident where Anne was talking negatively about

10   management.

11   Q.    The AWOL comment?

12   A.    Correct.

13   Q.    Nothing else that you can remember?

14   A.    Correct, besides the Tony comment.

15   Q.    Have there been any incidents in which other

16   employees have spoken negatively of management?

17   A.    Not in the tone or the manner that Anne

18   would.

19   Q.    What do you remember?

20   A.    I don't really -- they would not -- they, the

21   staff, would not speak about an individual more about

22   how we could do a task or someone could perform

23   something better.

24   Q.    We were looking at Exhibit 6.  You told me

25   this was circulated and then subsequent to the issuance

A-79

JAMES T. CHANDLER, IV

Page 142

1  of this memo, Tony becomes director of the preneed

2  department, so to speak; right?

3       A.   No.

4       Q.   Tell me where I'm wrong.

5       A.   Tony -- nothing -- the only thing that

6  changed was that Tony would be the management rep that

7  would work with Anne on preneed just as I had done

8  previously.

9       Q.   So he displaced you as her supervisor?

10      A.   No, he was not her supervisor.

11      Q.   So then what was his role then subsequent to

12  this memo?

13      A.   Tony?

14      Q.   Yeah.

15      A.   Tony was a partner.  Each one of the -- well,

16  I was the partner that was the partner that dealt with

17  preneed with Anne.

18      Q.   So then he became the partner?

19      A.   That's correct.

20      Q.   To deal with Anne on preneed?

21      A.   That's correct.

22      Q.   So why the change?

23      A.   We felt we -- again, my relationship with

24  Anne had deteriorated.  Her conduct was something that

25  was -- there was a lot of tension in the office.  We

A-80

JAMES T. CHANDLER, IV

Page 143

1  thought we'd try something different and have Tony take

2  over as --

3       Q.    Why are you saying your relationship

4  deteriorated, sir?

5       A.    As we continued to go down the path of

6  developing a seasoned preneed team, the tension, Anne's

7  mood, the tension increased, Anne's -- just the mood of

8  the office increased.

9       Q.    Can you be anymore specific than that?

10      A.    Well, you had to be there to really

11  experience it.  I can't -- you had to be there.  There

12  was tension.

13      Q.    Tell me whether you would agree with a notion

14  that a salesperson would be reasonably concerned if

15  they thought that their sales territory or -- their

16  sales territory would be restricted, limited?

17      A.    Would they be concerned?

18      Q.    Yeah, reasonably concerned.

19      A.    Sure they would be.

20      Q.    And were you aware that part of Anne's

21  success was depended upon receiving leads from the

22  funeral directors and the employees working at

23  Locations 1 and 2 for follow-up?

24      A.    Follow-up is an interesting subject.

25      Q.    Well, let's first answer the question and

A-81

JAMES T. CHANDLER, IV

Page 148

1    Q.    Do you know what the outcome was?

2    A.    No.

3    Q.    Do you know of any incident in which --

4    strike that.

5          Did Anne have a supervisor in '04?

6    A.    Anne never had a supervisor.

7    Q.    So she would report to the partners?

8    A.    She would report to me.

9    Q.    To you?

10   A.    Because I was the partner rep that was

11   assigned preneed.

12   Q.    But that changed?

13   A.    That's correct.

14   Q.    And that changed in September of '04?

15   A.    That's correct.

16   Q.    Did it change again?

17   A.    No.

18   Q.    So that remained the case until she was

19   fired?

20   A.    Well, it was called to my attention that

21   in -- when we first formed the LLC, that Tony and Anne,

22   Tony was the management rep that was going to deal with

23   preneed.  It was a short term relationship and changed

24   back to me.

25   Q.    When did it change back to you?

A-82

JAMES T. CHANDLER, IV

Page 149

1        A.    Within months.

2        Q.    So within months of September 30th of '04?

3        A.    No, no, no.  I'm going back to when the FSOD

4    was initially formed.

5        Q.    So he was going to be the management rep for

6    preneed and then it changed back to you?

7        A.    And he was management rep for months in

8    '02 -- '01, and then from '01 to September of '04 I was

9    the partner that Anne dealt with.

10       Q.    And then from after September of '04 --

11       A.    It was Tony.

12       Q.    -- to January of '05?

13       A.    Correct.

14       Q.    All right.  Do you recall any meeting in

15   which Woodside and/or insurance company representatives

16   were present in which Anne was present and the partners

17   on the issue of leads was discussed?

18       A.    Well, we were trying to have a sales meeting

19   and there was a lot of tension in the room.  Todd was

20   in the room, Anne was -- I assume this is what you're

21   speaking of or this is what I remember.  Anne was in

22   the room, who else was in the room?  Chad was in the

23   room, Tony was in the room.  There may have been

24   another insurance person in the room, I don't really

25   remember.  And we were trying to discuss how we were

A-83

JAMES T. CHANDLER, IV

Page 185

1    Q.    Where were you that day?

2    A.    That Monday?

3    Q.    Yeah.

4    A.    I don't remember.  I wasn't in the building.

5    Q.    You were at work?

6    A.    I could have been at work.  I could have been

7    at play.  I could have been I don't know where.

8    Q.    You carry a cell phone?

9    A.    Yeah.

10   Q.    Every one has that cell phone number?

11   A.    I don't always have my cell phone on.

12   Q.    Does Tony have the cell phone number?

13   A.    Yes.

14   Q.    Your best belief is you heard about the

15   incident the following day?

16   A.    I may have heard it that night.  I honestly

17   don't recall.

18   Q.    So tell me what you remember where you were

19   when you first heard that there was an incident?

20   A.    Tony's ready to talk to Anne about preneed,

21   never got on the subject --

22   Q.    No, I don't want to know about the substance

23   yet.  I want to know where you were --

24   A.    I don't know where I was.

25   Q.    You came into work?

A-84

JAMES T. CHANDLER, IV

Page 216

1    A.    Yes.

2    Q.    By whom?

3    A.    Kelly Burns, who works at Chandler.

4    Q.    What did she say?

5    A.    I believe Anne is working for McCrery.

6    Q.    And when you heard that, what was your

7    impression?

8    A.    Well, the businessman in me took over and we

9    have someone of Anne's skill working for our principal

10   competitor, what, as a business should we do?

11   Q.    And this McCrery Funeral Home is located how

12   far from your funeral homes?

13   A.    I'm going to guess a quarter mile from our

14   building on Concord Pike.

15   Q.    So they're your principal competitor?

16   A.    On Concord Pike.

17   Q.    On Concord Pike.  Okay.

18         Now, so when you say the businessman in

19   you gave you some pause for concern, you mean that Anne

20   was a capable salesperson and she was working for a

21   principal competitor?

22   A.    Correct.

23   Q.    And so you were concerned about -- well, tell

24   me, what was your concern?

25   A.    I was concerned about their business.  Their

A-85

JAMES T. CHANDLER, IV

Page 217

1   pre -- well, I believe their preneed department, they

2   being McCrery was weak.  Anne now arrives at the scene.

3   I worked for 10 years, know what she can do, became

4   concerned for Chandler Funeral Homes.

5         Q.   Did you discuss that concern at that point in

6   time when you find out from Kelly with your partners?

7         A.   I know I talked to Chad immediately.  I say

8   immediately, that day.

9         Q.   What did you tell Chad?

10        A.   I just told him.  Kelly told me that Anne's

11  working up the street.  That's what she heard.  I don't

12  know how Kelly got her information, but that's what she

13  heard.  So I tell Chad, I imagine I -- I distinctly

14  remember telling Chad.  I'm surely told Tony.

15        Q.   What did Chad say?

16        A.   I don't recall what he said.

17        Q.   Even generally?

18        A.   (Witness shakes head no.)

19        Q.   What did Tony say?

20        A.   I don't recall what he said.

21        Q.   Did you talk with anyone at McCrery about

22  this once you found out that Anne was working at the

23  McCrery Funeral Home?

24        A.   No.

25        Q.   Do you know of anyone at your company that

JAMES T. CHANDLER, IV

Page 218

1  talked to somebody at McCrery about the fact that Anne

2  was working for them?

3      A.  No.

4      Q.  Is that what precipitated your retaining

5  Victor Battaglia?

6      A.  Well, I read her employment agreement, was

7  not sure if it was in force.  Sent it to an attorney

8  friend named Victor Battaglia, Chad and I agreed on

9  this.  Alerted Tony what we had done.  Victor reads the

10 agreement.

11     Q.  After you sent the fax on January 14th with

12 the employment agreement, did you speak with Victor

13 about the information that you were transmitting on

14 Exhibit 14, and the fact that Anne was working at

15 McCrery, or so you heard, did you talk to him about it?

16     A.  Well, I notified him that we were advised

17 that she was working for McCrery -- what did you,

18 specifically, did you want to know about this?

19     Q.  Well, you send it?

20     A.  Yes.

21     Q.  You told Battaglia that you heard that she

22 was working at McCrery?

23     A.  Right.

24     Q.  What response did Mr. Battaglia provide to

25 you upon receiving and presumably reviewing the

A-87

JAMES T. CHANDLER, IV

Page 219

1  employment agreement?

2      A.    He thought the agreement was in force.  And

3  I -- shortly thereafter asked what kind of chance we --

4  I think we had a meeting about going down the path of

5  I'll say suing Anne, and suing her employer.  He

6  recommended we sue her employer.  At that time I called

7  McCrery when we made a decision we were going to go

8  down the path that we were going to sue McCrery.

9      Q.    Now, when you said that you had a question as

10  to whether the agreement was in force?

11      A.    Correct.

12      Q.    What did you mean by that?

13      A.    It's a legal document written by lawyers.

14  I'm not a lawyer.

15      Q.    In January of '05, did you, after you found

16  out that Anne's at McCrery, did you read Section 3 of

17  the employment contract?

18      A.    Say --

19      Q.    You find out -- you fired Anne --

20      A.    Yeah.

21      Q.    You find out Anne's at McCrery, my question

22  to you is, did you read the entirety of the employment

23  agreement?

24      A.    I read the entire agreement before --

25      Q.    Including Section 3?

A-88

JAMES T. CHANDLER, IV

Page 283

1       A.    I assume it was.

2       Q.    -- scheduled?

3       A.    I don't know what the title was.

4       Q.    I'm sorry, after she didn't show up, did

5   Chandler schedule a seminar at a Boscov's store on the

6   topic of Curious About Cremation?

7       A.    I don't know.  We may have.

8       Q.    Did there come a time when you were advised

9   by Mr. Battaglia that my client was filing a motion

10  with the court against your companies for sanctions?

11      A.    I don't recall.

12      Q.    Do you recall learning from Mr. Battaglia

13  that my client requested that you drop the lawsuit?

14      A.    I don't recall.

15      Q.    Did you discuss with Mr. Battaglia whether or

16  not to drop your lawsuit against my client?

17      A.    Yes.

18      Q.    When was the first time that came up?

19      A.    As we progressed -- well, we're getting bills

20  from Victor.  We're getting into the finite of the

21  case.

22      Q.    Did you say what?

23      A.    Finite.  Like what's a trade secret, those

24  types of things.

25      Q.    You mean like the details?

A-89

JAMES T. CHANDLER, IV

Page 284

1      A.   Details.  And I'm wondering, Victor, I don't

2 think our case is as good as you think it is.

3      Q.   Who's saying that?

4      A.   Me.  And we're going to spend how much and

5 how long is this going to take?  I'm not optimistic

6 about the long term on time, money and outcome.

7 Victor, I'd like to withdraw.

8      Q.   When did that happen?

9      A.   It happened before Anne's deposition.  I'll

10 say the week before, something like that.

11      Q.   Her deposition had been scheduled to take

12 place?

13      A.   Yeah.  I think it was in April, I believe.

14      Q.   All right.  Now, were you aware that Mr.

15 Battaglia prior to canceling the deposition of my

16 client, made a demand of my client to pay a sum of

17 money?

18      A.   A demand?

19      Q.   Yeah.  Communicated that your companies would

20 drop the lawsuit against my client if my client would

21 pay your companies a sum of money?

22      A.   I'm aware of that.

23      Q.   How are you aware of that?

24      A.   Victor told me.

25      Q.   He told you before he conveyed that to me?

A-90

JAMES T. CHANDLER, IV

Page 285

1    In other words, he told you he was going to do that?

2         A.    Yeah.

3         Q.    Did he tell you what he was going to demand?

4         A.    The amount?

5         Q.    The amount.

6         A.    I think we reviewed the amount.

7         Q.    What was it?

8         A.    I don't remember.

9         Q.    $10,000?

10        A.    I think it was higher than that.

11        Q.    $50,000?

12        A.    I forget.  I know we reviewed the amount.

13   Victor had a suggested amount.  I believe I agreed with

14   Victor.

15        Q.    So around $50,000?

16        A.    I believe that's what the number was.

17        Q.    And was that the number that went in your

18   mind, you're thinking, we're spending too much money on

19   this and I don't know whether we're going to win?

20        A.    I don't know if that number was relevant to

21   what we had spent or not.

22        Q.    I'm not asking you whether it was relevant to

23   what you had spent, but I'm asking you in terms of

24   timing, did you come to the impression that you were

25   spending too much money on this litigation, you didn't

JAMES T. CHANDLER, IV

Page 286

1  know whether or not you were going to prevail, you

2  wanted out, and you came up with this notion of saying,

3  okay, well, demand $50,000 from my client and you guys,

4  the Chandler defendants will drop the matter?

5      A.    It was Victor's idea.

6      Q.    And you agreed with it?

7      A.    I agreed with it.

8      Q.    And as far as you know it was conveyed to my

9  client?

10      A.    Correct.

11      Q.    And you were aware that it was rejected?

12      A.    That's correct.

13      Q.    Were you aware that at some later point Mr.

14  Battaglia conveyed a smaller dollar amount by which he

15  demanded money from my client in exchange for your

16  company dropping the lawsuit?

17      A.    I believe he lowered the number.

18      Q.    What did he lower it to?

19      A.    I have no idea.

20      Q.    $10,000?

21      A.    I don't remember.  I know he lowered the

22  number and conveyed that he was lowering the number.

23      Q.    And that was in conjunction with talking to

24  you with your approval?

25      A.    Yes.              A-92

JAMES T. CHANDLER, IV

Page 287

1    Q.    And that was rejected by my client?

2    A.    Correct.

3    Q.    Was the number --

4    A.    The dollar amount.

5    Q.    The dollar amount that was demanded of my

6    client, how was that calculated?

7    A.    You'll have to ask Victor.

8    Q.    You have no idea?

9    A.    No idea.

10    Q.    Was there any discussion about the amount

11    that was demanded of my client to drop your lawsuit in

12    the context of the amount of money that your companies

13    had spent on legal fees?

14    A.    No.  I think it was just a number that Victor

15    thought would work for the case.

16    Q.    At some point you were informed that my

17    client was not willing to pay --

18    A.    Correct.

19    Q.    -- anything?

20    A.    Correct.

21    Q.    Right?

22          And therefore, at that point what

23    occurred?

24    A.    I believe we withdraw the suit.

25    Q.    You told Mr. Battaglia to withdraw the suit?

A-93

JAMES T. CHANDLER, IV

Page 301

1      A.    Anne was the star of the preneed team, even

2   though she's a detriment to the team, she was the star

3   preneed player.

4      Q.    Underneath that line we have some other words

5   it says, Anne so good, business decision to suit; did I

6   read that correctly?

7      A.    Yes.

8      Q.    What does that mean?

9      A.    Well, it's just that one sentence I think we

10  need to continue reading the others.

11     Q.    Okay.  When working for primary competitor

12  one mile up street?

13     A.    Yeah.

14     Q.    What does that mean, what are those?

15     A.    Well, I've already stated that Anne is

16  excellent at what she does.  She went to our principal

17  competitor, which is I think less than a mile up the

18  street, referring to McCrery at Concord Pike.  She's

19  working for our primary competitor.

20     Q.    Well, can you read the rest of your notes?

21     A.    Victor said --

22     Q.    This states if Victor said?

23     A.    "If Victor said no case, no go."

24     Q.    What does that mean?

25     A.    I do not know.  A-94

JAMES T. CHANDLER, IV

Page 302

1    Q.    And then we have some numbers?

2    A.    Early on, I'll say in the month of January,

3    Victor you feel we have a good case?  You feel our

4    agreement is in force.  What are our chances of

5    winning?  There was, before Victor recognized that FSOD

6    was part of the picture, so he said 70/30.

7    Q.    What's the 60/40?

8    A.    It's known that FSOD is the entity that Anne

9    was working for.

10    Q.    Then underneath that what does it say?

11    A.    IV after discussing details of providing --

12    Q.    Is that proving?

13    A.    Could be.  IV after discussing details of

14    proving our case, common sense said she would probably

15    lose and cost.

16    Q.    We not she?

17    A.    We.

18    Q.    And we is your companies?

19    A.    Let me reread this.  Probably lose and cost

20    would go up.

21    Q.    So this memorializes that you, after getting

22    into the details came to the conclusion that common

23    sense said we will probably lose this case against my

24    client and your costs would be going up?

25    A.    That's correct. A-95

CHAD CHANDLER

Page 1

IN THE SUPERIOR COURT OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

- - -

ANNE M. ROWAN,                    :
                                  :
        Plaintiff,                : No. 06-258-GMS
                                  : Civil Action
        Vs.                       :
                                  :
JAMES T. CHANDLER & SON,          :
INC., and FUNERAL SERVICES        :
of DELAWARE,                      :
                                  :
        Defendants.               :

- - -

TUESDAY, JANUARY 30, 2007

- - -

        Oral deposition of CHAD CHANDLER, taken pursuant
to Notice, before Shari Bowen, Certified Shorthand
Reporter and Notary Public, at SWARTZ CAMPBELL, LLC,
300 Delaware Avenue, Suite 1130, Wilmington, Delaware,
commencing at 1:00 p.m.



KARASCH & ASSOCIATES
REGISTERED PROFESSIONAL REPORTERS
PENNSYLVANIA and DELAWARE
(800) 621-5689

A-96

CHAD CHANDLER

Page 8

1      Q.     How many years have you worked in the funeral

2    business?

3      A.     That's an interesting question because when

4    it's a family business you're in it for even Denny and

5    Bruce, my brothers, would think they were in it.  I've

6    been actively employed since March of 1975.

7      Q.     And during that entire time have you always

8    worked within your family's business?

9      A.     Yes.

10     Q.     Do you currently hold any licenses?

11     A.     I have a driver's license.

12     Q.     Any professional licenses.

13     A.     Funeral director, insurance, I don't know if

14   they're -- I guess they're professional.

15     Q.     You have an insurance license as well?

16     A.     Yes.

17     Q.     And for what states?

18     A.     For Delaware.

19     Q.     When did you obtain your insurance license?

20     A.     It would have been -- I know I can't say you

21   can't hold me to this, but it would be in the late

22   eighties, early nineties.

23     Q.     And in what states do you maintain a funeral

24   director's license?

25     A.     State of Delaware.

A-97

Page 11

1    A.    I met her.

2    Q.    What was your first impression of her?

3    A.    She seemed very much like a go-getter.

4    Q.    When Jimmy recommended hiring Anne, do you

5    recall what his reasons were?

6    A.    Well, once again, I'm naive in the game we're

7    playing here, but you don't have to print it out --

8    Q.    She has to write everything, I'm sorry.

9    A.    That's fine.  I'll try and be good, Bob.

10         You didn't print that, did you?

11         THE COURT REPORTER:  I have to put

12   everything that comes out of your mouth.  You're under

13   oath.

14         THE WITNESS:  I know.  I'm always under

15   oath.  Honesty is the best policy.  You can print that

16   one.  My father said it to me a hundred times.

17         What was your question again?

18   BY MS. CONNELLY:

19   Q.    What were the reasons that Jimmy recommended

20   hiring Anne?

21   A.    Okay.  In the funeral service, once again,

22   we're a mom and pop-type shop and most funeral homes

23   are.  The what we call at need, so when someone has a

24   death takes precedent over anything else.  So funeral

25   homes couldn't afford to have two different divisions

A-98

CHAD CHANDLER

Page 12

1   because it's like we would, I mean, my dad, my

2   grandfather, my brother and I would change the tires,

3   the light bulbs, embalm the body -- that's with an E --

4   type thing, so it was a way that we could grow in our

5   community.  So funeral people, at need people don't

6   have preneed mentality.  So I know that it sounds

7   ridiculous, but that's -- so it was a way that we could

8   grow the company.

9        Q.    Do you remember why Jimmy wanted to hire Anne

10  for the preneed position?

11       A.    At the point he wanted to hire her, Jimmy and

12  I had already set up a preneed agency that we were

13  doing preneed funerals and selling preneed contracts,

14  but once again, you go back to the at need where we're

15  on call, going out at 2 o'clock in the morning and

16  we're supposed to see the Smith family at whatever --

17  it doesn't work, even though they blend they can't --

18  it's not co-mingle, but it's just -- I don't know.

19       Q.    You're giving me the reasons why you needed

20  to hire a preneed salesperson and I understand that.

21       A.    Okay.

22       Q.    What I'm trying to figure out is why did

23  Jimmy think Anne would be a good person to do preneed

24  sales for your company?

25       A.    I don't know.  She appeared to be good at

A-99

CHAD CHANDLER

Page 19

1    the coming year?

2        A.    Anne would have had her own goals.

3        Q.    Did anyone at Funeral Services or the

4    Chandler Funeral Home set goals for Anne other than

5    Anne?

6        A.    There were outside sources that told us that

7    we could be doing more which we then relayed to Anne

8    which were not well received.

9        Q.    When did you have that conversation?

10       A.    Over her life at whatever you want to call

11   us.

12       Q.    When you say outside source, what was your

13   outside source?

14       A.    It would be through the funeral community,

15   through the marketing companies that Anne was using,

16   and we also use them so it's not like Anne -- they were

17   new to Anne or new to the company.

18       Q.    Was this one occasion where an outside source

19   said you could be doing more or --

20       A.    It was numerous.

21       Q.    How many times would you estimate?

22       A.    Ten.

23       Q.    And would you relay that information to Anne

24   each time you heard it?

25       A.    Well, that relates to us trying or Anne

A-100

CHAD CHANDLER

Page 20

1   hiring or interviewing, hiring, training, and putting a

2   new sales a force on the street, so to speak, which I

3   think at least 12 to 15 times also failed.

4        Q.    You're saying that she hired 12 to 15

5   employees who did not --

6        A.    In that neighborhood.  No, Anne -- whether

7   she believes it or not -- she oversaw everything that

8   she was doing.

9        Q.    I just want to make sure I understand what

10  you're saying.

11             You're saying that over the course of

12  several years, 12 to 15 employees were hired to handle

13  preneed sales; is that correct?

14       A.    Anne found them, interviewed them, trained

15  them, hired them, and then they left.  That's an

16  amazing statistic.

17       Q.    Did she have the ability to hire people on

18  her own?

19       A.    No.

20       Q.    Then who would actually gave approval to hire

21  these 12 to 15 --

22       A.    Either Jimmy or I.

23       Q.    Would either Jimmy or you also participate in

24  the interviewing?

25       A.    In the beginning process we did, but as

A-101

CHAD CHANDLER

Page 21

1 things progressed we would be more of a part of the

2 final interview.

3     Q.   Okay.  And do you recall specifically whether

4 these 12 to 15 employees, were they fired, did they

5 leave voluntarily?

6     A.   They left on their accord.  They left because

7 they didn't get any leads.  They couldn't sell anything

8 that they were promised.

9     Q.   Why couldn't they get leads?

10     A.   Not being a salesperson, even though we all

11 sell everything, my humble opinion was that Anne covets

12 the leads and did not give her pupils anything to live

13 on.

14           Does that --

15     Q.   Did these 12 to 15 salespeople, did they tell

16 you that that was why they were leaving?

17     A.   You know, some did.

18     Q.   Can you give me an estimate of how many?

19     A.   My guesstimate would be half a dozen.

20           I'm trying to test your vocabulary.

21     Q.   And did you talk to Anne about the fact that

22 none of the salespeople would stay or that none of them

23 were able to make sales because of the lead

24 distribution?

25     A.   Yeah.  I'm sure we had conversations on the

A-102

CHAD CHANDLER

Page 22

1  subject.

2       Q.    Do you have any specific recollections of

3  conversations on the subject?

4       A.    Well, it was always that there weren't enough

5  leads, or this individual wasn't what he said he was

6  going to be or not.  We formed an entire division

7  around Anne with a secretary, three or four salespeople

8  in one of our funeral homes, okay, computers, the

9  entire works and I'll say within reason they had about

10 zero sales.

11      Q.    Okay.

12      A.    So it wasn't for lack of us doing our side of

13 the equation.

14      Q.    But do you recall having specific

15 conversations with Anne about the fact that she was not

16 able to get a team together?

17      A.    Yeah.  It was always the peoples fault.  It

18 wasn't her fault.  I bent over backwards for Anne.

19      Q.    What do you mean by that?

20      A.    That I gave her everything she asked for.

21      Q.    During your yearly reviews with Anne, did you

22 discuss her performance in terms of putting together a

23 sales team?

24      A.    Yeah.  We always talked about it.  It was

25 always the moving target.  It's -- and once again, you

A-103

CHAD CHANDLER

Page 23

1   have to understand, I'm not schooled in this, but she's

2   very educated, all this type of stuff and she would

3   find the people, she would train the people, she would

4   hire the people and they failed, okay?  There's a track

5   history here between 12 and 15 people that can't work

6   with Anne Rowan.

7        Q.    When you say that they can't work with Anne

8   Rowan, what makes you say that?

9        A.    Because she's not a team player.  She needs

10  to be the team.

11       Q.    And are you relating that back to the lead

12  distribution?

13       A.    It's Anne.  So it's -- it's all the above.

14  If you're in sales and you control the leads you

15  control the jugular which is the thing that gives you

16  blood and stuff.

17       Q.    One of the salespeople that was hired to work

18  in the preneed department was Jason Casper; is that

19  correct?

20       A.    Yes.  I hired Jason.

21       Q.    You hired Jason?

22       A.    Uh-uh.

23       Q.    And how long had you known Jason before you

24  hired him?

25       A.    How long -- couple of years.  My wife and his

A-104

CHAD CHANDLER

Page 46

1     A.    Well, I remember her telling one of the

2  secretaries who made $40,000 a year and had two

3  children and one husband and they both worked that she

4  was annoyed that she wasn't going to make $150,000 this

5  year and she has children and her American Express bill

6  was due.  That to me is unprofessional, it's also very

7  insensitive.  Remember, we're a family.  These are the

8  same people that she goes out to lunch with.  Same

9  people she goes exercising with.  The same people she

10 has over at her house and they have her over at her

11 house.

12     Q.    Do you recall any other unprofessional

13 comments that you witnessed Anne making either in the

14 workplace or at a meeting in the workplace?

15     A.    Well, she would say that we had no fucking

16 clue about what's going on.  I think that's

17 unprofessional.

18     Q.    When did she say that?

19     A.    Numerous times.

20     Q.    Did you ever discuss that comment with her?

21     A.    Well, it was a situation where she would blow

22 up, she would rant and rave.  She would slam the door

23 and leave, and then the next day it was, like, you

24 know, everybody forgot it, or she thought they did.

25             And once again, Jimmy and I are not the

A-105

CHAD CHANDLER

Page 47

1  fastest people in the universe, so we would take it, we

2  would think about it, and decide what we're going to do

3  about it.  And normally, and this probably goes back,

4  and I'm not beating on my father, but it goes back to

5  my father's philosophy that you let it ride and

6  don't -- if you need to do something do it, if you

7  don't then don't.

8      Q.  So you and Jimmy would decide not to do

9  anything about the comments that she was making?

10     A.  Yeah.  We have thick skins.  His is thicker

11  than mine, actually.  That you can definitely print.

12     Q.  Do you recall any other comments or

13  statements that you witnessed Anne making that you

14  thought was unprofessional?

15     A.  I mean, I can't quote her, but I know that

16  there were.  I mean, she would make sexist remarks type

17  stuff, but I can't tell you what it was or when it was.

18     Q.  Can you remember the nature of the remarks?

19     A.  No.  I mean, sexist I think is kind of

20  catchall.

21     Q.  Did you witness her making any other comments

22  or statements that you thought were unprofessional?

23     A.  Other than the ones I've told you?

24     Q.  Yes.

25     A.  No.

A-106

KARASCH & ASSOCIATES
800-621-5689

CHAD CHANDLER

Page 50

1      Q.    How about Tony Latina?

2      A.    Tony doesn't use profanity anywhere that I've

3  ever been.

4      Q.    You told me about some of the comments that

5  you thought Anne had said to you and to Jimmy that you

6  thought were unprofessional, did you witness Anne

7  making any comments to Tony that you thought were

8  unprofessional?

9      A.    Well, how can I describe this?  Anne was --

10 Jimmy and I were the original team, I'll say.  Anne

11 came on board, so Anne was able to do whatever she

12 wanted to with Jimmy and I, so to speak.  So we had a

13 working relationship.

14          The marriage with Tony, Anne didn't want

15 any part of.  So she instantly did not like Tony, what

16 he did or did not bring to the table, so she instantly

17 did not like this person.  So she had to put up with

18 Jimmy and I, or whatever you want to call it, but she

19 couldn't stand him.  So yeah, she would talk more

20 openly about her disgust with Tony as who is he or

21 whatever than she did with probably Jimmy and I would

22 be my guess.  Once again, I try not to dwell on that

23 stuff.

24     Q.    Did Tony talk to you about the fact that she

25 was making unprofessional comments to him?

A-107

CHAD CHANDLER

Page 51

1    A.    Yeah, but Tony also has a thick skin.

2    Q.    What did Tony say?

3    A.    You know, he just made the comments that

4 Anne's saying this or that or whatever.  I mean,

5 they're numerous meetings that Anne would get up, rant

6 and rave, throw a fit, and believe me I can throw a

7 fit, and then bolt out of the room, so whatever.

8    Q.    Did you ever sit down with Anne to talk to

9 her about her conduct?

10    A.    Sure.

11    Q.    What did you say?

12    A.    Well, I'm sure -- I assume I said, it can't

13 continue, Anne.  You can't just do this stuff.  Once

14 again, Jimmy and I have thick skins.  So it wasn't so

15 much about you can't bad mouth my brother in front of

16 the consumer or the office it doesn't work that way.

17 It was more about her behavior and she would, once

18 again, it would be, like, instantly she's hot, and then

19 she would calm down and knows and she'd go into her car

20 and bolt out of the parking lot and the next day it

21 would be like nothing happened.

22    Q.    And how many times did you tell her that she

23 can't continue or can't do this kind of behavior?

24    A.    It would be four times a year at least.

25    Q.    What would her response to that be?

A-108

CHAD CHANDLER

Page 64

1   called me, once again, being the therapist of the

2   office, he called me, I think that night at home, which

3   I should get an unlisted phone number, and explained to

4   me, I don't know if you knew what happened at the

5   office, but -- and then he gave me his two cents about

6   it, you know, that Anne was making comments about his

7   wife and children, I think he said, and he took offense

8   to it.  I think I'm correct on that.

9       Q.   Did you ask Anne for her version of what had

10  happened?

11      A.   She didn't show up the next day.

12      Q.   If she had showed up would you have asked her

13  what had happened?

14      A.   Yeah.

15      Q.   Did you call her on the phone to ask her what

16  happened?

17      A.   No.

18      Q.   When she came in on January 5th, did you talk

19  to her about what had happened?

20      A.   No.  She came in.  Jimmy met with her and she

21  left.

22      Q.   When was the decision made to terminate

23  Anne's employment?

24      A.   It would have probably been on the 4th.

25      Q.   Who participated in that decision?

A-109