CHAD CHANDLER

Page 65

1        A.    The partners.

2        Q.    And that includes Tony?

3        A.    Yeah.   They're only three partners.   Jimmy,

4    Tony and I.

5        Q.    What was said during that meeting?

6        A.    Just that we had reached the point.

7        Q.    Do you remember anything specifically that

8    Tony said during that meeting?

9        A.    Nothing negative in the -- no, I don't.

10       Q.    Do you remember anything that Jimmy said

11   during that meeting?

12       A.    Once again, it's a small company, so it's

13   painful -- I mean, Anne has been there for 10 years, so

14   it's -- it's -- I mean, Anne came to my wedding, you

15   know.   It's not -- she took my daughter to Paris for

16   the weekend.   So it's -- once again, all decisions are

17   not business decisions but that one was.

18       Q.    Do you remember anything specifically that

19   you said during that meeting?

20       A.    No.   I was in agreement, as painful as it

21   was, it was the right decision to make.

22       Q.    Who initiated the conversation, who said that

23   it seems as though it's reached the point?

24       A.    We all had been on the same page.   I'll say

25   it's unanimous or whatever the right phrase is.

A-110

Page 66

1      Q.   Is there any discussion about offering Anne

2  some sort of severance package?

3      A.   No.  With her conduct, no.

4      Q.   And did you discuss during that meeting who

5  would tell Anne that she had been fired?

6      A.   Jimmy would be the one.

7      Q.   Did Jimmy volunteer or was he elected?

8      A.   It would be his responsibility.  He hired

9  Anne.  It's his responsibility to fire her.  Just like

10 if I hired somebody, it would be my responsibility to

11 fire somebody.

12     Q.   Were you aware that Jimmy sent a letter to

13 Anne's then fiance advising that he had terminated Anne

14 and explained the reasons why he terminated Anne?

15     A.   Yeah.

16     Q.   Did he discuss it with you before he sent it?

17     A.   It would have been either, before, during or

18 right after.

19     Q.   Do you remember what he said to you about it?

20     A.   Once again, it's a family business.  We knew

21 Jess, all that type stuff.  Jimmy in his own defense,

22 you know, it was the humane thing to do in our opinion.

23     Q.   Why?

24     A.   Because we're a small business.  We're

25 family, okay.

A-111

ANTHONY LATINA

Page 1

IN THE SUPERIOR COURT OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

- - -

ANNE M. ROWAN,                    :
                                  :
     Plaintiff,                   : No. 06-258-GMS
                                  : Civil Action
     Vs.                          :
                                  :
JAMES T. CHANDLER & SON,          :
INC., and FUNERAL SERVICES        :
of DELAWARE,                      :
                                  :
     Defendants.                  :

- - -

FRIDAY, JANUARY 12, 2007

- - -

Oral deposition of ANTHONY LATINA, taken pursuant
to Notice, before Shari Bowen, Certified Shorthand Reporter
and Notary Public, at SWARTZ CAMPBELL, LLC, 300 Delaware
Avenue, Suite 1130, Wilmington, Delaware, commencing at 9:20
a.m.



KARASCH & ASSOCIATES

REGISTERED PROFESSIONAL REPORTERS

PENNSYLVANIA and DELAWARE

(800) 621-5689
A-112

ANTHONY LATINA

1   CFH 194.

2       A.   Okay.

3       Q.   Now, skipping around a little bit here, but before

4   the deal was consummated, on average how many employees at

5   any given point in time did the Latina company have?

6       A.   Usually two.

7       Q.   Had you ever fired anyone?

8       A.   No.

9       Q.   And other than --

10      A.   Excuse me?

11      Q.   Sure.

12      A.   That's not true.  I did ask one individual to

13  leave.

14      Q.   Who was that?

15      A.   That was a Matt Genereux.

16      Q.   Okay.  And why was that?

17      A.   His performance -- I guess his performance --

18  actually, your question was did I ever fire any employees?

19      Q.   Yeah.

20      A.   Actually, Matt was not an employee he was a

21  subcontractor and I no longer did business with him.

22      Q.   When you entered the LLC, did you have an

23  understanding as to the extent of what your ownership

24  interest in the company would be?

25      A.   Yes, I did.

A-113

ANTHONY LATINA

Page 44

1    Q.    What was that?

2    A.    It was 18 percent.

3    Q.    Did that continue to the present?

4    A.    Yes.

5    Q.    And tell me, if you would, how that ownership

6    interest relates to your ability to make decisions on behalf

7    of the company or for the company?  It's a poorly worded

8    question, but do you understand?

9    A.    Yeah.  In part of that document, Bill, you'll see

10   that in some of the more important decisions, borrowing

11   money, things like that, that it had to be unanimous between

12   all three owners even though I was a minority owner.  We

13   established some criteria for other children.  We established

14   a few things that would reflect that, even though I was a

15   minority owner, I would still get a one-third vote.  And

16   that's how pretty much -- that's how pretty much we've --

17   we've been running the business that way.

18   Q.    Okay.  So you're saying that historically since the

19   formation of the LLC, you've been running the business as

20   informally equal partners?

21   A.    Informally equal partners, correct.

22   Q.    You, Chad and Jimmy?

23   A.    Correct.

24   Q.    So can you give me just some illustrative, some

25   examples of situations where the three of you just decided

A-114

ANTHONY LATINA

Page 45

1   jointly on some management decision?

2       A.   Buying a new vehicle, $50,000 hearst, buying new

3   equipment, when we hired Jason Casper.  Generally --

4   generally all three voices were heard, and on occasion, some

5   of us, one or the other would concede to an issue that was a

6   stronger point by the other, we felt the need to.

7       Q.   So your feeling is that you've run the business by

8   consensus?

9       A.   Yes.

10      Q.   I detected some hesitation, no?

11      A.   By consensus, the three of us have a lot of respect

12  for each other, even though I came from a very small firm.  I

13  have an enormous amount of respect for my partners, and as a

14  rule, yeah, we pretty much try to make all the decisions

15  together.

16      Q.   So you've never felt that Jimmy and Chad, by virtue

17  of their superior ownership interest, have essentially made

18  the key decisions themselves without you?

19      A.   No, I don't.

20      Q.   After the formation of the LLC, tell me if you

21  would, what the system was for the distribution of profits

22  from the company?

23      A.   The system, we can take a look at it right there,

24  it's spelled out.  The distributions were -- 75 percent of

25  the distribution was by ownership, the other 25 percent of

A-115

Page 46

1    the distribution was by profitability of the branch.

2        Q.    I'm trying to -- I read that.  I was trying to

3    figure out how it works.

4            So the revenues -- by the way, you understood at

5    the time of the formation of the LLC that this was a separate

6    company?

7        A.    Uh-uh.

8        Q.    Yes?

9        A.    Yes.

10       Q.    And your company continued to exist, the

11   Corleto-Latina, Inc. --

12       A.    Yes.

13       Q.    -- company?  Yes?

14       A.    Yes.

15       Q.    In fact, the Corleto-Latina, Inc. company was a

16   shareholder in the LLC?

17           MS. CHEEK:   Objection to the form.

18   BY MR. SALZER:

19       Q.    Is that correct or am I wrong?

20       A.    Corleto-Latina was a shareholder, I'm not sure

21   that -- I'm not sure whether that's the legal jargon in

22   there, Bill.  It could be.  I really don't know the answer to

23   that question.

24       Q.    Well, you know what, I think you're probably right

25   that it's not the correct legal jargon, but let me show you
                                A-116

ANTHONY LATINA

Page 47

1  Schedule A to the LLC and ask you whether you recognize --

2      A.    Yes.

3      Q.    -- that document?

4      A.    Yes.  Their contribution was 2.9, which constituted

5  82 percent; my contribution 500,000 and that's how we arrived

6  at the percentages of ownership.

7      Q.    But what I'm trying to confirm is that the members

8  of the LLC are your company, Corleto-Latina Funeral Home,

9  Inc., and James T. Chandler & Son, Inc.; is that correct?

10     A.    Correct.

11     Q.    And that's remained the case to the present?

12     A.    Yes.

13     Q.    So you personally, you Tony, are not a member of

14  the LLC?

15     A.    I guess you could say that.

16     Q.    Did you know that?

17     A.    Not until this morning, no, but I guess you could

18  say that, yeah.  The LLC is owned by -- or `the LLC was

19  created by the working capital, as I understand it, of those

20  two companies, not me personally, I guess.  I'm sorry I

21  appear naive to this, Bill.

22     Q.    That's fine.

23     A.    I just don't know for sure whether what you're

24  saying is accurate, I honestly don't know.

25     Q.    Well, then, that's the answer.

A-117

ANTHONY LATINA

Page 48

1    A.    Okay.

2    Q.    I don't want you to just --

3    A.    Okay.

4    Q.    -- surmise or guess.

5    A.    Okay.

6    Q.    Now, in distributing the profits, when the LLC has

7    X dollars of net income at the end of the year, let's say it

8    was a million dollars, for example, 75 percent of that

9    million dollars would be $750,000?

10   A.    Correct.

11   Q.    Granted?

12   A.    Right.

13   Q.    Of that $750,000 and 18 percent --

14   A.    Right.

15   Q.    -- of that amount --

16   A.    Right.

17   Q.    -- would be expected to go to Corleto; right?

18   A.    Corleto-Latina Funeral Home, correct.

19   Q.    And then the $250,000 difference, that number, how

20   would the distribution of the profits among the members of

21   the LLC be allocated?

22   A.    By -- well, we generally didn't do it at the end of

23   the year.  We try to do it quarterly if we had the money.

24   That remaining 25 percent would be distributed by profit of

25   the location.  I was responsible for Location 3.

A-118

Page 51

1   try to maintain.  So even though the marketing strategy, I

2   would say, was kind of combined, we tried marketing the two

3   independently.

4       Q.   When you first came on board, so to speak, were you

5   informed that Anne had at any time a written employment

6   agreement with the Chandler company?

7       A.   When I first came on board was I informed?  I don't

8   think I was.

9       Q.   At any time prior to her termination of employment,

10  were you apprised that Anne had, in the past, a written

11  employment contract with the Chandler company?

12      A.   Bill, I don't think I really found out that there

13  was an employment contract in place until the litigation

14  began with Mr. Battaglia.  When that surfaced, I wasn't

15  necessarily surprised, but I was somewhat surprised, but I

16  don't think I knew that we had that document, no.

17      Q.   At the time that the alliance was created and the

18  LLC was established, were you aware of the fact that James T.

19  Chandler & Son, Inc. continued as a separate company?

20      A.   Yes.

21      Q.   And how were you aware of that?

22      A.   I knew that we called it Inc. for short; that Inc.

23  continued to run as Inc.  They didn't try to hide it from me

24  and so I was aware of it.

25      Q.   And what did Inc. do?

A-119

ANTHONY LATINA

Page 52

1    A.    I'm not certain what Inc. did.

2    Q.    Were you aware of that Inc. leased property to

3  Funeral Services of Delaware --

4    A.    Yes.

5    Q.    -- LLC?

6    A.    Yes, I was aware of that as did Corleto-Latina

7  Funeral Home.

8    Q.    Oh, I see.  So the Corleto-Latina, Inc. entity

9  leased the physical establishment to the LLC?

10    A.    Correct.

11    Q.    And the LLC paid rent to the Latina, Inc. entity?

12    A.    Correct.

13    Q.    And likewise, the LLC paid rent to the Chandler,

14  Inc. for the two locations?

15    A.    Correct.

16    Q.    Were you aware of whether Chandler, Inc. had

17  employees on its own payroll at the time, or thereafter, of

18  the formation of the LLC?

19    A.    I think -- ask me that again, Bill.

20    Q.    Were you aware that there was some employees on the

21  payroll of Chandler, Inc., even after the formation of the

22  LLC?

23    A.    I think that I was.  I believe some of the

24  children, maybe wives, were still on the payroll.  I knew

25  that their father was receiving some compensation from that.

A-120

ANTHONY LATINA

Page 54

1   that is your home?

2       A.   Yes.

3       Q.   And this was in her capacity as the director of the

4   preneed department?

5       A.   Correct.

6       Q.   And what was your understanding as to who Anne

7   reported to at the time of the formation of the LLC, which

8   once again, we're talking about June of '01?

9       A.   It's my recollection, Bill, that prior to that Anne

10  was reporting to Mr. Chandler.

11      Q.   Jimmy?

12      A.   Jimmy.  And right after the formation of the LLC,

13  Jimmy decided to turn that responsibility over to me.  That

14  didn't last too long, however, and the responsibility went

15  back to Jimmy, IV.

16      Q.   And when did it revert back to Jimmy, IV?

17      A.   I'd say after the alliance was formed, it lasted

18  maybe, Bill, maybe six, seven months, maybe even not that

19  long.

20      Q.   Was there an explanation given as to -- from

21  Jimmy -- as to Anne now reporting to you for this period of

22  sevens months?

23          MS. CHEEK:  Objection to form.

24  BY MR. SALZER:

25      Q.   Do you understand the question?

A-121

ANTHONY LATINA

Page 55

1    A.    You can --

2    Q.    After the alliance -- let's step back.

3          Anne was the director of the preneed department at

4    the time of the alliance; correct?

5    A.    Correct.

6    Q.    June of '01, and your understanding was that she

7    reported to Jimmy, IV?

8    A.    Correct.

9    Q.    And then at some point she reported to you?

10   A.    Correct.

11   Q.    And that was for a period of seven months?

12   A.    It was shortly -- shortly after the alliance, June

13   of '01, that we decided that that responsibility could be

14   shifted to me.

15   Q.    "We" meaning?

16   A.    We, the three owners.

17   Q.    And what was the reason for that?

18   A.    I'm going to say the reason was that I had had some

19   experience which we talked about earlier with Jerry Bogos,

20   and in the programs, we began dividing up responsibilities

21   who was going to do what and we just agreed that I could

22   begin overseeing that.

23   Q.    That decision had nothing to do with Anne Rowan how

24   she did her job, this was just --

25   A.    No.

A-122

ANTHONY LATINA

Page 56

1    Q.    -- an allocation of responsibility?

2    A.    Allocation of responsibilities, I would say yes.

3    Q.    Okay.  So you worked with Anne then in this

4  seven-month period, tell me what that entailed?

5    A.    Anne and I would, we would get together and talk

6  about the budgets, didn't last too long.  The budgets, what

7  was going on, you know, the direct mails, what her plans

8  were, what her forecasts were, typically just overseeing the

9  program.

10    Q.    And what was your impression of her during that

11  period of time?

12    A.    It didn't give me a whole lot of time -- that

13  wasn't my only responsibility.  At that point in time I had

14  to presume Anne knew what she was doing.  She was successful

15  and I pretty much listened and my impression was things were

16  okay.

17    Q.    You were aware this was an established department?

18    A.    Yes.

19    Q.    And it was running pretty much on its own?

20    A.    Yes.

21    Q.    So would it be fair to state that during this time

22  period you were not providing direction to her, she was

23  taking the initiative and running the department?

24    A.    For the most part, I think that one of the first

25  run-ins or disagreements that Anne and I had was when I

A-123

ANTHONY LATINA

Page 57

1   wanted to introduce another insurance carrier, I believe this

2   was in the beginning.  I wanted to introduce another

3   insurance carrier called Fortus and Anne was very much

4   opposed to that.

5        Q.   Why was that a run-in?

6        A.   Anne disagreed because she didn't like the Fortus

7   rep.  I don't think she liked the Fortus company.  I don't

8   think she had faith in the promises that Fortus, they were

9   making to us.  This is sort of speculation, Bill.  I'm

10  presuming those were some of the reasons that Anne disagreed

11  with us trying to do that.

12       Q.   Do you recollect what she said about Fortus or --

13       A.   I don't know whether I can recollect what she said,

14  but I probably can't recollect what she said, but --

15       Q.   Do you recollect that the reasons she offered for

16  not wanting to do business with Fortus were business reasons?

17       A.   Rephrase that for me.

18       Q.   Do you recollect that the reasons she offered for

19  not doing business with Fortus were grounded in business

20  considerations?

21       A.   I can't say that I honestly recollect that, no.

22       Q.   You don't know one way or the other?

23       A.   No.

24       Q.   Correct?

25       A.   Correct.

A-124

ANTHONY LATINA

Page 58

1    Q.    But a few moments ago you characterized that as a
2    run-in, why did you say that?
3    A.    It was a disagreement.  She disagreed with me, or
4    us, the rest of the team, with even entertaining the
5    possibility of bringing in another insurance carrier.
6    Q.    Well, what was your reason for bringing in Fortus
7    or suggesting it?
8    A.    My reasons, Bill, were they were a larger company.
9    I was hoping they could help us with co-op advertising money.
10   I was hoping that they could help us to one of their -- one
11   of their ideas was that they would also help us find and
12   train another counselor to work with us.  They had a very
13   flexible commission and return schedule.  And I thought that
14   it would be a good idea to at least entertain this company
15   and find out what they had to offer.
16   Q.    Sitting here today, you can't remember what the
17   rationale was for Anne's, as you recall, opposition to those
18   suggestions; is that correct?
19   A.    I know that she didn't care for the representative.
20   His name was Ken something.  I know she didn't care for him.
21   I think she felt as though the company we were already with
22   was a better company.
23   Q.    Which company was that?
24   A.    I believe at the time they were called
25   Commonwealth.  I believe it was Bob Ray's company, but I

A-125

ANTHONY LATINA

Page 59

1    can't recall her saying, Tony, here's why I don't think we

2    should do it.

3        Q.    Well, did she say anything inappropriate to you?

4        A.    At that time, no.

5        Q.    Was there anything that she did that was

6    inappropriate?

7            MR. PEARCE:    You're talking about at that point in

8    time?

9            MR. SALZER:    Yeah.

10           THE WITNESS:    At that point in time, no.

11    BY MR. SALZER:

12        Q.    So why did you say it was a run-in?

13        A.    Run-in was a wrong word.    It was a disagreement.

14    She and I disagreed with our feelings on whether we should

15    bring Fortus into it.

16        Q.    And reasonable people can disagree on --

17        A.    Sure.

18        Q.    -- matters?

19        A.    Sure.

20        Q.    Now, we were on the topic of your interaction with

21    Anne in this seven-month period of time, and I presume that

22    this particular incident occurred in that time frame?

23        A.    I would have to think so.    I honestly, it would

24    have to have, I would guess.

25        Q.    Do you recall any other incident in which there was

A-126

ANTHONY LATINA

Page 60

1  a disagreement between you and Anne with regard to the

2  preneed program in this time frame?

3       A.    No.  You used the word disagreement.

4       Q.    Disagreement.

5       A.    No, I don't think so.  My recollection is, Bill,

6  that it was -- it wasn't too much longer after that that the

7  responsibility was given back to Jim.  I did feel at that

8  time that Anne -- I did feel at that time that Anne really

9  didn't respect my judgment for even wanting to try, but, you

10  know, I could live with that.  She was certainly entitled to

11  that.

12       Q.    Willing to try what?

13       A.    Try moving to another insurance carrier.

14       Q.    Oh, I see.

15       A.    And I don't think -- I don't think in that time

16  period there were any disagreements.  I think it was shortly

17  thereafter that Jim resumed the responsibility of Anne

18  answering to Jim as a supervisor.

19       Q.    How did that come about?

20       A.    I honestly don't know how that came about.

21       Q.    Why?

22            MS. CHEEK:  Objection to form.

23  BY MR. SALZER:

24       Q.    Why did it happen, what precipitated it?

25       A.    I think actually Anne precipitated it.  I think it

A-127

ANTHONY LATINA

Page 61

1   became evident that Anne just didn't want to work with me.

2       Q.   Is that just an assumption that you had or did Anne

3   say that?

4       A.   I don't know.  She may have said it.  It was

5   certainly -- I shouldn't use the word certainly.  She may

6   have said it to Jimmy.  She may not have said it to me, but

7   she may have said, Jimmy, I'm not comfortable working with

8   Tony.

9       Q.   Do you recollect Jimmy or Chad telling you that?

10      A.   I don't recollect Jimmy or Chad telling me that,

11  but more than likely at one of the partners meetings, Jimmy

12  probably said, Tony, I think it's going to be in everybody's

13  best interest that I take over the program again, it doesn't

14  seem to be working the way it was.

15      Q.   Do you recollect that?

16      A.   I don't recollect it, but that's the way Jimmy

17  operates.  He wouldn't just say, I'm taking over the program

18  again.  He would say -- he would give me an explanation as to

19  why.

20      Q.   But you don't remember?

21      A.   I don't remember, no.

22      Q.   In any event, you and Anne never discussed it?

23      A.   No.

24      Q.   Is that correct?

25      A.   That would be correct.

A-128

ANTHONY LATINA

Page 70

1 assume the mantle of selling preneed policies for Location 3?

2      A.   She may have been.  I don't honestly remember for a

3 short period of time, but the -- our reason for asking Jason

4 to try is the same, we were trying to grow the preneed sales

5 staff.

6      Q.   I realize that, but Jason had failed in doing that?

7      A.   Jason had failed in doing it, right.

8      Q.   So then the question is, why was it that Anne was

9 not requested, either to sell directly for preneed policies

10 at Location 3, or to hire someone and oversee that person for

11 selling preneed at Location 3?

12      A.   I may be able to answer the second part of that

13 question for you.  I know from discussions with Jim and Chad,

14 I was not a part of the Chandler Funeral Home then, but I

15 know from discussions with Jim and Chad that Anne had tried

16 several times before to hire and train salespeople to work

17 for her.  I think it was in the number of a dozen or so

18 people and that -- she continued -- or they continued, they

19 failed at it, she failed at it, I'm not sure who failed at

20 it, but I know there were quite a list of people that were --

21 they, meaning the Chandler organization and Anne, attempted

22 to train and join the team and they all failed.

23      Q.   Are you saying that at the time that Jason was

24 moved to at need, you recall speaking to Jimmy and Chad about

25 the notion of Anne taking responsibility for Location 3 and

A-129

ANTHONY LATINA

Page 71

1   hiring people for that location, you recall that at that

2   time?

3        A.   Ask the question again, Bill.  Do I recall --

4        Q.   You're saying -- what you've told me, you didn't

5   have firsthand knowledge about Anne's overseeing sales,

6   persons or training?

7        A.   I was not there then.

8        Q.   Right.

9        A.   These were conversations in numerous meetings, not

10  a meeting because Jason was failing at that position.  We

11  didn't have a meeting and say, okay, where do we go from now

12  because Anne had tried hiring and training and was not

13  successful in several occasions, in excess of 10, no, we

14  didn't have a meeting and discuss that.  They knew from past

15  history that that's what had happened and over the course of

16  many meetings, many partners meetings, lots of information

17  was shared and I come to gain that knowledge.  So the

18  position of us, I believe, was we don't think given the

19  history that we go down that -- we go down that path again,

20  so where do we go.

21       Q.   You have a specific recollection of that

22  discussion?

23       A.   No, not a specific recollection of that discussion.

24       Q.   But that would not explain why Anne would not,

25  after Jason moved, then sell preneed policies for Location 3,

A-130

ANTHONY LATINA

Page 72

1   would it?

2          MS. CHEEK:  Objection to form.

3          THE WITNESS:  Bill, to be honest with you, I'm not

4   sure that for a short period of time she may not have.  She

5   may have sort of, we'll say, use the term picked up the

6   slack.  I'm not really positive that that didn't happen for

7   however short or however long a period of time.

8   BY MR. SALZER:

9      Q.    So you then in some manner became introduced to

10  Todd Woodside?

11     A.    Right.

12     Q.    And do you know how it came to be?

13     A.    I don't remember how I met Todd, but I had known

14  him -- by then I had known him for awhile.

15     Q.    Did Jason know Todd?

16     A.    I don't think so.

17     Q.    So tell me what took place in Todd in terms of

18  reaching out to him?

19     A.    I don't know that we really reached out to him at

20  that point in time.  I may have known by then, and I don't

21  know for sure, I may have known by then from a conversation

22  with him in unrelated matters that he was not happy at his

23  current position.  He was the president I believe of Bring

24  Hearse Funeral Home and that he was considering -- he was

25  considering forming a company of his own.  And I think I had

A-131

ANTHONY LATINA

Page 100

1          THE WITNESS:  I think we had hoped that we could

2    nurture the Hispanic business a little better than we had,

3    which was one of the primary reasons for the union, but they

4    did not express to me that I was not doing a good job, no,

5    BY MR. SALZER:

6          Q.    I don't think that was the question.

7                My question was, did they express to you any

8    concerns about the profitability of Location 3?

9          A.    In '03 and '04?

10         Q.    Yeah.

11         A.    No.

12         Q.    In '04, the beginning of '04, Anne is the director

13   or manager of preneed reporting to Jimmy?

14         A.    At that time I believe she was reporting to Jimmy.

15         Q.    And then in September I believe of '04 there was a

16   change; correct?

17         A.    It could be the right date.

18         Q.    I'm going to show you the document, but tell me if

19   you would what you recall taking place between January of '04

20   and September of the '04 in terms of your interaction with

21   Anne?

22         A.    January of '04 and September of '04, I can't recall

23   specific -- I can't recall specifically some of the

24   interactions, but if you could get more specific with me it

25   may be helpful to recall some of the situations.

A-132

ANTHONY LATINA

Page 101

1    Q.   Do you know what accounted for the decision in

2  September of '04 to now make you the director of preneed and

3  to have Anne report to you?

4    A.   To the best of my knowledge, Jimmy was emotionally

5  worn out with confrontations that would occur between he and

6  Anne.  And that he felt that I had had a successful program

7  for that short period of time on Union Street while we had a

8  counselor there, meaning Jerry Bogos, that I interacted more

9  with that counselor during that period of time than Jimmy or

10  Chad interacted with Anne during the time she was there, the

11  director of preneed sales.

12    Q.   Do you recollect a discussion or meeting with Jimmy

13  in which he said that he was emotionally worn out, is this

14  your --

15    A.   Yes.

16    Q.   He used those words?

17    A.   I'm emotionally -- you can't paraphrase me, but he

18  was emotionally drained, emotionally drained, just weakened,

19  weary, and he asked if I would take the responsibility.

20    Q.   Is this your perception of Jimmy or is this what he

21  told you?

22    A.   This is what he said.

23    Q.   And what specifically did he say about why?

24    A.   I can't answer specifically as to why but that was

25  the reason.                    A-133

ANTHONY LATINA

Page 102

1    Q.   Because you don't know or you don't remember?

2    A.   I believe what I know is that very often Jimmy and

3    Anne would have differing opinions toward how the program

4    should be run.   Lead distribution I know was one of them,

5    certain aspects like that.

6    Q.   How do you know that?

7    A.   Jimmy would tell us.   I mean, we would talk about

8    it at the partners meetings.

9    Q.   What were the disputes?

10   A.   What were the disputes between Jimmy and Anne?

11   Q.   Yeah, about lead generation.

12   A.   I just know, for instance, that Anne did not think

13   Jimmy was qualified to do lead distributions, not having any

14   experience.   I know for a fact that Jimmy brought that up in

15   one of the meetings.   What some of the other disagreements

16   were I couldn't -- you'd have to ask Jimmy those.

17   Q.   What are lead distributions?

18   A.   When we were trying to create a team, we thought

19   that it would be best if Jimmy would take care of lead

20   distributions as to what counselors got what leads and Anne

21   disagreed with that.

22   Q.   It's a reasonable business disagreement?

23   A.   Sure.

24   Q.   Now, when this transition to you took place in

25   September of '04, did either Jimmy or Chad say to you that

A-134

ANTHONY LATINA

Page 109

1  interrupted, but he's in the office as often as required.

2      Q.   I take it that neither you or Jimmy ever expressed

3  any a concern that Chad wasn't around --

4      A.    I can't speak --  sorry.

5      Q.   -- wasn't available?

6      A.    I can't speak for Jimmy, but I never expressed any

7  concern.

8      Q.   How would you characterize the discussions and

9  communications between Anne and the partners, generally?

10     A.    Generally, they were -- want to give me a time

11 frame?

12     Q.   Really from the time that you came on board, you

13 know, just talking generally.

14     A.    Generally I would characterize them as somewhat

15 confrontational.

16     Q.   Why do you say that?

17     A.    Because Anne did not have any respect for any of

18 the three of us, in my opinion, and most of what we attempted

19 to do in her opinion was wrong.  She didn't think we had a

20 clue on how we think we wanted to proceed with the preneed

21 department.  So usually as a rule I would say, if you're

22 asking me to characterize them, they were somewhat

23 confrontational.

24     Q.   Well, when you say confrontational, we're not

25 talking about typically raised voices?

A-135

ANTHONY LATINA

Page 118

1    A.    I do not.

2    Q.    None whatsoever?

3    A.    No.

4    Q.    You've told me about the MIA comment?

5    A.    Uh-uh.

6    Q.    And then I think you told me about something along

7    the lines that she said that we, I guess, the partners had no

8    clue what we were doing, is that a specific quote, or is that

9    how you just took her comments to mean?

10   A.    No.  It was pretty much a quote that we -- she said

11   we don't -- and as a matter of fact, on one occasion it may

12   have only been me in the room that I don't know what the "F"

13   I'm talking about.  I don't know that Jimmy -- I'm pretty

14   sure Jimmy and Chad weren't in the room.  This may have been

15   an impromptu meeting that Anne and I were having and it got

16   heated to the point where she got upset and said that to me.

17   Q.    Oh, you distinctly recollect that?

18   A.    Yes.  I do not recollect the meeting.  I do not

19   recollect the context of the meeting, but I recollect her

20   telling me that she either said, I don't know what the "F"

21   I'm talking about or I don't have an F-ing clue how to run

22   this program or something of that nature.

23   Q.    Okay.  And not to mince words, but are you saying

24   my client said F-ing or fucking?

25   A.    She said fucking.

A-136

ANTHONY LATINA

Page 121

1      A.    No.

2      Q.    You're sure of that?

3      A.    I'm sure of it -- no, I'm not positive of that, but

4   I don't think I've told anybody.

5      Q.    In e-mail, writing or verbally?

6      A.    No.  I do very little e-mailing and I don't think I

7   told anybody verbally.  It's not --

8      Q.    What did you tell Anne when she said that?

9      A.    I don't think I said anything to Anne.  Once again,

10  with my last comment when Anne gets like that or when Anne

11  got like that, I found that I was best just to keep my mouth

12  shut, or I may have said to her, I could have said something

13  like, Anne, you're certainly entitled to your own opinion,

14  something of that nature.

15     Q.    Had you heard Anne use F-ing or fucking in any

16  other context any other place any other time?

17     A.    I believe my best recollection is that she used the

18  word "fucking" two times with me.  And don't ask me to recall

19  what the meeting was or what the situation was, but I think

20  she dropped the "F" bomb in front of me twice.  That was the

21  one time I remember and I think she did it one other time

22  because the second time wasn't as much as a surprise to me.

23     Q.    Directed at you or just in language?

24     A.    It was -- no, I don't think it was in language.  I

25  think it was directed at me.

A-137

Page 153

1    Q.    Any facts.

2    A.    When Anne -- I believe when Anne wrote this

3    contract, she wrote the contract under -- I believe this is

4    the one under Chandler/Corleto-Latina Funeral Home and it is

5    my belief that she did that in an attempt that the mailing or

6    the correspondence from the insurance company came to 2506

7    rather than 808.  Unfortunately, it did not, it came to 808

8    and that's how I discovered that Anne had written the

9    contract and it was very, very, very -- it was very unusual

10   why would she put Chandler/Corleto-Latina.

11   Q.    Did you ask her?

12   A.    I didn't ask her why.

13   Q.    And what happened?

14   A.    We confronted her with it and -- we confronted her

15   with it, and said, Anne, you know, you were instructed that

16   Location 3 cases went to Woodside.

17   Q.    Even if the call came in to the funeral home?

18   A.    Doesn't matter what line it came in on.

19   Q.    In other words, even though Woodside didn't procure

20   the business; right?

21   A.    Yeah.

22   Q.    And even though the call came in to the funeral

23   home, your view is if it was a Location 3 that you would farm

24   out the lead to Woodside?

25   A.    Yes.

A-138

ANTHONY LATINA

Page 154

1    Q.    And he would get the credit for commission?

2    A.    Yes.

3    Q.    So you confronted her?

4    A.    We confronted her.  Her response was instead of

5    reprimanding her we should have been grateful to her for

6    handling it.

7    Q.    And she signed it up?

8    A.    Uh-uh.

9    Q.    Yes?

10   A.    Yes.

11   Q.    And what did you say, or what did management say?

12   A.    Well, management -- I can't speak for management.

13   I can only speak for myself, we said or what I said.  Bill, I

14   forget what we said, but we, in essence, and I can remember

15   this for you, we in essence told Anne we're pretty sure that

16   you knew what you were doing here and that you intentionally

17   disregarded our instructions.

18        I can also tell you that at that meeting Anne was

19   not happy again.  She raised her voices at us.  She stormed

20   out the door and slammed it.  Then 15 seconds later, she came

21   back through the door and yelled at us again stating that

22   I'll make sure the entire staff knows that I'll no longer be

23   doing any Location 3 work and slammed the door a second time.

24   Q.    Okay.  So she wasn't happy about it?

25   A.    No.

A-139

ANTHONY LATINA

Page 169

1    Q.    It was, but that was your decision?

2    A.    That was our decision, yes.

3    Q.    Was there any discussions between you and your

4 partners prior to January 3, 2005 about firing my client?

5    A.    Not that I can recall.

6    Q.    Tell me as best you can recall what happened on

7 January 3rd?

8    A.    January 3rd we were to have a meeting with Anne,

9 Anne and I, to what I thought would be give her the good news

10 that we agreed with her proposal.

11    Q.    So you had a scheduled meeting?

12    A.    Yes.

13    Q.    And what time did the meeting take place?

14    A.    It was late in the afternoon, Bill.  I'm going to

15 say it was around 4:00.

16    Q.    Tell me what you can recall to the best of your

17 recollection from the time the meeting started till it ended,

18 a narrative?

19    A.    A narrative.  Okay.  Anne and I sat down and it

20 seemed as though -- it seemed as though Anne was already not

21 in a good mood and I couldn't imagine why.  I don't know how

22 we started the meeting, but I think I started with, well, you

23 know, I think we have some good news and we've come to a real

24 nice compromise and we're willing to accept your proposal.  I

25 believe that's how it started.  However, Bill, I can't be

A-140

ANTHONY LATINA

Page 170

1   certain that I even got that far in the meeting.

2        Q.    This is in your office?

3        A.    This is in our office, yeah.

4        Q.    In --

5        A.    Concord Pike conference room.

6        Q.    Location 3?

7        A.    No, this is Location 1.

8        Q.    Okay.  Location 1.

9        A.    I'm not sure I even got that far before Anne -- I

10  don't know how else to put it, but sort of started on me

11  about her displeasure in how the whole thing was handled, her

12  displeasure that the partners agreed that the at need team

13  could refer business to any of the salesmen they wanted at

14  her displeasure --

15       Q.    Go on.

16       A.    Okay.  -- at her displeasure on another of -- on a

17  number of topics.  As I said, I don't think I even kind of

18  got the good news out before she started on me and --

19       Q.    Before she started on you, I wanted to just ask you

20  a question before you get to that point, you said something

21  about the at need team --

22       A.    Okay.

23       Q.    -- could refer leads to whoever they wanted?

24       A.    That's correct.

25       Q.    And that team were, what, the funeral directors?

A-141