ANTHONY LATINA

1      A.    Funeral directors, that's at need, yeah.

2      Q.    That meant that if a call came in, or a walk-in,

3  where there was a lead for a preneed deal; right?

4      A.    Uh-uh.

5      Q.    That the person could decide, well, I'm going to

6  refer this to Todd?

7      A.    That's not correct.

8      Q.    You're saying that's not correct?

9      A.    That's not correct.  Your analogy is not correct.

10     Q.    All right.  So what were you telling me?

11     A.    Any call, walk-in, that came into that business it

12  was referred to Anne.  I don't care who answered the phone.

13  I don't care who met them at the door, it was referred to

14  Anne.  What I mean, Bill, by the at need team was that if a

15  funeral director, me, Jimmy, Chad, Jason, Duane, any of the

16  directors were meeting with the family or had a personal

17  friend or -- this is Location 3 aside.

18     Q.    Okay.  Location 3 aside.

19     A.    Had a personal friend, was meeting with a family

20  who said to them, I want to sit down when this is all over

21  and do a preneed for myself, the at need team, meaning a

22  death has occurred, that director could refer that family to

23  either of the two counselors, either Todd or Anne.  That's

24  all.

25     Q.    And that's not just leads coming to the partners

A-142

ANTHONY LATINA

Page 172

1    it's to any funeral director?

2        A.    Any funeral director, right.

3        Q.    Was that a change?

4        A.    No, it wasn't a change because Todd had never been

5    part of the team before.  So it was part of what -- I mean,

6    Todd was never really part of the team yet, so to speak,

7    except for Location 3.

8        Q.    Right.  But now it's a change as far as Location 1

9    and 2?

10       A.    Well, it's not a change as far as the location is

11   concerned.  It's a change as far as if a director feels more

12   comfortable with Todd or Anne, they have that choice.  Duane

13   did not have to give his leads to Todd, or Jason did not have

14   to give his leads to Anne and vice versa.  They could give

15   them to whoever they wanted.

16       Q.    Which means in effect that now Anne is competing

17   with Todd for leads from the funeral directors at Locations 1

18   and 2?

19       A.    For leads from the funeral directors?

20       Q.    Yeah.

21       A.    I would say yes.

22       Q.    And that's what she was upset about?

23       A.    Okay.

24       Q.    Right?

25       A.    Yes.

A-143

ANTHONY LATINA

Page 173

1    Q.    And you're aware of that?

2    A.    Yeah.  She didn't want the funeral directors to

3    have the choice.  She wanted the funeral directors to send

4    the leads to her.

5    Q.    So she was objecting to now whereas 1 and 2 were

6    her exclusive realm, right now she would be competing with an

7    outside salesperson, Todd, for leads for business at 1 and 2?

8         MS. CHEEK:  Objection to form.

9    BY MR. SALZER:

10   Q.    Correct?

11   A.    It's not exactly right, Bill.

12   Q.    Tell me how I'm wrong?

13   A.    You're wrong because all of the preneed business

14   that came into Location 1 or 2 was hers.  The only difference

15   was if a funeral director, one of our directors had an

16   occasion to get firsthand knowledge of this family that I

17   know, that I've served in the past, they've called me for

18   some reason or other, and said, I want to do a

19   prearrangement.  That director had the opportunity to refer

20   that call to whomever he wanted to or that -- I'm not even

21   going to call it a lead -- that referral to whoever he wanted

22   to.

23   Q.    That wasn't part of her proposal, though?

24   A.    No.  That was the only exception to her proposal

25   that I remember.

A-144

ANTHONY LATINA

Page 174

1    Q.   Okay.   So you're saying it wasn't long before --

2   now, tell me what happens.

3    A.   Okay.   Well --

4    Q.   On January 3rd.

5    A.   As I said, she started right in on me, and I sat

6   there quiet, as I usually did, and just listened and took it

7   like I usually did.   I may have said to her, this is when I

8   may have said to her, by the way, we referred to this earlier

9   in the day, Anne, I don't understand why you're getting so

10  upset.   We've agreed to what you've wanted.   Okay.   In place

11  of how someone termed it, she was over emotional.   I was

12  quoted as saying that, which I don't think I said, what I may

13  have said and we said this earlier, well, Anne, I don't know

14  what you're so upset about.   So she went on to -- and I

15  probably tried to get out what I needed to get out, she -- I

16  probably did get it out at some point in time.   She continued

17  on -- on me and --

18   Q.   What do you mean by continued on me?

19   A.   She was always on my case.   I didn't know anything.

20  She had no respect for me.   I didn't know what I was doing --

21   Q.   Right now I'm talking about January 3rd.

22   A.   I know.   Me, too.

23   Q.   Tell me what she said.

24   A.   Okay.   I can't tell you verbatim what she said, but

25  she was -- she was complaining to me.   She was complaining to

A-145

ANTHONY LATINA

Page 175

1  me.  The decision probably even to give Todd -- probably not

2  because it was her idea -- to the decision that the directors

3  would get incentives for referring, an incentive that the

4  directors could give their follow-ups to any counselor they

5  wanted, she was probably complaining about that and --

6      Q.    Do you remember that?  You said probably.

7      A.    She was complaining, Bill.  I don't remember what

8  she was complaining about but she was complaining to me.

9      Q.    She was complaining on January 3rd, but sitting

10  here today you cannot --

11     A.    I cannot pinpoint what she was complaining about

12  except I am fairly certain that was one of the issues.

13     Q.    Go on.

14     A.    They should not be getting compensated and they

15  should have to bring their leads to me.

16     Q.    Go on.

17     A.    I'm fairly certain.  Finally, you know, I may have

18  said to her, I don't understand why you're so upset.  We

19  thought this was good news and she continued to complain and

20  then she continued to escalate the conversation, even in a

21  louder tone, and again, I sat there to the point where she

22  began verbally attacking, or personally attacking Mr.

23  Woodside and then personally attacking Mr. Casper.

24     Q.    Let's talk about the personal attacks on Mr.

25  Woodside, what do you remember?

A-146

Page 176

1    A.    The only thing that I remember, I believe, she said

2  that he has no experience, and he's not a proven salesperson,

3  and then escalated to the part and he cheats on his wife.

4  And I believe out of nowhere the same thing came out of her

5  mouth as far as Jason.

6    Q.    You say you believe, as you sit here today --

7    A.    No -- no.  Sorry, I'll interrupt you.  She said

8  those words.

9    Q.    She said the same thing as far as Jason's

10 concerned?

11   A.    Yes.  She accused Todd Woodside of cheating on his

12 wife and then segway into Jason Casper and how he cheated on

13 his wife.

14   Q.    Now, in that moment when she's talking about Todd,

15 did she explain why she thought that was important?

16   A.    No.

17   Q.    Did she explain that it was important as a member

18 of the community to be respected?

19   A.    No.

20   Q.    So she made no further explanation as to why that

21 was not a good idea to use Todd, she simply said, he cheats

22 on his wife?

23   A.    No, that's exactly right.

24   Q.    That's it?

25   A.    Yes.

A-147

ANTHONY LATINA

Page 177

1    Q.    And made the same comment as far as Jason is

2    concerned?

3    A.    Correct.

4    Q.    And what connection was there between Jason and

5    Todd?

6    A.    Got me.

7    Q.    Don't know.  All right.

8    A.    Keep in mind, I told you that she just began.  She

9    started in one of her outbursts, and when she got like that,

10   it just went on and on and on and she decided that she wanted

11   to tell me how she felt about those two people and accused

12   them, one after the other of infidelity.  Cheating -- they

13   cheat on their wives.

14   Q.    And what did you say?

15   A.    I didn't say anything.

16   Q.    Nothing?

17   A.    Nothing.

18   Q.    I take it that you didn't know one way or the

19   other --

20   A.    I was flabbergasted, Bill.

21   Q.    I take it you didn't know whether Todd or Jason

22   cheated on their wives?

23   A.    No.

24   Q.    You never heard any rumors to that affect?

25   A.    No.

A-148

ANTHONY LATINA

Page 178

1    Q.    It was never a subject of discussion in the office

2    or even rumors or chit-chat?

3    A.    No.

4    Q.    Correct?

5    A.    Correct.

6    Q.    And why did that matter to you?

7         MR. PEARCE:  Why did what matter?

8    BY MR. SALZER:

9    Q.    What comment, the comment that Todd and Jason

10   cheating on their wives.

11   A.    It didn't matter to me.

12        MS. CHEEK:  Objection to the form.

13   BY MR. SALZER:

14   Q.    It didn't matter to you?

15   A.    It didn't matter to me.

16   Q.    So then what happened?

17   A.    I said earlier in this part of the recap for you,

18   as this escalated, her voice got louder.  Jason, who was in

19   the office, this is probably 4:30 by now, obviously overheard

20   her and I'm almost certain that Diana overheard her as well.

21   Diana's desk is right outside the conference room.  Jason

22   came into the room, said something, don't ask me to quote

23   him, but he said, he defended himself to the extent that he

24   probably said something like, you have no right to accuse me

25   of anything like that.  Why would you -- whatever he said I

A-149

ANTHONY LATINA

Page 179

1   don't have a clue but he defended himself.

2       Q.    Do you recall Jason standing over her while she was

3   seated?

4       A.    Standing over her?

5       Q.    Yeah.

6       A.    No, not over her.  There's only enough room for one

7   person between the door and the chair.

8       Q.    She was seated in the chair?

9       A.    She was seated in the chair.

10      Q.    And where was Jason?

11      A.    He was standing -- he gave himself enough room to

12  close the door behind him and he was standing right there.

13      Q.    Right where?

14      A.    Right adjacent to the door.

15      Q.    Do you recall seeing Jason pointing at her?

16      A.    I do not recall seeing Jason pointing at her.  That

17  does not necessarily mean it didn't happen, I don't recall

18  it.

19      Q.    Do you recall Jason basically yelling at her in her

20  face, very close to her face?

21      A.    Well, the proximity of where Jason was standing and

22  where Anne was sitting was close to begin with.  To say that

23  he got in her face I could not agree with that.

24      Q.    How far would you estimate Jason was in relation to

25  where Anne was sitting?       A-150

ANTHONY LATINA

Page 180

1    A.    Two feet.

2    Q.    He was standing and she was sitting?

3    A.    Yes.

4    Q.    How big is he?

5    A.    Six-two.

6    Q.    And do you recall Jason shouting at her?

7    A.    Yeah, he was upset.

8    Q.    He was shouting at her?

9    A.    He probably was not shouting as loudly as she was

10   at me, but he was shouting, he was very upset.

11   Q.    Do you recall Rowan trying to leave the room?

12   A.    No.

13   Q.    Do you recall Rowan -- do you recall seeing Jason

14   having his hand on the door preventing her from leaving the

15   room?

16   A.    No.

17   Q.    Are you saying that that did not occur or you don't

18   know?

19   A.    I'm saying that I don't recall his hand on the

20   door.

21   Q.    So if it happened, you can't refute that, you just

22   don't recall?

23   A.    Correct.

24   Q.    Did you see him touch her?

25   A.    Absolutely not.  I would have noticed and I would

A-151

ANTHONY LATINA

Page 181

1   have -- I would have noticed if it had escalated that far.   I

2   was in a -- at that point, Bill, I was like, you know, I need

3   this right now like I need a hole in the head, just an

4   amazement.

5        Q.   Did you think what Jason did was appropriate?

6        A.   Bill, I do.

7        Q.   Why is that?

8        A.   Because he was defending his honor and I think any

9   man would have done that.

10        Q.   Well, I guess the assumption is that Jason didn't

11   cheat on his wife?

12        A.   I don't know to the contrary, and yeah, I would say

13   the assumption is, yeah.

14        Q.   Do you know whether Jason ever tried to approach

15   any of the employees at Funeral Services in a sexual manner?

16        A.   Do I know of?

17        Q.   Yeah.

18        A.   No, I don't know of any times.

19        Q.   Take me to the end of the event.

20        A.   What I recall was, Jason was -- Jason was defending

21   himself, he was angry, and all I remember is, I said nothing,

22   and Anne had a yellow pad and she just went like this

23   (indicating) as if to tone him out.

24        Q.   The witness is indicating holding a pad by the side

25   of the head to, you say, tune him out?

A-152

ANTHONY LATINA

Page 182

1    A.    Tune him out, just like, I don't have to listen to

2  this just to tune him out.  That's what I recall.

3    Q.    Then what happened?

4    A.    The best of my knowledge at that point in time, and

5  this was a matter of seconds, Diana Pinkerton entered the

6  room, and said, you need to calm down, or she either said --

7  she either said, you need to calm down or you need to leave,

8  and I believe she said the same thing to Anne, and you need

9  to leave, also.

10   Q.    So she pointed her finger at Jason and at Anne?

11   A.    And at Anne.  I believe she did, I remember --

12 Diana is like the -- she's like the mother of the office, you

13 know.  She's like the mother of the office and she came in

14 and she didn't hesitate coming in, you know, you need to calm

15 down and leave and you need to leave and --

16   Q.    Witness is indicating --

17   A.    Jason first.

18   Q.    -- to --

19   A.    Jason first and then Anne.

20   Q.    All right.  Then what happened?

21   A.    What I know happened was Anne got up and left.  I

22 think Jason may have said -- I think Jason may have said

23 something like, I don't know why I have to leave, to the

24 effect that I didn't do anything wrong, but I'm not sure that

25 he said that.  I don't recollect much of any conversation

A-153

ANTHONY LATINA

Page 184

1  when she made an accusation like that.  I had seen her lose

2  her temper before, I had seen her get upset before.  I've

3  heard her drop the "F" bomb before, but this to me was, geez,

4  that was like, where did this come from?  Why are you even

5  bringing them up?

6         Now, here again, Bill, I'm in a meeting trying to

7  give her the good news.  Anne, you got what you wanted, you

8  know, and it never even got to that point.  I thought it was

9  going to be a great meeting.  It didn't happen.

10     Q.   So what happened, did you talk to your partners

11  that day?

12     A.   I think I may -- don't know who I called.  I may

13  have called Jimmy that night, and said, Jim, I gotta tell you

14  what happened.  It's not good, you know, just gave him a

15  recap of what happened, just like I did for you.  And he

16  said, okay, well, we'll talk about it in the morning.

17     Q.   The morning being?

18     A.   I guess it had to have been January 4th.

19     Q.   Then what happened?

20     A.   I think we had an impromptu meeting.  We called

21  Chad and said this was important, we need to talk about it.

22  And I think, I'm pretty sure that was when the decision was

23  made that it was time for us to -- it was going to be

24  impossible to convince Anne that we needed to blend these two

25  players together and she was just resisting to the point

A-154

ANTHONY LATINA

Page 185

1  where she wore us all down.  And it was time for -- it was in

2  everybody's best interest that we part company.

3       Q.   Are you summarizing the discussion that took place

4  in this morning's --

5       A.   No, that's not the discussion, but --

6       Q.   That's what I'm trying to find out, sir, what you

7  remember being talked about in that morning meeting.

8       A.   What talked about was I did a recap of exactly what

9  happened.  I think Jimmy was the first one to offer, I think

10 Jimmy was the first one to offer the notion that, you know,

11 we may just be beating our heads against the wall and maybe

12 it's in everybody's best interest that we part ways and he

13 didn't get much objection from either Chad or I.

14      Q.   So your best recollection is that he's the first

15 one that broached the idea of firing her?

16      A.   I think that it was.

17      Q.   And you weren't pushing it?

18      A.   Was I pushing her dismissal?

19      Q.   Yeah.

20      A.   No, I wouldn't say I was pushing it.

21      Q.   Was Chad pushing her dismissal?

22      A.   Pushing --

23      Q.   Let's fire her?

24      A.   No, nobody was happy about this.

25      Q.   I'm not asking whether anybody was happy about it.

A-155

ANTHONY LATINA

Page 186

1    A.    It was --

2    Q.    I'm asking whether --

3    A.    It was -- okay, I'll answer that.  No, no one was

4  pushing for it.

5    Q.    So your recollection is that Jimmy was the first to

6  articulate?

7    A.    May be the time.

8    Q.    To part company?

9    A.    May be the time had come that we needed to part

10  company.

11    Q.    Those are words that you kind of remember him

12  saying?

13    A.    No.  He said something like that.

14    Q.    Something like that?

15    A.    Maybe, you know, I don't know how much more we

16  can -- I don't know how he articulated, but it was not we

17  should fire her.  It was nothing like that.  It was in a

18  reservation -- it was in a reservation demeanor that there's

19  nothing else we can do here, there's just nothing else.

20  We've tried everything.  We've agreed to give her what she

21  wanted and it still wasn't enough.  So it was a disappointing

22  meeting for us.

23    Q.    And was this the first that you recall termination

24  as an option being discussed?

25    A.    Yes, that I recall.

A-156

ANTHONY LATINA

Page 187

1    Q.    Is there anything that you can recall about that

2  meeting?  Take your time.

3    A.    That might have been one of the meetings on one or

4  two occasions, on one or two occasions, don't ask me to give

5  you times, but that could have been one of the meetings that

6  Anne made reference to in her -- how do I put it?  In her

7  dissatisfaction with me and the company that she may have

8  made reference to, I can go up the street any time I want and

9  have a job waiting for me.  She did that on more than one

10  occasion, I think that was part of her -- when she got going

11  she just went and I sat and listened.

12    Q.    I'm talking about the meeting when you guys decided

13  to terminate her.

14    A.    No, this was the January 3rd meeting.  I think that

15  was one of the times that she did in my presence.

16    Q.    Is there anything more that you can remember about

17  the meeting of the partners?

18    A.    Oh, the partners meeting?

19    Q.    Yeah.

20    A.    No.  That was -- that was not a long meeting.  It

21  was not a good meeting for us.  It was with -- it was with,

22  Bill, I know you're going to find this hard to believe, but

23  it was with heavy hearts that we had to do this.  We tried

24  everything we could to keep Anne and to get her to accept,

25  and to make her understand that we just want to grow the

A-157

ANTHONY LATINA

1  department and we had two really good people at it and she

2  still wanted no parts of it.

3      Q.   Was there a decision that Jimmy was going to be the

4  person to handle the nasty part of telling her that she was

5  fired?

6      A.   No, there was not a decision.  Jimmy volunteered.

7  He said I'll tell Anne.

8          MR. SALZER:  Maybe we should just take a short

9  break.

10          (Whereupon, a break was taken.)

11  BY MR. SALZER:

12      Q.   You've had a chance of looking at that listing of

13  various incidents involving my client, was the answer to

14  question Number 4 in the interrogatories, and you told me

15  about various incidents.

16          Can you recall any other incidents in which Anne

17  acted in your presence unprofessionally?

18          MR. PEARCE:  Objection to the form.

19  BY MR. SALZER:

20      Q.   Do you understand the question?  Rude or

21  unprofessional, anything else that comes to your mind other

22  than what you've told me so far?

23      A.   With meetings just with me?

24      Q.   Well, other people could be there in your presence.

25      A.   Other times than what we've already talked about --

A-158

ANTHONY LATINA

Page 189

1    Q.    I guess we can summarize them.

2          You've reviewed the answer to Number 4; correct?

3    A.    Yeah.

4    Q.    Please review it again and take as much time as you

5    need.

6    A.    Here's an example at a meeting with the partners on

7    April 12th of '04.  Again, Anne was expressing her

8    dissatisfaction with the way the company was run when she

9    accused us of the ship going down.

10   Q.    Were you there?

11   A.    Yes.  She blamed -- she very directly looked at me

12   and blamed the Union Street branch on the reason the ship was

13   going down.

14   Q.    What did she say?

15   A.    By and large, nothing has been -- nothing has been

16   accomplished since we merged with Latina and she saw the

17   merger as a detriment to the company as opposed to an asset.

18   She didn't understand, I don't think she ever bothered to

19   ask, what our rationale was for doing the merger, but I

20   remember that meeting where she -- I mean, it was very

21   unprofessional of her to tell us that this organization we

22   have there was no leadership, there was no direction, the

23   ship's going down, you guys don't have a clue what to do

24   about it.  I mean, that phrase triggered my memory, Bill.

25          I thought it was very discouraging when I would see

A-159

ANTHONY LATINA

Page 193

1    Chandler & Son, Inc., and then Funeral Services of Delaware,

2    LLC, the lawsuit that was filed by your companies against my

3    client Anne Rowan.

4         A.    I probably did not read all of them.

5         Q.    Did you ever see them?

6         A.    I was probably given an opportunity to read them

7    all.  Jimmy would probably --

8         Q.    Sir, you're saying probably, think back and

9    recollect whether you remember seeing a document in the

10   nature of a complaint by Chandler, Inc., or Funeral Services

11   of Delaware against Anne Rowan, a complaint filed in the

12   court?

13        A.    Bill, to answer your question, I don't remember

14   seeing it, but that doesn't mean I didn't see it.

15        Q.    Did you meet with Battaglia?

16        A.    Never.

17        Q.    Anyone in his law firm?

18        A.    Never.

19        Q.    Did you ever speak to him on the phone?

20        A.    No.

21        Q.    Anyone in his law firm?

22        A.    No.  Jimmy was the liaison for that litigation.

23        Q.    Let me show you what's been previously marked as

24   B-5.

25             MR. PEARCE:   B-5 is the amended complaint?

A-160

JASON CASPER

Page 1

IN THE SUPERIOR COURT OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

- - -

ANNE M. ROWAN,                      :
                                    :
        Plaintiff,                  : No. 06-258-GMS
                                    : Civil Action
        Vs.                         :
                                    :
JAMES T. CHANDLER & SON,            :
INC., and FUNERAL SERVICES          :
OF DELAWARE,                        :
                                    :
        Defendants.                 :

- - -

THURSDAY, JANUARY 18, 2007

- - -

COPY

Oral deposition of JASON CASPER, taken pursuant to
Notice, before Shari Bowen, Certified Shorthand
Reporter and Notary Public, at SWARTZ CAMPBELL, LLC,
300 Delaware Avenue, Suite 1130, Wilmington, Delaware,
commencing at 2:00 p.m.

KARASCH & ASSOCIATES

REGISTERED PROFESSIONAL REPORTERS

PENNSYLVANIA and DELAWARE

(800) 621-5689

A-161

JASON CASPER

Page 8

1      A.   If somebody needs to prearrange a funeral, I

2  take the information and create a file.

3      Q.   Do you actually sell preneed policies?  Now,

4  presently?

5      A.   I refer preneed policies, I would say.

6      Q.   Who do you refer them to?

7      A.   Currently I refer them to either Jerry Bogos

8  or Todd Woodside.

9      Q.   And what company are they with?

10      A.   I believe it's called TDW Associates, but I'm

11  not -- I'm not accurate with that.  I could be

12  inaccurate.

13      Q.   Okay.  What is your annual salary?

14          MR. PEARCE:  Objection.  That doesn't have

15  anything to do with this lawsuit.

16          MS. CONNELLY:  That's fine.

17  BY MS. CONNELLY:

18      Q.   How long have you worked for Funeral

19  Services?

20      A.   Four and one-half years.  It will be five

21  years in June.

22      Q.   Prior to working at Funeral Services, where

23  did you work?

24      A.   I was employed with  Gebhart Funeral Homes.

25      Q.   Gebhart?

A-162

JASON CASPER

1      A.    Gebhart, G-E-B-H-A-R-T.

2      Q.    And where are they located?

3      A.    The City of New Castle, Old New Castle and

4  Claymont.

5      Q.    What did you do for them?

6      A.    Funeral consultant as well.

7      Q.    How long did you work there?

8      A.    Two-and-a-half to three years.

9      Q.    Why did you leave?

10     A.    Better opportunity to go with Funeral

11 Services of Delaware, better schedule.

12     Q.    Prior to working at Gebhart, where did you

13 work?

14     A.    Brandywine School District.

15     Q.    What did you do there?

16     A.    I was an elementary school teacher.

17     Q.    How long did you work there?

18     A.    Since 1994, so '94 to 2001.

19     Q.    Why did you leave there?

20     A.    I chose a different career path.

21     Q.    Prior to working at Funeral Services, were

22 you ever disciplined at work?

23     A.    Do you mean in a formal -- I'm not sure if I

24 understand the question.

25     Q.    We'll start there with a formal discipline.

A-163

JASON CASPER

Page 20

1    A.    Yes, I did.

2    Q.    When the job was offered to you, who were you

3    to report to?

4    A.    Tony.

5         MS. CONNELLY:  Can you mark this Casper 1.

6         (Whereupon, a document was marked for

7    identification as Casper Exhibit Number 1.)

8    BY MS. CONNELLY:

9    Q.    Mr. Casper, I'm going to show you what we've

10   just marked as Casper 1, which is Bate Stamped P 00703.

11        Have you seen this document before?

12   A.    Yes.

13   Q.    Is that your signature at the bottom of the

14   page?

15   A.    Yes.

16   Q.    Can you tell me what this is?

17   A.    It was a document that Anne had drawn up

18   because she had a hissy fit over me writing a preneed

19   contract or contracts for Locations 1 and/or 2, I don't

20   recall.  There was a Chandler family that needed to be

21   met.

22   Q.    What do you mean by hissy fit?

23   A.    Anne felt that she was in charge of preneed.

24   She was very territorial.

25   Q.    Back in the summer of 2002, who was in charge

A-164

JASON CASPER

Page 21

1  of the preneed department?

2        A.    I would assume the partners.

3        Q.    No one ever identified themselves as being

4  the head of the preneed department?

5        A.    They only had Anne Rowan as the only preneed

6  salesperson but she was not a manager or anything like

7  that.

8        Q.    Okay.  How many policies did you sell for

9  Locations 1 and 2 prior to this agreement?

10       A.    I would have to look at the preneed sales

11  report.  I don't know.

12       Q.    Was it more than 10?

13       A.    I would think not, but I would have to look

14  at records.  I don't know that for sure.

15       Q.    When you first began working for Funeral

16  Services, did you and Anne sit down and talk about the

17  division of labor?

18       A.    I don't believe Anne was there when I first

19  was hired.  I think she was on a trip or vacation or

20  something.

21       Q.    Okay.

22       A.    I could be mistaken.  I don't recall her

23  being present my first -- my first week or so.

24       Q.    After the first week or so, did you have any

25  conversations about how the preneed department would be

A-165

JASON CASPER

Page 72

1     Q.    So were you walking back and forth along the

2  hallway?

3     A.    Correct.

4     Q.    And you overheard --

5     A.    Correct.

6     Q.    Okay.  Did you stop at any point when you

7  could overheard this information?

8     A.    Well, I was stopped at the filing cabinet to

9  file.  I was stopped at Debbie's desk to gather files

10 and at my mailbox to get more bills.

11    Q.    Could you hear what Anne was saying from your

12 office?

13    A.    From my office I could not hear what she was

14 saying, but she could be heard.

15    Q.    You could hear her voice?

16    A.    Yes.  Her voice was carrying throughout the

17 area.

18    Q.    From where you were standing when you were

19 over by your mailbox, could you hear what Anne was

20 saying?

21    A.    Yes.

22    Q.    And I assume, then, when you're standing at

23 Debbie's desk?

24    A.    Correct.

25    Q.    You could also hear?

A-166

JASON CASPER

Page 73

1    A.    Correct.

2    Q.    And then when you were standing in front of
3 the at need you could hear?

4    A.    I might as well been sitting in there with
5 them.

6    Q.    And you told me that you overheard her saying
7 that --

8    A.    I believe she used the term, "you're an
9 idiot."

10           This is talking to one of the owners, the
11 folks that paid her salary.

12    Q.    At that point in time, did you know who she
13 was in the conference room with?

14    A.    At that point I was told she was in with
15 Tony.

16    Q.    Who told you that?

17    A.    The -- it was either/or Diana.  One of the
18 girls had said, Anne's in a meeting with Tony.  I don't
19 recall which of the ladies had said that.

20    Q.    So you heard her calling someone in the
21 meeting incompetent and an idiot?

22    A.    Correct.

23    Q.    And she also said, "you don't know what
24 you're doing"?

25    A.    Correct.          A-167

JASON CASPER

Page 74

1    Q.    What else did you hear her say?

2    A.    She referred to Todd Woodside as Dirty Dick,

3    and she made comments about me and my marriage to my

4    wife.

5    Q.    What did she say about you?

6    A.    She said, "everybody knows that Jason runs on

7    his wife and he can't be trusted."

8    Q.    What did you do at that time?

9    A.    I believe I asked one of the ladies, Debbie

10   or Diana or maybe both of them, "did I just hear her

11   say what I think she said?  Is she in there talking

12   about my marriage, my relationship with my wife?"

13   Q.    What was their response?

14   A.    I don't recall.

15   Q.    Then what did you do?

16   A.    I walked over to the mailbox -- I may have

17   gone back into my office, I don't recall.  At some

18   point I know I entered the room.

19   Q.    Did you walk around after you heard Anne say,

20   Jason runs on his wife and can't be trusted, or did you

21   head right into the conference room after that?

22   A.    I may have put my files down in my office.  I

23   don't recall.

24   Q.    The next thing that you recall is walking

25   into the conference room?
A-168

JASON CASPER

Page 75

1      A.    Yes.

2      Q.    What happened when you walked into the

3   conference room?

4      A.    I walked into the conference room and told

5   Anne not to speak of my marriage or my relationship

6   with my wife again.

7      Q.    Is that what you recall saying to her?

8      A.    "Don't speak about my marriage, don't speak

9   about my wife.  You know nothing about my relationship

10  with my wife.  It's none of your business."

11     Q.    Were you standing when you said that?

12     A.    Yes, I was.

13     Q.    Was she sitting when you said that?

14     A.    Yes, she was.

15     Q.    Where were you standing in relation to her?

16     A.    I was standing in the room.  If she were

17  seated I would be to her right.

18     Q.    How close were you standing to her?

19     A.    Three feet.  I don't know.  How close are you

20  and I?

21     Q.    You were standing as close to Anne as you're

22  currently sitting to me?

23     A.    Yeah.  36 inches.

24     Q.    When you walked into the room, were Anne and

25  Tony in mid-conversation? A-169

JASON CASPER

Page 76

1    A.    Yes.

2    Q.    Do you know what they were talking about?

3    A.    At that point, no.

4    Q.    When you said to her, don't speak about my

5  marriage, don't speak about my wife, what was her

6  response?

7    A.    She had yelled "shut up."  She had put a

8  notebook in front of her face and began to use some

9  profanity.

10    Q.    What kind of profanity?

11    A.    "Fuck you.  Get out of here.  You're nothing

12  but a fucking prick."

13    Q.    What was your response?

14    A.    I didn't use profanity.

15    Q.    What was your response?

16    A.    I think I just reiterated again, do not speak

17  about my marriage to my wife.

18    Q.    Did she remain sitting?

19    A.    She was seated, correct.

20    Q.    Did you point your finger at her?

21    A.    I don't recall pointing my finger at her, so

22  I would say no to that.

23    Q.    After you reiterated, don't speak about my

24  marriage or my wife, what was her response?

25    A.    She continued to use more profanity, and put

JASON CASPER

1    the -- it was like a yellow notepad like you're using

2    now by her face.

3        Q.    What was the profanity that she used?

4        A.    What I -- she used the "F" word specifically

5    calling me a "fucking prick."

6        Q.    She said that twice?

7        A.    I would say she said it 15 to 20 times.

8        Q.    Then what happened?

9        A.    I didn't count.

10            She was -- at that point Diana had come

11    into the office because the conversation was, again,

12    carrying into the common area, which is not appropriate

13    or professional.

14        Q.    What did Diana said?

15        A.    She asked us to calm down and told Anne to

16    leave.

17        Q.    What did Anne say?

18        A.    I don't recall.

19        Q.    Do you recall Anne saying anything else other

20    than what you've told me?

21        A.    No.   When she got up to -- when she got up to

22    walk down the hall, walking down the hall, she

23    continued to refer to me as her coined phrase.

24        Q.    Which is?

25        A.    "Fucking prick A"-171 I'm sorry.

JASON CASPER

Page 78

1      Q.    I'm sorry you have to say it.

2      A.    I don't mean to say it in the presence of

3  everybody, but --

4      Q.    I just want to make sure I understand.

5            The only thing that you recall saying to

6  Anne is, you said twice, don't speak about my marriage

7  or --

8      A.    "Don't speak about my marriage and my

9  relationship with my wife.  It's none of your business.

10  You know nothing about my marriage."

11     Q.    Is that the only thing that you recall saying

12  to her?

13     A.    Yes.

14     Q.    And you told me that she called you a

15  "fucking prick" 15 to 20 times?

16     A.    That's between the -- being seated and going

17  down the hallway.

18     Q.    Okay.  And you also said that she said, "fuck

19  you and get out of here"?

20     A.    Yes.

21     Q.    Do you recall her saying anything else?

22     A.    No.  That's just, you know, of course those

23  words are what stick in your brain.

24     Q.    Is it possible that she said something else

25  you just don't recall?    A-172

JASON CASPER

Page 79

1        A.    I don't remember.

2        Q.    Did she ask you to let her leave the room?

3        A.    No.

4        Q.    Did you physically prevent her from leaving

5   the room?

6        A.    No.

7        Q.    Did she attempt to go to the door at any time

8   before Diane came in?

9        A.    No, she was seated.

10       Q.    She was seated the entire time?

11       A.    Yes, she was.

12             MR. PEARCE:  Excuse me, what do you mean

13   by the entire time?

14             MS. CONNELLY:  Let me clarify.

15   BY MS. CONNELLY:

16       Q.    Before Diana came, did Anne remain --

17       A.    At that point --

18       Q.    -- seated?

19       A.    I don't remember if she was seated when Anne

20   walked -- or when Diana walked in or not.  When Diana

21   walked in, she may have been getting up at that point.

22       Q.    But that was the first time that she tried to

23   get up?

24       A.    I guess she had -- she was a healthy lady,

25   she could stand up on her own.

A-173

JASON CASPER

Page 80

1    Q.    You don't recall her standing up at any other

2    point before the time when Diana was coming in?

3    A.    No, I don't.

4    Q.    Did you have your -- the entire time that

5    this conversation took place, did you remain standing

6    to Anne's right?

7    A.    Yes.

8    Q.    Did you attempt to move the notebook away

9    from her face?

10   A.    I don't remember doing that.

11   Q.    Did you put your hand on the door to prevent

12   her from opening it?

13   A.    No.

14   Q.    Approximately how long did that conversation

15   last?

16   A.    15, 30 seconds.  Less than a minute for sure.

17   Q.    Did you at any time tell her that you would

18   harm her for saying what she was saying?

19   A.    Never.

20   Q.    You said that Diana entered the room and told

21   Anne to leave; is that correct?

22   A.    Yes.

23   Q.    Did she also tell you?

24   A.    She may have.  I was leaving on my own

25   anyway.

A-174

JASON CASPER

Page 85

1 be talking to me. I think Jimmy was at that point
2 going to intervene.
3    Q.  Did Jimmy talk to you?
4    A.  Yes.
5    Q.  What did he say?
6    A.  He questioned me about the incident. I
7 think -- how did he put it?  Do you regret going into
8 the room, something like that.
9    Q.  What was your response?
10    A.  I believe I just sat there and listened to
11 what Jimmy had to say. I don't recall a direct
12 response to Jimmy's question. I mean, it was more a
13 conversation of, you know, this is what happened and
14 I'm just sorry that the building had to listen to her
15 tirade.
16    Q.  Did Jimmy say what was going to happen to
17 Anne?
18    A.  No.
19    Q.  Did Jimmy say anything about Anne during that
20 conversation?
21    A.  Well, he talked about, you know, Anne's had
22 this type of behavior before, they will be discussing
23 the matter with Anne as well.
24    Q.  Did you talk to Tony about it?
25    A.  No, not that I can recall. I don't

Page 86

1 specifically remember. I tried to just -- at that
2 point I just wanted to forget about the whole thing.
3    Q.  Did you receive any discipline for the
4 incident?
5    A.  I received -- well, I guess I would refer to
6 that as a verbal reprimand.
7    Q.  And what was the verbal reprimand?
8    A.  If the door's closed you really don't
9 enter -- if you're not invited don't enter the meeting.
10    Q.  And that was from Jimmy?
11    A.  That was Jimmy's -- I don't -- I mean, it was
12 never stated that this is your verbal reprimand, sign
13 this. I took it as a --
14    Q.  An the day of the incident, did you go out
15 into the parking lot to cool down?
16    A.  Maybe when I was leaving.
17    Q.  Did you see any employees out there?
18    A.  Sal. Sal was out there having a cigarette.
19    Q.  Anyone else?
20    A.  No.
21    Q.  Do you recall saying to Bob Simpson that day
22 that you needed to cool down?
23    A.  I don't recall seeing Bob Simpson that day at
24 all.
25    Q.  Other than the conversation that you had with

Page 87

1 Jimmy and Chad after the incident, did you have any
2 conversations with anyone else in the office about what
3 had happened?
4    A.  Folks -- when there's something like that
5 that happens, you know, people in the office talk.
6    Q.  What was the talk that was going on?
7    A.  Just people, just being nosey and wanting to
8 know what had happened.
9    Q.  Who wanted to know what happened?
10    A.  I'll venture to say the other at need staff.
11 Maybe -- maybe the secretarial staff. Helen -- or not
12 Helen. Kelly, Helen, they might have been asking
13 questions as to what had taken place if they weren't
14 there but --
15    Q.  Did anyone ask you any questions?
16    A.  I was asked what happened with Anne, what was
17 the incident with Anne.
18    Q.  What did you say?
19    A.  I wasn't talking about anything.
20    Q.  Did Anne come in the next day?
21    A.  No.
22    Q.  Did you have any further conversations with
23 Anne after that incident?
24    A.  No.
25    Q.  Do you know what happened to Anne?

Page 88

1    A.  I don't understand the question.
2    Q.  I'm sorry, that was a bad question.
3        Did you learn that Anne had been
4 terminated?
5    A.  There was, again, talk in the office when
6 Anne was in her office boxing up her belongings.
7    Q.  What was the talk?
8    A.  I believe Debbie stated that she should have
9 been fired years ago for bad behavior.
10    Q.  Did anybody else say anything?
11    A.  I believe Helen said that that was long over
12 due. She should have been fired years ago for bad
13 behavior.
14    Q.  Do you recall anybody else saying anything?
15    A.  Not specifically, no.
16    Q.  Did you say anything about Anne being fired?
17    A.  Not a word.
18    Q.  Did you have any conversation with Jimmy
19 about Anne being fired?
20    A.  Not a word about that.
21    Q.  Did you have any conversation with Chad?
22    A.  No.
23    Q.  How about Tony?
24    A.  No.
25    Q.  Did you have any discussion with Todd?

22 (Pages 85 to 88)

DIANA PINKERTON

Page 1

IN THE SUPERIOR COURT OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

- - -

ANNE M. ROWAN,                    :
                                  :
     Plaintiff,                   :  No. 06-258-GMS
                                  :  Civil Action
     Vs.                          :
                                  :
JAMES T. CHANDLER & SON,          :
INC., and FUNERAL SERVICES        :
OF DELAWARE,                      :
                                  :
     Defendants.                  :

- - -

FRIDAY, JANUARY 19, 2007

- - -

     Oral deposition of DIANA PINKERTON, taken pursuant
to Notice, before Shari Bowen, Certified Shorthand
Reporter and Notary Public, at SWARTZ CAMPBELL, LLC,
300 Delaware Avenue, Suite 1130, Wilmington, Delaware,
commencing at 10:45 a.m.


COPY

KARASCH & ASSOCIATES

REGISTERED PROFESSIONAL REPORTERS

PENNSYLVANIA and DELAWARE

(800) 621-5689

A-175

DIANA PINKERTON

Page 24

1  from any staff members or owners?

2      A.   I would say that Duane and I have a very

3  casual relationship where he may say something to me

4  and I may -- he calls me "pretty," I call him "ferbie."

5      Q.   Up call him what?

6      A.   Ferbie, but it's nothing offensive.  It's

7  just a nickname.

8      Q.   Other than Duane, do you recall anyone else

9  making comments about it being, approaching a woman's

10 time of the month or --

11     A.   No.

12     Q.   -- anything like that?

13     A.   Duane never made a comment about it being the

14 time of the month.

15     Q.   Did you ever hear anyone call Anne a bitch?

16     A.   No.

17     Q.   Did you ever hear Anne use profanity?

18     A.   Yes.

19     Q.   How often?

20     A.   I'd say she used in the same that I've said,

21 "where the hell is the file?"

22          I did hear her screaming at Helen Johnson

23 in the counter one time and she was using harsh

24 language at Helen in anger.

25     Q.   What kind of harsh language?

A-176