DIANA PINKERTON

Page 25

1     A.    Saying the "F" word.

2     Q.    What was the discussion that she was having

3   with Helen?

4     A.    They had a joint talk the night before and

5   Anne did not like the way something had happened and

6   she was revisiting the subject with Helen and yelling

7   at her about it.

8     Q.    What was Helen's response?

9     A.    She said, you know, basically, I'm not doing

10  this with you Anne.

11    Q.    Did Helen yell?

12    A.    No.

13    Q.    Did you ever hear Anne say that someone

14  doesn't know what the fuck they're doing or what the

15  "F" they're doing?

16    A.    I don't know if I've heard those exact words.

17    Q.    Did you ever hear Anne describe the clientele

18  at the Corleto-Latina Funeral Home as being spics and

19  niggers?

20    A.    No.

21    Q.    Did you ever hear Anne ever use the word spic

22  or nigger?

23    A.    I would say the "N" word, but I don't recall

24  spic.

25    Q.    When do you hear her use the "N" word?

A-177

DIANA PINKERTON

Page 26

1    A.    I don't recall the exact time but I may have

2  heard her say that word.

3    Q.    Do you have a specific recollection of her

4  using the "N" word?

5    A.    I believe I do, but I don't know what it was

6  regarding.

7    Q.    And you don't know when?

8    A.    No.

9    Q.    Was anyone else there when she said it?

10    A.    I don't know.  I don't remember.

11    Q.    Was it something where she was quoting

12  someone else?

13    A.    I don't remember.

14    Q.    Okay.  Did you ever see Anne act

15  unprofessionally?

16    A.    Yes.

17    Q.    When?

18    A.    She would have some -- in her sales meetings,

19  sometimes she would get pretty emotional and volatile

20  and when she didn't like what she was hearing a lot of

21  times run out of the office.

22    Q.    How would she get emotional and volatile?

23    A.    Well, she would start yelling and screaming.

24    Q.    And what would that be about?

25    A.    She might been not have -- she might not have

DIANA PINKERTON

Page 27

1    been in an agreement with whatever somebody was saying

2    to her.

3        Q.    And who would be in attendance at the

4    meeting?

5        A.    Could be the whole staff depending on who was

6    at the staff meeting that morning.

7        Q.    Do you have any specific recollection of any

8    incidents that took place?

9        A.    Yes.    There was one, I don't remember what

10   the subject matter was about.    Jimmy had made a

11   decision about something, Anne did not agree with it.

12   She clinically stated that she did not agree with it.

13   Jimmy, I remember saying something to the effect, well,

14   I understand, but this is the way it is.    And she said,

15   well, I'm just not -- or not taking this, or not going

16   to listen to this anymore.    I'm going to leave now and

17   she got up and left.

18       Q.    What was Jimmy's response?

19       A.    Nothing.    I don't know if he talked to her

20   afterwards or not.    I don't recall.

21       Q.    Okay.    When did that occur?

22       A.    I don't remember the exact year.

23       Q.    Can you give me a general time frame?

24       A.    No.

25       Q.    Do you have any other specific recollections

A-179

DIANA PINKERTON

1   of meetings?

2       A.   Well, she -- she had the incident with Helen

3   in her office.  And there was another incident with

4   Helen, I don't recall what it was about, but they had a

5   little fight in the office.  Anne left, and then

6   called, and I answered the phone, and she said she

7   wanted to talk to Helen again.  About 30 seconds later,

8   she called again and said that Helen had hung up with

9   her and she wanted to talk to her again.  Then she

10  called again, a few seconds after that, and Helen came

11  out and said that she would not take Anne's call if she

12  called again.

13      Q.   Did you ask Helen what the dispute was about?

14      A.   No, but she just said that Anne was yelling

15  at her and she was not going to listen to it.

16      Q.   Do you know what Anne was yelling at her

17  about?

18      A.   No.

19      Q.   Do you know if Helen was yelling back at her?

20      A.   I don't recall Helen yelling back at her and

21  she had her office door open.

22      Q.   Is there any other incidents that you recall?

23      A.   Sometimes she would have, I will call it, a

24  lively discussion with a funeral director over

25  something, whether it was something she promised a

A-180

DIANA PINKERTON

Page 29

1  family on the preneed side and when it converted to the

2  at need side it became a problem.  I mean, Anne was not

3  shy about confrontation.

4       Q.   What do you mean by lively discussion?

5       A.   Spirited.  When you have a strong viewpoint

6  on something and you state it emphatically.

7       Q.   Do you recall any other incidents?

8       A.   She had yelling matches at Jimmy.  I don't

9  know what they were over, but that had happened pretty

10 much throughout my tenure there.

11      Q.   Anything else?

12      A.   Not that I can remember right now.  There may

13 be but --

14      Q.   Okay.  Did you ever talk to Anne about the

15 fact that you felt she was acting unprofessionally?

16      A.   Yes.

17      Q.   What did you say?

18      A.   I told her she needed to calm down.

19      Q.   Did you specifically tell her that you felt

20 she was being unprofessional?

21      A.   I don't know if I used the word

22 unprofessional.

23      Q.   But you remember telling her to calm down?

24      A.   Yes.

25      Q.   When was that?  A-181

DIANA PINKERTON

Page 30

1    A.    Many times.

2    Q.    What was her response?

3    A.    She would basically say she knows.  She

4 understood that sometimes she could become loud.

5    Q.    Did you ever talk to anyone else in the

6 office about your belief that Anne was acting

7 unprofessionally?

8    A.    Well, Kelly and I have both talked to Anne

9 together and separate about her needing to calm down.

10 She could be very wired.

11    Q.    Other than that?

12    A.    I don't think so.  I may have, I don't know.

13    Q.    Did you ever hear Anne call Tony "fucking

14 incompetent"?

15    A.    She's had -- she has had discussions with

16 him.  I don't recall if she did or did not call him

17 that.  She may have.

18    Q.    Did you ever see Anne eavesdrop on a

19 conference?

20    A.    I would say that I probably see everybody at

21 some point by the conference door trying to figure out

22 whether who was in there.  Whether it was a family or

23 was it two people talking or somebody on the phone.

24 Whether she's eavesdropping or not, I can't personally

25 say.  I had gone to the conference room to say, is that

A-182

DIANA PINKERTON

Page 32

1       A.    No.

2       Q.    Has he ever been rude to any members of the

3    staff?

4       A.    Not that I know of.

5       Q.    Has he ever been rude to any clients?

6       A.    Not that I know of.

7       Q.    Has he ever acted unprofessionally in the

8    office?

9       A.    I would have to say no.

10       Q.    Any other staff member ever acted

11    unprofessionally in the office?

12       A.    No.

13       Q.    Did any other staff members get into

14    disagreements with each other?

15       A.    Yes.

16       Q.    Any other staff members get into heated

17    disagreements with each other?

18       A.    I would say yes.

19       Q.    Who?

20       A.    I think everybody.

21       Q.    How frequently?

22       A.    I wouldn't -- maybe once a month, maybe not

23    even once a month.

24       Q.    Did you ever see Jason get angry?

25       A.    Jason was upset that day in the conference

A-183

DIANA PINKERTON

Page 36

1     Q.   And then you said that you heard Anne still

2  being loud and then you heard another bang, do you know

3  what that second bang was?

4     A.   No.

5     Q.   Were there customers in the office at the

6  time?

7     A.   I do remember seeing a man come by me to the

8  right and said something to me.  I'm pretty sure he was

9  the florist saying he had left something, which is the

10  reason why I went in because they were being so -- I

11  should say, it was becoming loud.  Anne was becoming

12  loud where I didn't want someone walking in and hearing

13  it.

14     Q.   Were you expecting any customers to come in

15  at that time?

16     A.   They come in all -- they can come in at any

17  time.  We have people who have just lost a loved one

18  that will just show up at the funeral home without

19  calling.

20     Q.   What happened when you walked into the

21  conference room?

22     A.   I walked in and I said that it was too loud

23  in here.  I said, Anne, I can hear you.  I said, this

24  has to stop.  And she had called Jason an F-ing prick.

25  He was saying something about that she could not talk

A-184

DIANA PINKERTON

1    about his wife like that, or his mother like that, I'm

2    not sure which word he used.  I said, Jason, why don't

3    you just leave.  And he said no, that Anne was bringing

4    personal things into the meeting and she had no right,

5    on or about those words.  And I said, Jason, you really

6    need to leave.  I said, it's too loud and then he said,

7    no, and then I turned to Anne, and I said, then you

8    need to leave.  And she said, fine, then, she would

9    leave.

10       Q.    When you walked into the conference room,

11   where was Jason?

12       A.    Jason was to the right.

13       Q.    Was he standing?

14       A.    Yes.

15       Q.    Where was Anne?

16       A.    Anne, to the best of my knowledge, was

17   sitting down, but I do remember her getting up to call

18   him the F-ing prick.

19       Q.    She stood up when she called him that?

20       A.    I believe so, yes.

21       Q.    And did she use the actual word?

22       A.    Yes.

23       Q.    When Jason was standing to the right of Anne,

24   how close was he?

25       A.    Well, Anne would be here (indicating), and

A-185

DIANA PINKERTON

Page 38

1    Jason would be about here (indicating).

2        Q.   Can you tell me --

3        A.   Two-and-a-half, three feet, I don't know.

4    That's a guess.

5        Q.   That's fine.  And where were you in

6    relationship to them?

7        A.   Can I stand up?

8        Q.   No, I'm not going to be able to --

9        A.   Okay.  When I come through the door, the door

10   opens and I've got Jason behind -- Jason is in front to

11   the side of the door, Anne is to my left.

12       Q.   So you were standing in between Jason and

13   Anne?

14       A.   Yes, with the door.

15       Q.   Okay.  Did you leave the open door or did you

16   close the door when you walked in?

17       A.   Open.

18       Q.   Was Anne able to go through the door or were

19   you blocking the pathway?

20       A.   No, she could go through the door.

21       Q.   Did you have any difficulty opening the door?

22       A.   No.

23       Q.   Okay.  Was Anne holding a legal pad at the

24   time?

25       A.   I don't remember.

A-186

DIANA PINKERTON

Page 39

1    Q.    Why did you tell Jason that he had to leave?

2    A.    Because once I got into the office and saw

3    that it was still Anne and Tony, I thought that was

4    Anne and Tony's meeting that Jason should be the one to

5    leave.

6    Q.    Where -- was Tony sitting or standing?

7    A.    Sitting.

8    Q.    Did he say anything?

9    A.    Not that I remember.

10    Q.    Do you know why Jason refused to leave?

11    A.    No.  I guess because he was still talking to

12    Anne.

13    Q.    And was he yelling?

14    A.    I would say he was talking loud, he was not

15    yelling, because I did not hear him outside.

16    Q.    Even once -- when you were inside the

17    conference room, was he still talking loudly, but not

18    yelling?

19    A.    Yeah, I would say that was not yelling.

20    Q.    And how would you describe Anne's volume?

21    A.    Loud.

22    Q.    Was she yelling?

23    A.    She yelled F-ing prick.  She was very angry.

24    Q.    Did she say it once or did she say it

25    multiple times?

A-187

KARASCH & ASSOCIATES
800-621-5689

DIANA PINKERTON

Page 40

1    A.    I remember once.

2    Q.    After Anne left the room, what happened?

3    A.    She went into her office and I believe she

4  got her purse and she was going to leave.

5    Q.    Did you say anything to her?

6    A.    I don't remember.

7    Q.    Did you stay in the room after Anne left?

8    A.    No, I think I left the room.

9    Q.    Did you ever ask anyone what the banging

10  noise was?

11    A.    No.

12    Q.    Did the banging noise sound like someone

13  slamming a door?

14    A.    It may have.

15    Q.    Did the banging noise sound like someone's

16  hand closing a door?

17    A.    It could have.

18    Q.    Did you have any conversation with Anne about

19  the incident after it occurred?

20    A.    No.

21    Q.    Did you have any conversation with Jason

22  about the incident after it occurred.

23    A.    No.  He did apologize the next day.  He said

24  I'm sorry that you had to come in because you thought

25  that it was getting loud.  A-188

DIANA PINKERTON

Page 45

1    Q.   What was Kelly's response?

2    A.   She just, you know, said I'm sorry you had to

3  probably do that or I don't remember specifically.

4    Q.   Did anyone in the office talk about the fact

5  that Anne was fired?

6    A.   Well, the owners told us that if we had any

7  preneed calls come in that we should tell them that

8  Anne's no longer with the company.

9    Q.   Did any of the staff say anything?

10   A.   I don't remember.

11   Q.   Did any of the owners talk to you about

12 firing Anne?

13   A.   I think Jimmy may have made a general

14 announcement maybe the next day.  I don't remember.

15   Q.   Going back to the January 3rd incident for a

16 minute, how long would you say Jason was in the meeting

17 room?

18   A.   I couldn't say exactly.  It definitely wasn't

19 a minute, maybe like 15 seconds.  I don't know.  It

20 didn't seem very long.

21   Q.   Did any of the owners talk to you about the

22 fact that they filed a lawsuit against Anne?

23   A.   I think that they made a general announcement

24 that there was going to be some legal action.

25   Q.   And did they say what the legal action would

A-189

VICTOR BATTAGLIA
December 19, 2006

---

**Page 1**

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

* * *

ANNE M. ROWAN                    :

    -vs-                         :
                                     NO. 06-258 (GMS)
JAMES T. CHANDLER & SON, INC.    :
and FUNERAL SERVICES OF
DELAWARE                         :

* * *

            Oral deposition of VICTOR BATTAGLIA,
held in the law offices of Swartz Campbell, LLC, 300
Delaware Avenue, Wilmington, Delaware, on Tuesday,
December 19, 2006, beginning at approximately 9:00
a.m., before Audree E. Burg, Certified Court Reporter
and Notary Public in and for the Commonwealth of
Pennsylvania.

* * *

            KARASCH & ASSOCIATES
        REGISTERED PROFESSIONAL REPORTERS
            PENNSYLVANIA and DELAWARE
                (800) 621-5689

---

**Page 2**

1  APPEARANCES:
2      SWARTZ CAMPBELL, LLC
       BY:  WILLIAM T. SALZER, ESQUIRE
3         NICHOLAS E. SKILES, ESQUIRE
       300 Delaware Avenue
4      Wilmington, DE 19102
       (215) 299-4346
5
       – Representing the Plaintiff Ann Rowan
6
       YOUNG, CONAWAY, STARATT & TAYLOR, LLP
7      BY:  TERESA A. CHEEK, ESQUIRE
       1000 West Street - 17th Floor
8      Wilmington, DE 19801
9      -- Representing the Defendants
10     FERRY, JOSEPH & PEARCE, P.A.
       BY:  ROBERT K. PEARCE, ESQUIRE
11     824 Market Street - Suite 904
       Wilmington, DE 19899
12
       – Representing the Defendants
13
14
15
16
17
18
19
20
21
22
23
24
25

---

**Page 3**

1              INDEX
2
3  WITNESS:                     PAGE
4  VICTOR BATTAGLIA
5     BY:  MR. SALZER              4
6     BY:  MS. PEARCE
7              83
8           EXHIBITS
9  NUMBER      DESCRIPTION        PAGE
10 B-1     12/5/05 Invoice      9
11 B-2     Fax dated 1/14/05    13
12 B-3     1/19/05 Letter       16
13 B-4     1/17/05 Fax          18
14 B-5     Complaint            27
15 B-6     Agreement            29
16 B-7     Answer               52
17 B-8     Amended Verified Complaint  55
18 B-9     Notes                63
19 B-10    Notes                65
20 B-11    Answer to Amended Complaint 68
21 B-12    1/27/05 Letter       76
22 B-13    Motion               78
23 B-14    Resp. to Req. For Admissions 79
24         (Exhibits Retained by Counsel)
25

---

**Page 4**

1          VICTOR BATTAGLIA, after having been
2   first duly sworn, was examined and testified
3   as follows:
4              EXAMINATION
5   BY MR. SALZER:
6      Q.  My name is Bill Salzer.  Me met before.
7   We're going to conduct your deposition in the case that
8   my client and Rowan filed against Chandler Funeral
9   Homes and Funeral Services of Delaware.
10         As you are longstanding counsel I will
11  dispense with the instructions.
12         If you do not hear my question, let me
13  know and I will repeat it for you.  If you need a
14  break, I will be glad to accommodate you.
15         Are you represented today?
16     A.  I am not.
17     Q.  State your full name.
18     A.  Victor Battaglia.
19     Q.  You are a partner with Biggs and Battaglia?
20     A.  I am the senior person at Biggs and .
21  Battaglia.
22     Q.  How long have you been practicing law in
23  Delaware?
24     A.  Since 1960.
25     Q.  Do you have a particular specialty?

---

A-190

1 (Pages 1 to 4)

VICTOR BATTAGLIA
December 19, 2006

Page 13

1  letter was to him.  Do I have a specific recollection

2  of it?  No.

3      Q.   In your dealings with this matter did you

4  have communications with people other than Jim Chandler

5  IV at the beginning?

6      A.    Not early on.  At some point Jim was away and

7  I talked to Chad Chandler.  When that was, I couldn't

8  tell you.

9      Q.    Your primary contact in the beginning, at the

10 time the lawsuit was filed against my client, was Jim

11 Chandler IV?

12     A.    Correct.

13            MR. SALZER:  Mark this as B-2.

14            (Whereupon, Exhibit B-2 was so

15     marked for identification by the court

16     reporter, being Fax dated 1/14/05.)

17 BY MR. SALZER:

18     Q.   I handed you B-2.  This is a January 14, 2005

19 fax from Jim Chandler to yourself regarding Anne Rowan.

20           Do you recall receiving this document?

21     A.   I don't have a recollection, but obviously I

22 did.

23     Q.   It says Victor, and there are three items

24 that are identified?

25     A.   Yes.            A-191

VICTOR BATTAGLIA
December 19, 2006

Page 14

1      Q.    Do you recall receiving an employment

2  agreement on or about January 14, 2005?

3      A.    I'm sure I did.

4      Q.    Two says, draft of final pay letter

5  information you requested about Anne.

6            Do you recall receiving that?

7      A.    I don't have a specific recollection.  If it

8  says it here I'm sure I got it.

9      Q.    Do you recall what the information was that

10  you requested about Anne?

11      A.    I don't recall.

12      Q.    "Chandler Funeral Homes is the doing business

13  as name for both James T. Chandler & Son, Inc. and

14  Funeral Services of Delaware".

15            Do you recall receiving that information?

16      A.    I'm sure I got the information.  Do I have a

17  specific recollection of receiving it?  As I see

18  Funeral Services of Delaware mentioned there I wince

19  because maybe that's something I should have picked up

20  earlier.

21      Q.    The billing entry on exhibit B-1 makes

22  reference to a letter that you drafted to Rowan and a

23  letter to James Chandler.  Do you see that?

24      A.    Yes.

25      Q.    Do you know what the letter to Chandler

A-192

VICTOR BATTAGLIA
December 19, 2006

Page 33

1     Q.    That verification means what to you?

2     A.    Same as an affidavit.

3     Q.    Attesting that the information in the

4  Complaint is true and correct?

5     A.    That is correct.

6     Q.    Keeping in mind that you say that you

7  recommended that a lawsuit be filed and they authorized

8  you to do so, before they filed the lawsuit, did they

9  ask you for a legal opinion as to the reasonableness of

10  the lawsuit?

11     A.    I'm sure they did.  It was not in writing and

12  I did not give them one in writing.  I'm sure they

13  asked about whether or not this is what they ought to

14  do.

15     Q.    You don't have a recollection of that, sir?

16     A.    That would be my usual practice.  I can't

17  believe I did not follow my usual practice in this

18  situation.

19     Q.    The fact is you do not have a recollection of

20  that conversation?

21     A.    I have no specific recollection of words

22  spoken.

23     Q.    Did you send the Complaint to Mr. Chandler

24  for his review and approval prior to it having been

25  filed?

A-193

VICTOR BATTAGLIA
December 19, 2006

Page 34

1      A.    I don't see a note on my billing record that
2    I did that.  I suspect probably what happened was that
3    Jim probably came into the office and signed it and we
4    reviewed it at that time.

5      Q.    Client conference, January 26?

6      A.    I have one on the 28th.  Is it the 26th?  I
7    have it on the 28th.

8      Q.    Also one on --

9      A.    I don't see it on the 26th.

10     Q.    First line for the 26th?

11     A.    Thank you, yes.

12     Q.    You are telling me you don't have the
13    specific recollection of the conference other than what
14    you told me before?

15     A.    Yes.

16     Q.    But you believe that Mr. Chandler reviewed
17    the draft lawsuit before it was filed?

18     A.    In my presence.

19     Q.    As well as a petition for a Temporary
20    Restraining Order against Ms. Rowan?

21     A.    Is it there?  Who notarized the signature?  I
22    don't have a recollection.

23     Q.    Did you explain to Mr. Chandler that your
24    lawsuit was going to request an injunction, a court
25    order which would bar her from working at McCrery?

A-194

VICTOR BATTAGLIA
December 19, 2006

Page 35

1      A.   What I explained to him as best my

2  recollection is, that we wanted to stop her from

3  competing with Chandler.

4      Q.   Did you explain to Mr. Chandler that the

5  result of the lawsuit was barring her from working in

6  the funeral home business in New Castle County?

7      A.   No, sir, I don't believe I did that.  I

8  believe what I said was that it would stop her from

9  competing in this area, pre-need area that she worked

10 on in Chandlers.

11     Q.   Is that what you said?

12     A.   I can't tell you exactly what I said.  That

13 would be the gist of what we discussed.

14     Q.   Your recollection is somewhat hazy?

15     A.   No question about it.  Almost nonexistent.

16     Q.   Let's look at the Complaint.  We can agree

17 this is the lawsuit that you filed, and it was verified

18 by Mr. Chandler?

19     A.   Correct.

20     Q.   You see it makes reference in the

21 verification that Complaint for Temporary Restraining

22 Order and preliminary and permanent injunction;do you

23 see that, on the verification?

24     A.   Yes.

25     Q.   Read that.        A-195

KARASCH & ASSOCIATES
800-621-5689

VICTOR BATTAGLIA
December 19, 2006

Page 38

1    Q.    Did they tell you all benefits were paid by

2  Funeral Services?

3    A.    No discussion about that.

4    Q.    Did they tell you all taxes were paid by

5  Funeral Services, deductions for taxes?

6    A.    No discussion about that.

7    Q.    When you had the Employment Agreement given

8  to you I take it that you looked at Section III, which

9  is on Page 2 of the document?

10    A.    Let me look and see what you are talking

11  about.

12    Q.    Do you have Page 2 of the Employment

13  Contract, Section III?

14    A.    Yes.

15    Q.    Read that to yourself for a moment.

16    A.    Okay.

17    Q.    When you met with Mr. Chandler before the

18  suit was filed did you discuss this part of the

19  contract?

20    A.    We did.  My understanding was that

21  notwithstanding the fact that this was to be for a

22  specific term of one year the parties continued to work

23  together under the same terms and conditions up to the

24  time she was -- she left their employ.

25            My recollection is that I had seen a

A-196

VICTOR BATTAGLIA
December 19, 2006

Page 39

1  number of contracts that she had written in the name of

2  Chandler. I thought on the basis of the fact that they

3  had continued to work together, the conditions were the

4  same, that minor tinkering with wages and reimbursement

5  and that.

6          Essentially her obligations remain the

7  same and their obligation remains the same to the time

8  of the termination.

9      Q.    Before the lawsuit was filed did Chandler ask

10  for your opinion as to the significance of the fact

11  that Section III of the contract stated that the terms

12  of the agreement would be for a period of one year

13  terminated September 11, 1996?

14      A.    I can't say whether they asked for an

15  opinion. We discussed it. It was my opinion because

16  of the continuation of things and the status quo that

17  things just carried over.

18      Q.    Meaning what?

19      A.    It continued to exist from year to year to

20  year.

21      Q.    When did you express that view?

22      A.    I can't tell you.

23      Q.    Do you know whether you expressed it before

24  the lawsuit was filed?

25      A.    I would be almost certain that I did.

A-197

VICTOR BATTAGLIA
December 19, 2006

Page 45

1  him going to Boscov's?

2      A.    Yes.

3      Q.    Was that at your suggestion?

4      A.    Right.

5      Q.    You didn't know she was going to be at

6  Boscov's?

7      A.    I knew that -- whether I saw an ad.  Boscov's

8  runs ads on those things.  I think I saw the ad that

9  she was going to be there.

10              They have seminars on all kind of things.

11  That's how I think I knew about it.  I can't be

12  certain.

13      Q.    It is your best recollection it was you that

14  came up with the idea of hiring a private investigator?

15      A.    I referred him to a friend of mine who is in

16  the business.

17      Q.    What was the factual basis for the allegation

18  that Ms. Rowan is soliciting business?

19      A.    If somebody is scheduled to appear on behalf

20  of Chandler and they say I'm cancelling but I'll be

21  back on behalf of McCrery, that's a clear indication

22  that they are there to solicit business for the

23  competition.

24      Q.    The only information you got was from the

25  investigator?

A-198

KARASCH & ASSOCIATES
800-621-5689

VICTOR BATTAGLIA
December 19, 2006

Page 46

1    A.    That is correct.

2    Q.    You relayed that information to Chandler?

3    A.    I think I saw the ad, suggested that, asked

4  Chandler for permission to hire the investigator.  Sent

5  the investigator out.  He came back with a report.

6         I sent the report or talked to Chandler

7  about the report.  That convinced me she was soliciting

8  business in violation of the restricted covenant.

9    Q.    Look at paragraph ten.

10   A.    Okay.

11   Q.    In this allegation Chandler states my client

12  is using and disclosing trade secrets.

13         What information did Chandler provide to

14  you prior to the filing of the lawsuit with regard to

15  this allegation?

16   A.    First of all, you got to read it in

17  connection -- there's a section in the contract that

18  talks about things that would be considered secrets,

19  stipulated things.

20         Here we have word she was out soliciting

21  business.  And if she is doing that in this area, in my

22  mind it said she had to be working on the basis of

23  disclosing pricing, list of customers, places to make

24  seminar presentations.  All of that seemed to me to be

25  within the terms of -- let me look at the agreement.

A-199

VICTOR BATTAGLIA
December 19, 2006

Page 47

1           Section VII of the agreement.  I didn't
2   think she could be doing that without involving all of
3   those things.
4       Q.   What information did the Chandlers provide
5   with regard to the allegations in paragraph ten?
6       A.   I think that was probably more as a result of
7   the information I got from the investigator than from
8   Chandler.
9       Q.   More so, did the Chandlers provide any
10  information with regard to the allegation in paragraph
11  ten?
12      A.   I don't have a specific recollection, I'm
13  sorry.
14      Q.   What information did you communicate with the
15  Chandlers with regard to paragraph ten prior to it
16  being filed, if you recall?
17      A.   What I just said to you.
18      Q.   I'm not interesting in your mental
19  impressions with regard to drafting of the Complaint.
20           I'm asking did you have a discussion with
21  the Chandlers with regard to the basis for the
22  allegation in paragraph ten of the Complaint?
23      A.   I think they are the same.  The mental
24  impressions I gave you, those are things I talked to
25  Jim Chandler about.
                        A-200

VICTOR BATTAGLIA
December 19, 2006

Page 48

1    Q.   Do you have a specific recollection, sir, of

2  communicating with Mr. Chandler as to the basis for

3  your averment in paragraph ten?

4    A.   Absolutely not, no.

5    Q.   Your mental impressions, sir, with regard to

6  paragraph ten, were based exclusively on what you had

7  learned as a result of the investigator going to

8  Boscov's?

9    A.   I didn't say exclusively.  There may have

10 been another ad or something that was called to my

11 attention.  I'm not sure of it.  I don't think it was

12 just one ad, is my recollection at this point.

13   Q.   Pertaining to a seminar?

14   A.   Yes.

15   Q.   At Boscov's?

16   A.   I don't think so.  I don't have a memory, I'm

17 sorry.

18   Q.   You tipped off a few things and I'm trying to

19 understand what your mindset was at the time.

20        You told me earlier when you learned that

21 Ms. Rowan had been at Boscov's and cancelled a

22 scheduled presentation and that it was to be

23 rescheduled, in your mind you view that as competitive

24 activity?

25   A.   Yes, rescheduled on behalf of McCrery is what

VICTOR BATTAGLIA
December 19, 2006

Page 49

1    the investigator said to me.  That sounds to me -- what

2    she used to do for Chandler she was going to do for

3    McCrery.

4         Q.    What about the scheduled seminar led you to

5    conclude that she was using and disclosing trade

6    secrets?

7         A.    When you read it with paragraph seven of the

8    agreement as to all of the things that she was not to

9    do, it seemed to me it fell right within.

10        Q.    We agree she cancelled the seminar to be held

11   at Boscov's?

12        A.    Indeed.

13        Q.    What about the cancellation of the seminar at

14   Boscov's led you to you conclude there was a violation

15   of trade secrets clause?

16        A.    She promised she would be back to do it for

17   McCrery.

18        Q.    What about that constituted a violation?

19        A.    She is dealing with all of this.  She is

20   dealing with prices, services, products -- all within

21   the business of Chandler.

22        Q.    Did Chandler convey any facts to you that she

23   had misappropriated pricing information?

24        A.    You use the word misappropriate.

25        Q.    Took confidential pricing information.  Did

VICTOR BATTAGLIA
December 19, 2006

Page 50

1    she tell you that?

2        A.    They told me she had information.    I don't

3    use the word misappropriated.    She had all of this

4    knowledge that is important to their operation.

5        Q.    Did they tell you she had misappropriated

6    pricing information, used pricing information she had

7    gained in a manner that was disruptive to their

8    business?

9        A.    They told me she had the pricing information.

10   If she had she was using it for a competitor and in

11   violation of Section VII.    That was my conclusion.

12       Q.    I'm not asking that.

13       A.    I can only tell you what they told me.    I'd

14   like to adopt it to your phraseology.    I find it

15   difficult to do that.

16       Q.    I'm trying to find out other than the fact

17   that she was scheduled to appear at Boscov's to provide

18   a seminar relating to cremation, I believe, and that it

19   was cancelled, what information did you provide to your

20   client which pertained to the allegation in paragraph

21   ten that Rowan was using and disclosing trade secrets?

22       A.    Not only was it cancelled, but she promised

23   to come back and do it for a competitor, and it

24   involved all of those subjects.

25               Putting on a seminar on cremation, unless

VICTOR BATTAGLIA
December 19, 2006

Page 51

1  you involve all of those issues, it would be totally

2  useless.  She would talk about pricing, accessibility,

3  sources.  She would be talking about customers.  She

4  would be talking about processes.  All of those things

5  were subject to Section VII in my mind.

6      Q.  What facts did you have at the time that she

7  would be talking about that, or are you speculating?

8      A.  You call it speculation.  I say it is a fair

9  judgement to make.  If you are going to give a seminar

10 you have to get into every one of those things.

11     Q.  Did the Chandlers ask you at the time the

12 Complaint was filed whether there was evidence that she

13 had, in fact, disclosed that information?

14     A.  There was no discussion about that.  Our

15 discussion was this is what the investigator learned

16 and this is what I think it means.

17     Q.  The sole information that the Chandlers had

18 was she was scheduled to appear at Boscov's to give a

19 seminar, cancelled and she was to appear at some later

20 point as a representative of McCrery; correct?

21     A.  I can't say the sole information Chandlers

22 had.  It is the information I gave to the Chandlers.

23     Q.  Thank you.  Nothing else in regard to that?

24     A.  I think that is right.

25     Q.  Before the suit was filed did you talk with

VICTOR BATTAGLIA
December 19, 2006

Page 53

1                    Do you recall reviewing my answer to the

2    Complaint?

3         A.    I'm sure I did.

4         Q.    Did you provide the document to your client?

5         A.    I don't have a recollection of doing that.  I

6    probably would have told them that you filed an answer

7    and that you raised the issue of Funeral Services.  I'm

8    assuming that's what I would have said.

9         Q.    Do you see the affirmative defenses, a

10   variety of factual allegations?

11                   Did you discuss those with your client?

12        A.    I don't think I discussed them as affirmative

13   defenses, I would ask them for information that I

14   thought was relevant to the allegations.

15        Q.    When you characterized them as affirmative

16   defenses, is it fair to say you discussed what my

17   client was alleging?  You discussed that with your

18   client, alleging, these affirmative defenses, factual

19   allegations?

20        A.    I don't have a recollection of doing that.

21   Normally I would go over the factual allegations.

22        Q.    That's what I mean.

23        A.    Not the contentions.  I would not discuss

24   them as contentions.  Getting information.

25        Q.    You told them my client was bringing to light

VICTOR BATTAGLIA
December 19, 2006

Page 54

1   the fact that she had been working for Funeral Services

2   of Delaware, LLC?

3       A.   Yes, I did.

4       Q.   When you bought that to their attention, to

5   Jim Chandler's attention --

6       A.   I don't have a recollection whose attention

7   it was.

8       Q.   What did they say?

9       A.   My recollection is they told me she continued

10  to work for Chandlers.  And my recollection is I looked

11  at a lot of contracts.  She must have written a lot of

12  contracts.

13      Q.   Insurance contracts?

14      A.   Pre-need contracts.  All in the name of

15  Chandlers.

16           I looked at some publication that referred

17  to her as an employee of Chandlers, Anne Rowan of

18  Chandlers.  That convinced me that even though they

19  would be paid by Funeral Services, that she continued

20  in the employ of Chandlers, and the terms of the

21  contract.  I at that point -- I told Chandler I thought

22  that we had -- it was a viable Complaint.  We ought to

23  push forward.

24      Q.   Was there an amended Complaint filed?

25      A.   Yes.

VICTOR BATTAGLIA
December 19, 2006

Page 55

1      Q.    Why did you file that?

2      A.    Once you raise the issue about Funeral

3   Services I thought to be safe we ought to have both

4   named.

5                I wasn't at all sure that the Complaint

6   with Chandlers wasn't sufficient without Funeral

7   Services.    There's no sense in taking a chance.

8                MR. SALZER:   Mark this as B-8.

9                (Whereupon, Exhibit B-8 was so

10       marked for identification by the court

11       reporter, being Amended Verified Complaint.)

12  BY MR. SALZER:

13     Q.    I want to re-visit the issue of trade

14  secrets.

15                At any time did the Chandlers convey to

16  you that they had come into possession of information

17  that my client was disclosing trade secrets?

18     A.    I don't think so because I don't think we

19  talked about it in those terms.    I asked them for

20  factual information they had.

21                I made a determination that it fit within

22  the context of paragraph seven of the Employment

23  Agreement.    As between them, between the two

24  contracting parties, stipulated that those things were

25  what I thought was the nature of trade secrets.