VICTOR BATTAGLIA
December 19, 2006

1  by that?

2      A.   I don't have a recollection of telling them

3  what I meant by that.

4      Q.   Is it a possibility you prepared the

5  Complaint based on your ideas and asked him to verify

6  it and file it?

7      A.   That's a possibility.

8      Q.   When you filed the amended Complaint did the

9  Chandlers tell you that James T. Chandler and Sons,

10  Inc. and Funeral Services of Delaware, LLC were

11  separate legal entities, separate companies?

12      A.   I knew it because you raised it in the

13  Answer.

14      Q.   I'm trying to find out, what was the nature

15  of the discussion with your clients with regard to my

16  allegation or that being a fact?

17      A.   My recollection is what they said to me is

18  Chandler remains as it was with all of its employees.

19  Corleto remains as it was.  They are not dissolved.

20  Funeral Services is really just a vehicle for paying

21  salaries and distributing profit between the two.  I

22  think on an 8 to 18 percent basis, or something like

23  that.

24      Q.   The Chandlers were aware that JTC and the

25  Corleto Funeral Home were separate companies?

VICTOR BATTAGLIA
December 19, 2006

Page 60

1   Chandlers about the Limited Liability Agreement in the

2   context of paragraph one of the amended Complaint?

3       A.   I can't say for sure.  I don't have a

4   specific memory.  I believe so.

5       Q.   Look at Page 2 of the Amended Complaint.

6   Specifically, paragraph nine.  Read that to yourself.

7       A.   Sure.

8       Q.   Let me understand, at the time you filed this

9   what was your understanding of your allegation that

10  Funeral Services was the alter ego or successor in

11  interest of James T. Chandler?

12      A.   I thought all of these people were still in

13  place, even though Chandler continued to exist.  They

14  were all doing the same work, all continuing to sell

15  for Chandler.  They were all being paid the same way

16  except the payroll was now transferred to Funeral

17  Services.

18          And frankly, that whatever interest

19  Chandler had in the employees, in the business became

20  the business of Funeral Services, and that there was

21  implicit assignment of rights and liabilities each had.

22      Q.   Have you read paragraph nine?

23      A.   Yes.

24      Q.   Did the Chandlers ask you what you meant when

25  you pled in paragraph nine that, "Funeral Services was

VICTOR BATTAGLIA
December 19, 2006

Page 61

1  the assignee of all rights, responsibilities,

2  liabilities and interests in the employment contracts

3  between James T. Chandler and Son, Inc. and its

4  employees".

5          Did they ask what you meant by that?

6     A.   I can't say specifically they asked that

7  question, but they wanted to know the relationship

8  between Funeral Services and to the employees.  I would

9  have told them that Funeral Services, under my theory

10  became the assignee of all rights and obligations they

11  had with respect to the employees.

12     Q.   You told them -- you have a specific

13  recollection of telling them that Funeral Services

14  became assignee?

15     A.   Do I have a specific recollection of doing

16  it?  My practice would be to do that.  I could see no

17  reason why I did not in this case.

18     Q.   You don't specifically recall?

19     A.   Absolutely not, no.

20     Q.   Did you ask them do you have an assignment of

21  the contract that we looked at, exhibit A from Chandler

22  to Funeral Services?

23     A.   No, I don't think so.  I would not have

24  thought the word assignment would have any meaning to

25  them.

VICTOR BATTAGLIA
December 19, 2006

Page 62

1    Q.    You didn't ask?

2    A.    I did not ask that question.

3    Q.    Why did you conclude the word assignment

4    would not have any meaning for them?

5    A.    I thought they were a relatively small family

6    business.  That they were not going to understand

7    sophisticated legal maneuvering.  I thought this would

8    be foreign to them.

9    Q.    Do you know whether they had corporate

10   counsel?

11   A.    I have no idea whether they had corporate

12   counsel.  I know that the guy that used to do the legal

13   work for the Chandlers was a Ray Becker.  He is now

14   deceased.

15          It was a mutual friend of ours.  He was a

16   small office guy, not into sophisticated corporate

17   work.

18   Q.    Do you know who drafted the Limited Liability

19   Agreement?

20   A.    I do not.

21   Q.    You will see that in paragraph five of the

22   Amended Complaint the strike out language.  You were

23   withdrawing the allegation Ms. Rowan remained

24   continuously employed until the date of termination

25   pursuant to the contract identified as exhibit A.

VICTOR BATTAGLIA
December 19, 2006

Page 66

1  rent.  Seven, business card changes.  Under that

2  something about mailing plan.  Does by Anne Rowan.  I

3  can't make out the last line because it is cut in half.

4  The last words are Chandler Funeral.  First three words

5  I can't make out.

6          Q.   Do you know the significance of these notes?

7          A.   I don't have the foggiest notion.

8          Q.   Did you discuss with the Chandlers Rowan's

9  contention that the employment contract that was

10 attached as exhibit A to the Complaint had never be

11 assigned to Funeral Services?

12         A.   I think what I told them, based on the

13 information that everything continued in place and that

14 Funeral Services was simply an entity which allowed

15 Chandler and Corleto to operate together indicated to

16 me that Funeral Services inherited whatever Chandler

17 had or was doing, and the obligations that Chandler

18 had.

19         Q.   A few moments ago I believe you told me that

20 was your mindset, but you didn't have a specific

21 recollection of a conversation, conveying that

22 information to the Chandlers.

23              Are you changing your testimony, sir?

24         A.   Whether I'm changing it or not, I'm trying to

25 give you the best I can at this time.

VICTOR BATTAGLIA
December 19, 2006

Page 70

1    A.   I don't honestly recall. My recollection is

2  there was some paper or something. Maybe it was the --

3  I don't recall. That was my firm belief.

4    Q.   I'm not asking your belief. You put it in

5  the Complaint so I assume it was your belief. What

6  information did they give you for that?

7    A.   I can't recall.

8    Q.   Obviously that information could only come

9  from the Chandlers because it says the employees were

10  aware of these contentions?

11    A.   I don't share your certainty about that.

12    Q.   Why is that?

13    A.   I don't know. If I knew I would tell you,

14  but I don't know.

15    Q.   Fair enough. Did you discuss with the

16  Chandlers Rowan's request that you withdraw the

17  lawsuit?

18    A.   I think I did. I recollect telling them that

19  I thought that was a device to create a threat. I did

20  not think it was justifiable.

21    Q.   What are you referring to?

22    A.   I was referring to your sanction letter.

23    Q.   My letter to advise your clients that we

24  would be seeking sanctions if the lawsuit was not

25  withdrawn and you discussed that with the Chandlers?

VICTOR BATTAGLIA
December 19, 2006

Page 71

1      A.    Yes.

2      Q.    Did the Chandlers instruct you to proceed

3  with the lawsuit?

4      A.    They asked for my advice and agreed to accept

5  my advice.

6      Q.    What was your advice at that time?

7      A.    That I thought the threat was unjustified.

8  That I thought there was a solid legal basis for

9  pursuing the relief that they were entitled to and they

10  should push forward.

11      Q.    You had a specific recollection of that?

12      A.    I do.

13      Q.    Where did that take place?

14      A.    I can't tell you.  I'm sure it took place in

15  the conference room of my office on the first floor.

16      Q.    Do you remember when that was?

17      A.    I truly do not.

18      Q.    Did you explain why you were so confident?

19      A.    I thought we had done some research at that

20  point and were comfortable we did not have a statute of

21  frauds problem.

22            We had an assignment situation, that we

23  had a continuation of the relationship.  That we had

24  all of the contracts that continued to be signed by her

25  as for Chandler.  At that point we had a number of

VICTOR BATTAGLIA
December 19, 2006

Page 72

1  places where she advertised as an employee of Chandler.

2      Q.    I asked you specifically -- my question is

3  simple.  Did you explain to the Chandlers why you were

4  confident that the matter had merit, not what was in

5  your mind?

6      A.    I meant to say I thought I went over those

7  things with them.

8      Q.    You don't have a specific recollection?

9      A.    Do I have a specific recollection of the

10 verbiage?  No.

11     Q.    Did you discuss with the Chandlers that Rowan

12 was seeking sanctions?

13     A.    Yes.

14     Q.    At some point did you make a demand of Rowan

15 that was short of the demand in the lawsuit?

16     A.    Sure.

17     Q.    When was that?

18     A.    I don't remember the date.  You unloaded a

19 ton of discovery on us and I talked to them about the

20 expense of completing the responses to the discovery.

21 Whether or not it was economically feasible to continue

22 the litigation.

23          I asked the Chandlers to allow me to

24 attempt to settle it on a reasonable basis short of the

25 relief that we asked for.

VICTOR BATTAGLIA
December 19, 2006

Page 73

1          He accepted my advice and I wrote you the

2     letter and said this is the settlement offer, which you

3     rejected out of hand.

4          Q.    You mean settlement demand?

5          A.    I thought I sent it as a settlement offer.

6          Q.    The settlement offer was that my client --

7     Rowan would pay your client $10,000?

8          A.    Sure.

9          Q.    That was the settlement offer?

10         A.    Yes.

11         Q.    In exchange for your dropping the lawsuit?

12         A.    Yes.

13              MR. SALZER:  Let's take a break.

14              (Whereupon, a short recess was

15         taken.)

16    BY MR. SALZER:

17         Q.    Whose idea was it to make a demand of $10,000

18    in exchange for dropping your lawsuit?

19         A.    It was my suggestion that I attempt to settle

20    the case by asking for a payment of $10,000.  I think

21    it was my idea.

22         Q.    They agreed?

23         A.    Absolutely, yes.  They routinely took

24    whatever advice I threw at them.

25         Q.    Who broached the discussion about settlement?

KELLY BURNS

Page 1

IN THE SUPERIOR COURT OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

- - -

ANNE M. ROWAN,                        :
                                      :
    Plaintiff,                        :  No. 06-258-GMS
                                      :  Civil Action
    Vs.                               :
                                      :
JAMES T. CHANDLER & SON,              :
INC., and FUNERAL SERVICES            :
OF DELAWARE,                          :
                                      :
    Defendants.                       :

- - -

FRIDAY, JANUARY 19, 2007

- - -

    Oral deposition of KELLY BURNS, taken pursuant to
Notice, before Shari Bowen, Certified Shorthand
Reporter and Notary Public, at SWARTZ CAMPBELL, LLC,
300 Delaware Avenue, Suite 1130, Wilmington, Delaware,
commencing at 9:20 a.m.



KARASCH & ASSOCIATES

REGISTERED PROFESSIONAL REPORTERS

PENNSYLVANIA and DELAWARE

(800) 621-5689

KELLY BURNS

Page 17

1    sale; is that correct?

2         A.    Yes, I believe so.

3         Q.    And the changes, you said her commission

4    changed frequently, that was the percentage of

5    commission that she received changed?

6         A.    Yes.

7         Q.    And that was based on what insurance company

8    she was going through for the insurance policies; is

9    that correct?

10        A.    Yes.

11        Q.    Do you know why she changed companies

12   frequently?

13        A.    No.

14        Q.    Other than the one conversation that you had

15   with Jim questioning the way that Anne was calculated

16   her commissions, did you have any other conversations

17   with Jim about Anne's commissions?

18        A.    In the beginning we had a lot of discussions

19   about that.

20        Q.    You and Jim?

21        A.    Yes.

22        Q.    And what were those discussions?

23        A.    I think he would try to make me accountable

24   for Anne's department.

25        Q.    How would he do that?

KELLY BURNS

Page 18

1    A.    He would ask me questions regarding her
2    commissions that I could not answer.
3    Q.    What kind of questions?
4    A.    Why did Anne get this much money?  Why does
5    her department have a negative balance?  Why is it
6    losing money?  Let's move this marketing from preneed
7    marketing to regular marketing so her numbers look
8    better.  After discussing it with Anne, she would say,
9    well, that's not a preneed.  That's a regular
10   marketing.  So I would say manipulating the numbers.
11   Q.    That was at Jim's direction?
12   A.    After discussing it with Anne.
13   Q.    And you said that those conversations
14   occurred in the beginning, more recently, let's say
15   from 2000 to 2004, do you recall having conversations
16   with Jim about Anne's commission?
17   A.    There came a point in time that it seemed
18   like -- well, I guess I decided I didn't want to be
19   accountable.  So I said, I'm staying out of it.  I'll
20   just pull myself out of the equation and if there was a
21   question I wouldn't try to answer the question, I would
22   have him go directly to Anne.
23   Q.    Do you remember when that point in time was?
24   A.    Probably around 19 -- I don't know.  '97/'98.
25   Q.    Was there a specific event that precipitated

KELLY BURNS

Page 19

1  that?

2      A.    I don't know if there was a specific event.

3  There was a series of events.

4      Q.    Do you remember what those series of events

5  were?

6      A.    Well, I think after they would meet I would

7  be like the bad guy and I would be the troublemaker and

8  it was -- so I took myself out of the equation.

9      Q.    Who made you feel like you were the bad guy

10 or the troublemaker?

11     A.    Jim and Anne.

12     Q.    How would they do that?

13     A.    They would say -- I think Anne had Jim's ear

14 and would say things to him.  "She doesn't understand

15 this and she has a personal vendetta against me."

16          And Jim would say, "well, is it personal?"

17 And I decided that it wasn't personal, it was business

18 but I'm just going to take myself out of it, and he

19 just wanted us all to get along so that's what I did.

20     Q.    Do you know as fact that Anne told Jim that

21 you had a personal vendetta against her?

22     A.    Do I know as fact?  She told me that.  Anne

23 told me that.

24     Q.    That she told Jim that she felt --

25     A.    No, she told me that.  Anne said, you have --

KELLY BURNS

Page 20

1    it's personal, you know.  I remember having a

2    conversation with her where I told her that my job had

3    nothing to do with her job.  And I was clear -- we

4    decided to keep it that way.

5        Q.    Had you had any arguments with Anne prior to

6    that conversation?

7        A.    Yes.

8        Q.    How many?

9        A.    I don't remember.

10       Q.    A few?

11       A.    A lot.

12       Q.    What kind of arguments?

13       A.    Well, I think she thought I was trying to

14   make her look bad.

15       Q.    Why do you think that?

16       A.    Because her department was losing money.

17       Q.    Did she say to you, you're trying to make me

18   look bad?

19       A.    I don't remember if they were the exact

20   words.

21       Q.    Would she raise her voice in those

22   discussions with you?

23       A.    Yes.

24       Q.    Would you raise your voice?

25       A.    No.

KELLY BURNS

Page 21

1      Q.    Did she ever use profanity during those

2   disagreements?

3      A.    Yes.

4      Q.    What kind of profanity?

5      A.    One time earlier she called me the "C" word

6   and said she would have my job.

7      Q.    What was your response to that?

8      A.    Take it.

9           MR. PEARCE:  I didn't hear what your

10  answer was.

11          THE WITNESS:  I said take it.  I don't

12  remember what my response was, but I remember being

13  surprised that she attacked me verbally.

14  BY MS. CONNELLY:

15     Q.    Did she use any other profanity in

16  disagreements with you?

17     A.    No.  We stopped fighting and we became --

18  once I -- once I got out of the equation we were

19  friends.

20     Q.    So after you -- you had said there came a

21  point in time where you said, I'm staying out of it,

22  after that you and Anne had a good relationship?

23     A.    Yes.  We had a good relationship.  She was

24  very emotional about her income.

25     Q.    What do you mean by very emotional?

KELLY BURNS

Page 13

1    A.    Anne.

2    Q.    What was Jim's demeanor?

3    A.    Jim's -- he's usually quiet.

4    Q.    Would he be quiet during those meetings?

5    A.    I've never heard him raise his voice.

6    Q.    Would you hear Anne raise her voice?

7    A.    Yes.

8    Q.    Would you describe Anne's natural speaking

9 voice as being loud?

10    A.    Yes.

11    Q.    In her conversations with Jim would her voice

12 get louder than normal?

13    A.    Yes.

14    Q.    Could you hear what the substance of the

15 conversations were?

16    A.    Well, my office is on the other side, so you

17 could just hear yelling.

18    Q.    So you would describe her voice as being

19 yelling?

20    A.    Yes.

21    Q.    During her meetings with Jim?

22    A.    Yes.

23    Q.    How often would she be yelling in meetings

24 with Jim?

25    A.    She probably blew up at him a couple of

KELLY BURNS

Page 14

1    times, maybe once every couple of months.

2                    MR. PEARCE:  I'm sorry, what was your

3    answer?

4                    THE WITNESS:  Once every couple of months.

5    BY MS. CONNELLY:

6        Q.    Is that going back from the time when she

7    first began working at Chandler through to 2005?

8        A.    Yes.

9        Q.    And your understanding of those meetings was

10   about her commission?

11       A.    I don't know what else they discussed.

12       Q.    At any point did you question the method by

13   which Anne was requesting commissions?

14       A.    Yes.

15       Q.    Who did you question?

16       A.    Jim.

17       Q.    What did you ask him?

18       A.    In the beginning, it was my understanding

19   that the commissions that were received were supposed

20   to cover the expense of the entire department,

21   including the commissions she earned.  And when the

22   department was losing money on the commissions, I

23   questioned Jim about it.

24       Q.    What was Jim's response?

25       A.    He would discuss it with Anne.

KELLY BURNS

Page 36

1    Q.    Did you ever hear Anne use profanity?

2    A.    Yes.

3    Q.    How often?

4    A.    Pretty often.

5    Q.    Was it more so than other people in the

6    office?

7    A.    Yes.

8    Q.    What type of profanity have you heard Anne

9    use?

10    A.    What are you asking?  What words she said?

11    Q.    Yes.

12    A.    I mean, probably all of them.

13    Q.    How often would she say "fuck" or "fucking"?

14    A.    Often.

15    Q.    Did you ever complain to anyone about her use

16    of profanity?

17    A.    No.

18    Q.    Did you ever hear her refer to a group of

19    people -- and I apologize for having to say this -- but

20    as spics and niggers?

21    A.    No.

22    Q.    Did you ever hear her say that someone

23    doesn't know what the "F" they're doing?

24    A.    I don't specifically remember.

25    Q.    Did you ever hear her call Tony fucking

KELLY BURNS

Page 37

1    incompetent?

2        A.    I don't specifically remember that.

3        Q.    Did you ever hear anybody call Tony

4    incompetent?

5        A.    I have heard her say incompetent, but I don't

6    know if was F-ing incompetent.

7        Q.    Have you heard anyone else call Tony

8    incompetent?

9        A.    I don't know.  No, I don't think so.  I don't

10   remember.

11       Q.    Did you ever see Anne act unprofessionally?

12       A.    Yes.

13       Q.    When?

14       A.    When she would get into arguments.

15       Q.    How often would that occur?

16       A.    Every couple of months.

17       Q.    And who would these arguments be with?

18       A.    The owners.  One time with Helen, couple of

19   sometimes with Helen.  She was very emotional.

20       Q.    What do you mean by that?

21       A.    Well, sometimes when she had a meet, we

22   would, me and Diana would maybe sit with her and tell

23   her that she needed to calm up down that she needed to

24   lower her voice, and she needed to think about what she

25   was saying before she went into a meeting, because she

KELLY BURNS

Page 38

1  would get overly emotional and you usually would hear

2  yelling and she would storm out.

3       Q.   Did she ever cry in the office?

4       A.   Oh, yes.

5       Q.   How often?

6       A.   Ever couple of months, maybe I would see her

7  cry.

8       Q.   What would precipitate that?

9       A.   Sometimes it was her personal life and

10  sometimes -- mostly it was her personal life, but

11  sometimes she would be frustrated with management.

12       Q.   Did she tell you why she was frustrated with

13  management?

14       A.   Sometimes she would tell me.

15       Q.   What would she tell you?

16       A.   I knew she was frustrated when the Tony --

17  when the merger -- the liability, the partnership and

18  Tony, he was -- he questioned her commissions.

19       Q.   Tony questioned her commissions?

20       A.   Tony would question, they would have preneed

21  meetings and he would question her the way she did

22  things.

23       Q.   And she told you she was frustrated by that?

24       A.   I think she thought he didn't have the right

25  to question her department.

KELLY BURNS

Page 39

1    Q.    Other than having arguments with the owners

2  and Helen, have you ever seen her have arguments with

3  anyone else, other than the ones that you described

4  between yourself and Anne?

5    A.    That was the worse one and that was in the

6  beginning.

7    Q.    The worse argument that you've seen is the

8  one between you and Anne?

9    A.    No.

10    Q.    I'm sorry.

11    A.    She had -- the worse one I saw was with

12  Helen.

13    Q.    What happened with the argument with Helen?

14    A.    There was a problem where Helen -- they did a

15  seminar together.  I don't exactly remember but she

16  didn't like the way Helen handled it and she was

17  screaming at Helen.

18    Q.    Where did that argument take place?

19    A.    In the office.

20    Q.    Can you be more specific?

21    A.    Well, it was our old office, so it was right

22  in the middle of the office near Helen's -- I mean

23  not -- off to the side, but it was pretty much --

24  everybody in the office could hear it and see it.

25    Q.    Was Helen also screaming?

KELLY BURNS

Page 40

1   A.    No.

2   Q.    Did Anne use profanity during the argument?

3   A.    Yes.

4   Q.    Do you recall specifically what Anne said?

5   A.    No.

6   Q.    Do you recall what Helen said?

7   A.    No.

8   Q.    Were there any other arguments that Anne got

9   into that you recall?

10   A.    Well, I mean, she was emotional so she would

11   argue with the owners and me.  I think she may have --

12   she may have had an argument with Duane, one of the

13   directors, Jason.  I mean, I don't specifically

14   remember but it wasn't just one person.

15   Q.    You're describing her as being emotional, I

16   just want to understand what you mean by emotional.

17   A.    She was very high strung, neurotic.  She

18   needed a lot of reassurance.

19   Q.    Did you ever see her act unprofessionally

20   with clients?

21   A.    Can you be more specific?

22   Q.    Well, you told me that you saw her act

23   unprofessionally when she got into arguments with the

24   owners, with Helen, with yourself, and possibly some

25   other people, did you ever see her get into any

KELLY BURNS

Page 53

1    Q.    As the accountant, did you understand the

2    financial implications of that merger?

3                    MS. CHEEK:  Objection to the form.

4                    THE WITNESS:  I don't understand your

5    question.

6    BY MS. CONNELLY:

7    Q.    As a result of the merger, did you have an

8    understanding as to what company was employing all of

9    the employees?

10    A.    What company was employing all the employees?

11    Yes, Funeral Services of Delaware.

12    Q.    Was it your understanding that James Chandler

13    Funeral Homes employed any employees?

14    A.    In the beginning it was just a matter of

15    cleaning up the books and I did a lot of overtime for

16    James T. Chandler & Son, Inc., so I may have been paid

17    through them, and we kept our payroll open a couple of

18    years.  We paid James Chandler, III a pension through

19    that company, and some of the fringe benefits that were

20    paid to the owners, just Jim and Chad, for a couple of

21    years.

22    Q.    Is there still an open payroll?

23    A.    No.

24    Q.    So there's no payroll for James Chandler?

25    A.    That's correct.

KELLY BURNS

Page 54

1    Q.    And all employees and all owners are now paid

2    through Funeral Services?

3    A.    Yes.

4    Q.    Does James Chandler Funeral Homes continue to

5    exist?

6    A.    It's a real estate holding company.

7    Q.    What real estate does it hold?

8    A.    The building, the 2506 Concord Pike and

9    Hockessin Crematory Company.

10    Q.    So two buildings, am I understanding your

11    answer correctly?

12    A.    Well, it's the -- right.  It's the owner of

13    Hockessin Crematory Company and Chandler Funeral Homes.

14    Q.    You told me before that Jason had mentioned

15    to you that he had a friend that he would go out to

16    dinner with, do you recall when he told you that?

17    A.    He's been separated for months so he just

18    told me that recently.

19    Q.    Prior to his separation, did he ever tell you

20    that he was involved with any women?

21    A.    I believe he was separated before.  I believe

22    he was separated before.  Him and his wife had been

23    separated before.  I think they've been together for a

24    very long time and they have been separated before.

25                    MS. CONNELLY:  Those are all the questions

TODD WOODSIDE

Page 1

IN THE SUPERIOR COURT OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

- - -

ANNE M. ROWAN,                          :
                                        :
      Plaintiff,                        :  No. 06-258-GMS
                                        :  Civil Action
      Vs.                               :
                                        :
JAMES T. CHANDLER & SON,                :
INC., and FUNERAL SERVICES              :
of DELAWARE,                            :
                                        :
      Defendants.                       :

- - -

TUESDAY, JANUARY 30, 2007

- - -

      Oral deposition of TODD D. WOODSIDE, taken
pursuant to Notice, before Shari Bowen, Certified
Shorthand Reporter and Notary Public, at SWARTZ
CAMPBELL, LLC, 300 Delaware Avenue, Suite 1130,
Wilmington, Delaware, commencing at 10:00 a.m.



KARASCH & ASSOCIATES

REGISTERED PROFESSIONAL REPORTERS

PENNSYLVANIA and DELAWARE

(800) 621-5689

Page 19

1   Anne's underwriter about them, Bob Wright, and

2   everything else I would have heard, I just would have

3   been listening.  I would say that would have been

4   hearsay at best, just conversation that I would just

5   view that as conversation.

6        Q.    When you discussed it with Anne, what was her

7   response?

8        A.    Not positive.

9        Q.    What did you say to her?

10       A.    We were discussing various sales techniques

11  and that would happen when we would run into each other

12  previous to my involvement with Chandlers.  This is

13  while I was involved with Bringhurst.  And she would

14  say, she would do this, this and this and how she would

15  write it, and I would just say, I wouldn't do it that

16  way.

17       Q.    And her response would be what?

18       A.    Not favorable.

19       Q.    How many times did you have discussions about

20  sales closing techniques with Anne?

21       A.    Perhaps 10 over a period of zero to five

22  years.

23       Q.    After you agreed to handle the preneed sales

24  for the Corleto-Latina Funeral Home, what was your

25  first encounter with Anne?

TODD WOODSIDE

Page 20

1    A.    The one that I remember, an encounter being

2    there was a spoken conversation as opposed to just

3    looking and walking the other way was her common

4    behavior.  I was accessing a file for a family at

5    Corleto-Latina Funeral Home, which is stored at the

6    Concord Pike number 1 location.  She steamed out of her

7    office and told me I had no business there.  Why am I

8    stealing her sales?  Jimmy or Chad, why don't we be rid

9    of him?  I think it was Jimmy, I was accessing a file

10   that was prepared years ago because a family had a

11   question about it.

12            Her behavior was -- I found it to be

13   embarrassing to the whole staff and quite

14   unprofessional and she steamed around and stomped and

15   steamed, and as I remember, it was Jimmy not Chad.

16   Jimmy came out and asked her to come to his office or

17   her office and he squashed the conversation.

18   Q.    Other than yourself and Anne, was anyone else

19   present during the conversation?

20   A.    Well, let me say, it was hardly a

21   conversation.  It was more of a Anne yelling at me and

22   I'm just not going to be drawn into that.  Any office

23   staff person could have been there.  Diana or Debbie

24   would be my recollection.  They're very professional.

25   They probably ignored the whole conversation.

TODD WOODSIDE

Page 21

1    Q.    Did you have -- just going back to the

2  decision for you to provide preneed sales services for

3  Corleto-Latina, was that a series of conversations or

4  was that one discussion?

5    A.    That would have been an ongoing series of

6  conversations like any other business relationship.

7    Q.    And were those conversations primarily with

8  Tony Latina or were other members of Funeral Services

9  involved?

10   A.    I would think primarily with Tony Latina my

11 recollection would be.

12   Q.    You didn't have any conversations with Anne

13 during that time period; is that correct?

14   A.    Why -- during what period?

15   Q.    During the negotiations to bring you on board

16 to sell preneed policies for the Corleto-Latina Funeral

17 Home.

18   A.    Anne attempted to recruit me at one time in

19 that time frame, so she would have been part of that

20 conversation of me becoming involved with the Funeral

21 Services organization to do preneed sales.  So there

22 would have been conversation that included her.

23   Q.    When did she or how did she attempt to

24 recruit you?

25   A.    Very formally.  Asked me to come down and I

TODD WOODSIDE

Page 22

1    met with Tony.  I met with Chad and Jimmy at one point

2    when there were compensation issues.

3        Q.   What compensation issues?

4        A.   Questions how I would be paid from the

5    underwriter or the funeral home where Anne was in the

6    mix.  How the leads would be distributed.  What the

7    check and the balance of the lead system would be?  And

8    that's -- that was my role at Bringhurst.  I managed

9    people concerning those issues, so I wasn't new to this

10   practice.

11       Q.   Those issues that you discussed compensation,

12   what was your understanding about compensation?

13       A.   I'm not sure I understand the question.

14       Q.   You said that Anne had attempted to recruit

15   you --

16       A.   That's correct.

17       Q.   -- and as a result, you had discussions with

18   Chad and Jimmy and Tony and Anne was present and that

19   you discussed several issues including compensation.

20       A.   Right.

21       Q.   What was that discussion?

22       A.   The compensation was the commissioned amount,

23   the payment period, weekly, bi-weekly.  If there were

24   salary or not and what are the benefits and the

25   distribution which directly related to the

TODD WOODSIDE

Page 28

1  please refrain.  Then she would take her -- turn that

2  behavior to him.  And he's a -- he's a true gentleman.

3      Q.   Okay.  Did you have any discussions with any

4  of the principals Tony, Jim or Chad, about the fact

5  that Anne seemed reluctant to have you come on board?

6      A.   With Anne sitting in the conference room we

7  had that conversation.

8      Q.   When did that conversation take place?

9      A.   2000/2001.

10     Q.   What was that conversation?

11     A.   That would have been the conversation

12 involving from Anne trying to recruit me, compensation

13 to lead distribution.

14     Q.   So that meeting that we talked about before?

15     A.   Uh-uh.

16     Q.   What specifically did you say to the

17 owners -- I think I'm confused.

18     A.   Okay.

19     Q.   You told me that she initially recruited you

20 for an in-house position.

21     A.   She attempted to recruit me for an in-house

22 position.

23     Q.   And then during that same conversation?

24     A.   No.  There was a meeting.  There were offers

25 and possibilities talked about.  I believe there's

TODD WOODSIDE

Page 29

1    another meeting it was reduced to paper and mailed to

2    me at my home.  I came in to discuss that once again,

3    Anne being present then, also.

4                The offer from the organization I thought

5    was fair and generous, the problem I had was, I knew of

6    Anne's lack of professional behavior, I didn't want to

7    taint my own reputation.  Her distributing leads, as I

8    mentioned previously, that was my role at one point.  I

9    knew how that went.  I've managed people, it was a very

10   uncomfortable environment with Anne involved.  I didn't

11   want to be part of that.  There was no reason to be

12   part of that.  My thoughts were I'll just maintain a

13   relationship with the Chandler Funeral Home, a

14   professional organization, and go back to Philadelphia

15   and proceed with my career there.

16       Q.   And that's what you said during this meeting?

17       A.   I don't know -- that certainly isn't a quote,

18   but my thoughts were, thank you for the offer, it's

19   very generous.  And with Anne sitting there, I'm very

20   uncomfortable with the lead distribution, I don't think

21   it's fair.

22       Q.   And what was the response?

23       A.   Well, Anne's response was less than

24   favorable, but I don't remember what it was other than

25   perhaps steaming out of the room.  Jim and Chad thanked

TODD WOODSIDE

Page 31

1    A.  This would have been after '98, before '01.

2    Q.  Did you have any other experiences prior to

3  this 2000 or 2001 meeting to discuss this in-house

4  sales position where you personally observed Anne's

5  lack of professional behavior?

6    A.  Do you mean within the office or do you

7  mean -- I only attended one seminar with her.  So that

8  would have been the only professional seminar that I

9  did with her.  She made people, other people, and she

10  made me feel very uncomfortable when I would come in

11  after I was addressing the sales she would be very

12  hostile.

13    Q.  What do you mean by that?

14    A.  "What are you doing here" would be the

15  greeting.

16    Q.  Obviously you felt that she made you

17  uncomfortable and that she was hostile, but were there

18  other people that you witnessed her being how you

19  described hostile?

20    A.  Yes.  I didn't view her behavior exclusive to

21  me.  I've felt that -- when Anne was -- when I saw Anne

22  coming, the hostile environment came with her.

23    Q.  Who were the other people that you saw her

24  being as you described it hostile?

25    A.  When I was in the building, anyone in my