TODD WOODSIDE

Page 32

1  sphere she would be -- it would be a totally hostile

2  environment.  It wouldn't make any difference who was

3  there, totally hostile.

4      Q.    I don't understand what you mean by your

5  sphere.

6      A.    Okay.  I walk into the building to -- for

7  whatever purpose.  Anne comes out and greets me with,

8  "what are you doing here?"  And she's stomping around

9  and she's creating a very uncomfortable atmosphere.

10 Embarrassing atmosphere for everyone involved because

11 they know from my behavior I was never going to be

12 drawn into that behavior.  I would just do my business

13 and move on and she would make various different

14 comments.

15     Q.    Okay.  Did you have any discussion with any

16 of the principals prior to -- immediately prior to you

17 agreeing to provide independent contracting services

18 for the Corleto-Latina Funeral Home about your

19 relationship with Anne or how Anne would respond?

20     A.    Did you say immediately prior to me going

21 there?

22     Q.    Yes.

23     A.    There was a conversation where another

24 funeral home wanted to perhaps merge with their

25 organization.  We had a meeting concerning them merging

9/30/04 DMR required to meet
with 3 partners + was
told Tony will be in
charge of the PN program
after 9 yrs of me doing
it. He has No sales experience
no sales mgt experience.
"Build a PN team for
FSD" bring in 2
competitors for 2 locations
DMR asked why? & How
C Kradle Bros - dropped
the ball in leadership,
Mgt. Tony to set mtg
time + place to get started
Memo distributed to
all staff making the
announcement

P01053

10/12/04 Tony met with AWR requested 04 Budget + proposal for 05 Budget. Was told outside contractor would be selling for IT be doing funeral follow up. AWR not to sell for 3. AWR currently doing all follow up. AWR suggested in forming "team" she be given over-ride to manage outside contractors activity + was refused. Tony no experience at managing sales. AWR suggested insurance reps be part of a meeting to organize team. Tony wants to meet with reps only not AWR & told. I am being forced out - female try 4 for now not changing

©1993 Franklin Quest Co.   Printed in USA                    CL 11096

insurance carriers but will
All of these the 1st full day
AMC has worked after breaking
her ankle & left foot. She
has produced 3 contracts
less than a week from having
surgery.

10/18/04  Tony brought Todd W
in unannounced, AMC
closed office - no communication

10/19/04 2⁰⁰ pm
Tony called at 2³⁰ to ask if
he could meet with me for seminar. He
shows up with Todd W. To discuss
other employees sending referrals & how
they should be compensated. I lost
it at the sight of Todd W

P01055

©1993 Franklin Quest Co.  Printed in USA    CL 11096

having anything to do with the established P.M. program. I confronted both with their lack of experience + inability to think things thru for themselves - I also questioned Todd why he needed to invade Chandler's P.M. if he was so successful with his other accounts. He replied that this is a democracy the answers to Mgmt only

9/20/04 8:35 am
RMR calls Tony + apologize for outbursts + requests mtg with Tony alone. He calls at 9:10 to say he is 5 min away

9/20/04 9:05 am
Tony arrives to meet with RMR with coffee in hand. RMR restates that outburst is not best way to accomplish desired goal

©1993 Franklin Quest Co. Printed in USA                    CL 11098

P01056

A-244

of getting non sales experienced
person to understand why it
is detrimental to allow
outside contracts access to
"gravy" leads. Tony is listening.
WWR explains outburst is due
to extreme frustration of
not being heard, rendering
poor judgment decisions
being made about the
program she gave birth
to without consulting
her. "I feel like the child
(the program) I've given birth
to, raised, nourished +
supported has been molested,
raped + left to die" WWR
further explained + defined
what the role of an
outside contractor should
be. He is responsible for
generating his own leads

©1993 Franklin Quest Co. Printed in USA    CL 11096

P01057

+ delivering closed sales,
nothing else. He receives no
marketing support from the
company + is responsible for
paying for any marketing that
he would do. Tony disagree
with that. Tony also tried
to assure that outside contractor
was not out for AMK's job.
AMK does not believe this.
AMK stated her extreme
displeasure with the "ganging
up" factor. Meetings with
AMK have been 3 men to
1 female. On 10/19/04 Tony
+ outside contractor 2 miles
met with AMK. Tony asked
AMK if outside contractor is
not given funeral follow-up
"arrangements" what should he
be doing? AMK responded
with his own dir mail, experts
etc. Tony (speaking for mgt
team) stated he thought my data

©1993 Franklin Quest Co. Printed in USA

CL 11096

P01058

was full + NMM didn't have time to do Rush follow up. NMM responded by saying she can manage it if given the opportunity. Historically, CFH has discouraged any Rush follow up as it was in direct conflict with after-care program. NMM negotiated to give PN Mgr—STC II to reduce 1 yr waiting period to 6 mos then 3 mos. It was working. Outside Contractor is mailing info pkts to funeral bill going out from 1st death. Good taste, some judgment to do this. Meeting concluded with Tony resolving to convey ideas to 3 other owners at next partners mtg + to see that he would research firms the role of an sales organizations that ?

©1993 Franklin Quest Co. ..Printed in USA    CL 1109B

outside contractor. RWK also
encouraged him to seek referral
info regarding current
outside contractor past
performance with prior employers.
Mtc concluded with Deb
being cleared.

10/1/04  Brian Mikle

10/2/04  Surgery - 3 fractures
         10 to 98 weeks
         no wt bearing for 6 who min
         crutches + walker

10/3/04  RWK contact workers
         1-3 pm none available
         9 pm RWK gets Chad - not very
                                happy
                 He informs Deb

10/4/04  Call from outside contractor
         Could he take my part?
         RWK said no, called TC to
         the only one this him me
         Other important - All other
         rescheduled for
         Fri 10/8 at 350 b
         6 of 10/9 in house
8-5 Mtc Closed by 10/9 with Brian Mikle

©1993 Franklin Quest Co. · Printed in USA    CL 1096

RMM feared for job loss

For month of Oct RMM continued to book appts from home + go to office ?? for appts. Closed 2-2 for Oct - no driving, compromised physical condition.

On 10/25/04 RMM wrote business/ ?? marketing plan for 2005 LOC 1.72

Plan was presented 11/16/04 3pm to 3 owners, outside contractor, 3 insurance carrier reps. Outside contractor - outburst of anger directed ?? RMM ?? who clarified the role of an outside contractor - no access to funeral follow-up leads (part of RMM's lead source.) Out C had no meeting plan or sales goals written ?? Attached. Owners asked for RMM + outside C. to be excused. - Insurance carrier reps - told owners

993 Franklin Quest Co. Printed in USA                    CL 1?008

ORIGINAL

P01061

to give NM what she wanted or her
production would walk. Owners
see NM as territorial not team
player & said they would meet
themselves & see if NM's plan was
acceptable

12/22/04 NM tipped off that ~Dinna
NM heard Scrults Jason was making
arrangements with outside
contractors for Loc 1 after policy
had been established NM to do
all of 1+2. Jason asked
Tony if OK to do, Tony agreed
Policy was written under Loc 3

12/23/04 10⁰⁰pm
          NM flipped with this news
+ confronted Jimmy about it who
said he'd look into it
Commission stolen from NM
direct violation (we
of enclave)  NM also
confronted TV for OK on plan.
He had no answer.
NM sees it all Boys Club - Tony, Jason,
outside contractors
in cahoots

©1993 Franklin Quest Co. Printed in USA                    CL 11096

P01062

A-250

# MEMO

**SEPTEMBER 30, 2004**

TO;        ALL FUNERAL SERVICES OF DELAWARE STAFF

FROM;    FUNERAL SERVICES OF DELAWARE PARTNERS


EFFECTIVE IMMEDIATELY, TONY WILL BE DIRECTING

THE PRE-NEED PROGRAM FOR FUNERAL SERVICES OF

DELAWARE.  TWO OF OUR PRIMMARY GOALS ARE:

A.  TO CREATE A PRE-NEED SALES TEAM

AND

B.  TO INCREASE OUR MARKET SHARE


THE COOPERATION OF EVERYONE DURING THIS TRANSITION
WILL BE APPRECIATED.  IF YOU HAVE ANY QUESTIONS
REGARDING THIS CHANGE, PLEASE SEE TONY

CFH00801

# *Jason Casper:  Pre-Need Sales Report for July 2002*

| | July 2002 | Last Year MTD | Change | This YTD | Last YTD | Change |
|---|---|---|---|---|---|---|
| No. Sold | 3 | | | 3 | | |
| Gross Sales | $20,033.00 | | | $20,033.00 | | |
| Average Sale | $6,677.67 | | | $6,677.67 | | |
| No. Cash | 2 | | | 2 | | |
| Cash Sales | $16,033.00 | | | $16,033.00 | | |
| No. Terms | 1 | | | 1 | | |
| Term Sales | $4,000.00 | | | $4,000.00 | | |
| No. Cremations | 0 | | | 0 | | |
| Cremation Sales | $0.00 | | | $0.00 | | |
| Avg. Cremation Sales | $0.00 | | | $0.00 | | |
| No. Traditional | 3 | | | 3 | | |
| Traditional Sales | $20,033.00 | | | $20,033.00 | | |
| Avg. Traditional Sales | $6,677.67 | | | $6,677.67 | | |
| Average Age | 86.66 | | | 86.66 | | |

| Purchase | Salesperson | Amount | Type | Source | Payment | Age | Carrier | Loc. |
|---|---|---|---|---|---|---|---|---|
| Deery, Susan M. | Jason | $6,560 | Trad | Walk-In | Paid in Full | 77 | Americo | 3 |
| Silvestri, Dominic | Jason | $9,473 | Trad | Walk-In | Paid in Full | 104 | Americo | 3 |
| Baez, Catalina Kuilan | Jason | $4,000 | Trad | Walk-In | Budget | 79 | Trust | 3 |
| | TOTAL | $20,033 | | | | | | |

| | | | | |
|---|---|---|---|---|
| Jason YTD = 3 | Jason = 3 | 3 - Walk In | Average Age: | 86.66 |
| Trust YTD = 1 | Trust = 1 | | | |
| Unity YTD = 0 | Unity = 0 | | | |
| Americo YTD = 2 | Americo = 2 | | | |

**P00538**

AGREEMENT

In support of management's decision to run two (2) separate sales operations under
Funeral Services of Delaware, Anne Rowan and Jason Casper have agreed to the
following:

1.  Anne Rowan will have the sole responsibility of running the sales operation for
    Chandler's (both locations). All leads requesting the services of Chandler's are to be
    directly managed by Anne. This includes but is not limited to any phone inquiries,
    walk-ins, seminar leads, direct mail, inserts, referrals, families previously served and
    future marketing efforts. All commissions generated for Chandler's will be credited to
    Chandler's both locations 1 and 2. Anne will be compensated for all sales generated
    for Chandler's.

2.  Jason Casper will have the sole responsibility of running the sales operation for
    Corleto-Latina Funeral Home. All leads requesting the services of Corleto-Latina are
    to be directly managed by Jason. This includes but is not limited to any phone
    inquiries, walk-ins, seminar leads, direct mail, inserts, referrals, families previously
    served and future marketing efforts. All commissions generated for Corleto-Latina
    will be credited to Corleto-Latina. Jason will be compensated for all sales generated
    for Corleto-Latina.

3.  Pre Need Weekend  Coverage is to be managed by the following procedure:  Anne
    Rowan is to be called for all Chandler pre need phone inquiries, walk-ins and pre
    need emergencies. (Home and cell numbers are readily available on the employee
    listing). Jason Casper is to be called for all Corleto-Latina pre need inquiries, walk-
    ins and pre need emergencies. (Home, and beeper numbers are readily available on
    the employee listing).

4.  Vacation Coverage is to be managed by the following procedure: Anne Rowan will
    provide a calendar for Chandler Pre Need appointments to be scheduled by the office
    staff during her absence. She will also be available by phone should there be a
    Chandler pre need emergency. The office will have the phone numbers. Jason will do
    likewise for Corleto-Latina.

5.  All At Need/On Call funeral directors and office staff need to be aware of this
    agreement.

6.  In an extenuating circumstance, Anne and Jason are committed to resolving it
    themselves with management's approval.

Anne M. Rowan

Dated: 9/17/02

Jason Casper

Dated: 9/17/02

**P00703**

A-253

## EMPLOYMENT AGREEMENT

This Agreement made between Anne M. Rowan, of 37 N. Warner Street, Woodbury, New Jersey, 08096, hereinafter referred to as "Employee", and James T. Chandler and Son, Inc., corporation of the State of Delaware, whose principal place of business is located at 2506 Concord Avenue, Wilmington, Delaware 19803, hereinafter referred to as "Employer".

1.    Employer is engaged in the business of funeral services.

2.    Employee has been engaged, and has a great deal of experience, in the above-designated business as a Pre-Need Sales Manager.

3.    Employee is willing to be employed by Employer, and Employer is willing to employ Employee, on the terms, covenants, and conditions hereinafter set forth.

For the reasons set forth above, and in consideration of mutual promises and agreements hereinafter set forth, Employer and Employee agree as follows:

## SECTION I
### EMPLOYMENT

Employer hereby employs, engages, and hires Employee as the Pre-Need Sales Manager for Employer, and Employee hereby accepts and agrees to such hiring, engagement, and employment, subject to the general supervision and pursuant to the orders, advice, and direction of

a/95   10:21   ☎1 302 654 7936        BECKER/IPPOLITI                        ☒003

Employer. Employee shall perform such other duties as are customarily performed by one holding such position in other, same, or similar businesses or enterprises as that engaged in by Employer, and shall also additionally render such other business-related services and duties as may be assigned to her from time to time by Employer.

## SECTION II
### BEST EFFORTS OF EMPLOYEE

Employee agrees that she, at all times, faithfully, industriously and to the best of her ability, experience, and talents, perform all the duties that may be required of, and from her, pursuant to the express and implicit terms hereof, to the reasonable satisfaction of Employer. Such duties shall be rendered at the principal place of business of the Employer, or its branch offices or offices, and as such other place as Employee shall consider to be in the best interest of the Employer, or at such other places as Employer shall require.

## SECTION III
### TERMS OF EMPLOYMENT

The term of this Agreement shall be for a period of one year commencing on September 11, 1995, and terminating on September 11, 1996, subject, however, to prior termination as hereinafter provided. At the expiration date of September 11, 1996, the parties shall reconsider further employment.

CFH00860

## SECTION IV

## COMPENSATION OF EMPLOYEE

Employer shall pay Employee, Employee shall accept from Employer, in full payment for Employee's services rendered hereunder as follows:

1.  Base salary is $28,000 per year, payable bi-weekly, in the amount of $1,076.92 bi-weekly for current year of contract.

2.  A commission of 12 %, for Pre-Need Sales Contracts which have been produced by Employee, with the final Pre-Need Sales Contracts being signed in front of Employee and the funds therefore collected.

3.  2-1/2 % when a Pre-Need Sales Contract has been accomplished with the production of others at the funeral home.

Said over-ride is to be paid in connection with Items 2 and 3, on the same bi-weekly basis as the base salary. Moreover, in connection with Items 2 and 3, when insured is age 90 or above, current insurance company (Forethought) pays no commission to Employer. Therefore, Employee agrees to receive a 50% reduction in commission in over-ride when insurance company pays no commission to Employer.

4.  Employer shall reimburse Employee for business-related mileage at the IRS Federal established rate.

5.  Employee shall be reimbursed for business-related telephone calls.

6.  Employee shall be reimbursed for approved educational seminar expenses.

7.  Employee shall be entitled to a free funeral so long as still employed with Employer, as well as family discounts on funerals for members of the family as long as Employee is still employed by Employer.

CFH00861

8.   Employee shall be entitled to all benefits as set forth in the Employee's Manual, provided, however, that Employee shall be entitled to reimbursement for health insurance premiums until such period of time as she would be covered under the Flexible Benefits Company Plan; thereafter, she would be covered under the Flexible Benefits Company Plan.

9.   All other benefits are as set forth in the Employee's Manual.

10.   Employer and Employee shall discuss possible bonus plans for continued good performance of Employee.

## SECTION V

## OTHER EMPLOYMENT

1.   Employee shall devote all of her time, attention, knowledge and skills solely to the business and interest of Employer, and Employer shall be entitled to all the benefits, profits or other issues arising from, or incident to, all work, services and advice of Employee, and Employee, shall not, during the term hereof, be interested, directly or indirectly, in any manner, as partner, officer, director, stockholder, advisor, employee, or in any other capacity in any other business similar to Employer's business or allied trade.   Employee is currently writing a book on the subject of Pre-Planning, with the intention to publish said book.   This section does not pertain to the above-mentioned book.

## SECTION VI

## RECOMMENDATIONS FOR IMPROVING OPERATIONS

A-257

CFH00862

Employee shall make available to Employer all information of which Employee shall have any knowledge and shall make all suggestions and recommendations that will give mutual benefit to Employer and herself.

## SECTION VII
### TRADE SECRETS

Employee shall not, at any time, or in any manner, either directly or indirectly, divulge, disclose or communicate to any person, firm or corporation, in any manner, whatsoever, any information concerning any matters affecting or relating to the business of Employer, including without limiting the generality of the foregoing, any of its customers, the prices it obtained, or has obtained, in connection with its services, or any of the products that it sells, or any other information concerning the business of Employer, its manner of operation, its plans, processes, or other data, without regard to whether all of the foregoing matters will be deemed confidential, material, or important, the parties hereto stipulating that as between them, the same are important, material and confidential, and gravely affect the effective and successful conduct of the business of Employer, and the Employer's good will, and that any breech of the terms of this paragraph shall be a material breech to this Agreement.

## SECTION VIII
### TERMINATION CLAUSE

A-258

CFH00863

If Employee violates any of the provisions of this Agreement, or if Employee breeches her duty of trust to Employer, Employer shall have the right to cancel this Agreement forthwith.  Likewise, if Employer violates any of the provisions of this Agreement, Employee shall have the right to cancel this Agreement forthwith.

## SECTION IX

### SHORT TERM DISABILITY AND LONG TERM DISABILITY WITH RENEGOTIATION OF CONTRACT

Short term disability shall be as defined in the Employee's Manual.  In the event that Employee shall be unable to perform her duties for a continuous period of time over ten business working days, the terms of this Contract shall be considered to be null and void and the Employer and Employee shall renegotiate said Contract.

## SECTION X

### RESTRICTIVE COVENANT

In the event that Employee is no longer employed by Employer, Employee agrees that she shall not compete with the Employer, either directly or indirectly, in any manner, as a Partner, Officer, Director, Shareholder, Advisor, Employee, Pre-Need Sales Manager, Pre-Need Sales Person, or in any other capacity in any funeral establishments or Pre-Need funeral contract business at any place in New Castle County for a period of at least three years from the date that Employee is no longer employed by Employer.  It is agreed that said competition would create irreparable harm to Employer.

A-259

CFH00864

## SECTION XI

## SEVERABILITY

All Agreements and Covenants contained herein are severable, and in the event any of them shall be held to be invalid by any competent Court, this Contract shall be interpreted as if invalid agreements or covenants were not contained therein.

## SECTION XII

## CHOICE OF LAW

The intention of the parties hereto with this Agreement and the performance hereunder in all suits and special proceedings herewith to be construed in accordance with and pursuant to the laws of the State of Delaware.

IN WITNESS WHEREOF, the parties have executed this Agreement on this ___11th___ day of ___September___, 1995.

WITNESSED:


_____          _____
                                   ANNE M. ROWAN


_____          By: _____
                                   JAMES T. CHANDLER & SON, INC.
                                   President


A-260

CFH00865



LIMITED LIABILITY COMPANY AGREEMENT

OF

FUNERAL SERVICES OF DELAWARE, LLC

This Limited Liability Company Agreement (the "Agreement") of Funeral Services of Delaware, LLC (the "Company") is entered into by and between James T. Chandler & Son, Inc. and Corleto-Latina Funeral Home, Inc., as initial members (the "Initial Members"), and those persons or entities that become parties to this Agreement and are admitted as additional or substitute members as provided herein.

The Initial Members hereby form a limited liability company pursuant to and in accordance with the Delaware Limited Liability Company Act, 6 Del. C. §§18-101, et seq. (the "Act"), and hereby agree as follows:

## ARTICLE I
### Formation and Definitions

1.1.    Effective Date. This Agreement shall become binding and effective as an agreement among the parties on the date (the "Effective Date") of its execution as expressed on the signature page hereof and shall continue in effect until the termination of the Company following dissolution pursuant to Article V hereof.

1.2.    Name. The name of the limited liability company formed hereby is Funeral Services of Delaware, LLC

1.3.    Principal Office. The principal office of the Company in the State of Delaware is located at 2506 Concord Pike, Wilmington, Delaware 19803.

1.4.    Registered Office and Agent. The registered office of the Company in the State of Delaware is 2506 Concord Pike, Wilmington, Delaware 19803. The name and address of the registered agent of the Company for service of process on the Company in the State of Delaware is Funeral Services of Delaware, LLC, 2506 Concord Pike, Wilmington, Delaware 19803.

1.5.·    Formation and Term. The Initial Members hereby authorize Norris P. Wright to prepare, execute and file with the Delaware Secretary of State on or after the Effective Date an initial certificate of formation substantially in the form attached to this Agreement as Schedule E for the purpose of constituting the Company as a limited liability company under the Act. The Company shall be formed at the time of the filing of such initial certificate of formation or at such later date or time specified therein. The term of the Company shall commence upon the date and time of its formation as provided above, and such term shall continue until the Company is dissolved as provided in Article V of this Agreement. Following the dissolution of the Company and the completion of winding up of its business and affairs as provided in Article V of this Agreement, and upon the subsequent filing of a certificate of cancellation for the Company as required under the Act, the Company shall be terminated.

A-261

CFH 00171

# LIMITED LIABILITY COMPANY AGREEMENT

## OF

## FUNERAL SERVICES OF DELAWARE, LLC

This Limited Liability Company Agreement (the "Agreement") of Funeral Services of Delaware, LLC (the "Company") is entered into by and between James T. Chandler & Son, Inc. and Corleto-Latina Funeral Home, Inc., as initial members (the "Initial Members"), and those persons or entities that become parties to this Agreement and are admitted as additional or substitute members as provided herein.

The Initial Members hereby form a limited liability company pursuant to and in accordance with the Delaware Limited Liability Company Act, 6 Del. C. §§18-101, et seq. (the "Act"), and hereby agree as follows:

## ARTICLE I
### Formation and Definitions

1.1.    Effective Date. This Agreement shall become binding and effective as an agreement among the parties on the date (the "Effective Date") of its execution as expressed on the signature page hereof and shall continue in effect until the termination of the Company following dissolution pursuant to Article V hereof.

1.2.    Name. The name of the limited liability company formed hereby is Funeral Services of Delaware, LLC

1.3.    Principal Office. The principal office of the Company in the State of Delaware is located at 2506 Concord Pike, Wilmington, Delaware 19803.

1.4.    Registered Office and Agent. The registered office of the Company in the State of Delaware is 2506 Concord Pike, Wilmington, Delaware 19803. The name and address of the registered agent of the Company for service of process on the Company in the State of Delaware is Funeral Services of Delaware, LLC, 2506 Concord Pike, Wilmington, Delaware 19803.

1.5.    Formation and Term. The Initial Members hereby authorize Norris P. Wright to prepare, execute and file with the Delaware Secretary of State on or after the Effective Date an initial certificate of formation substantially in the form attached to this Agreement as Schedule E for the purpose of constituting the Company as a limited liability company under the Act. The Company shall be formed at the time of the filing of such initial certificate of formation or at such later date or time specified therein. The term of the Company shall commence upon the date and time of its formation as provided above, and such term shall continue until the Company is dissolved as provided in Article V of this Agreement. Following the dissolution of the Company and the completion of winding up of its business and affairs as provided in Article V of this Agreement, and upon the subsequent filing of a certificate of cancellation for the Company as required under the Act, the Company shall be terminated.

CFH 00171

1.6.    Definitions.

(a)    Act. As used herein, the term "Act" shall have the meaning set forth in the Recitals.

(b)    Agreement. As used herein, the term "Agreement" shall have the meaning set forth in the Recitals.

(c)    Authorized Person. For purposes of executing any certificates to be filed with the Delaware Secretary of State under the Act, an "authorized person" (as such term is used in the Act) shall be Norris P. Wright and/or either Initial Member.

(d)    Company. As used herein, the term "Company" shall have the meaning set forth in the Recitals.

(e)    Effective Date. As used herein, the term "Effective Date" shall have the meaning set forth in Article 1.1.

(f)    Initial Members. As used herein, the term "Initial Members" shall have the meaning set forth in the Recitals.

(g)    IRS. As used herein, the term "IRS" shall have the meaning set forth in Section 3.8(a).

(h)    LLC Interest. As used herein, the term "LLC Interest" shall mean a limited liability company interest (as defined in §18-101(8) of the Act) in the Company. Each member shall have the LLC Interest, expressed as a percentage, set forth opposite his name on Schedule A hereto, as said Schedule may from time to time be amended.

(i)    Intentionally Omitted.

(j)    Majority Vote. As used herein, the term "Majority Vote" shall mean, at the time of reference thereto, the affirmative vote or consent of members owning of record not less than fifty-one percent (51%) of all of the LLC Interests owned by members.

(k)    Member and Members. As used herein, the term "member" shall mean, at the time of reference thereto, any individual or entity who executes this Agreement and who is listed on Schedule A hereto as a member of the Company, and/or any other individual or entity who is admitted as a substitute or additional member of the Company in accordance with this Agreement, in each case in such individual's or entity's capacity as a member of the Company, and "members" shall mean all such persons, collectively. The business, residence or mailing addresses of the members are as listed on Schedule A to this Agreement.

(l)    Membership Termination Event. As used herein, the term "Membership Termination Event" shall have the meaning set forth in Article 5.1(b).

CFH 00172

    (m)   <u>Net Proceeds.</u>  As used herein, the term "Net Proceeds" shall mean the receipts for services provided by the Company or excess refinancing proceeds for any period in which the Company is in existence, less operating expenditures of the Company.  For purposes of this calculation, operating expenditures of the Company shall mean:

    (i)    unfinanced costs of improvements;

    (ii)    routine operational expenses;

    (iii)    payments of principal and interest due on indebtedness of the Company, including loans from members; and

    (iv)    sums allowable to the Company as reserves as set forth in the then applicable budget.

    (n)   <u>Offer to Sell.</u>  As used herein, the term "Offer to Sell" shall have the meaning set forth in Section 6.1.

    (o)   <u>Permitted Transferee.</u>  As used herein, the term "Permitted Transferee" shall have the meaning set forth in Article 6.7.

    (p)   <u>Person.</u>  As used herein, the term "person" shall mean any natural person or any corporation, general partnership, limited partnership, joint venture, association, firm, joint stock company, trust, business trust, unincorporated association or other entity.

    (q)   <u>Remaining Members.</u>  As used herein, the term "Remaining Members" shall have the meaning set forth in Article 6.2.

    (r)   <u>TMM.</u>  As used herein, the term "TMM" shall have the meaning set forth in Article 3.8(a).

    (s)   <u>Transfer.</u>  As used herein, the term "Transfer" shall have the meaning set forth in Article 6.1.

    (t)   <u>Transferor.</u>  As used herein, the term "Transferor" shall have the meaning set forth in Article 6.1.

    (u)   <u>Unanimous Vote.</u>  As used herein, the term "Unanimous Vote" shall mean, at the time of reference thereto, the affirmative vote or consent of members owning of record all of the LLC Interests.

### ARTICLE II
### <u>Purposes and Powers</u>

The purposes of the Company shall be to engage in any lawful act or activity for which limited liability companies may be formed under the Act.  The Company shall have the

CFH 00173

power and is authorized to do any and all acts and things necessary, appropriate, advisable and/or convenient for the furtherance and accomplishment of the purposes of the Company, including, without limitation, providing funeral and burial services and any services in connection therewith.

In furtherance of the above purposes, the Company will enter into the leases of real property described in the leases attached hereto under Schedule B.

## ARTICLE III
### Finance

3.1.    Capital Contributions.  On or about the Effective Date, each Initial Member shall contribute all cash or other property set forth opposite such member's name on Schedule A to this Agreement and shall receive in return the LLC Interest, expressed as a percentage, indicated on Schedule A.  The agreed value of such contribution, if other than cash, shall be as set forth on Schedule A.  Each Member has been issued the LLC Interest set forth opposite its name on Schedule A.

3.2.    Additional  Contributions.

(a)    Each member shall be required to make additional capital contributions to the Company as determined by Majority Vote of the Members within thirty (30) days of such vote.

(b)    Any member who fails to make a required capital contribution in full within three (3) months of the date of the vote to require additional capital contributions shall have his LLC Interest reduced proportionately.  Proportionate reductions shall be determined by calculating each Member's new LLC Interest as follows:  the numerator shall be the Member's total capital contribution and the denominator shall be all capital contributions of all Members, which fraction shall thereafter be expressed as a percentage.

3.3.    Loans from Members.  Nothing herein shall preclude the Company from borrowing from one or more members such additional funds as it may from time to time require. Each member shall have the right but not the obligation to lend the Company a sum equal to the amount being lent thereto by any other member.  The Company shall not make such borrowing or accept such loans unless that decision has been approved by Unanimous Vote.  If any member shall make any loan or loans to the Company, or advance money on its behalf, the amount of any such loan or advance shall not be deemed an increase in, or contribution to the LLC Interest of the lending member or in any way increase his share of the distributions of the Company.  Interest shall accrue on any such loan at an annual rate of two percentage points in excess of the national commercial rate of interest published in the "Money Rates" column of the Wall Street Journal on the date such loan is made to the Company (but not in excess of the maximum rate allowable under applicable usury laws).  Any payments of principal or interest with respect to such loan shall be deemed to be a current operating expense for purposes of computing Net Proceeds or otherwise computing net income to members.

CFH 00174

3.4.    Capital Accounts.

(a)    The Company will maintain a separate capital account for each member and each member will be furnished with a statement of his capital account as of the close of each fiscal year of the Company.

(b)    The capital account of each member will be equal to said member's capital contributions to the Company increased by the profits (as determined for federal income tax purposes) of the Company allocated to said member pursuant to Article 3.5 below, and decreased by the amount of any cash distributions and the fair market value of any property distributions made to said member, and decreased by the losses (as determined for federal income tax purposes) of the Company allocated to said member pursuant to Article 3.5 below.

(c)    No interest will be paid by the Company to any member on his capital contribution or any other amount credited to his capital account.

(d)    In the event of a transfer of all or a portion of a member's LLC Interest pursuant to the provisions hereof, a separate capital account will be created for the transferee as of the effective date of such transfer, in which will be reflected the portion of the transferring member's capital account transferred to the transferee, and the capital account of the transferring member will be correspondingly adjusted as of such date. In addition, appropriate adjustments shall also be made to the transferee member's capital account if an election under §754 of the Internal Revenue Code of 1986, as amended, is in effect at the time of transfer.

3.5.    Allocations of Profit and Losses. The Company's profits and losses (as determined for federal income tax purposes), including Net Proceeds, shall be allocated among the Members of the Company as set forth in Schedule D attached hereto. Notwithstanding anything herein to the contrary, deductions attributable to non-recourse loans to the Company made by members shall be allocated to the member who bears the economic risk of loss with respect to such loan pursuant to Temp. Reg. §§1.704-1T(b)(4)(iv)(h) and 1.704-1(b)(4)(iv)(k)(1).

3.6.    Distributions. Prior to its resignation from the Company and/or prior to the dissolution and winding up of the Company, a member shall be entitled to receive distributions from the Company in accordance with the formula set forth in Schedule D attached hereto which may only be amended by Unanimous Vote; provided, however, no distribution shall be made that violates §18-607(a) of the Act. Any distribution of cash or other property shall be made only to Members and transferees of LLC Interests permitted under this Agreement who in each case are listed as such on the records of the Company on the date of distribution. Distributions shall be made in the same proportion as the then capital account balances of the recipients thereof.

3.7.    Accounting.

(a)    The fiscal year of the Company shall be the calendar year.

(b)    Funds of the Company shall be deposited in its name in such bank account or accounts as may be determined by Majority Vote.

CFH 00175

(c)    The Company shall keep, or cause to be kept, full and true books of account, in which each Company transaction shall be entered fully and accurately. Each member shall at all reasonable times have access thereto at the Company's principal place of business. The books shall be kept for an annual accounting period consisting of the fiscal year. Within forty-five (45) days after the end of each fiscal year, the Company shall furnish to the members a statement showing their distributive shares, for income tax purposes, of all Company items for the year and distributions made to them during the year. The Company also shall cause federal and state income tax information returns to be prepared, and to be timely filed, for each year. Each member shall have the right, at any reasonable time and upon due notice to all other members, to (i) inspect those returns, and/or (ii) conduct a private audit of the Company books and records at his expense.

### 3.8.    The Tax Matters Member.

(a)    In the event that the Internal Revenue Service ("IRS") commences an examination of the Company's tax return(s), James T. Chandler & Son, Inc. (attn: James T. Chandler, IV) is hereby designated the tax matters member ("TMM") who shall have primary responsibility for conducting negotiations with the IRS in connection with any administrative proceedings at the Company level with respect to Company items, and, if necessary, for filing a petition for readjustment of a final Company administrative adjustment by the IRS with the United States Tax Court, the district court of the United States for the district in which the Company's principal place of business is located, or the United States Court of Claims for a readjustment of a final Company administrative adjustment.

(b)    The TMM shall engage legal counsel to represent the Company in any administrative proceedings at which such legal counsel deems it appropriate to be present and in any judicial proceedings which are brought by the TMM.

(c)    The TMM shall notify all members of the commencement of any administrative proceeding by the IRS and shall keep all members currently advised of developments in any such proceedings.

(d)    Notwithstanding anything to the contrary contained in Articles 3.8(a) and 3.8(b), the TMM shall have no authority to bind any member by any settlement agreement entered into by the TMM and the IRS, unless, after the TMM has notified the member of a matter under audit and its intention to bind the member to a settlement agreement, the member has provided such authorization. If the member has not notified the TMM in writing within sixty (60) days that he is not so authorized, the member will be deemed to have provided to the TMM such authorization. Within thirty (30) days after the TMM has received notice from the IRS of a final Company administrative adjustment, the TMM shall notify all of the members of such final administrative adjustment and the effect it will have on their individual tax returns on a per unit basis. Such notification shall also include information concerning the members' right to request the same settlement terms from the IRS.

(e)    The TMM shall be entitled to indemnity from the Company for any act performed by him within the scope of his duties as tax matters partner, except for his grossly

CFH 00176